SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Gregg M. Galardi
J. Gregory St. Clair

Proposed Counsel for Debtors and
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CIT GROUP INC. and CIT GROUP FUNDING COMPANY OF DELAWARE LLC, | : | Case No. 09-16565 |
| Debtors. | : | (Motion for Joint Administration Pending) |

**DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014 AND 3017 AUTHORIZING EMPLOYMENT AND RETENTION OF FINANCIAL BALLOTING GROUP LLC AS VOTING AGENT AND SPECIAL NOTICING AGENT FOR PUBLICLY-HELD SECURITIES**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), [1] hereby submit this application (the "Application") for entry of an order under sections 327(a) and 328 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014 and 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to employ and retain Financial Balloting Group LLC ("FBG") as the

[1] CIT Group Inc. is located at 505 Fifth Avenue, New York, NY 10017. Its tax identification number is 65-xxx1192. In addition to CIT Group Inc., CIT Group Funding Company of Delaware LLC, Case No. 09-16566, is a debtor in these related cases. CIT Group Funding Company of Delaware LLC is located at 1 CIT Drive, Livingston, NJ 07039. Its tax identification number is 98-xxx9146.

Debtors' voting agent for publicly held securities (the "Voting Agent") in connection with the solicitation and tabulation of votes with respect to the Plan (defined below) and special noticing agent for publicly held securities (the "Special Noticing Agent"). In support of the Application, the Debtors submit the Declaration Of Jane Sullivan In Support Of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) And 328 And Fed. R. Bankr. P. 2014 And 3017 Authorizing Employment And Retention Of Financial Balloting Group LLC As Voting Agent And Special Noticing Agent For Publicly-Held Securities, executed on October 30, 2009 (the "Sullivan Declaration"), a copy of which is attached hereto as Exhibit A and the Declaration Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "First Day Declaration") filed concurrently herewith under Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").[2] In further support of the Application, the Debtors, by and through their undersigned counsel, respectfully represent:

**JURISDICTION**

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 327(a) and 328, and Bankruptcy Rules 2014 and 3017.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## BACKGROUND

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration. The Debtors continue to manage and operate their businesses as debtors-in-possession under Bankruptcy Code sections 1107 and 1108.

## RELIEF REQUESTED

3. By this Application, the Debtors seek entry of an order authorizing them to employ and retain FBG, pursuant to the terms and conditions of the engagement agreement dated September 24, 2009 (the "Engagement Agreement"), a copy of which is attached hereto as Exhibit B, as Voting Agent and Special Noticing Agent.

## BASIS FOR RELIEF

4. On October 1, 2009, the Debtors launched exchange offers for certain unsecured notes and amended the exchange offers on October 16, 2009 (collectively, the "Exchange Offer"). Contemporaneous with the Exchange Offer, the Debtors began solicitation of votes for the Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (as may be amended, supplemented or otherwise modified, the "Plan"). FBG rendered services in connection with both the Exchange Offer and the solicitation of votes for the Plan as described below prior to the commencement of these chapter 11 cases.

5. On the date hereof, the Debtors filed the Plan and corresponding disclosure statement (the "Disclosure Statement") with this Court.

6. Also on the date hereof, the Debtors filed a motion seeking the scheduling of a hearing to approve the adequacy of the prepetition solicitation procedures and the Disclosure Statement (the "Combined Hearing Motion"). In the Combined Hearing Motion, the Debtors set forth the prepetition procedures used in transmitting the Disclosure Statement, the Plan and Plan-related materials to all persons or entities entitled to vote on the Plan.

7. Following the commencement of these chapter 11 cases, the Debtors plan to continue to solicit the acceptance of their Plan from certain of their prepetition noteholders. Bankruptcy Code section 1125(g) allows a debtor to continue soliciting votes for acceptance or rejection of a plan after the commencement of a case without the requirement of a court-approved disclosure statement if the holder was solicited before the commencement of the case in a manner that complied with applicable nonbankruptcy law. The deadline to vote to accept or reject the Plan for the majority of the creditors entitled to vote on the Plan was 11:59 p.m. (New York City time) on October 29, 2009. However, holders of certain prepetition notes have until 11:59 p.m. (New York City time) on November 5, 2009 to vote on the Plan, while other holders have until 11:59 p.m. (New York City time) on November 13, 2009 to cast their vote. Accordingly, the Debtors intend to use FBG's services to assist with such postpetition solicitation and tabulation of votes.

8. FBG's vast experience in facilitating the solicitation of public debt securities has led the Debtors to seek to retain FBG as Voting Agent and Special Noticing Agent to assist the Debtors in performing Plan-related solicitation services such as vote tabulation noticing, consultation, and if necessary, distribution of voting documents to the creditors entitled

to vote on the Plan.[3] In chapter 11 cases, the solicitation of votes from holders of public securities and the distribution of solicitation materials to such holders present complexities which do not exist with respect to other types of creditors. These complexities stem from the fact that public securities often are often held in a "Street" name by a custodian (such as a bank, broker or other nominee) rather than in the name of the beneficial owner. In most instances, the identities of beneficial owners of public securities entitled to receive notices and solicitation materials are not easily known or determinable.

