SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Gregg M. Galardi
J. Gregory St. Clair

Proposed Counsel for Debtors and
  Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :     Chapter 11
                                                            :
CIT GROUP INC. and                                          :     Case No. 09-16565
CIT GROUP FUNDING COMPANY                                   :
OF DELAWARE LLC,                                            :
                                                            :
                          Debtors.                          :     (Motion for Joint Administration Pending)
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§
105, 363(b), 507(a), 541, 1107(a) AND 1108 AUTHORIZING, BUT NOT DIRECTING,
DEBTORS *INTER ALIA* TO MAINTAIN EMPLOYEE BENEFITS AND PAY
PREPETITION WAGES AND COMPENSATION**

            The debtors and debtors-in-possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move this Court (the "Motion") for entry of interim and final orders,

pursuant to sections 105, 363(b), 507(a), 541, 1107(a) and 1108 of title 11 of the United States

Code (the "Bankruptcy Code"), (a) authorizing the Debtors to pay prepetition amounts owing to

---

[1]      CIT Group Inc. is located at 505 Fifth Avenue, New York, NY 10017.  Its tax identification number is 65-
         xxx1192.  In addition to CIT Group Inc., CIT Group Funding Company of Delaware LLC, Case No. 09-
         16566, is a debtor in these related cases.  CIT Group Funding Company of Delaware LLC is located at 1
         CIT Drive, Livingston, NJ 07039.  Its tax identification number is 98-xxx9146.

or for the benefit of current and former employees and retirees for compensation, benefits and reimbursable expenses, (b) authorizing the Debtors to continue postpetition, in the ordinary course of business, the employee-related plans, programs and policies in effect immediately prior to the filing of these cases, (c) confirming that the Debtors are permitted to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods, (d) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third-party providers under, employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their employees, and (e) directing all banks to honor prepetition checks for payments made in satisfaction of any employee-related obligations authorized to be paid hereunder.  In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "First Day Declaration") filed concurrently herewith under Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").[2]  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

for the relief requested herein are Bankruptcy Code sections 105, 363(b), 507(a), 541, 1107(a) and 1108.

**BACKGROUND**

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration. The Debtors continue to manage and operate their businesses as debtors-in-possession under Bankruptcy Code sections 1107 and 1108.

**RELIEF REQUESTED**

3. By this Motion, the Debtors hereby move for entry of an order authorizing the Debtors to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Employee Obligations") to or for the benefit of their current and former employees (collectively, the "Employees"), for compensation, benefits and expense reimbursements under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "Employee Programs").[3]

4. Specifically, (a) the Debtors request that they be authorized to pay, in their discretion, any obligations arising under the Employee Programs which were accrued or earned but unpaid as of the Petition Date; and (b) the Debtors request that the Court confirm their right

---

[3] Certain Employee Programs described herein cover both the Employees of the Debtors and the employees of their non-Debtor affiliates on a consolidated basis. Such non-Debtor affiliates are expected to reimburse the Debtors for the proportional cost of such programs and benefit plans attributable to employees of non-Debtor affiliates. Therefore, unless otherwise stated, the figures set forth herein reflect the approximate cost of such programs and benefit plans attributable to the Employees of the Debtors, net of any amounts to be reimbursed by non-Debtor affiliates.

to continue each of the Employee Programs in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of these cases and to make payments in connection with expenses incurred in the administration of any Employee Program. With respect to certain of the Employee Programs the Debtors will defer making any payments on account of prepetition or postpetition amounts due until the earlier of confirmation of the Debtors Plan of Reorganization or further order of this Court.

5.     The Employee Programs under which the Prepetition Employee Obligations arise are described more fully herein and include, without limitation, plans, programs, policies and agreements providing for (a) wages, salaries, ordinary course holiday and vacation pay, sick leave pay and other accrued compensation; (b) ordinary course severance programs; (c) reimbursement of business, travel, educational, relocation, and other reimbursable expenses; and (d) various health and welfare and related types of benefits (including, without limitation, medical, dental, vision, prescription drugs, flexible spending accounts, life and dependent life insurance, accidental death insurance, disability insurance, and employee assistance programs); and (e) 401(k) plan benefits and other savings and retirement plans benefits.

6.     The Debtors also seek confirmation that they are permitted to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and Medicare taxes (the "Payroll Taxes"), whether remitted or paid by the Debtors. In addition, the Debtors seek confirmation that they are permitted to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for

garnishments, benefit plans, insurance programs, and other similar programs (the "Payroll Deductions, and together with the Payroll Taxes, the "Employee Withholdings").

7.      In addition, the Debtors request authorization to satisfy their obligations under various programs for the benefit of their retired employees (the "Retired Employee Benefits") to continue the Retired Employee Benefits in the ordinary course of business.

8.      The Debtors further request that, with respect to any Employee Programs and Prepetition Employee Obligations that are administered or paid through a third-party administrator or service provider (collectively, "Providers"), the Debtors be expressly authorized to pay any prepetition claims of such Providers in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees.  The Debtors also request authorization to pay outstanding amounts owed to agencies that supply the Debtors with temporary workers.

9.      In aid of the foregoing relief, the Debtors request that the Court authorize and direct all banks to receive, process, honor and pay any and all checks drawn on the payroll and other bank accounts used by the Debtors to satisfy their Prepetition Employee Obligations, whether presented before, on or after the Petition Date, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Motion, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.   The Debtors additionally request that the Court authorize them to issue new postpetition checks to replace any checks that may be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

10.      By filing this Motion and seeking the relief herein, the Debtors are not seeking to assume any of the employment and service agreements to which the Debtors are a

party or any of the Debtors' employee benefit policies, plans, programs, practices and procedures under Bankruptcy Code section 365(a).  The Debtors reserve all of their rights in this regard.

**BASIS FOR RELIEF**

**A.      Wages, Salaries and Commissions**

11.      The following chart summarizes key information relating to the Employees in the United States.  The chart indicates the total number of employees employed by the Company and the average payroll amount for the Company.  Summary information is also provided solely with respect to the Debtors' Employees.

| | Debtors and Non-Debtors (United States) | Debtors Only |
|---|---|---|
| Full-Time Employees (as of October 15, 2009)[4] | 3,104 | 530 |
| Part-Time Employees (as of October 15, 2009)[5] | 15 | 3 |
| Commission Status Employees (as of October 15, 2009)[6] | 860 | 0 |
| Independent Contractors (as of October 22, 2009) | 235 | 90 |
| Average Monthly Payroll (Including Employer Paid Portion of Payroll Taxes) | $40 million | $7.5 million |
| Estimated Accrued But Unpaid Wages, Salaries, | $9 million | $2 million[7] |

---

[4]   Full-time Employees work at least 35-40 hours per week, are salaried and can be classified as exempt or non-exempt.