9. The successful dissemination of solicitation materials to beneficial owners of public securities requires close coordination with numerous parties (including banks, brokerages or other nominees) to ensure that these entities properly forward solicitation materials to their customers. The collection of votes from beneficial holders of public securities similarly requires close coordination and cooperation with the record holders of these securities. The Debtors submit that retaining a Voting Agent and Special Noticing Agent with specialized knowledge regarding the solicitation and noticing of public security holders is necessary to ensure that the Debtors satisfy applicable requirements under the Bankruptcy Code and Bankruptcy Rules in a cost-effective manner.

10. The Debtors have numerous public securities holders to whom certain notices may be sent if further solicitation is required. The specialized knowledge required for distributing materials to holders of public securities makes it impracticable for the Debtors to undertake the task of sending notices without assistance. Accordingly, the Debtors respectfully request that FBG be retained to assist the Debtors in performing Plan-related solicitation services,

---

[3] The Debtors are also seeking to retain Kurtzman Carson Consultants LLC ("KCC") as noticing and claims agent. FBG will coordinate its efforts with KCC and any other retained personnel to make use of any existing information databases in order to minimize or avoid duplication of efforts and costs to the estates.

such as voting and tabulation services and distributing required notices to its public securities holders if further solicitation is required.

## QUALIFICATIONS

11. FBG is well-qualified to act as the Voting Agent and Special Noticing Agent in these cases. FBG specializes in bankruptcy transactions involving public securities, including notes, particularly in the context of soliciting and tabulating votes on a plan of reorganization. Jane Sullivan, who is the Executive Director of FBG, has broad experience in all types of bankruptcy solicitations and has significant experience in providing services, advice, and support for large, complex chapter 11 solicitations. FBG also utilizes state-of-the-art mailing facility and tabulation systems, both of which are vital to ensuring an orderly and proper bankruptcy solicitation.

12. Jane Sullivan will have primary responsibility for ensuring that the Debtors satisfy their solicitation requirements in these cases. Ms. Sullivan has more than 20 years of experience in public securities solicitations and other transactions and has specialized in bankruptcy solicitations since 1991. Ms. Sullivan has worked on more than 125 prepackaged and traditional bankruptcy solicitations nationwide.[4] Ms. Sullivan will work closely with other members of FBG's staff, including certain individuals employed by affiliates of FBG, each of

[4] Nationally, FBG has worked recently on In re Portola Packaging, Inc., No. 08-12001 (Bankr. D. Del 2008); In re Key Plastics Finance Corp., No. 08-13324 (Bankr. D. Del. 2008); In re Mrs. Fields' Original Cookies, Inc., No. 08-11953 (Bankr. D. Del. 2008); In re Vertis Holdings, Inc., No. 08-11460 (Bankr. D. Del. 2008); In re ACG Holdings, Inc., No. 08-11467 (Bankr. D. Del. 2008); In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. 2007); In re Adelphia Communications Corp., No. 02-41729 (Bankr. S.D.N.Y 2007); In re Delta Airlines, Inc., No. 05-17923 (Bankr. S.D.N.Y. 2007); In re Dura Automotive Systems, Inc., No. 06-11202 (Bankr. D. Del. 2007); In re Movie Gallery US, LLC, No. 07-33853 (Bankr. E.D. Va. 2007); In re Movie Gallery, Inc., No. 07-33849 (Bankr. E.D. Va. 2007); In re Northwest Airlines Corp., No. 05-17930 (Bankr. S.D.N.Y. 2007); In re Remy Worldwide Holdings, Inc., Remy International, Inc., No. 07-11481 (Bankr. D. Del. 2007); In re Solutia Inc., No. 03-17949 (Bankr. S.D.N.Y. 2007); In re Tower Automotive, Inc., No. 05-10578 (Bankr. S.D.N.Y. 2007); In re Silicon Graphics, Inc., No. 06-10977 (Bankr. S.D.N.Y. 2006); In re Calpine Corp., No. 05-60200 (Bankr. S.D.N.Y. 2006); In re Premier Entm't Biloxi LLC, No. 06-50975 (Bankr. S.D. Miss. 2006); In re UAL Corp., No. 02 B 48191 (Bankr. N.D. Ill. 2006); In re Owens Corning, et al., No. 00-03837 (Bankr. D. Del. 2000).

whom is experienced in all aspects of plan solicitations, including working with banks and brokerage firms to conduct the proposed solicitation in these chapter 11 cases.

13. FBG is highly familiar with the necessary processes involved and uniquely qualified to perform the services needed in these cases. In light of the above, the Debtors submit that the retention of FBG is necessary and in the best interests of the Debtors, their estates, and creditors.

**SERVICES TO BE RENDERED**

14. As noted above, a vast majority of FBG's services have already been rendered to the Debtors in connection with the Solicitation of votes on the prepackaged plan of reorganization. To the extent necessary to complete the pending solicitation and as issues arise during the chapter 11 cases, FBG will handle the mailing of Plan documents to holders of bonds, will take calls from banks, brokerage houses, and other security intermediaries who may have questions about the Plan, conduct the tabulation of votes and prepare related filings for the Court, if necessary, as well as handle any Plan-related notices that may be further required. These services will be provided pursuant to the FBG Agreement and in accordance with the requisite Bankruptcy Rules.