[5]   Of the Debtors' Part-time Employees, 100% are salaried and work at least 20 hours per week but less than 35-40 hours per week.  These Employees are entitled to additional benefits above and beyond those benefits offered to Part-time Employees who work less than 20 hours per week.  The remaining Part-time Employees work less than 20 hours per week and are paid on an hourly basis.

[6]   Commission Status Employees are eligible for certain benefits based on their individual job descriptions. Certain Commission Status Employees receive the same benefit package as Full-time Employees (the "Commission Benefit Employees").

[7]   Does not include an estimated $19 million of accrued but unpaid bonuses as of October 31, 2009 (the "Discretionary Bonuses").   The amount is subject to review and approval of the compensation committee of the Board of Directors of CIT Group.

| | | |
|---|---|---|
| Commissions, Other Compensation And Employer Paid Portion of Employee Taxes (as of October 31, 2009) | | |
| Outstanding Checks to Employees (as of October 30, 2009) | less than $30,000 | less than $5,000 |

12.     Employees are paid every other Tuesday for work through and including the previous Tuesday. Thus, Employees are paid one week in arrears. The Debtors last pay date for all their Employees prior to filing these chapter 11 cases was on October 27, 2009, for the two week pay period ending on October 20, 2009. The Debtors accelerated a payroll period for certain of their Employees to ensure that no Employees were owed amounts greater than $10,950. For the pay period ending November 3, 2009, the next scheduled pay date for the Debtors' Employees is November 10, 2009.

13.     Pursuant to this Motion, the Debtors seek to (a) pay the outstanding amounts owed to Employees as of the Petition Date for accrued and unpaid wages and salaries, (b) remit amounts that the Debtors are required by law to withhold from Employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes and the payroll administration fee, and (c) pay the employer portion of payroll taxes and other benefits.[8]  As noted above, the amount owed to any Employee on account of wages and salaries does not exceed $10,950.

---

[8]     As described in more detail in Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105, 345, 363, 364, 503(b)(1), 553, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing (I) Continued Use of Existing Cash Management System and Bank Accounts, (II) Waiver of Certain U.S. Trustee Requirements, (III) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code, and (IV) Continuation of Intercompany Transactions and Grant of Superpriority Status and First Priority Liens on Account of Intercompany Claims, payroll for both the Debtors and certain of their non-Debtor affiliates is disbursed from a single bank account owned by CIT Group Inc. However, such non-Debtor affiliates either fund or reimburse the Debtors for the proportional cost of such payroll attributable to the employees of the non-Debtor affiliates.

*(cont'd)*

**B. Other Compensation: Paid-Time Off, Severance, and Business Expenses**

14.     The Debtors offer their Employees other forms of compensation, including paid time off, overtime pay, other earned time off, severance, and reimbursement of certain business expenses.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

15.     **Holiday Time**.  Holiday time is provided to Employees for various nationally observed holidays.

16.     **Vacation Time**.  Following three months of introductory service with the Company, Employees begin to accrue vacation time (the "Vacation Time").  Vacation Time is accrued based upon years of service and grade of Employee.  Employees earn between 10 days (for the most junior of Employees) and 25 days (for the most senior of Employees) of Vacation Time per year.  Subject to applicable law, each year, a maximum of five (5) days of Vacation Time may be carried over to the following year.  At any point in time, Vacation Time is accruing, making it difficult to quantify the cost of accrued Vacation Time as of the Petition Date.  The Debtors seek to continue their Vacation Time policies in the ordinary course.

17.     **Sick Leave**.  Employees receive seven (7) sick days each calendar year (prorated for the first year of employment).  Sick days are accrued at the beginning of each year. Employees may carry over a maximum of twenty-eight (28) unused sick days each calendar year, for a total maximum of thirty-five (35) sick days.  Employees are not paid for unused sick days upon termination of employment or retirement.

---

*(cont'd from previous page)*
      Consequently, the funds disbursed by CIT Group Inc. on account of non-Debtor payroll are not property of the estate and disbursement of such funds does not deplete estate assets.

18.     **Personal Time**.  Salaried Employees receive four (4) personal days per calendar year (prorated for the first year of employment).[9]  Personal days may be used by Employees for reasons such as:  observing a religious holiday, attending the funeral of a friend or relative, their wedding day, or any other personal reason.  Employees may not carryover personal days.  Additionally, Employees are not paid for unused personal days when employment is terminated, except where state law requires otherwise.

19.     **Bereavement Leave**.  Eligible Employees are eligible to receive up to five (5) working days with pay to handle family affairs in the event of death of a member of the Employee's immediate family.  Employees are not paid for unused bereavement leave upon termination of employment or retirement.

20.     By this Motion, the Debtors seek authority to honor in the ordinary course of business all liabilities to their Employees that arose under the paid time off policies or practices ("PTO") as described above.  The Debtors anticipate that their Employees will use any accrued PTO in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.[10]  Use of PTO is subject to the Debtors' corporate policies and procedures.

21.     **Severance.**  The Debtors offer severance to their Employees in the event their employment with the Debtors is terminated as specified in the Debtors' severance policy (the "Employee Severance Plan").  A summary of the benefits provided under the Employee Severance Plan is provided below:

---

[9]    New Employees earn personal days after completion of the three month introductory period with the Company.

[10]    As noted above, accrued PTO is paid out upon termination of the Employee.

| Participants | Timing of Payments | Core Benefit[11] | Other Benefits |
|---|---|---|---|
| Level 1 (Salary grade of 410 or higher) | Lump sum within 30 days of termination date | An amount equal to the sum of (i) 8 weeks base salary plus (ii) for each full year of continuous service (or part thereof) 2 weeks base salary up to a maximum aggregate severance payment of 52 weeks' base salary. | Pro rata bonus for year of termination.<br><br>Amount equal to 102% of COBRA payment for medical and dental for severance period, for participants covered by company-sponsored health plans.<br><br>Gross up for federal and state taxes on amount calculated with reference to COBRA rates. |
| Level 2 (Salary grades of less than 410) | | An amount equal to the sum of (i) 4 weeks base salary plus (ii) for each full year of continuous service (or part thereof) 2 weeks base salary up to a maximum aggregate severance payment of 52 weeks' base salary. | |

As of the Petition Date, no amounts were due to Employees under the existing Employee Severance Plan. By this Motion, the Debtors seek authority to continue the Employee Severance plan post-petition in the ordinary course of business, subject to the provisions of the Bankruptcy Code and applicable non-bankruptcy law (including the Troubled Asset Relief Program, as applicable).

22.     Additionally, under a prior severance plan (the "Legacy Severance Plan"), the Debtors are currently obligated to pay approximately $3.2 million in severance to their Employees terminated prior to the Petition Date.  Payments of approximately $825,000, $192,000, and $192,000 will become due during the months of November, December, and January, respectively.