15. FBG will also perform the following services, among others, if and as necessary:

(a) Provide advice to the Debtors and their counsel regarding all aspects of the Plan vote, including timing issues, voting and tabulation procedures and documents needed for the vote.

(b) Prepare a certificate of service for filing with the Court.

(c) Handle requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

(d) Respond to telephone inquiries from nominees regarding the voting procedures. FBG will restrict its answers to the information contained in the Plan documents and seek assistance from the Debtors or their counsel on any questions that fall outside of the voting documents.

(e) Receive and examine all ballots and master ballots cast by holders of bonds. FBG will date-stamp the originals of all such ballots and master ballots upon receipt.

(f) Tabulate all ballots and master ballots received prior to the voting deadlines in accordance with established procedures, and prepare a vote certification for filing with the Court.

(g) Undertake such other duties as may be agreed upon by the Debtors and FBG.

**FEES AND EXPENSES**

16. The Debtors propose to compensate FBG in accordance with the FBG Agreement. Most of FBG's services were rendered prior to the Petition Date. However, to the extent FBG renders services to the Debtors, such services will be compensated by the Debtors in accordance with the fee schedule annexed to the FBG Agreement.

17. FBG's current hourly consulting fee rates, which are subject to adjustment based on FBG's ordinary billing practices, are as follows:

| | |
|---|---|
| Executive Director | $410 per hour |
| Vice President | $360 per hour |

| | |
|---|---|
| Senior Case Manager | $300 per hour |
| Case Manager | $240 per hour |
| Case Analyst | $190 per hour |
| Programmer II | $195 per hour |
| Programmer I | $165 per hour |
| Clerical | $ 65 per hour |

18. FBG will, on a monthly basis, submit detailed invoices to the Debtors for services rendered.

19. The Debtors request authority to compensate and reimburse FBG for services rendered and expenses incurred in connection with the Debtors' chapter 11 cases in accordance with the payment terms, procedures and conditions set forth in the FBG Agreement.

20. The Debtors request that the fees and expenses of FBG incurred in performing the services described above be treated as an administrative expense of the Debtors' chapter 11 estates and be paid by the Debtors in the ordinary course of business.[5] If any dispute arises between FBG and the Debtors with respect to fees and expenses, such dispute shall be presented to the Court for resolution.

21. As part of the overall compensation payable to FBG under the terms of the FBG Agreement, the Debtors have agreed to certain limitations of liability and indemnification obligations as described in the indemnity section of the FBG Agreement.

---

[5] The Debtors do not believe that FBG, as an administrative agent, is a "professional" whose retention is subject to Bankruptcy Code sections 327 and 328 or whose compensation is subject to Bankruptcy Code sections 330 and 331. Nevertheless, out of an abundance of caution, the Debtors are filing this Application under Bankruptcy Code sections 327 and 328 and seeking a waiver of requirements under Bankruptcy Code sections 330 and 331.

22. For all of the foregoing reasons, the Debtors believe that the retention of FBG as the Solicitation Agent for the noteholders is appropriate and in the best interests of the Debtors, and their estates and creditors.

**DISINTERESTEDNESS**

23. To the best of the Debtors' knowledge, and as disclosed in the Sullivan Declaration, the members and employees of FBG do not have any adverse connection with the Debtors, the Debtors' creditors or any other party in interest or their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee.

24. To the best of the Debtors' knowledge, FBG is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b), in that its members and employees:

(a) Are not creditors, equity security holders or insiders of the Debtors;

(b) Are not and were not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the Debtors; and

(c) Do not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

25. In the Sullivan Declaration, Jane Sullivan represents, among other things that:

(a) FBG, in its capacity as Voting Agent, is not and will not be employed by the U.S. government or any federal agency (collectively, the "Government") and will not seek any compensation from the Government;

(b) By accepting employment in these chapter 11 cases, FBG waives any right to receive compensation from the Government;

(c) In its capacity as Voting Agent and Special Noticing Agent, FBG is not an agent of the Government and is not acting on behalf of the Government;

(d) FBG will not knowingly misrepresent any fact to the public; and

(e) FBG will not employ any past or present employees of the Debtors in connection with its work as Voting Agent and Special Noticing Agent in these chapter 11 cases.

26. Prior to the Petition Date, FBG performed certain professional services for the Debtors in connection with the Exchange Offer and solicitation of votes for the Plan. For such prepetition services, the Debtors made an advance payment to FBG in the form of a $100,000 retainer to be drawn down and applied to the Debtors' obligations under the Engagement Agreement as they arise. In the week preceding the Petition Date, FBG received a supplemental retainer of $250,000, which was to be used to pay any outstanding balance immediately prior to the filing of petitions in these chapter 11 cases. Accordingly, upon information and belief, the Debtors do not owe FBG any amount for services performed or expenses incurred prior to the Petition Date.

27. FBG will conduct an ongoing review of its files to ensure that no conflict or other disqualifying circumstances exist or arise. If any new facts are discovered, FBG will supplement its disclosure to the Court.