23.     **Expense Reimbursement.**  The Debtors have policies whereby their employees seek reimbursement of business related expenses including expenses for travel, lodging, ground transportation, meals, supplies, automobile usage and miscellaneous business

---

[11]     Highly compensated employees whose severance amount exceeds two times the applicable limit under section 401(a)(17) of the Internal Revenue Code receive their severance amount in two payments.  The initial severance amount, the amount that does not exceed the limit under section 401(a)(17) of the Internal Revenue Code, is paid within 30 days of the termination date.  The remainder of the severance amount due is paid on the first payroll date of the seventh calendar month following the calendar month in which the relevant employee was terminated.

expenses (collectively, the "Business Expenses").  The expenses are ordinary course expenses that the Debtors' employees incur in performing their job functions.

24.      Included in this category are all expenses incurred on the employees' American Express Corporate Cards.  It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses.  In addition, as an essential part of the operation of their business, the Debtors have required certain of their Employees to charge expenses for business travel which is undertaken in the ordinary course of performing their job functions to the Debtors' American Express "Central Bill Account."  Such expenses are the same types of expenses as are incurred on the Corporate Card program.  Use of the Central Bill Account is an integral part of the Debtors' cash management and account functions, and continuation of the ability of the Debtors' Employees to use the Central Bill Account for business travel is essential to the continued operation of the Debtors' business.

25.      Approximately $125,000 is paid to the Debtors' Employees with respect to Business Expenses each month.  The Debtors cannot estimate the amount of reimbursable expenses outstanding as of the Petition Date because not all Employees have submitted expense reports as of the Petition Date, however, the Debtors do not believe the outstanding amounts are in excess of the average monthly amount of $125,000.  The Debtors seek authority to reimburse all such expenses as and when reports are submitted by Employees.

26.      **Relocation Expenses.**  The Debtors provide certain Employees with relocation expenses to spur desirable candidates to accept positions (the "Relocation Expenses").  Relocation Expenses are paid directly to Employees through a third party vendor.  As of the Petition Date, the Debtors owed approximately $115,000 to such third party vendor for the

Relocation Expenses in connection with the relocation of two employees. By this Motion, the Debtors seek authority to pay the Relocation Expenses to their vendor in the ordinary course of business regardless of when they were incurred.

## C.  Bonus and Incentive Programs

27.  **Guaranteed and Discretionary Bonuses.** The Debtors have agreed to pay five current Employees guaranteed bonuses which are payable between December 2009 and March 2010 (the "Guaranteed Bonuses"). Additionally, the Debtors have accrued approximately $19 million of unpaid Discretionary Bonuses as of October 31, 2009. The ultimate award of these bonuses remains subject to the approval of the compensation committee of the Board of Directors of CIT Group Inc. The Debtors expect to make such payments in December 2009 and January 2010. To the extent the Debtors chapter 11 cases are still pending when such Guaranteed Bonuses become due and owing or the Discretionary Bonuses are awarded by the Board of Directors, the Debtors will defer payment of the Guaranteed and Discretionary Bonuses until the earlier of confirmation of the Plan of Reorganization or further order of this Court.

## D.  Employee Benefit Plans

28.  Prior to the Petition Date, the Debtors offered their Employees various standard employee benefits including, without limitation, (a) medical, vision, COBRA insurance, and prescription drug coverage, (b) dental insurance, (c) flexible spending accounts, (d) an employee assistance program, (e) life and accidental death and dismemberment insurance, (f) disability benefits, and (g) miscellaneous other benefits provided to the Employees in the ordinary course of business. Such benefits are administered pursuant to consolidated plans, programs and policies that cover the Employees of the Debtors, as well as the Employees of their non-Debtor affiliates. The amounts set forth below reflect the approximate cost of such

programs and benefit plans attributable solely to the Employees of the Debtors and are net of any amounts to be reimbursed by non-Debtor affiliates.

29.     **Medical Plans.**  The Debtors provide a number of Employees and their dependents with medical, vision, COBRA insurance and prescription drug benefits pursuant to several different medical plans (collectively, the "Medical Plans") through United Healthcare Insurance Company ("United HealthCare") and assorted health maintenance organizations, offering varying levels of coverage.  Approximately 500 of the Debtors' Employees participate in the Medical Plans.  The cost of the Medical Plans is borne primarily by the Debtors, but Employees contribute to the Medical Plans through payroll deductions.  Employee contributions are deducted from bi-weekly paychecks to pay for that month's coverage.  Payments made pursuant to the Medical Plans include employee contributions and premium payments.  The Medical Plans cost the Debtors approximately $540,000 each month for their Employees, which represents the gross amount of the Medical Plan before crediting the value of employee contribution.

30.     **Dental Plan.**  The Debtors offer their Employees dental benefits (the "Dental Plan") through United HealthCare.  Approximately 500 of the Debtors' Employees participate in the Dental Plan.  The cost of the Dental Plan is borne primarily by the Debtors, but Employees contribute to the Dental Plan through payroll deductions.  Employee contributions are deducted from bi-weekly paychecks to pay for that month's coverage.  Payments made pursuant to the Dental Plan include employee contribution and premium payments.  The Dental Plan costs the Debtors approximately $50,000 each month, which represents the gross amount of the Dental Plan before crediting the value of employee contribution.

31.     **Healthcare Flexible Spending Accounts.**  In addition, the Debtors offer their Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Medical Plans.  The flexible spending benefits (the "Flex Benefits") are administered by United Healthcare**.**  The Debtors remit employee contributions totaling approximately $125,000 per month to the Flex Benefits administrator.

32.     **Life and Accidental Death and Dismemberment Insurance.**  The Debtors automatically provide basic employee life insurance coverage, basic accidental death and dismemberment insurance ("AD&D"), and business travel insurance to their employees (collectively, the "Life Insurance Plans").  The Life Insurance Plans are administered by Prudential Insurance Company.  A summary of the basic benefits under the Life Insurance Plans is provided below.  The benefits available under the Life Insurance Plans are based upon an Employee's "Benefits Pay."  Benefits Pay is equal to an Employee's base salary, plus a three-year average of certain annual bonuses, certain annual sales incentives, and commissions.  Benefits Pay is updated annually at the beginning of each calendar year for those Employees who were employed as of July 1 of the previous year.  If Employees decide they need more income protection than what is offered through the Life Insurance Plans, they may purchase additional life insurance and/or AD&D coverage.  The cost for this supplemental coverage is paid on an after-tax basis and is based on the amount of coverage purchased.  Employees may also purchase life insurance and AD&D coverage for their dependents.  The cost for this benefit is paid by the Employee on a post-tax basis.  The Debtors remit approximately $8,000 per month to the insurers pursuant to the Life Insurance Plans and the AD&D Plans on account of their Employees, including additional Employee contributions for supplemental life insurance and or AD&D.