## NOTICE

28. Notice of this Application has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to: (a) the United States Trustee for the Southern District of New York; (b) the United States Attorney for the Southern District of New York; (c) the Federal Reserve; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) those parties identified in the schedules of the largest unsecured creditors annexed to the Debtors' petitions; (g) counsel to Bank of America, N.A., as Administrative Agent and Collateral Agent under the Senior Credit Facility; (h) counsel to Bank of America, N.A. as L/C Issuer; and (i) Counsel to the Lender Steering Committee. The Debtors submit that under the circumstances no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order authorizing FBG to act as Voting Agent for publicly-held securities and provide the services described above and such other and further relief as may be just and proper.

Dated: New York, New York
November 1, 2009

CIT Group Inc.
CIT Group Funding Company of Delaware LLC

_*/s/ Eric Mandelbaum*_____________
Name: Eric Mandelbaum

Title: Senior Vice President and Deputy General Counsel

**EXHIBIT A**

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Gregg M. Galardi
J. Gregory St. Clair

Proposed Counsel for Debtors and
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CIT GROUP INC. and CIT GROUP FUNDING COMPANY OF DELAWARE LLC, | : | Case No. 09-16565 |
| Debtors. | : | (Motion for Joint Administration Pending) |

**DECLARATION OF JANE SULLIVAN IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014 AND 3017 AUTHORIZING EMPLOYMENT AND RETENTION OF FINANCIAL BALLOTING GROUP LLC AS VOTING AGENT AND SPECIAL NOTICING AGENT FOR PUBLICLY-HELD SECURITIES**

Jane Sullivan, under penalty of perjury, declares and says:

1. I am the Executive Director of Financial Balloting Group LLC ("FBG"), having offices at 757 Third Avenue, 3rd Floor, New York, New York 10017. I submit this declaration in support of the application (the "Application") of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for authorization to employ

FBG as the Debtors' voting agent for publicly-held securities ("Voting Agent") in connection with the solicitation and tabulation of votes with respect to the Debtors' plan of reorganization and special noticing agent for publicly held securities ("Special Noticing Agent"), pursuant to the terms and conditions of the engagement agreement dated September 24, 2009 (the "Engagement Agreement"), a copy of which is attached to the Application as Exhibit B.

2. FBG is a firm with significantly experienced employees in all areas of bankruptcy balloting and related assignments, and with a specialization in soliciting, tabulating, and noticing holders of public debt and equity securities.

3. As the Executive Director of FBG and based on my familiarity with the Debtors' proposed solicitation requirements as described in the Application, I would be the person with primary responsibility for fulfilling such requirements in these chapter 11 cases should the Court approve the Application, but I would work closely with other members of FBG's staff, who are highly experienced in all aspects of plan solicitations, including in dealing with the back offices of banks and brokerage firms (the "Nominees"), and would be instrumental in carrying out the assignment.

4. I have over 20 years of experience in public securities solicitations and other transactions and have specialized in bankruptcy solicitations since 1991. I have worked on over 100 complex bankruptcy solicitations, including In re Portola Packaging, Inc., No. 08-12001 (Bankr. D. Del 2008); In re Key Plastics Finance Corp., No. 08-13324 (Bankr. D. Del. 2008); In re Mrs. Fields' Original Cookies, Inc., No. 08-11953 (Bankr. D. Del. 2008); In re Vertis Holdings, Inc., No. 08-11460 (Bankr. D. Del. 2008); In re ACG Holdings, Inc., No. 08-11467 (Bankr. D. Del. 2008); In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. 2007); In re Adelphia Communications Corp., No. 02-41729 (Bankr. S.D.N.Y 2007); In re Delta Airlines,

Inc., No. 05-17923 (Bankr. S.D.N.Y. 2007); In re Dura Automotive Systems, Inc., No. 06-11202 (Bankr. D. Del. 2007); In re Movie Gallery US, LLC, No. 07-33853 (Bankr. E.D. Va. 2007); In re Movie Gallery, Inc., No. 07-33849 (Bankr. E.D. Va. 2007); In re Northwest Airlines Corp., No. 05-17930 (Bankr. S.D.N.Y. 2007); In re Remy Worldwide Holdings, Inc., Remy International, Inc., No. 07-11481 (Bankr. D. Del. 2007); In re Solutia Inc., No. 03-17949 (Bankr. S.D.N.Y. 2007); In re Tower Automotive, Inc., No. 05-10578 (Bankr. S.D.N.Y. 2007); In re Silicon Graphics, Inc., No. 06-10977 (Bankr. S.D.N.Y. 2006); In re Calpine Corp., No. 05-60200 (Bankr. S.D.N.Y. 2006); In re Premier Entm't Biloxi LLC, No. 06-50975 (Bankr. S.D. Miss. 2006); In re UAL Corp., No. 02 B 48191 (Bankr. N.D. Ill. 2006); In re Owens Corning, et al., No. 00-03837 (Bankr. D. Del. 2000).

5. The solicitation process already initiated and continuing to be implemented by the Debtors is complex. I have extensive experience in executing complex solicitation procedures and am thoroughly versed in all aspects of the anticipated voting and tabulation processes. I possess the specialized knowledge to help the Debtors establish workable procedures and then carry out those procedures.