| Life and AD&D Insurance Coverage | |
|---|---|
| **Insurance Plan** | **Company-Provided Benefits** |
| Basic Life | One times Benefits Pay, to $500,000 maximum |
| Basic AD&D | One times Benefits Pay, to $500,000 maximum |
| Business Travel Accident | Five times base salary, to $1 million maximum |
| **Insurance Plan** | **Optional Benefits** |
| Employee Supplemental Life | One to six times Benefits Pay, to $2 million combined basic/supplemental maximum |
| Employee Supplemental AD&D | One to six times Benefits Pay, to $2 million combined basic/supplemental maximum |
| Dependent Life | Spouse/Domestic Partner: $50,000 maximum Child/Children: $15,000 maximum |
| Dependent AD&D | Spouse/Domestic Partner: $100,000 maximum Child/Children: $30,000 maximum Spouse/Domestic Partner and Child/Children: $130,000 maximum |

33.     **Disability Benefits.**  Through disability benefits provided by the Debtors, a portion of the Employee's income is continued in the event the Employee is unable to work due to illness or injury.  The Debtors provide a basic level of disability benefits at no cost to the Employee, in the form of short-term disability ("STD") and basic long-term disability ("LTD") benefits.  Additional LTD benefits ("Supplemental LTD," and together with STD and LTD, the "Disability Programs") may be purchased by an Employee at an additional cost.  The Debtors' STD and LTD insurance provider is Reliance Standard Life Insurance Program.

34.     Eligible Employees are automatically enrolled for STD benefits after completing three months of service.  The first five days of an illness or injury are considered a "waiting period" during which Employees must use available sick days.  Employees receive seven sick days at the beginning of each calendar year and may carry over a maximum of 28 sick days from the previous year.  After the expiration of the waiting period, Employees receive short-term disability coverage, based upon the Employee's years of service, as outlined in the chart below:

| Period of Service | Weeks at 100% of Base Salary | Weeks at 60% of Base Salary |
|---|---|---|
| More than 3 months, but fewer than 2 years | 0 | 25 |
| At least 2 years, but fewer than 5 years | 4 | 21 |
| At least 5 years, but fewer than 10 years | 12 | 13 |
| 10 years or more | 25 | 0 |

35.     LTD coverage pays a benefit when an Employee's approved disability continues beyond the STD period.  The Debtors provide a basic LTD benefit and provide the option to Employees to purchase supplemental coverage.  LTD benefits begin after the "waiting period" and STD benefits end (a combined period of 26 weeks).  The following table provides a summary of the LTD coverage options available to Employees:

| Option | Pay Level | Coverage | Cost | Enrollment |
|---|---|---|---|---|
| Basic LTD Benefit | All Employees | 50% of Benefits Pay, up to $10,000/month maximum | No cost to Employee; this is a fully-paid company benefit | Automatic |
| 50% Option | Employees with a Benefits Pay in excess of $240,000 have this option | 50% of Benefits Pay, up to $25,000/month maximum | The Employee and the Debtors share the cost of this benefit | Must elect coverage when first eligible for coverage as a new hire |
| 66 2/3% Option | Employees with Benefits Pay less than $449,977 | 66 2/3% of Benefits Pay, up to $25,000/month maximum | The Employee and the Debtors share the cost of this benefit | Must elect coverage when first eligible for coverage as a new hire |

The Disability Programs cost the Debtors approximately $60,000 each month, including additional Employee contributions for Supplemental LTD coverage.

36.     **Employee Assistance Program.**  The Debtors offer their Employees and their family members counseling services to help resolve personal issues (the "EAP") through Corporate Counseling Associates.  The EAP is funded by the Debtors and costs approximately $1,500 each month.

37.     **Honoring of Prepetition Benefits**.  As of the Petition Date, certain of the employee benefits described above remained unpaid or unprovided as of the Petition Date

because certain obligations of the Debtors under the applicable plan, program or policy accrued either in whole or in part prior to the commencement of these chapter 11 cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. The Debtors seek authority to pay or provide as they become due all prepetition Employee benefits and the related administrative fees described above that have already accrued.

38.     **Continuation of Employee Benefit Plans Postpetition**.  The Debtors also request confirmation of their right to continue to perform their obligations with respect to these employee benefit programs on a postpetition basis. These programs are an important component of the total compensation offered to the Employees, and are essential to the Debtors' efforts to maintain Employee morale and minimize attrition. The Debtors believe that the expenses associated with such programs are reasonable and cost-efficient in light of the potential attrition, loss of morale and loss of productivity that would occur if such programs were discontinued.

**E.     Savings and Retirement Plans**

39.     **The CIT Group Inc. Savings Incentive Plan.**  The CIT Group Inc. Savings Incentive Plan (the "401(k) Plan"), managed by Fidelity Investments, provides Employees with a tax-effective way to save for retirement.  Salaried Employees working at least 20 hours per week, and who are at least 18 years old and have completed 60 days of service, are automatically enrolled in the 401(k) Plan.  The common stock of CIT Group is not an eligible investment for the 401(k) Plan.  Unless an Employee elects otherwise, 3% of an Employee's pay is automatically deducted on a pre-tax basis from each paycheck and deposited into the Employee's 401(k) Plan account.  Employees may contribute up to 35% of their base salary and certain eligible bonuses and commissions with pre-tax and/or post-tax dollars, up to annual Internal Revenue Service limits.  The Debtors match up to 5% of an Employee's pre-tax

contributions to the 401(k) Plan dollar for dollar (the "401(k) Employer Matching"). The Debtors make one bi-weekly payment to the 401(k) Plan administrator which includes employee contributions, employer contributions and employee loan payments.

40. **Flexible Retirement Contributions under the 401(k) Plan**. The Debtors offer certain Employees (employed prior to November 1, 1999 who chose not to convert to the current cash balance plan formula under the Retirement Plan (as defined below)) a qualified flexible retirement contribution under the 401(k) Plan (the "401(k) Flexible Retirement Contribution"), pursuant to which the Debtors contribute a maximum of 3% of an Employee's base salary, up to the Internal Revenue Service limits (the "Flexible Retirement Contribution," and together with the contributions under the 401(k) Plan, the "Employer Matching").

41. The 401(k) Plan costs the Debtors approximately $170,000 a month for employer contributions on behalf of their Employees. The 401(k) Flexible Retirement Contribution costs the Debtors approximately $70,000 annually in employer contributions. The Employer Matching is the only true "cost" of these plans to the estate; if Employee salary reductions are not paid into the plan they must be paid to the participating Employees as salary.

42. During the expected pendency of these chapter 11 cases, the overwhelming majority of those Employees entitled to receive Employer Matching are lower salary, rank and file Employees who have not yet reached the maximum contributions allowed pursuant to the Internal Revenue Code. Such Employees include Employees who provide vital services to the Debtors including operating the service centers, monitoring receivables and collections, allocating cash, and performing accounting and regulatory compliance functions. Failure to continue the Employer Matching for such Employees who provide services necessary

to the Debtors successful reorganization would have a devastating effect on their morale at a critical time for the Debtors and their businesses.