6. FBG will continue to be responsible for the balloting and tabulation of votes on the Debtors' plan, as well as consulting services with respect to the public securities of the Debtors. To the extent necessary to complete the pending solicitation and as issues arise during the chapter 11 cases, FBG also will handle the mailing of Plan documents to holders of bonds, will take calls from banks, brokerage houses, and other security intermediaries who may have questions about the Plan, conduct the tabulation of votes and prepare related filings for the Court, if necessary, as well as handle any Plan-related notices that may be further required. I understand that the Debtors are also seeking to retain Kurtzman Carson Consultants LLC

("KCC") as noticing and claims agent in these chapter 11 cases. FBG will coordinate its efforts with KCC and any other retained personnel to make use of any existing information databases in order to minimize or avoid duplication of efforts and costs to the estates.

7. The fee payment and expense reimbursement provisions contained in the Engagement Agreement are the reasonable and customary terms of engagement for FBG and are competitive with those charged by comparable firms. FBG's fees and expenses will be treated as an administrative expense of the Debtors' estates and will be paid by the Debtors in the ordinary course of business.

8. To the best of my knowledge, FBG has not represented and does not represent any creditor or party-in-interest in matters adverse to the Debtors' estates. FBG is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, for the reasons discussed below.[1]

9. Although FBG does have a relationship with the following parties as described below, such relationships are in no way connected with FBG's representation of the Debtors:

| **Party** | **Relationship to the Debtors** | **Relationship to FBG** |
|---|---|---|
| AIG | Major Bondholder | Insurance Provider |
| Zurich American Insurance Co. | Employee Benefit Provider | Insurance Provider |
| Blue Cross Blue Shield | 1% or more of Preferred Stock | Insurance Provider (Blue Cross Blue Shield of Kansas City) |
| Morgan Stanley | Restructuring Professionals Representing Debtors | 401(k) Administrator |

[1] FBG is a division of the litigation, bankruptcy, and financial services firm of Epiq Systems, Inc. ("Epiq"). As defined in the Engagement Agreement and as used in this declaration, "FBG" includes Epiq, and the relationships described herein encompass any relationship of Epiq.

| Party | Relationship to the Debtors | Relationship to FBG |
|---|---|---|
| Deloitte & Touche | Significant Trade; Top 100 Creditors | Audit Firm |
| Verizon | Utilities | Utility |
| AT&T | Significant Trade; Top 100 Creditors | Utility |

10. In addition, it is possible that FBG may have rendered services to certain creditors or equity interest holders of the Debtors, in matters unrelated to the Debtors, that I have not discovered or may have been involved in matters unrelated to the Debtors in which these creditors or equity interest holders were also involved. Similarly, employees of FBG may have had business associations with certain creditors or parties-in-interest which have no connection to FBG's representation of the Debtors. FBG does not currently maintain any relationships or interests, and does not intend to develop additional relationships or interests during its representations of the Debtors in these chapter 11 cases, in matters that would be adverse to the Debtors' estates.

11. None of the services that FBG currently provides to the potential parties-in-interest listed in paragraph 10 above, regardless of the size or significance of the relationship involved, would compromise in any way FBG's ability to provide the services to the Debtors outlined in the Application, nor will FBG agree at any point in the future to provide services to any party that could compromise its ability to serve the Debtors in these chapter 11 cases.

12. FBG has no agreement with any other person or entity, prohibited by section 504 of title 11 of the United States Code (the "Bankruptcy Code"), to share with such person or entity any compensation received or to be received by FBG or any other person in connection with these chapter 11 cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 30th day of October, 2009, in New York, New York.

__________*/s/ Jane Sullivan*__________
Jane Sullivan

**EXHIBIT B**

**FINANCIAL BALLOTING GROUP LLC**
**757 THIRD AVENUE, 3RD FLOOR**
**NEW YORK, NY 10017**

September 24, 2009

CIT Group, Inc.
505 Fifth Avenue
New York, NY 10017

## AGREEMENT

This Agreement sets forth the terms and conditions under which Financial Balloting Group LLC and any employees or resources of Epiq Systems, Inc. and its subsidiaries ("FBG") will serve as balloting agent, exchange agent, tabulator, and consultant to CIT Group, Inc. ("CIT").

### Assumptions

We are making the following assumptions about public securities entitled to participate in the different elements:

- Approximately 300 publicly held debt issuances with an undetermined number beneficial owners

### A. Balloting and Tabulation Services

FBG shall undertake the following services:

As balloting agent, in addition to handling the mailing of prepackaged plan documents to holders of bonds, we would take calls from any bondholders who may have questions about the plan, conduct the tabulation of votes, and prepare related filings for the court (if necessary).

Public securities present a special challenge in any plan vote, including a prepackaged plan. The beneficial owners of any securities held in "Street name" through a brokerage firm or bank must receive their material through the firm or its agent. These firms, in turn, must either process the votes of beneficial owners on master ballots, or arrange for the beneficial owner to receive what is known as a "prevalidated" ballot. Calls from beneficial owners must be handled with particular care, because so many of them actually need to return their ballot to an entity other than the balloting agent.