43. In addition, CIT Group Inc., as plan sponsor of the 401(k) Plan has a fiduciary duty arising under Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") to administer the 401(k) Plan including the Flexible Retirement Contribution, in accordance with their terms. Moreover, the failure of the plan sponsor to administer the plan in accordance with its terms, including the mandatory Employer Matching provisions, would be a violation of the qualification standards of Section 401(a) of the Internal Revenue Code. Disqualification of the plan, which covers a large number of Employees of the Debtors as well as non-Debtor affiliates, would generally cause the trust under the plan to lose its tax exempt status under Section 501(a) of the Internal Revenue Code causing participants to be currently taxed on their balances under the plan, and would adversely affect the Debtors' ability to take a current tax deduction under Section 404(a)(5) of the Internal Revenue Code.

44. **The CIT Group Inc. Retirement Plan.** The CIT Group Inc. Retirement Plan (the "Retirement Plan") is a qualified plan and fully paid by the Debtors via a contribution typically made once per year, in April. Employees make no contributions to the Retirement Plan. Eligible Employees are salaried employees working at least 20 hours per week and who are at least 21 years old. Eligible Employees are automatically enrolled in the Retirement Plan after completing one year of service with the Debtors. Once eligible, an Employee's Retirement Plan account is credited with an amount equal to 5% to 8% of an Employee's base salary and certain eligible bonuses and commissions on a monthly basis, depending on such Employee's years of service. Employees are 100% vested in their Retirement Plan cash balance account after three years of service. The approximate amount funded annually by the Debtors for the Retirement

Plan is $28.8 million. The Debtors are not due to make contributions to the Retirement Plan until April 2010, and as such, will not be making a contribution during the expected pendency of these chapter 11 cases. To the extent any Employees are entitled to receive distributions under the Retirement Plan, such distributions are from the Retirement Plan trust and are not property of the estate.

45. **New Executive Retirement Plan.** The New Executive Retirement Plan (the "NERP") is designed to provide a company-funded retirement annuity of up to a maximum of 90% of a participant's final base salary, when combined with benefits payable under the Retirement Plan, the Supplemental Plan (as defined below) and the Debtors supplemental savings plan.[12] Benefits accrue based on age and years of service, with the maximum NERP benefit accrued after 30 years of service. The NERP also provides a death benefit equal to three times eligible base compensation while actively employed. Currently, the NERP costs the Debtors approximately $357,000 per month on account of 34 Employees and/or spouses. The Debtors next payment under the NERP is due December 1, 2009. In addition, the Debtors are required to make a lump sum payment to one former Employee in the amount of $810,000 in mid-November. All amounts payable under the NERP are unsecured obligations of the Debtors.[13]

---

[12] The Debtors are not seeking authority with respect to their supplemental savings plan at this time.

[13] Pursuant to the provisions of the NERP, one participant elected to forego compensation, which was used to fund a portion of the premium on the variable life insurance policy, in exchange for a "second to die" life insurance policy. A second to die life insurance policy is a policy that insures two people, typically a husband and wife, under which the death benefit is not paid to the beneficiary until the death of the second insured. The Debtors, prior to the commencement of these chapter 11 cases, paid all premiums related to the second to die life insurance policy and, upon death of the participant, the Debtors will be reimbursed 100% of the premiums paid, plus accrued interest. The remaining death benefit, after deducting the premiums and accrued interest to be paid to the Debtors, will be remitted to the participant's estate. All premiums related to the policy are paid, and during the pendency of these chapter 11 cases there will be no additional cash expenditures required by the Debtors.

46.     **Supplemental Retirement Plan.**  The Supplemental Retirement Plan (the "Supplemental Plan") is a non-qualified plan which is designed to provide retirement benefits mirroring those provided under the Retirement Plan for compensation in excess of applicable IRS limits. The Employees eligible for the Supplemental Plan are salaried employees working at least 20 hours per week and who are at least 21 years old.  Eligible Employees are automatically enrolled after completing one year of service with the Debtors and upon earning eligible compensation in excess of IRS limits.  Once eligible, an Employee's Supplemental Plan account is credited with an amount equal to between 5% and 8% (depending on service) of an Employee's base salary and certain eligible bonuses and commissions on a monthly basis only for the portion that exceeds IRS compensation limits. Employees are 100% vested in their Supplemental Plan cash balance after three years of service.  Benefits under the Supplemental Plan are payable in a lump sum.  The Debtors' unfunded liability as of the Petition Date is approximately $4.9 million.  It is not possible for the Debtors to predict the future costs associated with the Supplemental Plan, as benefits are paid in a lump sum at the time an active Employee terminates employment.

47.     **Supplemental Savings Plan.**  The Supplemental Savings Plan (the "SSP") is a legacy arrangement that covers certain existing Retirement Plan participants who opted to remain under the Retirement Plan's "traditional plan" formula.  The SSP provides a 3% contribution of participant's base salary in excess of IRS limits.  Existing balances in the SSP receive notionally invested returns that are payable in a lump sum following the participant's separation from service.  There are currently three (3) Debtor Employee participants in the SSP, with an unfunded liability of approximately $50,000.  It is not possible to predict the future costs associated with the SSP, as benefits are paid as the participant is terminated or retires.

48.     **Deferred Compensation Plan.**  The Deferred Compensation Plan (the "DCP") offers certain senior executives the opportunity to defer payment of a portion of their base salary and incentive compensation as a means of saving for retirement or other purposes. Amounts deferred under the DCP are notionally invested in various investment benchmarks selected by the participant from those offered under the DCP and that are aligned with those offered in the 401(k) Plan.  A participant's balance in the DCP is payable upon a separation of service, in an elected calendar year (subject to certain restrictions), or in the event of a participant's death, disability or unforeseeable emergency.  The DCP is considered unfunded, both for tax purposes and for purposes of Title I of Employee Retirement Income Security Act of 1974 and is not a tax-qualified retirement plan under the Internal Revenue Code.  Approximately nine of the Debtors' Employees currently participate in the DCP with an aggregate balance of approximately $3,000,000.[14]  Payments under the DCP are due to be paid in December 2009 and the first quarter of 2010.

**F.     Benefits to Retirees[15]**

49.     **Retiree Welfare Plans.**  The Debtors provide certain of their retirees and their dependents with life, medical and dental insurance benefits pursuant to several different retiree plans, (collectively, the "Retiree Benefit Plans") through United Healthcare Insurance Company and Prudential Life Insurance, offering varying levels of coverage.  The Retiree Benefit Plans provide: (i) life insurance to 760 retirees and dependents; (ii) medical insurance to 640 retirees and dependents; and (iii) dental insurance to 300 retirees and dependents.  The

---

[14]     The aggregate balance for the Debtors' Employees is as of October 21, 2009.  The DCP has a total aggregate liability for all Employees (Debtors and non-Debtors) of $7.1 million of which $150,000 is scheduled to be paid out to terminated participants over the next three months.

[15]     The Retiree Benefit Plans also cover a number of employees of non-Debtor affiliates.  Due to changes in the Company's corporate structure over the last two decades, it is impossible to reliably determine the number of Debtor retirees.