A more detailed breakdown of the elements we would handle as balloting and tabulation agent for the bonds follows:

1. Provide advice to the company and its counsel regarding all aspects of the prepackaged plan vote, including timing issues, voting and tabulation procedures, and documents needed for the vote.

2. Review the voting portions of the disclosure statement and ballots, particularly as they may relate to beneficial owners of securities held in Street name.

3. Work with the company to request appropriate information with respect to the bonds from The Depository Trust Company and the indenture trustee.

4. Mail voting documents to any registered record holders of bonds, if any, or other individual parties.

5. Coordinate the distribution of voting documents to Street name holders of bonds by forwarding the appropriate documents to the banks and brokerage firms holding the securities (or their agent), who in turn will forward it to beneficial owners for voting.

6. Distribute copies of the master ballots to the appropriate nominees after the initial mailing, so that firms may cast votes on behalf of beneficial owners.

7. Prepare a certificate of service for filing with the court.

8. Handle requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

9. Respond to telephone inquiries from nominees regarding the disclosure statement and the voting procedures. FBG will restrict its answers to the information contained in the plan documents. We will seek assistance from the company or its counsel on any questions that fall outside of the voting documents.

10. If requested to do so, FBG will make telephone calls to non-objecting beneficial owners and/or registered holders of bonds to confirm receipt of plan documents and respond to questions about the voting procedures.

11. Receive and examine all ballots and master ballots cast by holders of bonds. FBG will date- and time-stamp the originals of all such ballots and master ballots upon receipt.

12. Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a vote certification for filing with the court.

13. Undertake such other duties as may be agreed upon by CIT and FBG.

## Pricing for Balloting and Tabulation

For the above mentioned services, CIT agrees to pay FBG on the following basis:

1. For a stand-alone prepackaged plan solicitation, a project fee of $50,000 and a charge of $1,000 for each Cusip entitled to vote (with a cap of $50,000 for the per Cusip charges). This covers the coordination with all brokerage firms, banks, institutions and other interested parties, including the distribution of voting materials. This assumes one distribution of materials, which will be directed to the firms' proxy departments (for voting only, and no exchange offer, election or subscription as part of the voting process), a single plan, and no extensions of the voting deadline. This project fee is payable on the effectiveness of this Agreement.

2. For the mailing to any registered record holders or other individual parties, we would estimate labor charges at $1.75 - $2.25 per voting package, depending on the complexity of the mailing, with a $500 minimum for each file. The charge indicated assumes the package would include the disclosure statement, a ballot, a return envelope, and one other document. It also assumes that a window envelope will be used for the mailing, and will therefore not require a matched mailing.

3. A charge of $125 per hour for the tabulation of ballots and master ballots, plus set up charges of $1,000 for each tabulation element (e.g., each security or plan class). Standard hourly rates (as enumerated below) will apply for any time spent by senior executives reviewing and certifying the tabulation and dealing with special issues that may develop. A surcharge of $2,500 will apply for a voting deadline of later than 8:00 P.M., eastern time.

4. We will bill for consulting hours at our then applicable standard hourly rates. Listed below are our current standard hourly rates. Consulting services by FBG would include the review and development of materials, including the disclosure statement, plan, ballots, master ballots, and exchange offer documents, if applicable; participation in telephone conferences, strategy meetings or the development of strategy relative to the project; efforts related to balloting or exchange offer procedures, including issues that may arise during the balloting, tabulation, or exchange process; computer programming or other project-related data processing services; visits to cities outside of New York for client meetings or legal or other matters; efforts related to the preparation of testimony and attendance at court hearings; and the preparation of affidavits, certifications, fee applications (if required by the court), invoices, and reports.

Hourly rates:

| | |
|---|---|
| Executive Director | $410 per hour |
| Vice President | $360 per hour |
| Senior Case Manager | $300 per hour |
| Case Manager | $240 per hour |
| Case Analyst | $190 per hour |
| Programmer II | $195 per hour |
| Programmer I | $165 per hour |
| Clerical | $65 per hour |

**B. Exchange Offer Services**

FBG shall undertake the following additional services:

1. Provide advice to the company and its counsel regarding the exchange offer, including timing issues, procedures, and documents.

2. Review the exchange offer documents, particularly as they may relate to beneficial owners of bonds held in Street name.

3. Mail exchange offer documents to registered record holders of bonds, if any, or other individual parties.

4. Coordinate the distribution of exchange offer documents to Street name holders by forwarding the appropriate documents to the reorganization departments of the banks and brokerage firms holding the securities (or their agent), who in turn will contact their beneficial owners.

5. Handle requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

6. Create a website for the processing of request for documents from accredited investors.

7. Respond to telephone inquiries from nominees regarding the exchange offer. FBG will restrict its answers to the information contained in the exchange offer documents. We will seek assistance from the company or their counsel on any questions that fall outside of the prepared documents.

8. For the exchange offer, FBG is also able to act as ATOP agent and coordinate the transaction with DTC.

**Pricing for Exchange Offer Services**

For the above mentioned services, CIT agrees to pay FBG on the following basis:

1. An additional project fee of $50,000 to cover the exchange offer documents, and our cap on the per cusip charges would be increased by $25,000, to $75,000. This covers the additional coordination with all brokerage firms, banks, institutions and other interested parties, including the distribution of materials through the firms' reorganization departments, with no extensions of the deadline. This project fee is payable on the effectiveness of this Agreement.