Retiree Benefit Plans are funded by the Debtors and through contributions by certain participating retirees relating to medical and dental benefits. Payments made pursuant to the Retiree Benefit Plans include employee contributions and employer paid premium payments. Medical and dental insurance under the Retiree Benefit Plans for both the Debtors and their non-Debtor affiliates costs approximately $400,000 per month; life insurance costs approximately $37,000 per month. These amounts represent the gross costs of the plans, before crediting the value of employee contributions. The Debtors generally have the option to terminate or modify the benefits under the Retiree Benefit Plans in their discretion. The Debtors seek the authority to continue the Retiree Benefit Plans and to remit all amounts that are related to such programs that arose prior to the Petition Date in the ordinary course of the Debtors' business.

**G.     Other Benefits**

50.     The Debtors offer certain other benefits to Employees (the "Other Benefits"), including, but not limited to, a transportation reimbursement incentive plan ("TRIP"), dependent flexible spending account, tuition reimbursement, adoption assistance, and car allowance.

51.     <u>TRIP and Dependent Flexible Spending Account</u>. The TRIP and Dependent Flexible Spending Account ("DFSA") benefits are administrated by ADP. The TRIP allows Employees to set aside pre-tax dollars for eligible transportation and/or parking expenses. Based on the amount of an Employee's eligible monthly transportation expenses, an Employee will decide how much such Employees wants to contribute to pay for eligible transportation and/or parking expenses. The amount contributed is deducted from an Employee's paycheck before withholding. An Employee may elect to contribute up to $2,760 annually to the TRIP account. The Debtors believe that amounts contributed by Employees to the TRIP are not property of the Debtors' estates. Therefore, they request the authority to remit amounts withheld

pursuant to the TRIP to ADP. The DFSA permits Employees to set aside a portion of their pre-tax salary for the payment of eligible dependent care expenses. Employees may elect to contribute up to $5,000 annually. The Debtors remit Employee contributions totaling approximately $90,000 per month to the Flex Benefits administrator. The Debtors request the authority to remit any prepetition amounts due to ADP and to continue these benefits.

52. <u>Tuition Reimbursement</u>. The Debtors maintain a tuition reimbursement program to further the professional growth of their Employees and to help them find their work personally more rewarding while continuing to add value to the Debtors. The tuition reimbursement policy is intended to further eligible Employees' professional development by reimbursing employees for tuition paid in connection with eligible educational programs, degrees, courses, and certifications, as well as eligible exam fees. Reimbursement under the policy is discretionary and the Debtors may deny an Employee's tuition reimbursement application for any reason. All full-time employees are eligible to receive a maximum of $7,500 in tuition reimbursement per calendar year for undergraduate coursework/programs. All full-time Employees are eligible to receive a maximum of $10,000 per calendar year in tuition reimbursement payments for graduate coursework/programs. Other coursework and certifications necessary for job-related functions will also be reimbursed by the Debtors. By this Motion, the Debtors seek authority to continue the tuition reimbursement program and to remit all amounts owed for tuition reimbursement in the ordinary course of business.

53. The Debtors provide various other benefit programs which carry a *de minimis* annual cost, including back-up child care, entertainment discounts and promotions, fitness discounts and reimbursements, surviving spouse and LTD plans, and various wellness programs. These benefits maintain Employee morale and help retain the Debtors' workforce.

The Debtors assert that failing to continue such benefits would have an adverse affect on the Debtors' Employees. The Debtors request the authority to pay any prepetition amounts owed with respect to these programs and to continue them postpetition.

**H.    Payments to Third Party Administrators and Temporary Employee Agencies**

54.    In order to efficiently deliver employee benefits, the Debtors contract with several vendors (the "Benefit Administrators"). In most cases, the Debtors pay premium and administration fees for the services of the Benefit Administrators. For instance, administrative fees (and other necessary overhead paid to third-party vendors) for the Medical Plans, Dental Plan, Flex Benefits, and COBRA for the Debtors' Employees cost the Debtors approximately $150,000 per month. In conjunction with the Debtors' continuation of their Employee Programs, the Debtors seek specific authorization to continue to pay fees for the Benefit Administrators on a postpetition basis, including any claims for prepetition services rendered by such administrators and any claims for reimbursement based on any prepetition disbursements made by the Benefit Administrators on behalf of the Debtors.

55.    Because the services of the Benefit Administrators are vital to manage the Employee Programs, the Debtors plan to maintain their utilization of the Benefit Administrators' services during the pendency of these cases. Notwithstanding the executory nature of the Benefit Administrator agreements with the Debtors, the Debtors believe that the Benefit Administrators may terminate their services to the Debtors unless the Debtors continue to pay them and pay any prepetition amounts owed. Moreover, compelling the Debtors to engage replacement Benefit Administrators postpetition likely would cause disruption to the payment of expected benefits to the Employees. Accordingly, continued use of the Benefit Administrators' services is in the best interests of the Debtors' estates. Benefit Administrators include Buck Consulting (Retirement Administration), Focused Health, Staywell, TALX, and Mercer, among others.

56.     The Debtors also request authorization to continue to use the services and to pay their third-party payroll vendor ADP, Inc. (the "Payroll Administrator"), which vendor provides various payroll-related services for the Debtors.  The Debtors must be permitted to pay the Payroll Administrator (and to pay any prepetition claims of the Payroll Administrator) to ensure uninterrupted delivery of Employee payroll.  The estimated monthly cost for the services of the Payroll Administrator related to payroll processing and Human Resource Information Systems ("HRIS") is approximately $79,000.  Furthermore, because the services of the Payroll Administrator are vital to management of Employee payroll, the Debtors plan to maintain their utilization of the Payroll Administrator's services during the pendency of these cases.  Accordingly, the Debtors submit that payment of the Payroll Administrator's prepetition claims and the postpetition use of the Payroll Administrator's services is in the best interests of the Debtors' estates.

57.     The Debtors also request authorization to pay any outstanding amounts owed to agencies that supply the Debtors with staff workers that are necessary for the Debtors' business and continue this benefit postpetition.  The Debtors receive staff workers from various agencies to perform functions critical to the Debtors' businesses.  The Debtors contract with Adecco Group (the "Master Temp Agency") who in turn contracts with a multiple number of staffing agencies to ensure that the Debtors' staffing needs are met.  The agencies in turn pay the staff workers; thus, paying the staff workers is not the Debtors' obligation.  A number of staffing agencies however do not bill for services through the Master Temp Agency (the "Other Temp Agencies").  The Debtors pay the Master Temp Agency and the Other Temp Agencies approximately $2,000,000 a month.  The Debtors believe that they are current in their obligations to the Master Temp Agency and the Other Temp Agencies.  Out of an abundance of caution,

however, the Debtors seek authority to pay any outstanding amounts owed to the Master Temp Agency and the Other Temp Agencies.