2. For the mailing to any registered record holders or other individual parties, we would estimate labor charges at $1.75 - $2.25 per voting package, depending on the complexity of the mailing, with a $500 minimum for each file. The charge indicated assumes the package would include the offer document, a letter of transmittal, a return envelope, and one other document. It also assumes that a window envelope will be used for the mailing, and will therefore not require a matched mailing.

3. For the registration website, a hosting charge of $5,000 per month, plus hourly programming charges for development and maintenance.

**C. Notice Mailings**

Notice mailings would likely be required if a filing took place. FBG would receive printed copies of the notice (or print them) and work with the company to request appropriate information to ensure that the mailing can be done correctly. Mailings are completed as quickly and efficiently as possible. A certificate of service will be prepared for filing with the court.

Notice mailings to any registered holders of securities are straightforward, because their identities are known and notices can be sent directly to them. The mailing process is more complex for security holders in street name, because the notices need to be forwarded to beneficial owners of securities by the brokers or banks holding the securities, or their agent. We will coordinate with the firms in question, deliver the appropriate documents to them with instructions for mailing, and follow-up to be certain the notices are forwarded to beneficial owners.

**Pricing for Notice Mailings**

*Mailings to Registered Holders of Securities:*
Mailings to any registered record holders of securities would be charged at $0.50 - $0.65 per holder, for up to two paper notices included in the same envelope, with a $250 minimum. This assumes that labels and/or electronic data for these holders would be provided by the trustee, transfer agent or other party maintaining the records.

*Mailings to Holders of Public Securities in "Street" name:*
FBG's charges for a notice mailing to holders of debt securities in Street name would be $15,000

Hourly rates, as enumerated above, would apply for any related consulting work in connection with notice mailings. Out of pocket expenses would be charged separately, as noted below.

**D. Out of Pocket Expenses**

All out-of-pocket expenses relating to any work undertaken by FBG will be charged separately, and will include such items as travel costs, postage, messengers and couriers, etc., expenses incurred by FBG in obtaining or converting depository participant, creditor, shareholder and/or lists of Non-Objecting Beneficial Owners; and appropriate charges for supplies, in-house photocopying, telephone usage, etc. FBG reserves the right request advance payment for any significant expenses (including, but not limited to, postage advances).

**E. Charges**

For services rendered by FBG under this Agreement, CIT shall pay the charges set forth above. FBG will bill CIT monthly. All invoices shall be due and payable upon receipt.

In addition to all charges for services, CIT shall pay to FBG all taxes, however designated, levied or based that are applicable to this Agreement or are measured directly by payments made under this Agreement and are required to be collected by FBG or paid by FBG to taxing authorities. This provision includes, but is not limited to, sales, use and excise taxes, but does not include personal property taxes or taxes based on net income.

Where CIT requires measures that are unusual and beyond normal business practice of FBG such as, but not limited to, CPA audit, errors and omissions insurance, or off-premises storage of data, the cost of such measures, if provided by FBG, shall be charged to CIT at a competitive rate.

In the event of termination due to CIT's default, CIT shall be liable for all amounts then owing.

**F. Retainer**

Upon the effectiveness of the Agreement, CIT shall pay FBG a retainer in the amount of $100,000 (the "Retainer Amount") which shall be applied immediately in satisfaction of obligations incurred pursuant to this Agreement. FBG shall request replenishment of the retainer or an additional retainer (as needed) in its monthly or more frequent statement and invoice, at which time CIT shall immediately deliver to FBG such replenished amounts as is required so that the retainer held with FBG is replenished to the Retainer Amount. Any remaining retainer balance upon termination shall be applied against FBG's final invoice, provided however, in no event shall CIT's obligations to FBG be limited to the Retainer Amount so held by FBG as a retainer.

## G. Term

This Agreement shall become effective on the later of (i) the date it has been accepted by both FBG and CIT or (ii) if Bankruptcy Court approval is required, the date of entry of an order by the Bankruptcy Court approving this Agreement or such earlier date set by the Bankruptcy Court. The agreement shall remain in effect until it is terminated by CIT or FBG on one (1) month's prior written notice.

## H. Indemnity

CIT agrees to indemnify and hold FBG harmless against any loss, damage, expense (including, without limitation, legal and other related fees and expenses), liability or claim arising out of FBG's fulfillment of the Agreement (except for any loss, damage, expense, liability or claim resulting out of FBG's own gross negligence or willful misconduct). At its election, CIT may assume the defense of any such action. FBG hereby agrees to advise CIT of any such liability or claim promptly after receipt of the notice thereof; provided however, that FBG's right to indemnification hereunder shall not be limited by its failure to promptly advise CIT of any such liability or claim, except to the extent that CIT is prejudiced by such failure. The indemnification contained in this paragraph will survive the term of the Agreement. Except as provided herein, FBG's liability to CIT or any person claiming through or under CIT for any claim, loss, damage, expense of any kind, or for any lost profits, loss of business or other consequential damages even if FBG has been advised of the possibility of such damages, whether direct or indirect and unless due to gross negligence or willful misconduct of FBG shall be limited to the total amount billed or billable to CIT for the portion of the particular work which gave rise to the loss or damage. In no event shall FBG be liable to CIT for any special or consequential damages (including loss of anticipated profits) incurred by CIT in connection with or arising out of the services provided for in this Agreement.