## I.       Social Security, Payroll Taxes and Other Withholding

58.     The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include social security, FICA, federal and state income taxes, unemployment taxes, disability taxes, garnishments, charitable donations, and health care payments.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' bankruptcy estates.  Thus, the Debtors believe that they have authority to direct such funds to the appropriate parties in the ordinary course of business.

## I.       Direction to Banks

59.     Finally, the Debtors seek an order authorizing and directing the Debtors' banks to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any Prepetition Employee Obligations, and prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Prepetition Employee Obligations. The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

**APPLICABLE AUTHORITY**

**A.      The Proposed Payments Are Accorded Priority Under Bankruptcy Code
          Section 507**

60.      Bankruptcy Code sections 507(a)(4) and 507(a)(5) require that certain claims for prepetition wages, salaries, commissions, vacation, sick leave and employee benefit contributions be accorded priority in payment in an amount not to exceed $10,950 for each employee (to the extent such amounts accrued within 180 days of the Petition Date).  The overwhelming majority of the Employees are owed amounts under the statutory caps of Bankruptcy Code sections 507(a)(4) and 507(a)(5).  Thus, granting the relief requested is consistent with the Bankruptcy Code's purpose in ensuring employees are paid in full on account of the priority status of their claims, up to the statutorily imposed limit.

61.      Furthermore, the Debtors submit that no prejudice to creditors or other parties in interest would result from granting the relief requested herein. Specifically, concurrently herewith, the Debtors have filed a prepackaged plan of reorganization and accompanying disclosure statement. The plan provides that priority claims and general unsecured claims will be paid in full or otherwise reinstated on the effective date of the plan. Accordingly, irrespective of whether the Employees' compensation claims are priority claims or merely general unsecured claims, the Employees are entitled to payment in full for their prepetition claims and will receive no more pursuant to the relief requested herein than they would receive under the plan.

**B.      The Proposed Payments Are Appropriate Under Bankruptcy Code Section 363**

62.      Under Bankruptcy Code section 363(b), after notice and a hearing, a bankruptcy court may authorize a chapter 11 debtor to use property of the estate other than in the ordinary course of business.  Under Bankruptcy Code section 363(b), a court should authorize

28

non-ordinary course business transactions where the debtor has articulated a valid business justification for the requested use of estate assets.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  The payment of the Prepetition Employee Obligations serves the sound business purpose of maximizing the value of the Debtors' estates.  The Debtors' success in these cases hinges in large part on the morale and continued efforts of the Employees.  Through the payment of the Prepetition Employee Obligations, the Debtors seek to motivate and encourage the Employees to continue to support the Debtors' restructuring efforts.  Accordingly, this Court should grant the requested relief under Bankruptcy Code section 363.

**C.     The Payment Of The Prepetition Employee Obligations Is Appropriate Under Bankruptcy Code Section 541**

63.     The payment of the Employee Withholdings or payment of garnished wages will not prejudice the Debtors' estates because such withholdings are held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates under Bankruptcy Code section 541.  See Begier v. IRS, 496 U.S. 53 (1990).

**D.     The Debtors Should Be Authorized To Pay The Prepetition Employee Obligations Under Bankruptcy Code Sections 1107(a) And 1108**

64.     The Debtors, operating their businesses as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor-in-possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.

65.     Courts have noted that there are instances in which a debtor-in-possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  Id.  The CoServ court specifically noted that preplan satisfaction of prepetition claims would be a valid

exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498.

66.     Payment of the Prepetition Employee Obligations meets each element of the CoServ court's standard. As described above, the Employees likely maintain priority claims against the Debtors for the Prepetition Employee Obligations. In addition, any failure by the Debtors to pay the Prepetition Employee Obligations would negatively impact the morale of the Debtors' Employees at a critical time for the Debtors and their businesses. In short, the potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.

67.     With respect to the Employees, the Debtors have examined other options short of payment of the Prepetition Employee Obligations and have determined that to avoid significant disruption of the Debtors' business operations there exists no practical or legal alternative to payment of such obligations. Therefore, the Debtors can only meet their fiduciary duties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108 by payment of the Prepetition Employee Obligations.

**E.    Payment Of The Prepetition Employee Obligations Should Be Authorized Under Bankruptcy Code Section 105 And The Doctrine Of Necessity**

68.    The proposed payments of the Prepetition Employee Obligations should be authorized under Bankruptcy Code section 105 and under the "doctrine of necessity." Bankruptcy Code section 105 authorizes this Court to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).  For the reasons set forth herein, and in light of the critical need for the Debtors to preserve the value of their businesses in order to effect a successful reorganization through, among other things, preservation of the Debtors' workforce and its morale, payment of the wages and benefits as requested herein is proper in accordance with Bankruptcy Code section 105.

69.    Payment of the Prepetition Employee Obligations is further supported by the doctrine of necessity.  The doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor."  In re Ionosphere Clubs, Inc., 98 B.R. at 176; see also In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment);[16] In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the

---

[16]    The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in Miltenberger v. Logansport Ry. Co., 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  See id. at 309-14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in Miltenberger.  See In re Lehigh & New Eng. Ry., 657 F.2d 570, 581-82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

continued operation of the debtor."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

70. The doctrine of necessity is an accepted component of modern bankruptcy jurisprudence. See Just For Feet, 242 B.R. at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy debtor's business by refusing to deliver new inventory on eve of debtor's key sales season); In re Payless Cashways, Inc., 268 B.R. 543, 546-47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit); see also In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994); In re Ionosphere Clubs, Inc., 98 B.R. at 175. Moreover, courts have recognized the applicability of the doctrine of necessity with respect to the payment of prepetition employee compensation and benefits. See e.g., Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-89 (S.D.N.Y. 1987) (under "necessity of payment" doctrine, it is appropriate for bankruptcy court to defer to Debtors' business judgment in permitting payment of certain workers' compensation claims); In re Ionosphere Clubs, Inc., 98 B.R. at 176 ("This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.").

## F.     Immediate Relief Is Necessary To Avoid Immediate and Irreparable Harm

71. Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before

the filing of the petition . . ." Fed. R. Bankr. P. 6003(b). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For all the reasons set forth herein, the Debtors will suffer immediate and irreparable harm absent the Court's entry of an order granting the relief requested herein. Consequently, the relief requested herein is consistent with Bankruptcy Rule 6003. Accordingly, the order granting the relief requested herein should become effective and enforceable immediately notwithstanding Bankruptcy Rule 6004(h).

72. Accordingly, for all of the foregoing reasons, the Debtors submit that cause exists for granting the relief requested herein.