## I. Confidentiality

FBG agrees to preserve the confidentiality of all non-public information provided by CIT or its agents for its use in providing services under this Agreement, or information developed by FBG based upon such non-public information. All of CIT's data given to FBG will be safeguarded by FBG to the same extent that FBG safeguards data relating to its own business; provided, however, that if data is publicly available, was already in FBG's possession or known to it, or was rightfully obtained by FBG from a third party, FBG shall bear no responsibility for disclosure. CIT agrees that FBG shall not be liable beyond the limits provided under "Indemnity," above, for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any material supplied by CIT to FBG in the performance of this Agreement.

**J. General**

No waiver alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

This agreement may not be assigned by CIT without the express written consent of FBG, which consent shall not be unreasonably withheld. The services provided under this Agreement are for the sole benefit and use of CIT, and shall not be made available to any other persons.

This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law.

Certain financial products may be provided to CIT pursuant to FBG's agreement with Union Bank or other financial institution, and FBG may receive compensation from Union Bank or other financial institution for services FBG provides to it pursuant to such agreement.

The parties agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by certified mail or overnight courier, postage prepaid, and addressed as follows:

If to FBG:

Financial Balloting Group LLC
757 Third Avenue, 3rd Floor
New York, New York 10017
Attn: Jane Sullivan, Executive Director

If to CIT:

CIT Group, Inc.
505 Fifth Avenue
New York, NY 10017
Attn:

**If the above is agreed to by you, please sign and return this Agreement to Financial Balloting Group LLC, Attention: Jane Sullivan, 757 Third Avenue, 3rd Floor, New York, NY 10017.**

ACCEPTED:

CIT GROUP, INC.

By: Kenneth A Brause

Name: Kenneth A Brause

Title: Executive Vice President

Date: September 30, 2009

FINANCIAL BALLOTING GROUP LLC

By: Jane Sullivan
Jane Sullivan
Executive Director

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CIT GROUP INC. and CIT GROUP FUNDING COMPANY OF DELAWARE LLC, | : | Case No. 09-16565 |
| | : | (Jointly Administered) |
| Debtors. | : | |

**ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014 AND 3017 AUTHORIZING EMPLOYMENT AND RETENTION OF FINANCIAL BALLOTING GROUP LLC AS VOTING AGENT AND SPECIAL NOTICING AGENT FOR PUBLICLY-HELD SECURITIES**

Upon the application (the "Application")[1] of the Debtors for entry of an order (the "Order") under sections 327(a) and 328 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rules 2014 and 3017 authorizing the Debtors to employ and retain Financial Balloting Group LLC ("FBG") as the Debtors' voting agent for publicly held securities (the "Voting Agent") in connection with the solicitation and tabulation of votes with respect to the plan of reorganization and special noticing agent for publicly held securities (the "Special Noticing Agent"), pursuant to the terms set forth in the Application; and upon the Declaration of Jane Sullivan in Support of Debtors' Application for Order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014 and 3017 Authorizing Employment and Retention of Financial Balloting Group LLC as Voting Agent and Special Noticing Agent for Publicly-Held Securities, executed on October 30, 2009, annexed to the Application as Exhibit A (the "Sullivan

---

1 Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Application.

Declaration"), and the Court being satisfied, based on the representations made in the Application and in the Sullivan Declaration, that FBG is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and, as required by section 327(a) and referenced by section 328(c) of the Bankruptcy Code, neither represents nor holds an interest adverse to the Debtors and their estates; and this Court having determined that the relief requested in the Application is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Application has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1. The Application is GRANTED as set forth in this Order.

2. The Debtors are authorized to employ and retain FBG as their Voting Agent and Special Noticing Agent, as of the Petition Date, on the terms set forth in the Application and the Engagement Agreement.

3. The terms of the Engagement Agreement, including without limitation, the fee provisions, are reasonable terms and conditions of employment and are approved.

4. The fees and expenses of FBG incurred in the performance of the services set forth in the Application and the Engagement Agreement shall be treated as an administrative expense of the Debtors' chapter 11 cases and be paid by the Debtors in the ordinary course of business without further order of this Court and without the need to file and serve a formal application for payment. All requirements under sections 330 and 331 of the Bankruptcy Code, including any requirement to file fee applications, are hereby waived.

5. All requests of FBG for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final, as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, that in no event shall FBG be indemnified in the case of its own bad faith, self dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

6. In no event shall FBG be indemnified if the Debtors or a representative of their estates, asserts a claim for, and a court determines by final order that such claim arose out of, FBG's own bad faith, self dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

7. In the event that FBG seeks reimbursement for attorneys' fees from the Debtors pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in FBG's own applications (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of this Court under the standards of §§ 330 and 331 of the Bankruptcy Code without regard to whether such attorney has been retained under § 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

8. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

9. otwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, or 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

10. This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: New York, New York
, 2009

____________________________________
UNITED STATES BANKRUPTCY JUDGE