## NOTICE

73. Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to: (a) the United States Trustee for the Southern District of New York; (b) the United States Attorney for the Southern District of New York; (c) the Federal Reserve; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) those parties identified in the schedules of the largest unsecured creditors annexed to the Debtors' petitions; (g) counsel to Bank of America, N.A., as Administrative Agent and Collateral Agent under the Senior Credit Facility; (h) counsel to Bank of America, N.A. as L/C Issuer; and (i) Counsel to the Lender Steering Committee. The Debtors submit that under the circumstances no further notice is necessary.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request this Court enter an order,

substantially in the form annexed hereto, granting the relief requested in this Motion and such

other and further relief as may be just and proper.

Dated: New York, New York
       November 1, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    _/s/ Gregg M. Galardi_____
       Gregg M. Galardi
       J. Gregory St. Clair
       Four Times Square
       New York, New York 10036
       (212) 735-3000

       Proposed Counsel for Debtors and
        Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re:     :     Chapter 11
: 
CIT GROUP INC. and     :     Case No. 09-16565
CIT GROUP FUNDING COMPANY     : 
OF DELAWARE LLC,     : 
: 
         Debtors.     :     (Jointly Administered)
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER UNDER 11 U.S.C. §§ 105, 363(b), 507(a), 541, 1107(a) AND 1108, AUTHORIZING, BUT NOT DIRECTING, DEBTORS *INTER ALIA* TO MAINTAIN EMPLOYEE BENEFITS AND PAY PREPETITION WAGES AND COMPENSATION**

Upon consideration of the motion (the "Motion")[1] of the Debtors for entry of an interim order (the "Order"), under sections 105, 363(b), 507(a), 541, 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), (a) authorizing the Debtors to pay prepetition amounts owing to or for the benefit of current and former employees and retirees for compensation, benefits and reimbursable expenses, (b) authorizing the Debtors to continue postpetition, in the ordinary course of business, the employee-related plans, programs and policies in effect immediately prior to the filing of these cases, (c) confirming that the Debtors are permitted to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods, (d) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third-party providers under, employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their employees, and (e) directing all banks to honor prepetition checks for

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

payments made in satisfaction of any employee-related obligations authorized to be paid hereunder; and upon the First Day Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation thereon and sufficient cause appearing therefor, it is hereby

**FOUND that:**

1.      The relief granted by this Order is necessary to avoid immediate and irreparable harm to the Debtors.

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED on an interim basis as set forth in this Order.

2.      The Debtors are authorized to pay or otherwise honor the Prepetition Employee Obligations to, or for the benefit of, the Employees under the Employee Programs, provided, however that payments with respect to Employee compensation shall not exceed $10,950 per individual Employee.

3.      The Debtors are authorized to continue each of the Employee Programs, including but not limited to maintaining the Employee Benefits in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of these cases and to make payments in connection with expenses incurred in the administration of any Employee Program.

4.      The Debtors are authorized to continue (a) the employer match component of the 401(k) Plan and (b) the 401(k) Flexible Retirement Contribution.

5.     Notwithstanding anything contained in this Order, with respect to both Employees of the Debtors and the non-Debtors, until the earlier of confirmation of the Plan of Reorganization or further order of this Court, the Debtors are not authorized to make any payments related to the Guaranteed Bonuses, the Discretionary Bonuses, the Employee Severance Plan, the Legacy Severance Plan, the NERP, the Supplemental Plan, the SSP, or the DCP.

6.     Notwithstanding anything contained in this Order, with respect to both Employees of the Debtors and the non-Debtors, until the earlier of confirmation of the Plan of Reorganization or further order of this Court, the Debtors are not authorized to make further contributions into the Retirement Plan

7.     The Debtors are authorized to pay any and all local, state and federal withholding and payroll-related or similar taxes related to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and medicare taxes, whether such taxes relate to the period before or after the Petition Date.

8.     The Debtors are authorized to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for garnishments, benefit plans, insurance programs, and other similar programs.

9.     The Debtors are authorized to continue each of the Retired Employee Benefits in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Retired Employee Benefits were in effect immediately prior to the filing of these cases and to make payments in connection with expenses incurred in the administration of any Retired Employee Benefit.

10.     The Debtors are authorized to pay claims of the Benefit Administrators, in connection with administering and delivering payments or other benefits to Employees, on a postpetition basis for prepetition services rendered and claims for reimbursement based on prepetition disbursements made by the Benefit Administrators.

11.     The Debtors are authorized to pay any outstanding amounts owed to the Master Temp Agency and the Other Temp Agencies.

12.     The banks upon which any checks or wire transfers are drawn in payment of the Prepetition Employee Obligations, either before, on or after the Petition Date, are authorized and directed to receive, process, honor and pay any such checks or wire transfers; and such banks are authorized and directed to rely on the representations of the Debtors as to which checks and wire transfers are in payment of such obligations.  Further, the Debtors are authorized to issue new postpetition checks to replace any checks that may be dishonored and to reimburse any expenses that Employees may incur as a result of any bank's failure to honor a prepetition check.

13.     Any party receiving payment from the Debtors is authorized to rely upon the representations of the Debtors as to which payments are authorized by this Order.

14.     Neither the provisions of this Order, nor any payments made or not made by the Debtors pursuant to this Order, shall be deemed an assumption or rejection of any Employee benefit plan, program or contract, or otherwise affect the Debtors' rights under Bankruptcy Code section 365 to assume or reject any executory contract between the Debtors and any Employee.

15.     Notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in this Order shall create any rights in favor of, or enhance the status of any

claim held by, any Employee or Benefit Administrator. The authorizations granted to the Debtors herein are permissive and not obligatory, and the Debtors may, in the exercise of their discretion, determine whether or not to make any of the payments authorized hereunder.

16.     Any objections to entry of a final order on the Motion must be (a) filed with the Court no later than 4:00 p.m. (prevailing Eastern time) on                    , 2009 (the "Objection Deadline") and (b) served so as to be actually received by the following parties by the Objection Deadline: (i) CIT Group Inc., 1 CIT Drive, Livingston, New Jersey 07039 (Attn: Eric Mandelbaum); (ii) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Attn: Gregg M. Galardi and J. Gregory St. Clair); (iii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul K. Schwartzberg); (iv) those parties identified in the schedules of the largest unsecured creditors annexed to the Debtors' petitions; (v) counsel to Bank of America, N.A., as Administrative Agent and Collateral Agent under the Senior Credit Facility; (vi) Counsel to the Lender Steering Committee; and (vii) counsel to any official committee(s) appointed in these cases.

17.     A hearing will be held on                    at           (prevailing Eastern Time) to consider the relief requested in the Motion on a final basis (the "Final Hearing") and, pending entry of an order following the conclusion of the Final Hearing, the relief granted herein shall remain in effect on an interim basis. If no objection to the relief requested in the Motion on a permanent basis is received by the Objection Deadline, the Debtors may present to the Court a final Order with respect to the relief requested in the Motion without the need for a Final Hearing.

18.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the content of the Motion or otherwise deemed waived.

19.     Notwithstanding the possible applicability of Bankruptcy Rule 6004, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

20.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:      New York, New York
                                    , 2009

_____
UNITED STATES BANKRUPTCY JUDGE