SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Gregg M. Galardi
J. Gregory St. Clair

Proposed Counsel for Debtors and
  Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CIT GROUP INC. and | : | Case No. 09-16565 |
| CIT GROUP FUNDING COMPANY | : | |
| OF DELAWARE LLC, | : | |
| | : | |
| Debtors. | : | (Motion for Joint Administration Pending) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 362, 363 AND 364 AND FED. R. BANKR. P. 2002 AND 4001 AND LOCAL BANKR. R. 4001-2 (I) AUTHORIZING CIT GROUP INC. TO ENTER INTO A NEW SECURED LETTER OF CREDIT FACILITY AND (II) SCHEDULING FINAL HEARING

        The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors"),[1] hereby move this Court (the "Motion") for entry of interim and final orders,

under sections 105(a), 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[1]   CIT Group Inc. ("CIT") is located at 505 Fifth Avenue, New York, NY 10017. Its tax identification number is 65-xxx1192. In addition to CIT Group, Inc., CIT Group Funding Company of Delaware LLC, Case No. 09-16566, is a debtor in these related cases. CIT Group Funding Company of Delaware LLC is located at 1 CIT Drive, Livingston, NJ 07039. Its tax identification number is 98-xxx9146.

Rules"), and Rule 4001-2 of Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules") authorizing CIT to (i) enter into a new $500 million secured letter of credit facility from Bank of America, N.A., as issuing bank ("Bank of America"), and (ii) schedule a final hearing with respect to the relief requested herein. In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and Various First Day Applications and Motions (the "First Day Declaration") filed concurrently herewith under Local Bankruptcy Rule 1007-2.[2] In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 362, 363 and 364; Bankruptcy Rules 2002 and 4001; and Local Bankruptcy Rule 4001-2.

## BACKGROUND

2.       On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

First Day Declaration. The Debtors continue to manage and operate their businesses as debtors-in-possession under Bankruptcy Code sections 1107 and 1108.

3. Prepetition, CIT and certain related entities had access to several letter of credit facilities, which they used to issue letters of credit on behalf of their borrowers and drew on in support of their own general business needs. First, there is a $750 million standby letter of credit facility extended by a syndicate of approximately 27 banks, with JPMorgan Chase Bank, N.A. being the lead bank in the facility ("JPM L/C Facility"). As of the Petition Date, the Debtors had drawn approximately $350 million on the JPM L/C Facility. The JPM L/C Facility is secured by $100.0 million in amount of cash collateral.

4. The JPM L/C Facility expires in May 2010, but most of the letters of credit that are written under this facility require one year commitments. As a result, the JPM L/C Facility is not sufficient to satisfy CIT's business needs. Furthermore, the banks that provide the JPM L/C Facility would not allow CIT to extend the maturity of the facility without first cash collateralizing all of the outstanding letters of credit. Thus, although JP Morgan was one of the institutions initially considered by CIT for its new letter of credit facility, CIT accordingly determined in its business judgment that the L/C Facility was the best option.

5. Second, there are several individual pre-petition documentary and commercial letters of credit and private label letter of credit facilities (together with the JPM L/C Facility, the "Prepetition L/C Facilities") that are collateralized by the assets held in collateral accounts at these banks or in investment accounts at affiliates of these banks. These letters of credit are not given under a set or committed capacity. The banks that have been issuing these letters of credit have not been amenable to rolling or extending additional capacity to CIT.

6.	Also prior to the Petition Date, on July 20, 2009 CIT entered into a senior secured term loan facility, as amended and restated on July 29, 2009 and as further amended on August 3, 2009, August 31, 2009 and October 1, 2009, for up to $3 billion (the "Senior Credit Facility").  As of August 4, 2009, CIT and certain of its subsidiaries that are borrowers under the Senior Credit Facility (collectively, the "Senior Credit Facility Borrowers") had drawn the entire $3 billion in financing under the Senior Credit Facility.  CIT and all of its current and future domestic wholly owned subsidiaries, with the exception of CIT Bank and other regulated subsidiaries, special purpose entities, and immaterial subsidiaries, are guarantors of the Senior Credit Facility (the "Senior Credit Facility Guarantors").

7.	The Senior Credit Facility is governed by the terms of the Second Amended And Restated Credit And Guaranty Agreement (the "Senior Credit Facility Agreement") among the Senior Credit Facility Borrowers, the Senior Credit Facility Guarantors, Bank of America, as Administrative Agent and Collateral Agent, and the other lenders party thereto (the "Senior Credit Facility Lenders").  Immediately prior to the Petition Date, the Senior Credit Facility Agreement was amended to add a new tranche of multiple-draw senior secured term loans in an aggregate principal amount equal to up to $4.5 billion, to be used to effect the restructuring proposed in these chapter 11 cases.  The Senior Credit Facility is secured by a perfected lien on substantially all unencumbered assets of the Senior Credit Facility Borrowers and Senior Credit Facility Guarantors (other than CIT).

8.	The L/C Facility (defined below) would efficiently fill the voids created by CIT's inability to fully access the Prepetition L/C Facilities.  As described below, the L/C Facility serves an integral role in the continued operation of CIT's business.

## RELIEF REQUESTED

9.    Bank of America has agreed to provide to CIT and certain of its non-debtor subsidiaries a new $500 million senior secured credit facility for the issuance of standby and documentary letters of credit (the "L/C Facility").  The Borrowers (defined below) intend to use the L/C Facility to support obligations and commitments of themselves and their respective subsidiaries.  The L/C Facility is secured by a perfected senior priority security interest in unencumbered cash deposited into collateral accounts controlled by the Administrative Agent (as defined below) under the L/C Facility.

10.    A copy of the L/C Agreement among CIT, certain of its non-debtor subsidiaries, as borrowers (the "Subsidiary Borrowers" and, collectively, together with CIT, the "Borrowers"), certain of its non-debtor subsidiaries, as guarantors (collectively, the "Guarantors"), Bank of America, N.A., acting as Administrative Agent (in such capacity, the "Administrative Agent") and L/C Issuer (in such capacity, the "L/C Issuer"), and Banc of America Securities LLC, as sole lead arranger and sole bookrunner (the "L/C Agreement"), is attached hereto in substantially final form as Exhibit A.

11.    By this Motion, the Debtors request, pursuant to Bankruptcy Code sections 105, 362, 363, 364(c)(1), 364(c)(2) and 364(e), entry of interim and final orders (respectively, the "Interim Order" and the "Final Order" and together the "Orders") authorizing and/or approving, inter alia, the following:

(a)    authorizing CIT to obtain postpetition financing consisting of secured letters of credit in an aggregate principal or face amount of (i) up to $125 million pursuant to an Interim Order and (ii) up to $500 million pursuant to a Final Order, in accordance with the terms and conditions set forth in the L/C Agreement;

(b)    granting the Administrative Agent a non-voidable exclusive perfected security interest in cash collateral and any other amounts deposited in

deposit accounts controlled by the Administrative Agent (the "Cash Collateral") to secure the post-petition obligations under the L/C Facility;

(c) granting the Administrative a superpriority claim against CIT to secure the post-petition obligations under the L/C Facility having priority over all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Cash Management Order and any superpriority claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the Senior Secured Lenders under section 5.21 of the Senior Credit Facility Agreement, in each case which claims may be pari passu with the superpriority claims of the Administrative Agent under the L/C Agreement); and

(d) scheduling a hearing to consider entry of the Final Order (the "Final Hearing") and approving notice with respect thereto.

## TERMS OF THE L/C FACILITY

12. Pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2, the

Debtors submit the following concise statement of the material terms of the L/C Agreement:[3]

a) <u>Borrowers</u>. CIT and certain non-debtor subsidiaries of the Company, which initially shall include: The CIT Group/Business Credit, Inc., The CIT Group/Commercial Services, Inc., CIT Loan Corporation (formerly The CIT Group/Consumer Finance, Inc.), The CIT Group/Equipment Financing, Inc., CIT Healthcare LLC, CIT Capital USA Inc. and CIT Lending Services Corporation (together with the Company and any additional non-debtor subsidiaries designated in accordance wit the terms and conditions of the L/C Facility in the future, the "Borrowers").

b) <u>Guarantors</u>. CIT and all material current and future domestic wholly-owned subsidiaries of the Borrowers with the exception of CIT Group Funding Company of Delaware LLC, CIT Bank and other regulated subsidiaries, special purpose entities and immaterial subsidiaries. All guarantees will be guarantees of payment and not of collection.

---

[3] Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the L/C Agreement.

c)    <u>L/C Facility</u>.  A $500 million senior secured credit facility for the issuance of standby and documentary letters of credit by the L/C Issuer for the account of the Borrowers.  <u>See</u> L/C Agreement Section 2.01(a).

d)    <u>L/C Issuer and Administrative Agent</u>.  Bank of America, N.A.  <u>See</u> L/C Agreement Section 11.01.

e)    <u>Sole Lead Arranger and Sole Bookrunner</u>.  Banc of America Securities LLC

f)    <u>Maturity</u>.  The commitments in respect of the L/C Facility will terminate on the date (the "<u>Termination Date</u>") which is 18 months after the Closing Date (or, if such date is not a business day, the next preceding business day); provided that, subject to the written consent of the Borrowers and the L/C Issuer, on the date which is three months after the Closing Date and on each date that is three months thereafter, the Termination Date may be extended by an additional three months.  <u>See</u> L/C Agreement Section 2.09(a).

g)    <u>Purpose</u>.  Letters of Credit may be used solely to support obligations and commitments of the Borrowers and their respective subsidiaries.  Letters of Credit shall be issued in favor of third party beneficiaries.  <u>See</u> L/C Agreement Section 7.09.

h)    <u>Currency</u>:  Letters of Credit may be issued in U.S. Dollars, Sterling or Euros or other foreign currencies, including Thai Baht, Hong Kong Dollars, Canadian Dollars, Mexican Peso and Indian Rupee, reasonably acceptable to the L/C Issuer.  <u>See</u> "Alternative Currency," Section 1.01.

i)    <u>Expiration</u>:  Each Letter of Credit shall expire not later than the earlier of (i) 12 months after its date of issuance and (ii) the fifth day prior to the Termination Date (or, if such date is not a business day, the next preceding business day); *provided* that, subject to the discretion of the L/C Issuer, a Letter of Credit may provide that it shall automatically renew for additional periods subject to limitations to be set forth in the definitive documentation.  <u>See</u> L/C Agreement Sections 2.01(a)(ii) and (b)(iii).

j)    <u>Perfected Lien on Cash Collateral</u>:  The L/C Facility will be secured by an exclusive perfected security interest in U.S. Dollar-denominated cash to be deposited in deposit accounts controlled by the Administrative Agent (the "<u>Cash Collateral</u>")

pursuant to arrangements satisfactory to the Commitment Parties. The amount of cash that is part of the Cash Collateral shall be at all times at least (i) 105% of the Utilized Exposure in respect of U.S. Dollar-denominated Letters of Credit, plus (ii) 115% of the Utilized Exposure in respect of Letters of Credit denominated in Euro or Sterling, plus (iii) 120% of the Utilized Exposure in respect of Letters of Credit denominated in a permissible currency other than U.S. Dollars, Euro or Sterling (the "Collateral Requirement"). See L/C Agreement Section 4.02.

k)   Superpriority Claim:  The claims of the Administrative under the L/C Agreement shall be allowed superpriority claims in the case of CIT pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Cash Management Order and any superpriority claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the Senior Secured Lenders under section 5.21 of the Senior Credit Facility Agreement, in each case which claims may be pari passu with the superpriority claims of the Administrative Agent under the L/C Agreement);

l)   Material Conditions to Closing:  In addition to further conditions set forth more fully in the L/C Agreement, the closing of the L/C Facility is conditioned upon the Court's entry of and the continued effectiveness of the Interim Order and the payment of all fees contemplated by the L/C Agreement.  See L/C Agreement Section 5.01(a).

m)   Conditions to Each Issuance.  The issuance, amendment or extension of each Letter of Credit shall be subject to the following conditions and to customary conditions of the Issuing Bank for issuance of letters of credit:

(i)   absence of a default or event of default;

(ii)   accuracy of all representations and warranties in all material respects (except that representations and warranties that are qualified by materiality shall be true and correct in all respects) on and as of such credit date as though made on and as of such date (except to the extent that representations and warranties specifically relate to an earlier date, on and as of such earlier date);

(iii)     receipt of a letter of credit application and other customary documents required by the L/C Issuer;

(iv)     after giving effect to such issuance, the Total Outstandings shall not exceed the aggregate commitments under the L/C Facility;

(v)     After giving pro forma effect to such Credit Extension, and the delivery of any required Eligible Collateral to any Collateral Account, the Credit Parties shall be in compliance with Section 8.01(b) and Section 8.02(b)(xxiii).

(vi)     The Collateral Requirement shall be satisfied;

(vii)     In the case of a Credit Extension to be denominated in an Alternative Currency, there shall not have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of the Administrative Agent or the L/C Issuer would make it impracticable for such Credit Extension to be denominated in the relevant Alternative Currency.

(viii)     all fees payable in connection with the issuance of such Letter of Credit have been paid; and

(ix)     if the effective date of the Approved Restructuring Plan shall not have occurred, the Interim Order or, after the Interim Period, the Final Order (x) shall not have been reversed or vacated, (y) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Commitment Parties and (z) shall not be stayed at such time.

See L/C Agreement Section 5.02.

n)     Drawings:  If there is a drawing under a Letter of Credit, the Borrowers shall reimburse the Issuing Bank for such drawing, for commercial Letters of Credit, on the date of such drawing and, for standby Letters of Credit, within two business days of such drawing.  Any payment from the Collateral shall be consistent with the terms of the Interim Order or, after the Interim Period, the Final Order.  If the L/C Issuer is not so reimbursed within such period, or any fees or accrued interest are not paid when due, the L/C Issuer shall be entitled to effect payment of such amounts from the Collateral.  The Borrowers shall pay interest to the L/C Issuer on the amount of each drawing until reimbursed (either by the Borrowers or from the Cash Collateral) at a rate equal to the Eurocurrency Rate for the first two business days following the drawing and at the Default Rate thereafter.  See L/C Agreement Section 2.01(c).

o) <u>Representations and Warranties; Affirmative, Negative and Financial Covenants; and Events of Default</u>: Substantially similar to the Senior Credit Facility, as modified to reflect the terms of the L/C Facility. Significant events of default include (i) an event of default (after any applicable grace periods) under the Senior Credit Facility and (ii) an event of default if any of the Financing Orders shall have been (x) subject to a pending appeal or motion for leave to appeal, reversed or vacated, (y) amended, supplemented or otherwise modified without the prior written consent of the Commitment Parties or (z) stayed. <u>See</u> L/C Agreement Sections 10.01(b) and 10.01(p).

p) <u>Relief from Stay.</u> Consistent with the terms of the L/C Agreement and subject to any notice requirements contained therein, the automatic stay will be lifted without further court order to permit the enforcement of any remedies under the L/C Facility against CIT, including without limitation enforcement against the Cash Collateral. <u>See</u> Interim Order ¶ 8.

q) <u>506(c) Waiver</u>. The Debtors will waive their right to seek surcharge of the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code. <u>See</u> Interim Order ¶ 5.

r) <u>Fee Basis</u>: All fees will be calculated on the basis of a year of 360 days and the actual number of days elapsed. <u>See</u> L/C Agreement Section 2.04.

s) <u>Commitment Fee</u>: The Borrowers shall pay a fee (the "<u>Commitment Fee</u>") of 1.50% per annum on the Unutilized Exposure under the L/C Facility. The Commitment Fee shall accrue from the Closing Date to the date of termination of commitments under the L/C Facility, and shall be payable monthly in arrears and upon termination of commitments. "<u>Unutilized Exposure</u>" means (i) the aggregate commitments under the L/C Facility less (ii) the Utilized Exposure. <u>See</u> L/C Agreement Section 2.03(a).

t) <u>Utilization Fee</u>: The Borrowers shall pay a utilization fee (the "<u>Utilization Fee</u>") equal to 3.50% per annum on the Utilized Exposure under the L/C Facility. The Utilization Fee shall accrue from the date of initial issuance of a Letter of Credit under the L/C Facility to the date on which all Letters of Credit under the L/C Facility have expired or been terminated, and shall be pay-able monthly in arrears and upon termination of the L/C Facility. "<u>Utilized Exposure</u>" means (i) the aggregate undrawn face amount of Letters of Credit outstanding plus (ii)

the aggregate drawn and unreimbursed amount of Letters of Credit outstanding.  <u>See</u> L/C Agreement Section 2.03(b).

u)    <u>Default Rate</u>:  During an event of default under the L/C Facility, the Commitment Fee and the Utilization Fee shall be increased by 200 basis points and all other obligations shall accrue interest at a rate equal to the Base Rate (to be defined as the highest of (a) the Bank of America prime rate, (b) the Federal Funds rate plus 0.50% and (c) the Eurocurrency Rate plus 1.00%) plus 200 basis points.  <u>See</u> L/C Agreement Sections 2.03(a) and (b).

v)    <u>Issuance Fee</u>:  The Borrowers shall pay a fee of $1,500 for each letter of credit issued pursuant to the L/C Facility.  In addition, customary administrative, amendment, payment and negotiation charges shall be payable to the L/C Issuer.  <u>See</u> L/C Agreement Section 2.03(c).

w)    <u>Change of Control</u>: The L/C Agreement includes standard prohibitions on a change of control by CIT, unless such change of control is pursuant to the Approved Restructuring Plan.  <u>See</u> L/C Agreement Section 10.01(i).

x)    <u>Funding of Non-Debtor Entities</u>:  Obligations under the L/C Agreement including, but not limited to, obligations to provide the Cash Collateral, will be funded by the non-Debtor Borrowers either directly or by pass-through of such funds through CIT, consistent with the Debtors' continued cash management system as set forth more fully in the Debtors' Motion for Order under 11 U.S.C. §§ 345, 363 and 553 Authorizing (I) Continued Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, (III) Continued Use of Existing Business Forms, (IV) Waiver of Investment and Deposit Requirements, (V) Preservation and Exercise of Inter-company Setoff Rights, and (VI) Grant of Administrative Status for Postpetition Inter-company Transactions (the "<u>Cash Management Motion</u>").

y)    <u>Release of Senior Credit Facility Liens in Cash Collateral</u>. Pursuant to Section 10.20 of the Senior Credit Facility Agreement, upon the posting of the Cash Collateral to secure the obligations of the Borrowers under the L/C Facility, the liens of the Senior Secured Lenders under the Senior Credit Facility on the Cash Collateral will be automatically released and will be of no further force or effect and upon such release, the L/C Liens will be the only security interests existing in the Cash Collateral.

**BASIS FOR RELIEF**

13.     CIT needs a comprehensive letter of credit facility because of the sheer volume and monetary amount of the letters of credit that are routinely needed in the ordinary course of its business.  In the absence of immediate authorization of the L/C Facility, CIT could not continue to operate its business without interruption and immediate and irreparable harm would occur.

**A.      Efforts to Obtain Financing**

14.     The difficulty in obtaining debtor-in-possession financing in the current credit and capital markets environment is manifest.  Nevertheless, CIT and its investment banker, Evercore Partners ("Evercore"), evaluated all realistic options for obtaining necessary financing. Evercore is a well-qualified advisory firm with substantial experience in negotiating and structuring debtor-in-possession facilities.

15.     In the weeks leading up the filing of these cases, CIT and Evercore approached various sources of post-petition financing and sought additional financing from both new and existing lenders.  CIT and its investment banker evaluated all realistic options for obtaining the necessary financing and determined that, due to the size of the letter of credit facility needed, only a limited number of banking institutions are capable of providing the Borrowers with a sufficient letter of credit facility.  From that group, CIT then determined in the exercise of its business judgment that the best provider of a letter of credit facility would be Bank of America.

16.     It was clear from the outset that no entity would consider providing CIT with postpetition financing without some form of security.  Put simply, CIT was unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), unsecured credit allowable under Bankruptcy Code

sections 364(a) and 364(b), or even secured credit pursuant to Bankruptcy Code section 364(c) on terms and conditions more suitable and favorable to the estate than those offered by Bank of America under the L/C Facility.

17.     The L/C Facility is the product of active and arms' length bargaining between the Borrowers, on the one hand, and Bank of America, on the other hand.  CIT believes that the terms of the L/C Facility are the best available in the current credit market, particularly in light of the Borrowers' financing condition and in consideration of the amount of availability needed.  Agreeing to the terms in the L/C Facility reflects CIT's exercise of prudent business judgment consistent with its fiduciary duties.  Accordingly, the financing offered by Bank of America under the L/C Facility is in the best interests of the Borrowers and CIT's estate.

**B.     Interim Approval of the L/C Facility is Necessary to Prevent Immediate and Irreparable Harm**

18.     The availability of letters of credit is fundamental to CIT's business. Letters of credit are used in many of CIT's businesses. They are particularly important to support CIT's trade finance business.  CIT's trade finance business offers a full range of domestic and international services primarily involving accounts receivable.  These services include working capital and term loans, factoring, receivables purchasing, receivable management services, bulk purchases of accounts receivable, import and export financing, and letters of credit programs.  A substantial part of this segment's business is in the form of "factoring" or receivables purchasing — that is, the purchase of accounts receivable for a fee commensurate with projected sales volume, the underlying degree of credit risk and recourse.

19.     It would be catastrophic to CIT, its subsidiaries and its clients if CIT is prevented, for any period of time, from getting letters of credit opened during the course of the bankruptcy case.  For example, many of the clients of CIT's trade finance business are importers

and the foreign vendors to these importers require the importer to purchase products through documentary letters of credit. Without letters of credit, the importer will be unable to fulfill its obligations to its buyers, who are typically retailers. If there is any sort of disruption, those clients that can quickly find another factor will terminate their business relationship with CIT. Those clients that cannot quickly find another factor could go out of business.

20.     In addition, letters of credit are used by CIT's Corporate Finance business unit, especially in relation to middle market lending where CIT is often the lead lender among a small group of lenders. Many of these loans call for CIT to provide letters of credit under a credit agreement to support the ongoing business needs of these clients. Finally, CIT also intends to use the L/C Facility to support its own corporate needs such as insurance requirements.

21.     In any of these situations, the lack of a readily-accessible L/C Facility will cause immediate and irreparable harm to CIT, its subsidiaries, its employees, its clients, its creditors, retailers and even consumers at large because, for example, CIT's trade finance business supports a large percentage of the US apparel industry. CIT's clients are mainly small and middle market businesses, the very type of businesses that our government says the credit needs of which are being underserved currently by US banks and finance companies. See Weekly Radio Address by President Obama, dated October 24, 2009, found at www.whitehouse.gov ("But while credit may be more available for large businesses, too many small business owners are still struggling to get the credit they need.").

22.     CIT anticipates that it will require approximately $125 million of availability under the L/C Facility to adequately serve its business needs during the first three weeks of this bankruptcy case. CIT's need for letters of credit arises on a continuous and

frequent basis and CIT is unable to determine with certainty the amount of availability it will need over the next few weeks. CIT's management, with the assistance of its financial advisors, has used its best efforts to determine the appropriate amount of availability that is needed to meet CIT's business needs, both in the interim and over the term of the L/C Facility.

23.     As described above, the failure to secure an adequate letter of credit facility at this time would cause immediate and irreparable harm to CIT's business and could cause a devastating ripple effect through our economy, immediately prior to the biggest retail season of the year.

## APPLICABLE AUTHORITY

24.     Pursuant to Bankruptcy Code section 364(c), if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt: (a) with priority over any or all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b); or (b) that is secured by a lien on property of the estate that is not otherwise subject to a lien. See 11 U.S.C. § 364(c).

25.     Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2). The Debtors are seeking entry of the Interim Order to avoid immediate and irreparable harm. Without the relief requested in the Interim Order, CIT and its subsidiaries will suffer immediate and irreparable harm, because it will no longer be able to

operate in the ordinary course of business and may be forced to cease operations. Accordingly, the Court is authorized to grant the relief requested herein.

**(1)     The L/C Agreement Should be Approved**

        26.     CIT was unable to obtain adequate postpetition financing in the form of unsecured credit or unsecured debt with an administrative priority. The circumstances of these cases instead require CIT to obtain financing under Bankruptcy Code section 364(c). CIT engaged in an extensive process prior to the Petition Date to identify potential sources of postpetition financing. CIT contacted multiple potential lenders and based on their discussions with the potential lenders, determined that postpetition financing on an unsecured basis is unobtainable. Under these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Rather, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections of section 364(c) and (d). Id.; see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (holding that debtor made reasonable effort to secure financing when it approached four lending institutions for financing, was rejected by two, and selected the least onerous financing option from the remaining two lenders). CIT's good faith efforts to obtain postpetition financing satisfy this standard.

        27.     Having determined that financing was available only under Bankruptcy Code section 364(c), CIT negotiated the L/C Facility at arm's length and pursuant to its business judgment, which is to be accorded deference so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code. Courts routinely defer to the debtor's business judgment with respect to most business decisions, including the decision to borrow money, provided that this judgment is not arbitrary, capricious, or contrary to the provisions and policies

underlying the Bankruptcy Code.  See, e.g.,  In re Ames Dep't Stores, 115 B.R. at 40 (in

analyzing the debtors' request for approval of a postpetition financing agreement, court noted

that "[t]hese cases consistently reflect that the court's discretion under section 364 is to be

utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or

its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); In re

Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (in authorizing interim financing

agreement, court noted that "[b]usiness judgments should be left to the board room and not to

this Court").

           28.     To the extent the Debtors use estate funds to satisfy obligations under the

L/C Facility (or transfers of funds to the Debtors from non-Debtor affiliates of the Debtors to

enable the Debtors to satisfy obligations under the L/C Facility give rise to superpriority

intercompany claims as set for in the Cash Management Motion), the Debtors believe that such

use of estate property, to the extent not in the ordinary course of business, is appropriate under

section 363(b)(1) of the Bankruptcy Code.  Bankruptcy Code section 363(b)(1) permits a debtor-

in-possession to use property of the estate "other than in the ordinary course of business" after

notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course

of business may be authorized if the debtor demonstrates a sound business justification for it.

See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071

(2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant

debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R.

169, 178-79 (D. Del. 1991).  The court should not second guess a debtor's business decision

when that decision involves "a business judgment made in good faith, upon a reasonable basis,

and within the scope of [the debtor's] authority under the [Bankruptcy] Code." In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); see also In re Ames Dep't Stores, 115 B.R. at 40. Applying "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

29. The proposed L/C Facility is required to preserve and maintain CIT's going concern value and is, therefore, in the best interests of CIT's estate and creditors. The availability of credit under the L/C Facility is necessary to allow CIT to continue to operate its business. Immediate availability under the L/C Facility will minimize disruption to CIT's business and ongoing operations, and avoid immediate and irreparable harm to CIT, its creditors, its business, and its assets.

30. The terms and conditions of the L/C Agreement are fair, reasonable, and appropriate, and were extensively negotiated by the parties in good faith and at arms' length. Notably, the L/C Facility does not seek to prime any existing liens because pursuant to Section 10.20 of the Senior Credit Facility Agreement, upon the posting of the Cash Collateral to secure the obligations of the Borrowers under the L/C Facility, the liens of the Senior Secured Parties under the Senior Credit Facility on the Cash Collateral will be automatically released and will be of no further force or effect and upon such release, the L/C Liens will be the only security interests existing in the Cash Collateral. Further, the L/C Facility does not contain other extraordinary features such as cross-collateralization or a roll-up of prepetition debt.

31.     The various fees and charges required under the L/C Facility are reasonable and appropriate under the circumstances.

32.     In CIT's business judgment, the terms of the L/C Facility represent the best financing option to support and advance CIT's reorganization efforts.  Accordingly, the terms and conditions of the L/C Agreement, which were negotiated by the parties at arms length, are fair and reasonable, and Bank of America should be accorded the benefits of Bankruptcy Code section 364(e) in respect of the L/C Agreement.

33.     Based upon the foregoing, the Debtors respectfully request that the Court approve the L/C Facility in accordance with the terms of the Orders and L/C Agreement.

## C.      Approval of Modification of the Automatic Stay

34.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The L/C Agreement contemplates modification of the automatic stay to provide for the automatic vacation of the automatic stay to permit the enforcement of any remedies under the L/C Facility against CIT including, without limitation, enforcement against the Cash Collateral consistent with the terms of the L/C Facility Documents and subject to any notice requirements set forth therein.

35.     Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities (especially letter of credit facilities) and, in CIT's business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Orders.

## D.      Interim Approval of the L/C Agreement Should be Granted

36.     As set forth above, Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit under Bankruptcy Code section 364 may not be commenced earlier

than 15 days after the service of such motion. Upon request, however, pursuant to Bankruptcy Rules 4001(c), the Court is empowered to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable to the debtor's estate.

37.     As described in detail above, CIT requires the immediate use of the L/C Facility to ensure CIT's continued viability. In the absence of an immediate postpetition letter of credit facility, CIT's ability to preserve the value of their businesses and assets will be immediately and irreparably jeopardized, resulting in significant harm to CIT's estate and creditors. Thus, the limited use of the L/C Facility is necessary to avoid immediate and irreparable damage to CIT's estate, and the Debtors submit that interim relief is appropriate.

38.     Further, the Debtors seek a waiver of any stay of the effectiveness of any orders approving this Motion. Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). For all the reasons set forth herein, CIT will suffer immediate and irreparable harm absent the Court's entry of an order granting the relief requested herein. Accordingly, the orders granting the relief requested herein should become effective and enforceable immediately notwithstanding Bankruptcy Rule 6004(h), to the extent that it applies.

39.     Therefore, the Debtor requests that the Court enter the proposed Interim Order authorizing CIT to borrow up to $125 million under the L/C Facility prior to entry of the Final Order. This relief will enable CIT to operate its business in the ordinary course and avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

**F.      Establishing Notice Procedures and Scheduling the Final Hearing**

40.      Notice of this Motion has been provided by facsimile, electronic transmission, overnight delivery or hand delivery to: (a) the United States Trustee for the Southern District of New York; (b) the United States Attorney for the Southern District of New York; (c) the Federal Reserve; (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) those parties identified in the schedules of the largest unsecured creditors annexed to the Debtors' petitions; (g) counsel to Bank of America, N.A., as Administrative Agent and Collateral Agent under the Senior Credit Facility; (h) counsel to Bank of America, N.A. as L/C Issuer; and (i) Counsel to the Lender Steering Committee (collectively, the "Initial Notice Parties"). The Debtors submit that under the circumstances no further notice is necessary.

41.      The Debtors further respectfully request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to: (a) the Initial Notice Parties, (b) counsel to any statutory committees appointed in these chapter 11 cases, and (c) any party who filed a request for notices in these chapter 11 cases pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Order for the Final Hearing. The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

WHEREFORE, the Debtors respectfully request that this Court (i) enter the Interim Order, substantially in the form annexed hereto, granting the relief requested in this Motion; (ii) schedule the Final Hearing to consider entry of the Final Order enter a Final Order; (iii) grant such other and further relief as may be just and proper.

Dated: New York, New York
      November 1, 2009

                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP

By:    */s/ Gregg M. Galardi*
            Gregg M. Galardi
            J. Gregory St. Clair
            Four Times Square
            New York, New York 10036
            (212) 735-3000

            Proposed Counsel for Debtors and
            Debtors-in-Possession

# Exhibit A

**$500,000,000 LETTER OF CREDIT AGREEMENT**

Dated as of [_____ _____], 2009

among

**CIT GROUP INC.,**
a Debtor and Debtor-in-Possession,

and

**CERTAIN SUBSIDIARIES OF CIT GROUP INC.**

and

**BANK OF AMERICA, N.A.,**

as Administrative Agent and L/C Issuer,

and

The Other Lenders Party Hereto

**BANC OF AMERICA SECURITIES LLC,**

as

Sole Lead Arranger and Sole Bookrunner

# TABLE OF CONTENTS

## ARTICLE 1
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01. *Defined Terms* ...................................................................... 2
Section 1.02. *Other Interpretive Provisions* ..................................................... 42
Section 1.03. *Accounting Terms.* .................................................................. 43
Section 1.04. *Rounding* ............................................................................ 43
Section 1.05. *Exchange Rates; Currency Equivalents* ........................................ 43
Section 1.06. *Additional Alternative Currencies* .............................................. 44
Section 1.07. *Change of Currency* ................................................................ 45
Section 1.08. *Times of Day* ....................................................................... 45
Section 1.09. *Letter of Credit Amounts* ......................................................... 45

## ARTICLE 2
### THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01. *Letters of Credit.* .................................................................. 46
Section 2.02. *Termination or Reduction of Commitments* .................................. 56
Section 2.03. *Fees.* ................................................................................. 56
Section 2.04. *Computation of Interest And Fees* .............................................. 57
Section 2.05. *Evidence of Debt* ................................................................... 58
Section 2.06. *Payments Generally; Administrative Agent's Clawback.* .................. 58
Section 2.07. *Sharing of Payments by Lenders* ............................................... 60
Section 2.08. *Designated Borrowers.* ............................................................ 60
Section 2.09. *Extension of Maturity Date.* ..................................................... 62
Section 2.10. *Priority and Liens* ................................................................. 64
Section 2.11. *No Discharge; Survival of Claims* .............................................. 64
Section 2.12. *Assumption Upon Emergence* ................................................... 64

## ARTICLE 3
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01. *Taxes.* ................................................................................ 65
Section 3.02. *Increased Costs; Reserves on Eurocurrency Rate Obligations.* ...... 70
Section 3.03. *Compensation for Losses* ......................................................... 72

i

Section 3.04. *Mitigation Obligations*; *Replacement of Lenders.* ........................ 73
Section 3.05. *Survival* ...................................................................................... 74

## ARTICLE 4
COLLATERAL SECURITY

Section 4.01. *Security of the Borrowers* ............................................................ 74
Section 4.02. *Security Interest* ......................................................................... 74
Section 4.03. *Additional Obligations* ............................................................... 75
Section 4.04. *Certain Rights and Duties of Administrative Agent and Lenders* ...................................................................................... 75
Section 4.05. *Power of Attorney, etc* ............................................................... 75
Section 4.06. *Release of Collateral* .................................................................. 76
Section 4.07. *Optional Collateral Deliveries* .................................................... 77

## ARTICLE 5
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 5.01. *Conditions of Initial Credit Extension* .......................................... 77
Section 5.02. *Conditions Precedent to All Credit Extensions* ............................. 80

## ARTICLE 6
REPRESENTATIONS AND WARRANTIES

Section 6.01. *Organization*; *Requisite Power and Authority*; *Qualification* ....... 81
Section 6.02. *Capital Stock and Ownership* ...................................................... 82
Section 6.03. *Due Authorization* ...................................................................... 82
Section 6.04. *No Conflict* ................................................................................ 82
Section 6.05. *Governmental Consents* .............................................................. 83
Section 6.06. *Binding Obligation* ..................................................................... 83
Section 6.07. *Historical Financial Statements* ................................................... 83
Section 6.08. *No Material Adverse Change* ...................................................... 83
Section 6.09. *Adverse Proceedings, etc* ........................................................... 83
Section 6.10. *Payment of Taxes* ....................................................................... 84
Section 6.11. *Properties* .................................................................................. 84
Section 6.12. *Environmental Matters* ............................................................... 84
Section 6.13. *No Defaults* ............................................................................... 85
Section 6.14. *Governmental Regulation* ........................................................... 85
Section 6.15. *Margin Stock* ............................................................................. 86
Section 6.16. *Employee Matters* ...................................................................... 86
Section 6.17. *Employee Benefit Plans* .............................................................. 86
Section 6.18. *Certain Fees* .............................................................................. 87
Section 6.19. *Solvency* .................................................................................... 88

ii

Section 6.20. *Compliance with Statutes, etc* ...................................................... 88
Section 6.21. *Disclosure* .................................................................................. 88
Section 6.22. *Terrorism Laws and FCPA* ........................................................ 88
Section 6.23. *Insurance* .................................................................................. 89
Section 6.24. *Common Enterprise* ................................................................. 89
Section 6.25. *Perfection of Security Interest* .................................................. 89
Section 6.26. *Intellectual Property* ................................................................ 89
Section 6.27. *Permits, etc* ............................................................................... 90
Section 6.28. *The Financing Orders* .............................................................. 90

# ARTICLE 7
AFFIRMATIVE COVENANTS

Section 7.01. *Certificates; Other Information.* ............................................... 90
Section 7.02. *Existence* ................................................................................... 95
Section 7.03. *Payment of Taxes and Claims* .................................................. 96
Section 7.04. *Maintenance of Properties* ....................................................... 96
Section 7.05. *Books and Records; Inspections* .............................................. 97
Section 7.06. *Restricted Subsidiaries* ............................................................ 97
Section 7.07. *Further Assurances* .................................................................. 97
Section 7.08. *Non-Consolidation* ................................................................... 98
Section 7.09. *Purpose* ..................................................................................... 98
Section 7.10. *Unrestriction of Restricted Subsidiary* .................................... 98
Section 7.11. *Approved Restructuring Plan* ................................................... 99
Section 7.12. *Collateral Coverage* ................................................................. 99
Section 7.13. *Cash Management Order* .......................................................... 99

# ARTICLE 8
NEGATIVE COVENANTS

Section 8.01. *Indebtedness* ........................................................................... 100
Section 8.02. *Liens* ....................................................................................... 104
Section 8.03. *No Further Negative Pledges* ................................................. 109
Section 8.04. *Restrictions on Restricted Subsidiary Distributions* .................. 110
Section 8.05. *Fundamental Changes; Disposition Of Assets* ......................... 111
Section 8.06. *Conduct of Business* ............................................................... 112
Section 8.07. *Permitted Activities of the Company* ...................................... 112
Section 8.08. *Investments in a Debtor* ......................................................... 112
Section 8.09. *Investments in Regulated Entities* .......................................... 113
Section 8.10. *Amendments to Organizational Documents* ............................ 113
Section 8.11. *Issuance of Disqualified Capital Stock* ................................... 113
Section 8.12. *Capital Stock of Subsidiaries* ................................................. 113
Section 8.13. *Chapter 11 Claims* .................................................................. 114

(NY) 02826/146/CA/cit.group.lc.ca.doc                                    11/01/09 9:25 PM

Section 8.14. *Platform Asset Transfers Excluded* ............................................ 114

**ARTICLE 9**
GUARANTY

Section 9.01. *Guaranty of the Obligations* ...................................................... 114
Section 9.02. *Contribution by Guarantors* ...................................................... 115
Section 9.03. *Payment by Guarantors* ............................................................ 116
Section 9.04. *Liability of Guarantors Absolute* .............................................. 116
Section 9.05. *Waivers by Guarantors* ............................................................. 119
Section 9.06. *Guarantors' Rights of Subrogation, Contribution, etc* ............... 120
Section 9.07. *Subordination of Other Obligations* .......................................... 120
Section 9.08. *Continuing Guaranty* ................................................................ 121
Section 9.09. *Authority of Guarantors or Borrowers* ...................................... 121
Section 9.10. *Financial Condition Of Borrowers* ........................................... 121
Section 9.11. *Bankruptcy, etc.* ....................................................................... 121
Section 9.12. *Discharge of Guaranty Upon Sale of Guarantor* ........................ 122
Section 9.13. *Taxes* ....................................................................................... 122

**ARTICLE 10**
EVENTS OF DEFAULT AND REMEDIES

Section 10.01. *Events of Default* .................................................................... 123
Section 10.02. *Remedies Upon Event of Default* ............................................. 127
Section 10.03. *Application of Funds* ............................................................... 128

**ARTICLE 11**
ADMINISTRATIVE AGENT

Section 11.01. *Appointment and Authority.* ..................................................... 129
Section 11.02. *Rights as a Lender* ................................................................... 130
Section 11.03. *Exculpatory Provisions* ........................................................... 130
Section 11.04. *Reliance by Administrative Agent.* ........................................... 131
Section 11.05. *Delegation of Duties* ............................................................... 131
Section 11.06. *Resignation of Administrative Agent* ........................................ 132
Section 11.07. *Non-reliance on Administrative Agent and Other Lenders* ....... 133
Section 11.08. *No Other Duties, etc* ............................................................... 133
Section 11.09. *Administrative Agent May File Proofs of Claim* ....................... 133
Section 11.10. *Collateral and Guaranty Matters* ............................................. 134

**ARTICLE 12**
MISCELLANEOUS

Section 12.01. *Amendments, Etc* .................................................................... 135

(NY) 02826/146/CA/cit.group.lc.ca.doc                                    11/01/09 9:25 PM

Section 12.02. *Notices*; *Effectiveness*; *Electronic Communication.* ................. 136
Section 12.03. *No Waiver*; *Cumulative Remedies*; *Enforcement* ..................... 139
Section 12.04. *Expenses*; *Indemnity*; *Damage Waiver.* ................................... 139
Section 12.05. *Payments Set Aside* .............................................................. 142
Section 12.06. *Successors and Assigns* ........................................................ 142
Section 12.07. *Treatment of Certain Information*; *Confidentiality* .................. 147
Section 12.08. *Right of Setoff* ...................................................................... 148
Section 12.09. *Interest Rate Limitation* ....................................................... 148
Section 12.10. *Counterparts*; *Integration*; *Effectiveness* ................................. 149
Section 12.11. *Survival of Representations and Warranties* ........................... 149
Section 12.12. *Severability* ........................................................................... 149
Section 12.13. *Replacement of Lenders* ........................................................ 150
Section 12.14. *Governing Law*; *Jurisdiction*; *etc.* ........................................... 150
Section 12.15. *WAIVER OF JURY TRIAL* ..................................................... 152
Section 12.16. *No Advisory or Fiduciary Responsibility* ................................ 152
Section 12.17. *Electronic Execution of Assignments and Certain Other Documents* ............................................................................ 153
Section 12.18. *Patriot Act* ............................................................................ 153
Section 12.19. *Judgment Currency* ............................................................... 154

SIGNATURES ................................................................................ S-1

**SCHEDULES**

2.01     Commitments and Applicable Percentages
2.08     Designated Borrowers
4.01     Collateral Accounts
6.01     Jurisdictions of Organization and Qualification
6.02     Capital Stock and Ownership
6.10     Adverse Proceedings
12.02    Administrative Agent's Office; Certain Addresses for Notices

**EXHIBITS**

Form of

A-1     Assignment and Assumption
A-2     Administrative Questionnaire
B       Designated Borrower Request and Assumption Agreement
C       Designated Borrower Notice
D       Guarantor Counterpart Agreement

(NY) 02826/146/CA/cit.group.lc.ca.doc                          11/01/09 9:25 PM

# LETTER OF CREDIT AGREEMENT

This LETTER OF CREDIT AGREEMENT ("**Agreement**") is entered into as of [_____ ____], 2009, among CIT GROUP INC., a Delaware Corporation (the "**Company**"), a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and certain Subsidiaries of the Company party hereto either pursuant to Section 2.08 (each a "**Designated Borrower**" and, together with the Company, the "**Borrowers**" and, each a "**Borrower**"), or which are Subsidiary Guarantors (as defined below), each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**"), and BANK OF AMERICA, N.A., as Administrative Agent and L/C Issuer.

On November [ ], 2009, the Company and CIT Funding (together, in their capacities as debtors and debtors-in-possession, the "**Debtors**") each filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Company has requested that the L/C Issuer issue Letters of Credit in an aggregate face amount at any time outstanding not to exceed the Dollar Equivalent (defined below) of $500,000,000, and the L/C Issuer is willing to do so on the terms and conditions set forth herein.

To provide security for the reimbursement of any draft drawn under a Letter of Credit and the payment of the other obligations of the Borrowers hereunder and under the other Credit Documents and the other Obligations, the Borrowers will provide to the Administrative Agent the following (each as more fully described herein):

(a)     a joint and several allowed Superpriority Claim in the Case of the Company pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code;

(b)     a valid, perfected, non-voidable first priority Lien, pursuant to Section 364(c)(2) of the Bankruptcy Code, upon the Pledged Collateral in the Company Collateral Account, securing only the obligations of the Company under the Credit Documents; and

(c)     a valid, perfected, non-voidable first priority Lien upon the Pledged Collateral in the Subsidiary Collateral Accounts, securing only the obligations of the Subsidiary Borrowers under the Credit Documents.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE 1
### DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.  *Defined Terms.*  As used in this Agreement, the following terms shall have the meanings set forth below:

"**23A Transaction**" means any transfer or transfers of assets of the Company or any Restricted Subsidiary to CIT Bank pursuant to waivers of Section 23A of the Federal Reserve Act.

"**Additional Credit**" has the meaning set forth in Section 5.02(g).

"**Administrative Agent**" means Bank of America in its capacity as administrative agent under any of the Credit Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.02 with respect to such currency, or such other address or account with respect to such currency as the Administrative Agent may from time to time notify to the Company and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit A-2 or any other form approved by the Administrative Agent.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of the Company or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other regulatory body or any arbitrator whether pending or, to the best knowledge of the Company or any of its Restricted Subsidiaries, threatened against or affecting the Company or any of its Restricted Subsidiaries or any property of the Company or any of its Restricted Subsidiaries.

2

"**Aerospace**" means CIT Aerospace International.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding anything to the contrary herein, in no event shall the Administrative Agent, the Arranger, the L/C Issuer or any Lender, or any Person acquired or formed in connection with a workout, restructuring or foreclosure in the Ordinary Course of Business which is in an industry other than the business of the Company and its Restricted Subsidiaries be considered an "Affiliate" of any Credit Party.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Letter of Credit Agreement, and any annexes, exhibits, and schedules to the foregoing, in each case, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Alternative Currency**" means each of Euro, Sterling, Thai Baht, Hong Kong Dollars, Canadian Dollars, Mexican Peso and Indian Rupee, and each other currency (other than Dollars) that is approved in accordance with Section 1.06.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"**Amended Term Loan Agreement**" means that certain Second Amended and Restated Credit and Guaranty Agreement dated as of October 28, 2009 among the Company, certain Subsidiaries of the Company, various lenders and Bank of America, as administrative agent and collateral agent, as further amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Percentage**" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the obligation of the L/C Issuer to make Credit Extensions have been terminated

3

pursuant to Section 10.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"**Applicable Rate**" means a per annum rate equal to:

(a)  with respect to Commitment Fees, 1.50%;

(b)  with respect to Utilization Fees, 3.50%; and

(c)  with respect to all other obligations hereunder, the Base Rate.

"**Applicable Time**" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Applicant Borrower**" has the meaning specified in Section 2.08.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Restructuring Plan**" means the restructuring transactions contemplated in that certain document entitled "CIT Group Inc. and CIT Group Funding Company of Delaware LLC Offers to Exchange Relating to Any and All of their respective Outstanding Notes Listed Below and Solicitation of Acceptances of a Prepackaged Plan of Reorganization" dated October 16, 2009 and supplemented on October 23, 2009 on the terms and subject to the conditions on which the Lenders Steering Committee adopted same as an "Approved Restructuring Plan" as of October 16, 2009 as the same may be amended, supplemented or otherwise modified from time to time with the consent of the Administrative Agent and the L/C Issuer.

"**Arranger**" means Banc of America Securities LLC, in its capacity as sole lead arranger and sole bookrunner.

(NY) 02826/146/CA/cit.group.lc.ca.doc

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 12.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A-1 or any other form approved by the Administrative Agent.

"**Attributable Debt**" means as of the date of determination thereof, without duplication, the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, chief financial officer, treasurer or assistant treasurer, in each case, whose signatures and incumbency have been certified to Administrative Agent.

"**Authorized Signatory**" means the individuals listed on Schedule 1.01.

"**Availability Period**" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Commitments pursuant to Section 2.02, and (c) the date of termination of the obligation of the L/C Issuer to make Credit Extensions pursuant to Section 10.02.

"**Bank Activities**" means (i) 23A Transactions and (ii) any transfer or transfers of assets, Liens, Indebtedness, subordinations, participations, payments, assignments, reimbursements, purchases, granting of security interests, perfection thereof, and replacements thereof to secure obligations, servicing or other agreements or actions by the Company or any Restricted Subsidiary in favor of CIT Bank required to be taken or which would be prudent to take in order to comply with all agreements now and hereafter entered into between any of the Company or any Restricted Subsidiary and CIT Bank, or CIT Bank and its regulators, and all laws, federal, state and local statutes, rules, guidelines, regulations, codes, executive orders and administrative or judicial precedents or authorities, including the interpretation thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all

5

administrative orders, directed duties, requests, licenses and agreements with such governmental authorities, whether or not having the force of law, all arising from or relating to CIT Bank, together with all contractual indemnifications in connection with each of the above, and any and all actions undertaken in connection with any of the foregoing activities.

"**Bank of America**" means Bank of America, N.A. and its successors.

"**Bankruptcy Code**" means Title 11 of the United States Code as in effect from time to time.

"**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time.

"**Barbados Entities**" means, collectively, CIT Financial (Barbados) SRL and CIT Holdings (Barbados) SRL.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the Eurocurrency Rate plus 1.0% and (c) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate." The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Borrowed Money Indebtedness**" means Indebtedness of the type described in clauses (i), (ii), (iii), (iv) and (xiii) and, to the extent relating to any such Indebtedness, clauses (vi) and (viii) of the definition of "Indebtedness".

"**Borrower**" and "**Borrowers**" each has the meaning specified in the introductory paragraph hereto.

"**Borrower Collateral Amount**" means, with respect to any Borrower at any time, the aggregate amount of Eligible Collateral held in such Borrower's Collateral Account at such time; *provided*, that to the extent that the Company funds its Collateral Account to satisfy the Collateral Delivery Condition with respect to any Letter of Credit with respect to which such Borrower is a co-account party prior to the date on which the Final DIP Order shall have become a Final Order as contemplated by Section 2.01(b), such Borrower's "Borrower Collateral Amount" shall be deemed to include such amount.

6

"**Borrower Materials**" has the meaning specified in Section 7.01.

"**Borrower Outstandings**" means, with respect to any Borrower on any date, the aggregate Outstanding Amount of all L/C Obligations with respect to Letters of Credit issued for the account of such Borrower.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office with respect to Obligations denominated in Dollars is located and:

(a)      if such day relates to any interest rate settings as to the Eurocurrency Rate, fundings, disbursements, settlements and payments in Dollars in respect of any dealings in Dollars to be carried out pursuant to this Agreement in respect of any Obligations bearing interest at the Eurocurrency Rate, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market;

(b)      if such day relates to any fundings, disbursements, settlements and payments in Euro in respect of any dealings in Euro to be carried out pursuant to this Agreement in respect of any Obligations bearing interest at the Eurocurrency Rate, means a TARGET Day; and

(c)      if such day relates to any fundings, disbursements, settlements and payments in a currency other than Dollars or Euro in respect of any dealings in any currency other than Dollars or Euro to be carried out pursuant to this Agreement in respect of any Obligations bearing interest at the Eurocurrency Rate (other than any interest rate settings), means any such day on which banks are open for foreign exchange business in the principal financial center of the country of such currency.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is or is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a Capital Lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a premium or penalty.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Case**" and "**Cases**" have the meanings specified for such term in the recitals.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Collateral Account**" means a non-interest-bearing deposit account of one or more of the Borrowers at Bank of America in the name of Bank of America and under the sole dominion and control of the Administrative Agent, and otherwise established in a manner satisfactory to the Administrative Agent. The Cash Collateral Accounts as they exist on the date hereof are identified on Schedule 4.01.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities and repurchase agreements for marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government, or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) time deposits or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank (including any branch of a commercial bank) that (a) in the case of a commercial bank organized under the laws of the United States of America, any state thereof or the District of Columbia is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and has Tier 1 capital (as defined in such regulations) of not less than $100,000,000 or (b) in the case of any other commercial bank has a short-term commercial paper rating from S&P of at least A-1 or from Moody's of at least P-1; and (v) shares of any money market mutual fund that has (a) net

8

assets of not less than $500,000,000, and (b) the highest rating obtainable from either S&P or Moody's.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means, unless pursuant to an Approved Restructuring Plan, (i) a Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) (a) shall have acquired beneficial ownership or control of more than 50% of the total outstanding Capital Stock having ordinary voting power for the election of directors of Company (measured by voting power rather than number of shares) or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Company; (ii) the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Company cease to be occupied by Persons who either (a) were members of the board of directors of Company on the Closing Date, (b) were elected at the first meeting of shareholders after effectiveness of the Approved Restructuring Plan or (c) were nominated for election by the board of directors of Company, a majority of whom were directors described in either clause (a) or (b) of this sentence or whose election or nomination for election was previously approved by a majority of such directors (either by a specific vote or by approval of a proxy statement); or (iii) any "change of control" (or similar event, however denominated) shall occur under and as defined in any indenture or agreement in respect of Indebtedness of the Company or any Restricted Subsidiary in a principal amount in excess of $100,000,000.

"**CIT Bank**" means, collectively, CIT Bank, a bank organized under the laws of the State of Utah, and its consolidated subsidiaries, together with any other banking institution which is owned directly or indirectly by the Company from time to time (including, without limitation, any banking institution which is merged with or into CIT Bank or any of its subsidiaries or which is the successor in interest to such CIT Bank).

"**CIT Funding**" means CIT Group Funding Company of Delaware LLC.

"**CITLC Assigned Note**" means that certain Promissory Note No. 3 (MSN 30267), dated as of March 27, 2008, in the original principal amount of $12,223,183.20, by Snapdragon Ltd. in favor of C.I.T. Leasing Corporation, and

9

any promissory note issued from time to time in replacement thereof to the extent such replacement note is payable to the order of C.I.T. Leasing Corporation, together with certain payments received by or payable to C.I.T. Leasing Corporation thereunder.

"**CITLC Loan Assignment and Intercreditor Agreement**" means that certain Loan Assignment and Intercreditor Agreement, dated as of June 11, 2008, by and between C.I.T. Leasing Corporation (as both Administrative Agent and Assignor) and HSH Nordbank AG, New York Branch (as Assignee).

"**Closing Date**" means the first date all the conditions precedent in Section 5.01 are satisfied or waived.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral Accounts**" means the Company Collateral Account and the Subsidiary Collateral Accounts.

"**Collateral Delivery Condition**" shall be satisfied with respect to any Credit Extension with respect to any Letter of Credit if:

(a)     on or prior to the date on which the Letter of Credit Application with respect to such Letter of Credit is received by the Administrative Agent and the L/C Issuer, the Borrower requesting such Letter of Credit shall have delivered Eligible Collateral to its Collateral Account in the amount required by Section 2.01(b) (or with respect to any Letter of Credit Application received prior to the Final DIP Order becoming a Final Order, the Company shall have delivered such amount from its own funds (including proceeds of borrowings from other Borrowers who are co-account parties with respect to such Letter of Credit) to its Collateral Account); and

(b)     giving *pro forma* effect to the issuance of such Letter of Credit (i) the Total Collateral Amount shall equal or exceed the Total Collateral Requirement; and (ii) with respect to the Borrower for whose account such Letter of Credit is to be issued, the Borrower Collateral Amount shall equal or exceed such Borrower's Collateral Requirement.

"**Collateral Documents**" has the meaning specified in the Amended Term Loan Agreement.

"**Collateral Requirement**" means, on any date with respect to any Borrower, an amount equal to the sum of (A) 105% of the Borrower Outstandings with respect to Letters of Credit denominated in Dollars issued for the account of such Borrower at such time, (B) 115% of the Dollar Equivalent of the Borrower

Outstandings with respect to Letters of Credit denominated in Euro or Sterling issued for the account of such Borrower at such time and (C) 120% of the Dollar Equivalent of the Borrower Outstandings with respect to Letters of Credit denominated in Thai Baht, Hong Kong Dollars, Canadian Dollars, Mexican Peso, Indian Rupee or any other Alternative Currency issued for the account of such Borrower at such time.

"**Commitment**" means, as to each Lender, its obligation to purchase participations in L/C Obligations, in an aggregate principal amount at any one time outstanding not to exceed the Dollar amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"**Commitment Fee**" has the meaning specified in Section 2.03(a).

"**Company**" has the meaning specified in the introductory paragraph hereto.

"**Company Collateral Account**" means the Cash Collateral Account of the Company and any replacement, additional or successor Cash Collateral Account. The Company Collateral Account as it exists on the date hereof is identified opposite its name on Schedule 4.01.

"**Company Lien Event**" has the meaning specified in the Amended Term Loan Agreement.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Credit Documents**" means this Agreement, each Designated Borrower Request and Assumption Agreement, each Guarantor Counterpart Agreement, each Issuer Document and the Fee Letter.

"**Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"**Credit Parties**" means, collectively, the Company, each Subsidiary Guarantor and each Designated Borrower.

"**Debtors**" has the meaning set forth in the recitals.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means a rate equal to the Applicable Rate *plus* 2% per annum.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the participations in L/C Obligations required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder unless such failure has been cured, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute or unless such failure has been cured, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Designated Borrower**" has the meaning specified in the introductory paragraph hereto.

"**Designated Borrower Notice**" has the meaning specified in Section 2.08.

"**Designated Borrower Request and Assumption Agreement**" has the meaning specified in Section 2.08.

"**Discharged**" means, with respect to any Indebtedness and obligations, (a) the payment in cash of all amounts outstanding and unpaid in respect thereof (other than unasserted indemnity claims), (b) the termination of all commitments related thereto (including, with respect to any Capital Leases or Attributable Debt, the termination of all leases under which such Indebtedness arises), (c) with

12

respect to Indebtedness in respect of any letter of credit, letter of guaranty, bankers' acceptance facility, surety bond or similar credit transaction, the cash collateralization (including customary overage) of liabilities to reimburse drawings or drafts thereunder, (d) the release of all guarantees, endorsements or similar contingent liabilities in respect thereof and (e) the release of all collateral securing such Indebtedness and obligations, *provided*, that with respect to Permitted Debt Refinancings in respect of Refinancing Eligible Debt identified on Schedule 1.1.B to the Amended Term Loan Agreement as the "ECA Loan Facility", "TRS Facility" or "Rail Head Leases", only Indebtedness and obligations related to the assets repurchased pursuant to such Permitted Debt Refinancing need to be so Discharged and only such assets so released.

"**Disqualified Capital Stock**" means, at any time of determination, Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the then Term Loan Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in clause (a) above, in each case at any time prior to the first anniversary of the then Term Loan Maturity Date, (c) contains any repurchase obligation that may come into effect prior to payment in full of all Obligations, (d) requires cash dividend payments prior to one year after the then Term Loan Maturity Date, (e) does not provide that any claims of any holder of such Capital Stock may have against the Company or any other Credit Party (including any claims as judgment creditor or other creditor in respect of claims for the breach of any covenant contained therein) shall be fully subordinated (including a full remedy bar) to the Obligations in a manner satisfactory to Administrative Agent, or (f) provides the holders of such Capital Stock thereof with any rights to receive any cash upon the occurrence of a change of control prior to the first anniversary date on which the Obligations have been irrevocably paid in full, unless the rights to receive such cash are contingent upon the Obligations being irrevocably paid in full.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any Alternative Currency, the equivalent amount thereof in Dollars as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the

most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Domestic Subsidiary**" means any Restricted Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Electronic Platform**" has the meaning specified in Section 7.01.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Section 12.06(b)(iii), (v), and (vi) (subject to such consents, if any, as may be required under Section 12.06(b)(iii)).

"**Eligible Collateral**" means Cash which is (a) denominated in Dollars and (b) held in any Collateral Account.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed by, the Company, any of its subsidiaries or any of their respective ERISA Affiliates.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) public health and safety, protection of the environment or other environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company, any other Credit Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations thereunder.

"**ERISA Affiliate**" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.  Any former ERISA Affiliate of the Company or any of its subsidiaries shall continue to be considered an ERISA Affiliate of the Company or any such subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Company or such subsidiary and with respect to liabilities arising after such period for which the Company or such subsidiary could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) notice of intent to terminate a Pension Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by the Company, any of its subsidiaries or any of their respective ERISA Affiliates from

15

any Pension Plan with two or more non-related contributing sponsors or the termination of any such Pension Plan resulting in liability to the Company, any of its subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on the Company, any of its subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of the Company, any of its subsidiaries or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any liability or potential liability therefor, or the receipt by the Company, any of its subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could give rise to the imposition on the Company, any of its subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against the Company, any of its subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Euro**" and "**EUR**" mean the lawful currency of the Participating Member States introduced in accordance with the EMU Legislation.

"**Eurocurrency Rate**" means, as of any date, the rate per annum equal to the British Bankers Association LIBOR Rate ("**BBA LIBOR**"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to such date, for deposits in the relevant currency (for delivery on such date) with a term of one

month.  If such rate is not available at such time for any reason, then the "Eurocurrency Rate" as of such date shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in the relevant currency for delivery on such date in Same Day Funds, in the approximate amount of the Obligation owing, by Bank of America and with a term of one month would be offered by Bank of America's London Branch (or other Bank of America branch or Affiliate) to major banks in the London or other offshore interbank market for such currency at their request at approximately 11:00 a.m. (London time) two Business Days prior to such date.

"**Event of Default**" has the meaning specified in Section 10.01.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of any Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which such Borrower is located, (c) any backup withholding tax that is required by the Code to be withheld from amounts payable to a Lender that has failed to comply with clause (A) of Section 3.01(e)(ii), and (d) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Company under Section 12.13), any United States withholding tax that (i) is required to be imposed on amounts payable to such Foreign Lender pursuant to the Laws in force at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or (ii) is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with clause (B) of Section 3.01(e)(ii), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from such Borrower with respect to such withholding tax pursuant to Section 3.01(a)(ii) or (iii).  Notwithstanding anything to the contrary contained in this definition, "Excluded Taxes" shall not include any withholding tax imposed at any time on payments made by or on behalf of a Foreign Obligor to any Lender hereunder or under any other Credit Document; *provided*, that such Lender shall have complied with Section 3.01(e)(i).

"**Fair Market Value**" means, with respect to any asset, the value that would be paid by a willing buyer to an unaffiliated willing seller in a sale or other disposition of such asset not involving distress or necessity of either party, as determined in good faith by the chief financial officer, chief accounting officer, treasurer, assistant treasurer or controller, and, in the case of any transaction involving aggregate consideration in excess of $750,000,000, the Board of Directors of the Company or the Restricted Subsidiary.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" means the letter agreement, dated October 30, 2009 among the Company, the Subsidiaries of the Company party thereto, the Administrative Agent and the Arranger.

"**Final Cash Management Order**" means an order of the Bankruptcy Court substantially in the form of the Interim Cash Management Order and otherwise in form and substance reasonably satisfactory to the Administrative Agent and the L/C Issuer, which shall be in full force and effect and shall not have been vacated, stayed, reversed, amended or modified in any respect.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil

18

Procedure or any motion for a new trial, reargument or rehearing has been resolved by the court in which such motion was filed; *provided, however,* that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

"**Final DIP Order**" shall mean the final order authorizing the Company to obtain the post-petition financing provided under this Agreement pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2) and 364(e), which order shall be in form and substance satisfactory to the Administrative Agent in its sole discretion.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer, treasurer or assistant treasurer or equivalent officer of the Company that such financial statements fairly present, in all material respects, the financial condition of the Company and its Restricted Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from normal audit and year-end adjustments.

"**Financial Plan**" means the business plan of the Company and its subsidiaries most recently delivered pursuant to Section 7.01(a) or (b).

"**Financing Orders**" means the Interim DIP Order and the Final DIP Order.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Company and its Restricted Subsidiaries ending on December 31 of each calendar year.

"**Foreign Lender**" means, with respect to any Borrower, any Lender that is organized under the Laws of a jurisdiction other than that in which such Borrower is resident for tax purposes (including such a Lender when acting in the capacity of the L/C Issuer).  For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Obligor**" means a Credit Party that is a Foreign Subsidiary.

"**Foreign Subsidiary**" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.03(b), United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign state or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; or (b) a liability of such Person for an obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the primary purpose or intent thereof is as described in clause (a) above.

"**Guaranteed Obligations**" has the meaning specified in Section 9.01.

"**Guarantor**" means the Company and each Subsidiary Guarantor.

"**Guarantor Counterpart Agreement**" means a Guarantor Counterpart Agreement substantially in the form of Exhibit D delivered by a Credit Party pursuant to Section 7.06.

"**Guaranty**" means the guaranty of each Guarantor set forth in Article 9.

"**Guaranty Beneficiary**" means the Administrative Agent, the L/C Issuer and each Lender.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of the Company and its subsidiaries, for the Fiscal Year ended December 31, 2008, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Year, and (ii) for the interim period from January 1, 2009 to the Closing Date, unaudited financial statements of the Company and its subsidiaries, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for each quarterly period completed prior to forty-six (46) days before the Closing Date, in the case of clauses (i) and (ii), certified by the chief financial officer of the Company that they fairly present, in all material respects, the financial condition of the Company and its subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject, if applicable, to changes resulting from audit and normal year end adjustments.

"**Immaterial Subsidiary**" means (A) any subsidiary that (i)(a) has assets with an aggregate fair market value less than $5,000,000, (b) has aggregate revenues less than $5,000,000 for the period of four consecutive Fiscal Quarters most recently ended for which financial statements were delivered pursuant to Section 5.1 immediately preceding the date on which the calculation is required to

be made, and (c) is not integral to the business or operations of the Company and its subsidiaries (other than Immaterial Subsidiaries), and (ii) has no subsidiaries (other than Immaterial Subsidiaries), or (B) any subsidiary the Capital Stock of which was acquired in connection with the workout of assets or exercise of remedies in the conduct of Ordinary Course of Business or as the proceeds of collateral securing a loan or other financing asset.

"**Indebtedness**," as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money; (ii) Capital Lease Obligations; (iii) all obligations of such Person evidenced by notes, bonds or similar instruments or upon which interest payments are customarily paid and all obligations in respect of drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business having a term of less than six (6) months that are not overdue by more than sixty (60) days) which purchase price is (a) due more than six (6) months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument; (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person; (vi) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vii) the face amount of any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (viii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (ix) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (x) any liability of such Person for an obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (x), the primary purpose or intent thereof is as described in clause (ix) above; (xi) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Rate Management Transaction, whether entered into

for hedging or speculative purposes; (xii) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person and (xiii) all Attributable Debt of such Person. Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" has the meaning specified in Section 12.04(b).

"**Interim Cash Management Order**" means an interim order of the Bankruptcy Court in the cases, in form and substance satisfactory to the Administrative Agent and the L/C Issuer, approving the Debtors' cash management system and providing for authority for the Debtors to continue their respective cash management systems and including the following unless otherwise agreed by the Administrative Agent and the L/C Issuer, (i) post-petition loan protections for any investment loan, advance or intercompany transfer by any Credit Party or any of its Restricted Subsidiaries (in such case a "lending party") to any other Credit Party or any subsidiary thereof that is a Debtor, granting the lending party pursuant to Section 364 of the Bankruptcy Code a Superpriority claim against, and a Lien on the assets of, the applicable Debtor (other than cash collateral provided for letters of credit to the extent subject to a Lien permitted under Section 8.02(x)) and related protections pursuant to Section 364(e) of the Bankruptcy Code, (ii) authority for the Company to continue intercompany transfers to comply with Section 7.08 and other covenants herein and (iii) a waiver of the obligation under Bankruptcy Code section 345(b) of the Debtors and any entity with which money is deposited or invested by the Debtors in accordance with the Debtors' deposit and investment practices to obtain a bond or to deposit securities of the kind specified in 31 U.S.C. § 9303.

"**Interim DIP Order**" shall mean the interim order authorizing the Company to obtain the post-petition financing provided under this Agreement pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2) and 364(e) in an aggregate principal amount not to exceed $125,000,000, which order shall be in form and substance satisfactory to the Administrative Agent in its sole discretion.

"**Internal Control Event**" means a material weakness in, or fraud that involves management of, the Company, which fraud has a material adverse effect on the Company's internal controls over financial and other reporting, in each case as described in the Securities Laws, whether or not the Company is subject thereto.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Company or any of its Restricted Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Restricted Subsidiary of the Company from any Person, of any Capital Stock of such Person; (iii) any direct or indirect loan, advance or capital contributions by the Company or any of its Restricted Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from transactions with that other Person in the Ordinary Course of Business; and (iv) any direct or indirect Guarantee of any obligations of any other Person. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IRS**" means the United States Internal Revenue Service.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice, Inc. (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" means with respect to any Letter of Credit, the Letter of Credit Application and any other document, agreement and instrument entered into by the L/C Issuer and the Company (or any Subsidiary) or in favor of the L/C Issuer (including any authorization for air release of cargo or release of shipment without surrender of marine bills of lading) and relating to such Letter of Credit.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, in each case with a Person or Persons who are not subsidiaries of the Company, whether in corporate, partnership or other legal form; *provided*, in no event shall any corporate Restricted Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**JPMorgan Facility**" means that certain 5-Year Letter of Credit Issuance and Reimbursement Agreement, dated as of May 23, 2005, among the Company, J.P. Morgan Securities Inc., as sole lead arranger and bookrunner, Barclays Bank PLC, as syndication agent, Bank of America, N.A. and Citibank, N.A. as documentation agents, JPMorgan Chase Bank, N.A., as administrative agent and

as issuing bank, and the several banks and other financial institutions as lenders thereto, and any documents entered into or otherwise related thereto (including any cash collateral agreement).

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**L/C Advance**" means, with respect to each Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Applicable Percentage. All L/C Advances shall be denominated in Dollars.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made. All L/C Borrowings shall be denominated in Dollars.

"**L/C Exposure**" means, with respect to any letter of credit issued under the JPMorgan Facility or any other facility related to the issuance of letters of credit, at any time, the sum of (i) the undrawn face amount of such letter of credit <u>plus</u> (ii) the aggregate amount of all drawings under such letter of credit that have not yet been reimbursed by or on behalf of the account party under such letter of credit.

"**L/C Issuer**" means Bank of America in its capacity as issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"**L/C Obligations**" means, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit *plus* the aggregate of all Unreimbursed Amounts, including all L/C Borrowings. For purposes of computing the amount available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.09. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP or article 29 of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Lender**" has the meaning specified in the introductory paragraph hereto.

"**Lenders Steering Committee**" has the meaning specified in the Amended Term Loan Agreement.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Company and the Administrative Agent.

"**Letter of Credit**" means any letter of credit issued hereunder. A Letter of Credit may be a commercial letter of credit (payable against sight or time drafts, including any banker's acceptances arising from acceptance of time drafts) or a standby letter of credit. Letters of Credit may be issued in Dollars or in an Alternative Currency.

"**Letter of Credit Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"**Letter of Credit Expiration Date**" means the day that is five days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) or any jurisdiction.

"**LILO Transaction**s" means Refinancing Eligible Debt identified on Schedule 1.1B of the Amended Term Loan Agreement as "Rail Head Leases".

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on (i) the business operations, properties, assets, or condition (financial or otherwise) of the Company and its Restricted Subsidiaries taken as a whole; (ii) the ability of the Credit Parties as a whole to fully and timely perform the Obligations; (iii) the legality, validity, binding effect, or enforceability against a Credit Party of a Credit Document to which it is a party; (iv) the value of the Pledged Collateral or the Administrative Agent's Liens (on behalf of itself and the Secured Parties) on the Pledged Collateral taken as a whole, or on the priority of such Liens, taken as

a whole, except to the extent Liens on the Pledged Collateral are expressly not required to be maintained pursuant to this Agreement; or (v) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent, the L/C Issuer and any Lender or any Secured Party under any Credit Document.  In no event shall the filing of the Cases or the emergence therefrom in accordance with an Approved Restructuring Plan result in or be deemed a Material Adverse Effect under this Agreement or any other Credit Document.

"**Maturity Date**" means the later of (a) _____ [the date that is 18 months from the Closing Date] and (b) if maturity is extended pursuant to Section 2.09, such extended maturity date as determined pursuant to such Section; *provided*, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"**Multiemployer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, which (i) is maintained for employees or former employees of the Company, any of its subsidiaries, or any of their respective ERISA Affiliates and at least one Person other than the Company, any of its subsidiaries, or any of their respective ERISA Affiliates or (ii) was so maintained and in respect of which the Company, any of its subsidiaries, or any of their respective ERISA Affiliate could have liability under Section 4063 or 4064 of ERISA in the event such plan has been or were to be terminated.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of the Company and its subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate with comparison to and variances from the immediately preceding period and budget.

"**Net Cash Debt Proceeds**" means, with respect to any incurrence of Indebtedness, an amount equal to: (i) the sum of Cash payments and Cash Equivalents received by any Credit Party or any of its Restricted Subsidiaries from such incurrence of Indebtedness, minus (ii) attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses paid to Persons that are not Affiliates of Credit Parties actually incurred in connection therewith.

"**Non-Debtor Subsidiary**" shall mean each Subsidiary that is not a Debtor.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**Ordinary Course of Business**" means each of the following occurring in the ordinary course of business: (i) all activities conducted by the Company and its Restricted Subsidiaries (or their subsidiaries) in the ordinary course of their businesses, regardless of frequency, including, without limitation, the following activities: providing, arranging or syndicating financing (whether debt or equity), holding Portfolio Assets, asset management and servicing, factoring, trade accounts receivable purchasing, trade accounts receivable management services, leasing (both capital and operating leasing, and sales and exchanges pursuant to such leasing, and real estate leasing and subleasing to or from third parties with respect to operating locations), purchases, sales, transfers or other dispositions of Portfolio Assets, investment advisory services, insurance products, vendor financing, Portfolio Asset management, purchases and sales or other dispositions of assets and Capital Stock (including Investments in Joint Ventures) acquired in workouts of Portfolio Assets or factoring facilities, in each case in this clause (i), to third parties or to Subsidiaries in the ordinary course of business, (ii) any financings (including any Investments and other transactions in connection therewith) of the foregoing activities through securitizations, secured financings, bank loans, conduit facilities, trusts, special purpose vehicles or other means, (iii) any related workout, exercise of remedies or restructuring activities, including, without limitation, formation of a special purpose vehicle to acquire, hold or dispose of assets and Capital Stock obtained in connection with such restructuring or other activities, (iv) managing and operating assets and businesses acquired through the exercise of remedies, (v) business associated with investments, banking or investment banking (including commercial and retail deposit taking) and (vi) any reasonable extension or evolution of the foregoing activities.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement or limited liability company agreement,

28

as amended.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Credit Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Credit Document.

"**Outstanding Amount**" means, with respect to any L/C Obligations on any date, the Dollar Equivalent amount of the aggregate outstanding amount of such L/C Obligations on such date after giving effect to any Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"**Overnight Rate**" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent or the L/C Issuer, as the case may be, in accordance with banking industry rules on interbank compensation, and (b) with respect to any amount denominated in an Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of Bank of America in the applicable offshore interbank market for such currency to major banks in such interbank market.

"**Owner-Trustee**" means the owner trustee (not in its individual capacity but solely as trustee) of an owner trust, the property of which is beneficially owned by a Credit Party in the furtherance of Ordinary Course of Business.

"**Participant**" has the meaning specified in Section 12.06(d).

"**Participating Member State**" means each state so described in any EMU Legislation.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means an Employee Benefit Plan that is a "defined benefit plan" (as defined in Section 414(j) of the Code and Section 3(35) of ERISA) other than a Multiemployer Plan.

"**Permitted Acquisitions**" means the acquisition of all or substantially all of the business, assets or equity interests of another Person or division or business line or business unit of a Person in the same or a substantially similar business as the Company and its subsidiaries at the time (including, without limitation, businesses typically carried on by banks (commercial or retail), investment banks or finance institutions and any other line of business carried on by Regulated Entities or other subsidiaries of the Company or its Restricted Subsidiaries).

"**Permitted Debt Refinancing**" means the direct or indirect refund, refinancing or replacement of any Indebtedness and obligations with proceeds of Tranche 2 Term Loans to the extent that (a) such Indebtedness and obligations constitute Refinancing Eligible Debt; (b) contemporaneously with such application of Tranche 2 Term Loan proceeds, such Indebtedness and obligations shall have been Discharged; (c) the borrowing of such Tranche 2 Term Loans shall have occurred within the time frame identified for a "Refinancing" with respect to such Refinancing Eligible Debt on Schedule 1.1B to the Amended Term Loan Agreement; (d) each Person identified on Schedule 1.1B as an "Additional Borrower" with respect to such Refinancing Eligible Debt either (i) shall have duly executed and delivered a Borrower Counterpart Agreement and such Tranche 2 Term Loans shall have been made only to such Person or (ii) shall, to the extent such Tranche 2 Term Loans were made to the Funding Account Holder, have assumed such Loans from the Funding Account Holder pursuant to a duly executed and delivered Borrower Assumption Agreement; (e) substantially contemporaneously with such Permitted Debt Refinancing, each Person identified on Schedule 1.1B to the Amended Term Loan Agreement as an "Additional Guarantor" with respect to such Refinancing Eligible Debt shall have duly executed and delivered a Guarantor Counterpart Agreement; (f) other than with respect to Controlled Accounts subject to Section 5.19 of the Amended Term Loan Agreement, all agreements, instruments, filings, recordations, searches and other actions as are necessary or reasonably requested by the Collateral Agent shall have been (or contemporaneously shall be) entered into, executed or taken (as applicable) to create in favor of the Collateral Agent for the benefit of the secured parties under the Amended Term Loan Agreement a Lien perfected at first priority (subject in priority only to Liens permitted under clauses (b) through (e), (g) through (k), and (r) of Section 6.2) on all assets described on such Schedule 1.1B as "Collateral" granted by such Person with respect to such Refinancing Eligible Debt in accordance with and subject to the terms of the Collateral Documents (*provided*, that, with respect to a Permitted Debt Refinancing in respect of any Refinancing Eligible Equipment Financing, only

30

those assets described on such Schedule 1.1B as "Collateral" securing such Refinancing Eligible Equipment Financing shall be required to become subject to such Lien and, in the case of aircraft, only those actions described with respect to such Term Loan Collateral on Schedule 1.1A to the Amended Term Loan Agreement shall be required to be taken to perfect such Lien); and *provided*, *further*, that with respect to a Permitted Debt Refinancing in respect of Refinancing Eligible Debt identified on Schedule 1.1B of the Amended Term Loan Agreement as the "Trade Finance Business/Conduit" or the "Wells Fargo Facility", all assets described as "Collateral" on such schedule with respect thereto shall be or have become property of CMS Funding Company LLC and CIT Middle Market Funding Company, LLC, respectively (other than the membership interests in CIT Middle Market Funding Company, LLC and the proceeds thereof pledged by CIT Middle Market Holdings, LLC)); and (g) in the case that such Permitted Debt Refinancing involves an "Additional Borrower" or "Additional Guarantor" (each as defined in the Amended Term Loan Agreement) or Term Loan Collateral comprised of aircraft, rail cars or other rolling stock, each Lender and the Administrative Agent shall have received a legal opinion reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent rendered by outside counsel to the Credit Parties reasonably satisfactory to the Administrative Agent and the Collateral Agent regarding, as applicable, enforceability of the counterpart and/or assumption agreement and/or joinder agreement, the creation and perfection of Liens required with respect to the refund, refinancing or replacement of such Indebtedness and obligations and such other matters as are reasonably requested by the Administrative Agent or the Collateral Agent.

"**Permitted Exchange Indebtedness**" means Permitted Refinancing Indebtedness that is issued in exchange for Indebtedness of the Company or CIT Funding pursuant to an Approved Restructuring Plan, which Indebtedness may be secured by Liens permitted pursuant to Section 8.02(b)(xix).

"**Permitted Funding Indebtedness**" means any (i) Indebtedness incurred in the Ordinary Course of Business, the proceeds of which (if any) are used in the Ordinary Course of Business, including, without limitation, customary loans or lines of credit (revolving and term), asset swaps, factoring agreements, trade accounts receivable purchasing agreements, securitizations and conduits and other similar transactions, total return swaps, secured financings, letters of credit facilities, aircraft acquisition financings, purchase money financing, repurchase transactions, reverse repurchase transactions or warehouse financings (including any reasonable extension or evolution of such activities including for purposes of financing other types of financial or operating assets), and (ii) any and all indemnification or guaranty obligations arising in connection with any of the foregoing activities.

31

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 8.02.

"**Permitted Reestablishment Indebtedness**" means, with respect to each category of Refinancing Eligible Debt identified on Schedule 1.1B to the Amended Term Loan Agreement, Indebtedness of one or more of the Company's Restricted Subsidiaries that (a) is incurred in an aggregate principal amount not to exceed the principal amount of such Refinancing Eligible Debt outstanding on the Amendment Agreement Effective Date on terms and conditions no less favorable (when taken as a whole) to the obligors of such Indebtedness than those applicable to the Tranche 2 Loans or (b) would constitute Permitted Refinancing Indebtedness in respect of such Refinancing Eligible Debt.

"**Permitted Refinancing Indebtedness**" means Indebtedness that refunds, refinances, renews, replaces or extends any Indebtedness permitted to be incurred by the Company or any Restricted Subsidiary pursuant to the terms of this Agreement, whether involving the same or any other lender or creditor or group of lenders or creditors, but only to the extent that:

(a) the Permitted Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refunded, refinanced or extended or (b) at least 91 days after the last date on which the Final Maturity Date may occur,

(b) the Permitted Refinancing Indebtedness has a weighted average life to maturity that is equal to or greater than the remaining weighted average life to maturity of the Indebtedness being refunded, refinanced, renewed, replaced or extended,

(c) such Permitted Refinancing Indebtedness is in an aggregate principal amount that is less than or equal to the sum of (i) the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount) then outstanding plus all available commitments for funding under the Indebtedness being refunded, refinanced, renewed, replaced or extended, (ii) the amount of accrued and unpaid interest, if any, and premiums owed, if any, not in excess of preexisting prepayment provisions on such Indebtedness being refunded, refinanced, renewed, replaced or extended, (iii) the amount of reasonable and customary fees, expenses and costs related to the incurrence of such Permitted Refinancing Indebtedness and (iv) an amount equal to up to two percent (2%) of the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount) then outstanding under the Indebtedness being refunded, refinanced, renewed, replaced or extended with

32

respect to any required interest or payment reserves on such Permitted Refinancing Indebtedness,

(d)  unless such Permitted Refinancing Indebtedness is Permitted Exchange Indebtedness, it is incurred only by the same Person or Persons (or their successor(s)) that initially incurred (including by Guarantee) the Indebtedness being refunded, refinanced, renewed, replaced or extended or by a Credit Party or another Restricted Subsidiary (*provided*, that if the Indebtedness being refunded, refinanced, replaced, renewed or extended was initially incurred by the Company, until the occurrence of a Company Lien Event, such Permitted Refinancing Indebtedness is incurred by the Company); and

(e)  if the Indebtedness is (i) unsecured, such Permitted Refinancing Indebtedness is either unsecured or secured by Liens permitted pursuant to Section 8.02(b)(xix), or (ii) subordinated to the Obligations, such Permitted Refinancing Indebtedness is subordinated to the Obligations on terms at least as favorable to the Lenders as the Indebtedness being refinanced unless such Permitted Refinancing Indebtedness is Permitted Exchange Indebtedness.

"**Person**" means any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint stock company, trust, bank, trust company, land trust, business trust, joint venture, association, company or Governmental Authority or other entity.

"**Petition Date**" means the date on which the Debtors commence the Cases.

"**Plan**" means the Plan of Reorganization included in the Approved Restructuring Plan.

"**Platform**" means a business unit or units (or portions thereof) in the Company's "Transportation Finance," "Trade Finance," "Corporate Finance" or "Vendor Finance" business units or segments.

"**Platform Assets**" means, with respect to any Platform, any and all employees, assets (excluding Portfolio Assets and trade accounts receivable, but including the underlying trade finance contracts), personnel, systems, intellectual property, books and records, contracts and contractual rights, and other assets necessary for the operation of such Platform.

"**Platform Transfer**" means the contribution of a Platform and related Platform Assets to CIT Bank.

"**Pledged Collateral**" has the meaning set forth in Section 4.01.

"**Portfolio Assets**" means, any assets or rights acquired, funded, held, managed, financed, syndicated or otherwise generated or disposed of in the Ordinary Course of Business, including, without limitation, loans, leases, equipment, intellectual property rights, Securities and investment property (equity or otherwise), mortgages and instruments (negotiable or otherwise), receivables, trade payables or trade account receivables, and any other financial assets and the proceeds and products of the foregoing.

"**Public Lender**" has the meaning specified in Section 7.01.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) now existing or hereafter entered into which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures, or the purchase of credit default swaps.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Refinancing Eligible Debt**" means certain Indebtedness and obligations (including, in each case, accrued and unpaid interest (if any), premiums owed (if any) not in excess of prepayment provisions on such Indebtedness or obligations, which provisions were in existence on the Amendment Agreement Effective Date, and the amount of reasonable and customary fees, expenses and costs (if any) related thereto) in the maximum amounts, subject to the terms and conditions and secured by the collateral identified on Schedule 1.1B to the Amended Term Loan Agreement.

"**Refinancing Eligible Equipment**" means any or all of (a) the aircraft and related rights and documents subject to the ECA-supported financings described on Schedule 1.1B to the Amended Term Loan Agreement obtained by Madeleine Leasing Limited, as borrower, or (b) the railcars and other rolling stock and related rights and documents subject to the LILO Transactions, in each case as more fully described on Schedule 1.1B to the Amended Term Loan Agreement, as applicable.

"**Register**" has the meaning specified in Section 12.06(c).

"**Regulated Entity**" means any Person identified on Schedule 1.1C to the Amended Term Loan Agreement and each other Person identified by any Credit Party in writing to the Administrative Agent in accordance with Section 12.02 so long as, in each case, such Person is an entity directly regulated by a Governmental Authority, including CIT Bank and its subsidiaries, or whose assets or business consist primarily of assets (e.g., licenses) or businesses directly regulated by a Governmental Authority.

"**Regulation S-X**" means Regulation S-X as promulgated by the SEC under the Securities Act.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Reorganization Plan**" shall mean a plan of reorganization in any of the Cases.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the Aggregate Commitments or, if the obligation of the L/C Issuer to make Credit Extensions has been terminated pursuant to Section 10.02, Lenders holding in the aggregate more than 50% of the Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations being deemed "held" by such Lender for purposes of this definition); *provided*, that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means any individual holding the position of chairman of the board (if an officer), the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Credit Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Credit Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

"**Restricted Collateral**" means (a) the Term Loan Collateral listed on Schedule 1.1B of the Amended Term Loan Agreement, (b) all of the assets and property, whether now owned or hereafter acquired, of CMS Funding Company LLC and (c) all of the assets and property, whether now owned or hereafter acquired, of CIT Middle Market Funding, LLC.

"**Restricted Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Restricted Subsidiaries of that Person or a combination thereof; *provided*, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding. Notwithstanding the foregoing, the term Restricted Subsidiary shall not include (i) any Special Purpose Vehicle (whether bankruptcy remote or not), Regulated Entity, Joint Venture or Immaterial Subsidiary or any limited purpose trust of which an Owner Trustee is trustee (*provided* that, for avoidance of doubt, if any Person, corporation, partnership, limited liability company, association or other business entity (in each case that remains a subsidiary) shall cease to be a Regulated Entity, Special Purpose Vehicle, Joint Venture, Immaterial Subsidiary or any limited purpose trust of which an Owner-Trustee is the trustee, then that Person, corporation, partnership, limited liability company, association or other business entity shall be a Restricted Subsidiary and the Credit Parties will take all actions to comply with Sections 7.06 and 7.10), (ii) Care Investment Trust, Inc., or (iii) any subsidiary of any Person that is excluded from the term Restricted Subsidiary pursuant to the foregoing; *provided*, that (x) no Restricted Subsidiary shall at any time cease to be a Restricted Subsidiary unless at such time the Subsidiary Unrestriction Conditions have been satisfied or it is otherwise sold or liquidated in accordance with the provisions of this Agreement and (y) at no time shall any of CIT Funding, CIT Middle Market Funding, LLC, CMS Funding Company LLC or CIT Financial Ltd. cease to be a Restricted Subsidiary unless it is otherwise sold in accordance with the provisions of this Agreement.

"**Revaluation Date**" means, with respect to any Letter of Credit, each of the following: (i) each date of issuance or renewal of a Letter of Credit denominated in an Alternative Currency, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by the L/C

Issuer under any Letter of Credit denominated in an Alternative Currency, (iv) the first Business Day of each month and (v) such additional dates as the Administrative Agent or the L/C Issuer shall determine (including, without limitation, on any date when the L/C Issuer issues an airway bill release, steamship guarantee or a banker's acceptance in respect of a time Letter of Credit) or the Required Lenders shall require.

"**Same Day Funds**" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be reasonably determined by the Administrative Agent or the L/C Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Parties**" has the meaning specified in Section 4.02.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Laws**" means the Securities Act, the Exchange Act, Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the Securities and Exchange Commission or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"**Significant Subsidiary**" means each of (a) any Restricted Subsidiary or Regulated Entity that would constitute a direct or indirect "significant subsidiary" (as defined in Regulation S-X) of the Company and (b) any group of Restricted Subsidiaries and/or Regulated Entities of the Company that collectively would

constitute a direct or indirect "significant subsidiary" (as defined in Regulation S-X) of the Company.

"**Solvent**" means that, with respect to any Borrower, as of the date of determination, (a) the sum of such Borrower's debt and liabilities (including contingent liabilities) does not exceed the present fair saleable value of such Borrower's present assets; (b) such Borrower's capital is not unreasonably small in relation to its business as contemplated on the Closing Date or with respect to any transaction contemplated to be undertaken after the Closing Date; and (c) such Borrower does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise). For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"**Special Purpose Vehicle**" means a Person formed by the Company or a subsidiary of the Company for a limited purpose or with a limited business purpose in connection with its Ordinary Course of Business.

"**Spot Rate**" for a currency means the rate determined by the Administrative Agent or the L/C Issuer, as applicable, to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange computation is made; *provided*, that the Administrative Agent or the L/C Issuer may obtain such spot rate from another financial institution designated by the Administrative Agent or the L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and *provided further* that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Letter of Credit denominated in an Alternative Currency.

"**Sterling**" and "**£**" mean the lawful currency of the United Kingdom.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or

other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly, or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Subsidiary Borrower**" means each Borrower other than the Company.

"**Subsidiary Collateral Account**" means a Cash Collateral Account of any Subsidiary Borrower and any replacement, additional or successor Cash Collateral Account.  The Subsidiary Collateral Account of each Subsidiary Borrower as it exists on the date hereof is identified opposite the name each such Subsidiary Borrower on Schedule 4.01.

"**Subsidiary Guarantor**" means each Subsidiary of the Company that guarantees the obligations under the Amended Term Loan Agreement from time to time; *provided*, that at no time shall CIT Funding guarantee the obligations hereunder.

"**Subsidiary Unrestriction Conditions**" means, with respect to the proposed unrestriction of any Restricted Subsidiary of any Credit Party at any time, (a) no Event of Default shall have then occurred and be continuing; (b) such Restricted Subsidiary shall not own any Capital Stock in any Credit Party or any Restricted Subsidiary thereof; and (c) the Administrative Agent shall have received a duly executed certificate from an Authorized Officer of Company certifying the satisfaction of the foregoing conditions, together with such back-up information as the Administrative Agent may reasonably request in connection therewith.

"**Superpriority Claim**" shall mean a claim against the Company in the Case of the Company which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"**TARGET Day**" means any day on which the Trans-European Automated Real-time Gross Settlement Express Transfer (TARGET) payment system (or, if such payment system ceases to be operative, such other payment system (if any) determined by the Administrative Agent to be a suitable replacement) is open for the settlement of payments in Euro.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan**" has the meaning specified for such term in the Amended Term Loan Agreement.

"**Term Loan Agent**" means the Administrative Agent under the Amended Term Loan Agreement.

"**Term Loan Collateral**" has the meaning specified for the term "Collateral" in the Amended Term Loan Agreement.

"**Term Loan Maturity Date**" means January 20, 2012 or January 20, 2013, whichever is the latest maturity date in effect with respect to Tranche 2 Term Loans.

"**Term Loan Obligations**" has the meaning specified for the term "Obligations" in the Amended Term Loan Agreement.

"**Terrorism Laws**" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Patriot Act (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"**Total Assets**" means the total consolidated assets of the Company and its Subsidiaries as set forth on the most recent consolidated balance sheet of the Company and its Subsidiaries delivered pursuant to Section 7.01(a) or (b)immediately preceding the date on which any calculation of Total Assets is being made.

"**Total Collateral Amount**" means, at any time, the aggregate amount of all Eligible Collateral at such time.

"**Total Collateral Requirement**" means, on any date, an amount equal to the sum of (A) 105% of the Total Outstandings with respect to Letters of Credit

40

denominated in Dollars at such time, (B) 115% of the Dollar Equivalent of the Total Outstandings with respect to Letters of Credit denominated in Euro or Sterling at such time, and (C) 120% of the Dollar Equivalent of the Total Outstandings with respect to Letters of Credit denominated in Thai Baht, Hong Kong Dollars, Canadian Dollars, Mexican Peso, Indian Rupee or any other Alternative Currency at such time.

"**Total Outstandings**" means, on any date, the aggregate Outstanding Amount of all L/C Obligations.

"**Tranche 2 Term Loan Commitment**" has the meaning specified in the Amended Term Loan Agreement.

"**Tranche 2 Term Loans**" has the meaning specified in the Amended Term Loan Agreement.

"**TRS Facility**" means that certain ISDA Master Agreement, Schedule to the ISDA Master Agreement, Credit Support Annex and Confirmation, each dated June 6, 2008, between CIT Financial Ltd. and Goldman Sachs International, as modified pursuant to the Amended and Restated Confirmation dated October 28, 2009, between CIT Financial Ltd. and Goldman Sachs International, the guarantee in support of the obligations of CIT Financial Ltd. thereunder by the Company, and the guarantees in support of the obligations of CIT Financial Ltd. thereunder by the Company and CIT Financial (Barbados) Srl, in each case as amended, supplemented, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"**UCC**" or "**Uniform Commercial Code**" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of any applicable Requirement of Law, any of the attachment, perfection or priority of the Administrative Agent's or any other Secured Party's security interest in any Pledged Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unreimbursed Amount**" has the meaning specified in Section 2.01(c)(i).

"**Utilization Fee**" has the meaning specified in Section 2.03(b).

"**Wholly-Owned**" means, with respect to a subsidiary of a Person, a subsidiary of such Person all of the outstanding Capital Stock of which (other than (x) director's qualifying shares required by law, (y) shares owned by any director, officer or employee of the Company or any of its subsidiaries and (z) shares issued to foreign nationals to the extent required by applicable foreign law) are owned by such Person and/or by one or more Wholly-Owned Subsidiaries of such Person.

"**Wholly-Owned Subsidiary**" means, with respect to any Person, any other Person all of the Capital Stock of which (other than (x) director's qualifying shares, (y) shares owned by any director, officer or employee of the Company or any of its subsidiaries and (z) shares issued to foreign nationals to the extent required by applicable foreign law) is owned by such Person directly and/or through other Wholly-Owned Subsidiaries.

Section 1.02. *Other Interpretive Provisions.* With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Credit Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (iv) all references in a Credit Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Credit Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the

same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

Section 1.03.  *Accounting Terms.*

(a)     *Generally*.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, *except* as otherwise specifically prescribed herein.

(b)     *Changes in GAAP*.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); *provided*, that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.04.  *Rounding.*  Any financial ratios required to be maintained by the Credit Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05.  *Exchange Rates*; *Currency Equivalents.*  (a) The Administrative Agent or the L/C Issuer, as applicable, shall determine the Spot

Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  Except for purposes of financial statements delivered by Credit Parties hereunder or calculating financial covenants hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Credit Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent or the L/C Issuer, as applicable.

(b)     Wherever in this Agreement in connection with the issuance, amendment or extension of a Letter of Credit, an amount, such as a required minimum or multiple amount, is expressed in Dollars, but such Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the L/C Issuer.

Section 1.06.  *Additional Alternative Currencies.*  (a) The Company may from time to time request that Letters of Credit be issued in a currency other than those specifically listed in the definition of "**Alternative Currency;**" *provided* that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars.  Such request shall be subject to the approval of the Administrative Agent and the L/C Issuer.

(b)     Any such request shall be made to the Administrative Agent not later than 11:00 a.m., 10 Business Days prior to the date of the desired Credit Extension (or such other time or date as may be agreed by the Administrative Agent and the L/C Issuer, in their sole discretion).  The Administrative Agent shall promptly notify the L/C Issuer of any such request.  The L/C Issuer shall notify the Administrative Agent, not later than 11:00 a.m., five Business Days after receipt of such request whether it consents, to the issuance of Letters of Credit in such requested currency (such consent not to be unreasonably withheld or delayed).

(c)     Any failure by the L/C Issuer to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by the L/C Issuer to permit Letters of Credit to be issued in such requested currency. If the Administrative Agent and the L/C Issuer consent to the issuance of Letters of Credit in such requested currency, the Administrative Agent shall so notify the Company and such currency shall thereupon be deemed for all purposes to be an

44

Alternative Currency hereunder for purposes of any Letter of Credit issuances. If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.06, the Administrative Agent shall promptly so notify the Company.

Section 1.07. *Change of Currency*.  Each obligation of the Borrowers to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the date hereof shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation).  If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency.

(a)      Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(b)      Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

Section 1.08. *Times of Day*.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.09. *Letter of Credit Amounts*.  Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the Dollar Equivalent of the stated amount of such Letter of Credit in effect at such time; *provided*, that with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the Dollar Equivalent of the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

45

## ARTICLE 2
### THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01.  *Letters of Credit.*

(a)  *The Letter of Credit Commitment.*

(i)  Subject to the terms and conditions set forth herein, (A) the L/C Issuer agrees, in reliance upon the agreements of the Lenders set forth in this Section 2.01, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars or in one or more Alternative Currencies for the account of one or more of the Borrowers and to amend or extend Letters of Credit previously issued by it, in accordance with subsection (b) below, and (2) to honor drawings under the Letters of Credit; and (B) the Lenders severally agree to participate in Letters of Credit issued for the account of one or more of the Borrowers or and any drawings thereunder; *provided*, that after giving effect to any Credit Extension with respect to any Letter of Credit, (x) the Total Outstandings shall not exceed the Aggregate Commitments and (y) the Collateral Delivery Condition shall have been satisfied with respect to such Credit Extension.  Each request by the Company or by the relevant Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Company or such Borrower that the Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrowers' ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrowers may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)  The L/C Issuer shall not issue any Letter of Credit, if:

(A)  subject to Section 2.01(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Lenders have approved such expiry date; or

(B)  the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all Lenders have approved such expiry date.

46

(iii)     The L/C Issuer shall not be under any obligation to issue any Letter of Credit if:

(A)     any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or request that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense (for which the L/C Issuer is not otherwise compensated hereunder) which was not applicable on the Closing Date and which the L/C Issuer in good faith deems material to it;

(B)     the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally;

(C)     except as otherwise agreed by the Administrative Agent and the L/C Issuer, such Letter of Credit is in an initial stated amount less than $10,000;

(D)     except as otherwise agreed by the Administrative Agent and the L/C Issuer, such Letter of Credit is to be denominated in a currency other than Dollars or an Alternative Currency;

(E)     such Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder;

(F)     a Financing Order shall at any time (1) cease to be in full force and effect, (2) be subject to a pending appeal or motion for leave to appeal, reversed or modified in a manner material and adverse to the L/C Issuer or (3) be stayed.

47

(iv)     The L/C Issuer shall not amend any Letter of Credit if the L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof.

(v)     The L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) the L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)     The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article 11 with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article 11 included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(vii)     The L/C Issuer shall be under no obligation to issue time Letters of Credit in an aggregate amount outstanding at any time in excess of 10% of the aggregate Commitments at such time.

(viii)     The L/C Issuer shall be under no obligation to issue "direct-pay" Letters of Credit.

(b)     *Procedures for Issuance and Amendment of Letters of Credit; Auto-Extension Letters of Credit.*  (i) Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Company or relevant Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by an Authorized Signatory of the Company or the relevant Borrower, as the case may be.  Any Borrower may be a co-account party with the Company on any Letter of Credit issued at the request of such Borrower, including for avoidance of doubt being a co-account party with respect to the relevant Letter of Credit Application.  Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 11:00 a.m. at least two Business Days (or such later date and time as the Administrative Agent and the L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in

48

form and detail reasonably satisfactory to the L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount and currency thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (G) the purpose and nature of the requested Letter of Credit; and (H) such other matters as the L/C Issuer may reasonably require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail satisfactory to the L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the L/C Issuer may reasonably require. Upon delivery of any Letter of Credit Application, the relevant Borrower (or, in the case of any Letter of Credit Application delivered prior to the date on which the Final DIP Order shall have become a Final Order, the Company) shall transfer to its Collateral Account Eligible Collateral in an amount equal to the product of (x) the face amount of the requested Letter of Credit (as calculated pursuant to Section 1.09) and (y) with respect to Letters of Credit denominated in Dollars, 105%, with respect to Letters of Credit denominated in Euro or Sterling, 115% and with respect to Letters of Credit denominated in any other currency, 120%. Additionally, the Company shall furnish to the L/C Issuer and the Administrative Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, including any Issuer Documents, as the L/C Issuer or the Administrative Agent may reasonably require.

(ii) Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Company or the relevant Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the L/C Issuer has received written notice from any Lender, the Administrative Agent or any Credit Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article 5 shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the applicable Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices. Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the L/C Issuer a risk

49

participation in such Letter of Credit in an amount equal to the product of such Lender's Applicable Percentage times the amount of such Letter of Credit.

(iii)     If the Company so requests in any applicable Letter of Credit Application, the L/C Issuer may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "**Auto-Extension Letter of Credit**"); *provided*, that any such Auto-Extension Letter of Credit must permit the L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving 30 days' (or such other number of days as the L/C Issuer may agree) prior notice to the beneficiary thereof not later than a day (the "**Non-Extension Notice Date**") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued.  Unless otherwise directed by the L/C Issuer, neither the Company nor the applicable Borrower shall be required to make a specific request to the L/C Issuer for any such extension.  Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the L/C Issuer to permit the extension of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; *provided*, that the L/C Issuer shall not permit any such extension if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.01(a) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Administrative Agent that the Required Lenders have elected not to permit such extension or (2) from the Administrative Agent, any Lender or the Company that one or more of the applicable conditions specified in Section 5.02 is not then satisfied, and in each such case directing the L/C Issuer not to permit such extension.

(iv)     Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Company and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)     *Drawings and Reimbursements; Funding of Participations.*  (i) Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify the Company, the

relevant Borrower and the Administrative Agent thereof. In the case of a Letter of Credit denominated in an Alternative Currency, the relevant Borrower shall reimburse the L/C Issuer in such Alternative Currency, unless (A) the L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars, or (B) in the absence of any such requirement for reimbursement in Dollars, the Company or relevant Borrower shall have notified the L/C Issuer promptly following receipt of the notice of drawing that the Company or the relevant Borrower will reimburse the L/C Issuer in Dollars. In the case of any such reimbursement in Dollars of a drawing under a Letter of Credit denominated in an Alternative Currency, the L/C Issuer shall notify the Company and the relevant Borrower of the Dollar Equivalent of the amount of the drawing promptly following the determination thereof. Not later than 11:00 a.m. on the second Business Day following the date of any payment (or, in the case of any commercial Letter of Credit, not later than 11:00 a.m. on any date of payment) by the L/C Issuer under a Letter of Credit to be reimbursed in Dollars, or the Applicable Time on the date of any payment by the L/C Issuer under a Letter of Credit to be reimbursed in an Alternative Currency (each such date, an "**Honor Date**"), the relevant Borrower shall reimburse the L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing and in the applicable currency; *provided*, that the L/C Issuer may require the relevant Borrower to deposit the amount of any such drawing prior to making any payment under a commercial Letter of Credit in accordance with its usual procedures applicable to commercial Letters of Credit. If the relevant Borrower fails to so reimburse the L/C Issuer by such time, the L/C Issuer may request that the Administrative Agent apply Pledged Collateral first, from the Collateral Account of the Borrower for whose account such drawn Letter of Credit was issued, and second, if any unreimbursed amount remains outstanding after the application of such funds, from the Collateral Account of any other Borrower to reimburse the L/C Issuer in the amount of the unreimbursed drawing (expressed in Dollars in the amount of the Dollar Equivalent thereof in the case of a Letter of Credit denominated in an Alternative Currency) (the "**Unreimbursed Amount**"). If the Administrative Agent is unable for any reason to apply the Pledged Collateral to reimburse the L/C Issuer within one Business Day of such request, the Administrative Agent shall promptly notify each Lender of the Honor Date, the Unreimbursed Amount and the amount of such Lender's Applicable Percentage thereof. Any notice given by the L/C Issuer or the Administrative Agent pursuant to this Section 2.01(c)(i) may be given by telephone if immediately confirmed in writing; *provided*, that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii) Each Lender shall upon any notice pursuant to Section 2.01(c)(i) make funds available to the Administrative Agent for the account of the L/C Issuer, in Dollars, at the Administrative Agent's Office

for Dollar-denominated payments in an amount equal to its Applicable Percentage of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day specified in such notice by the Administrative Agent. The Administrative Agent shall remit the funds so received to the L/C Issuer in Dollars.

(iii)     With respect to any Unreimbursed Amount, the relevant Borrower shall be deemed to have incurred from the L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest from and including to but excluding the second Business Day after the Honor Date at the Eurocurrency Rate, and for each day thereafter, at the Default Rate. In such event, each Lender's payment to the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.01(c)(ii) shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.01.

(iv)     Until each Lender funds its L/C Advance pursuant to this Section 2.01(c) to reimburse the L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Applicable Percentage of such amount shall be solely for the account of the L/C Issuer.

(v)     Each Lender's obligation to make L/C Advances to reimburse the L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.01(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the L/C Issuer, the Company, the relevant Borrower, any Subsidiary or any other Person for any reason whatsoever; (B) the occurrence or continuance of a Default, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing. No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Company to reimburse the L/C Issuer for the amount of any payment made by the L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)     If any Lender fails to make available to the Administrative Agent for the account of the L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.01(c) by the time specified in Section 2.01(c)(ii), the L/C Issuer shall be entitled

52

to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the L/C Issuer at a rate per annum equal to the applicable Overnight Rate from time to time in effect, *plus* any administrative, processing or similar fees customarily charged by the L/C Issuer in connection with the foregoing.  If such Lender pays such amount (with interest and fees as aforesaid), the amount so paid shall constitute such Lender's L/C Advance in respect of the relevant L/C Borrowing.  A certificate of the L/C Issuer submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (vi) shall be conclusive absent manifest error.

(d)     *Repayment of Participations.*  (i) At any time after the L/C Issuer has made a payment under any Letter of Credit and has received from any Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.01(c), if the Administrative Agent receives for the account of the L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Company, relevant Borrower or otherwise, including proceeds of Pledged Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Applicable Percentage thereof in Dollars and in the same funds as those received by the Administrative Agent.

(ii)     If any payment received by the Administrative Agent for the account of the L/C Issuer pursuant to Section 2.01(c)(i) is required to be returned under any of the circumstances described in Section 12.05 (including pursuant to any settlement entered into by the L/C Issuer in its discretion), each Lender shall pay to the Administrative Agent for the account of the L/C Issuer its Applicable Percentage thereof on demand of the Administrative Agent, *plus* interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the applicable Overnight Rate from time to time in effect. The obligations of the Lenders under this clause shall survive the payment in full of the Obligations and the termination of this Agreement.

(e)     *Obligations Absolute.*  The obligation of the relevant Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(NY) 02826/146/CA/cit.group.lc.ca.doc                                          11/01/09 9:25 PM

(i)     any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Credit Document;

(ii)     the existence of any claim, counterclaim, setoff, defense or other right that the Company, the relevant Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)     any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)     any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)     any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Company or any Subsidiary or in the relevant currency markets generally; or

(vi)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Company or any Subsidiary.

The Company or relevant Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Company's or relevant Borrower's instructions or other irregularity, the Company or relevant Borrower will immediately notify the L/C Issuer.  The Company or relevant Borrower shall be

conclusively deemed to have waived any such claim against the L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f)     *Role of L/C Issuer.*  Each Lender, the Company and each other Borrower agree that, in paying any drawing under a Letter of Credit, the L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document.  The Company hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided*, that this assumption is not intended to, and shall not, preclude the Company's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuer, the Administrative Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.01(e); *provided*, that anything in such clauses to the contrary notwithstanding, the Company and the Borrowers may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Company and the Borrowers, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Company or a Borrower which the Company or such Borrower proves were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)     *Applicability of ISP and UCP.*  Unless otherwise expressly agreed by the L/C Issuer and the relevant Borrower when a Letter of Credit is issued, (i)

55

the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance shall apply to each commercial Letter of Credit.

(h)    *Conflict with Issuer Documents*.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(i)    *Letters of Credit Issued for Subsidiaries*.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Company and any other Borrower of which such Subsidiary is a subsidiary shall be jointly and severally obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit; *provided*, if such Subsidiary is a subsidiary of a Borrower that is a Foreign Subsidiary, only such Borrower and the Company shall be jointly and severally obligated to reimburse the L/C Issuer hereunder.  The Company and each such Borrower hereby acknowledge that the issuance of Letters of Credit for the account of such Subsidiaries inures to the benefit of the Company and each such Borrower, and that their business derives substantial benefits from the businesses of such Subsidiaries.

Section 2.02.  *Termination or Reduction of Commitments*.  The Company may, upon notice to the Administrative Agent, terminate the Aggregate Commitments, or from time to time permanently reduce the Aggregate Commitments; *provided*, that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof, and (iii) the Company shall not terminate or reduce the Aggregate Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Outstandings would exceed the Aggregate Commitments. The Administrative Agent will promptly notify the Lenders of any such notice of termination or reduction of the Aggregate Commitments.  Any reduction of the Aggregate Commitments shall be applied to the Commitment of each Lender according to its Applicable Percentage.  All fees accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

Section 2.03.  *Fees*.

(a)    *Commitment Fees*.  The Company shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable

56

Percentage, a commitment fee (the "**Commitment Fee**") in Dollars equal to the Applicable Rate times the actual daily amount by which the Aggregate Commitments exceed the Total Outstandings. The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article 5 is not met (or waived), and shall be calculated, and due and payable, monthly in arrears on the first Business Day after the end of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Commitment Fees shall accrue at the Default Rate.

(b)     *Utilization Fees.* The Company shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a utilization fee (the "**Utilization Fee**") in Dollars equal to the Applicable Rate times the Dollar Equivalent of the Total Outstandings on each day. Utilization Fees shall be due and payable monthly in arrears on the first Business Day after the end of each month, commencing with the first such date to occur after the issuance of a Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Utilization Fees shall accrue at the Default Rate.

(c)     *Documentary and Processing Charges Payable to L/C Issuer.* The Company shall pay directly to the L/C Issuer for its own account, in Dollars, an issuing fee of $1,500 for each Letter of Credit issued, and customary presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(d)     *Other Fees.* (i) The Company shall pay to the Arranger and the Administrative Agent for their own respective accounts, in Dollars, fees in the amounts and at the times specified in the Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(ii)     The Company shall pay to the Lenders, in Dollars, such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.04. *Computation of Interest And Fees.* All computations of interest when the Base Rate is determined by Bank of America's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and

actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Obligation for the day on which the Obligation is incurred, and shall not accrue on an Obligation, or any portion thereof, for the day on which the Obligation or such portion is paid; *provided*, that any Obligation that is repaid on the same day on which it is made shall, subject to Section 2.06(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.05. *Evidence of Debt.* (a) The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b) In addition to the accounts and records referred to in subsection (a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records evidencing the purchases and sales by such Lender of participations in Letters of Credit. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

Section 2.06. *Payments Generally*; *Administrative Agent's Clawback.*

(a) *General*. All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. on the date specified herein. Without limiting the generality of the foregoing, the Administrative Agent may require that any payments due under this Agreement be made in the United States. If, for any reason, any Borrower is

prohibited by any Law from making any required payment hereunder in an Alternative Currency, such Borrower shall make such payment in Dollars in the Dollar Equivalent of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent (i) after 2:00 p.m., in the case of payments in Dollars, or (ii) after the Applicable Time specified by the Administrative Agent in the case of payments in an Alternative Currency, shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by any Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)     *Payments by Borrowers*; *Presumptions by Administrative Agent.* Unless the Administrative Agent shall have received notice from a Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the L/C Issuer hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the L/C Issuer, as the case may be, the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Lenders or the L/C Issuer, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or the L/C Issuer, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

A notice of the Administrative Agent to any Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     *Obligations of Lenders Several.* The obligations of the Lenders hereunder to fund participations in Letters of Credit and to make payments pursuant to Section 12.04(c) are several and not joint. The failure of any Lender to fund any such participation or to make any payment under Section 12.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so purchase its participation or to make its payment under Section 12.04(c).

Section 2.07.  *Sharing of Payments by Lenders.*  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of the participations in L/C Obligations held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such participations and accrued interest thereon greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) subparticipations in L/C Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on the amounts owing them; *provided*, that:

(i)     if any such subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by a Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of subparticipations in L/C Obligations to any assignee or participant, other than to the Company or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a subparticipation pursuant to the foregoing arrangements may exercise against such Credit Party rights of setoff and counterclaim with respect to such subparticipation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such subparticipation.

Section 2.08.  *Designated Borrowers.* (a)  Effective as of the date hereof, each Restricted Subsidiary set forth in Schedule 2.08 shall be a "**Designated Borrower**" hereunder and may have Letters of Credit issued for its account on the terms and conditions set forth in this Agreement.

(b)     The Company may at any time, with the consent of the Administrative Agent and the L/C Issuer (such consent not to be unreasonably withheld), upon not less than the greater of (i) 15 Business Days' notice from the Company to the Administrative Agent and (ii) a commercially reasonable period (or such shorter period as may be agreed by the Administrative Agent in its sole discretion), designate any Non-Debtor Subsidiary of the Company (an "**Applicant**

60

**Borrower**") as an additional Designated Borrower to have Letters of Credit issued for its account hereunder by delivering to the Administrative Agent (which shall promptly deliver counterparts thereof to each Lender) a duly executed notice and agreement in substantially the form of Exhibit B (a "**Designated Borrower Request and Assumption Agreement**").  The parties hereto acknowledge and agree that prior to any Applicant Borrower becoming entitled to utilize the credit facilities provided for herein the Administrative Agent, the L/C Issuer and the Lenders shall have received (x) such supporting resolutions, incumbency certificates, opinions of counsel and other documents or information, in form, content and scope reasonably satisfactory to the Administrative Agent, as may be reasonably required by the Administrative Agent or the Required Lenders and (y) an application fee of $1,000 with respect to each request.  If the Administrative Agent and the Required Lenders agree that an Applicant Borrower shall be entitled to have Letters of Credit issued for its account hereunder, then promptly following receipt of all such requested resolutions, incumbency certificates, opinions of counsel and other documents or information and the application fee, the Administrative Agent shall send a notice in substantially the form of Exhibit C (a "**Designated Borrower Notice**") to the Company and the Lenders specifying the effective date upon which the Applicant Borrower shall constitute a Designated Borrower for purposes hereof, whereupon each of the Lenders agrees to permit such Designated Borrower to have Letters of Credit issued for its account hereunder, on the terms and conditions set forth herein, and each of the parties agrees that such Designated Borrower otherwise shall be a Borrower for all purposes of this Agreement; *provided*, that no Letter of Credit Application may be submitted by or on behalf of such Designated Borrower until a commercially reasonable time not less than five Business Days after such effective date.

(c)  The Obligations of the Company and each Designated Borrower that is a Domestic Subsidiary shall be joint and several in nature.  The Obligations of all Designated Borrowers that are Foreign Subsidiaries shall be several in nature.

(d)  Each Subsidiary of the Company that is or becomes a "**Designated Borrower**" pursuant to this Section 2.08 hereby irrevocably appoints the Company as its agent for all purposes relevant to this Agreement and each of the other Credit Documents, including (i) the giving and receipt of notices and (ii) the execution and delivery of all documents, instruments and certificates contemplated herein and all modifications hereto.  Any acknowledgment, consent, direction, certification or other action which might otherwise be valid or effective only if given or taken by all Borrowers, or by each Borrower acting singly, shall be valid and effective if given or taken only by the Company, whether or not any such other Borrower joins therein.  Any notice, demand, consent, acknowledgement, direction, certification or other communication delivered to the

61

Company in accordance with the terms of this Agreement shall be deemed to have been delivered to each Designated Borrower.

(e)     The Company may from time to time, upon not less than five Business Days' notice from the Company to the Administrative Agent (or such shorter period as may be agreed by the Administrative Agent in its sole discretion), terminate a Designated Borrower's status as such; *provided*, that there are no outstanding Letters of Credit issued for the benefit of such Designated Borrower, or other amounts payable by such Designated Borrower on account of any Letters of Credit issued for its benefit, as of the effective date of such termination. The Administrative Agent will promptly notify the Lenders of any such termination of a Designated Borrower's status.

Section 2.09.  *Extension of Maturity Date.*

(a)     *Requests for Extension.*  The Company may, by notice to the Administrative Agent (who shall promptly notify the L/C Issuer and the Lenders) on the date that is three (3) months after the Closing Date, and each date that is three (3) months thereafter (each, such date, an "**Extension Request Date**"), request that each Lender extend such Lender's Maturity Date for an additional three months from the Maturity Date then in effect hereunder (the "**Existing Maturity Date**").

(b)     *Lender Elections to Extend.*  Each Lender, acting in its sole and individual discretion, shall, by notice to the Administrative Agent given not later than the date (the "**Notice Date**") that is ten Business Days after the Extension Request Date, advise the Administrative Agent whether or not such Lender agrees to such extension (and each Lender that determines not to so extend its Maturity Date (a "**Non-Extending Lender**") shall notify the Administrative Agent of such fact promptly after such determination (but in any event no later than the Notice Date) and any Lender that does not so advise the Administrative Agent on or before the Notice Date shall be deemed to be a Non-Extending Lender.  The election of any Lender to agree to such extension shall not obligate any other Lender to so agree.

(c)     *Notification by Administrative Agent.*  The Administrative Agent shall notify the Company of each Lender's determination under this Section no later than the date that is fifteen (15) Business Days after the Extension Request Date (or, if such date is not a Business Day, on the next preceding Business Day).

(d)     *Additional Commitment Lenders.*  The Company shall have the right to replace each Non-Extending Lender with, and add as "**Lenders**" under this Agreement in place thereof, one or more Eligible Assignees (each, an

62

"**Additional Commitment Lender**") as provided in Section 12.13; *provided*, that each of such Additional Commitment Lenders shall enter into an Assignment and Assumption pursuant to which such Additional Commitment Lender shall, effective as of the Existing Maturity Date, undertake a Commitment (and, if any such Additional Commitment Lender is already a Lender, its Commitment shall be in addition to such Lender's Commitment hereunder on such date).

(e)      *Extension Requirement*.  If (and only if) the total of the Commitments of the Lenders that have agreed so to extend their Maturity Date (each, an "**Extending Lender**") and the additional Commitments of the Additional Commitment Lenders shall be (x) more than 50% of the aggregate amount of the Commitments in effect immediately prior to the Existing Maturity Date and (y) equal to or greater than the Total Outstandings as of the Existing Maturity Date, then, effective as of the Existing Maturity Date, the Maturity Date of each Extending Lender and of each Additional Commitment Lender shall be extended to the date falling three months after the Existing Maturity Date (except that, if such date is not a Business Day, such Maturity Date as so extended shall be the next preceding Business Day) and each Additional Commitment Lender shall thereupon become a "**Lender**" for all purposes of this Agreement.

(f)      *Conditions to Effectiveness of Extensions*.  As a condition precedent to such extension, the Company shall deliver to the Administrative Agent a certificate of each Credit Party dated as of the Existing Maturity Date (in sufficient copies for each Extending Lender and each Additional Commitment Lender) signed by a Responsible Officer of such Credit Party (i) certifying and attaching the resolutions adopted by such Credit Party approving or consenting to such extension and (ii) certifying that, before and after giving effect to such extension, (A) the representations and warranties contained in Article 6 and the other Credit Documents are true and correct in all material respects on and as of the Existing Maturity Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects as of such earlier date, and except that for purposes of this Section 2.09, the representations and warranties contained in Section 6.07 shall be deemed to refer to the most recent statements furnished pursuant to subsections (a) and (b) of Section 7.01, and (B) no Default exists.  In addition, on the Maturity Date of each Non-Extending Lender, the Commitment of such Lender shall terminate, any accrued Obligations of such Lender shall be prepaid and each Extending Lender's and Additional Commitment Lender's Applicable Percentage of the Total Outstandings shall be automatically adjusted as necessary to keep the Total Outstandings ratable with any revised Applicable Percentages of the respective Lenders effective as of such date.

(g)     *Conflicting Provisions*.  This Section shall supersede any provisions in Section 2.07 or Section 12.01 to the contrary.

Section 2.10.  *Priority and Liens.*  The Borrowers hereby covenant, represent and warrant that, (a) upon entry of a Financing Order, the Obligations of the Company hereunder and under the Credit Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several allowed administrative expense claims in the Cases having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all Pledged Collateral posted by the Debtors and maintained in the Company Collateral Account and any direct investments of the funds contained therein; and (b) from and after the Closing Date, the obligations of the Subsidiary Borrowers hereunder and under the Credit Documents shall at all times be secured by a perfected first priority Lien on all Pledged Collateral maintained in the Subsidiary Collateral Accounts and any direct investments of the funds contained therein.

Section 2.11.  *No Discharge*; *Survival of Claims.*  The Company agrees that (i) its Obligations hereunder shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Company, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent pursuant to the Financing Orders and described in Section 5.01(a) and the Liens granted to the Administrative Agent pursuant to the Financing Orders and described in Section 4.02 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

Section 2.12.  *Assumption Upon Emergence.*  Pursuant to the Approved Restructuring Plan and upon the effective date thereof, all of the assets of the Company shall have vested in the reorganized Company (the "**Reorganized Company**") in a manner reasonably acceptable to the Administrative Agent. Upon the effective date of the Approved Restructuring Plan, automatically and without any further consent or action required by the Administrative Agent, the L/C Issuer or any Lender, the Company, in its capacity as Reorganized Company, shall assume all of its Obligations hereunder and all other monetary obligations in respect hereof, all parties hereto shall continue to be bound hereby and each reference herein to "the Company" shall be deemed to be a reference to the Reorganized Company.

# ARTICLE 3
## TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01. *Taxes.*

(a) *Payments Free of Taxes*; *Obligation to Withhold*; *Payments on Account of Taxes.* (i) Any and all payments by or on account of any obligation of the respective Borrowers hereunder or under any other Credit Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes. If, however, applicable Laws require any Borrower or the Administrative Agent to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such Laws as determined by such Borrower or the Administrative Agent, as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii) If any Borrower or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by such Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii) If any Borrower or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment, then (A) such Borrower or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount so withheld or deducted by it to the relevant Governmental Authority in accordance with

65

such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by such Borrower shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or L/C Issuer, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b) *Payment of Other Taxes by the Borrowers.* Without limiting the provisions of subsection (a) above, each Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c) *Tax Indemnifications.* (i) Without limiting the provisions of subsection (a) or (b) above, each Borrower shall, and does hereby, indemnify the Administrative Agent, each Lender and the L/C Issuer, and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) withheld or deducted by such Borrower or the Administrative Agent or paid by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and any penalties, interest and reasonable expenses and costs arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Any indemnification payments in respect of expenses and costs made pursuant to this Section 3.01(c)(i) shall be made on an after-Tax basis, such that after all required deductions and payments of all Indemnified Taxes or Other Taxes, the Administrative Agent, each Lender and the L/C Issuer receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Indemnified Taxes and Other Taxes or expenses and costs. Each Borrower shall also, and does hereby, indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a Lender or the L/C Issuer for any reason fails to pay indefeasibly to the Administrative Agent as required by clause (ii) of this subsection. A certificate as to the amount of any such payment or liability delivered to a Borrower by a Lender or the L/C Issuer (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or the L/C Issuer, shall be conclusive absent manifest error.

(ii) Without limiting the provisions of subsection (a) or (b) above, each Lender and the L/C Issuer shall, and does hereby, indemnify each Borrower and the Administrative Agent, and shall make payment in

respect thereof within 10 days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel for such Borrower or the Administrative Agent) incurred by or asserted against such Borrower or the Administrative Agent by any Governmental Authority as a result of the failure by such Lender or the L/C Issuer, as the case may be, to deliver, or as a result of the inaccuracy, inadequacy or deficiency of, any documentation required to be delivered by such Lender or the L/C Issuer, as the case may be, to such Borrower or the Administrative Agent pursuant to subsection (e). Each Lender and the L/C Issuer hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or the L/C Issuer, as the case may be, under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this clause (ii). The agreements in this clause (ii) shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender or the L/C Issuer, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all other Obligations.

(d) *Evidence of Payments*. Upon request by a Borrower or the Administrative Agent, as the case may be, after any payment of Taxes by such Borrower or by the Administrative Agent to a Governmental Authority as provided in this Section 3.01, such Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to such Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to such Borrower or the Administrative Agent, as the case may be.

(e) *Status of Lenders*; *Tax Documentation*. (i) Each Lender shall deliver to the Company and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit the Company or the Administrative Agent, as the case may be, to determine (A) whether or not payments made by the respective Borrowers hereunder or under any other Credit Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by the respective Borrowers pursuant to this Agreement or otherwise to

establish such Lender's status for withholding tax purposes in the applicable jurisdictions.

(ii)   Without limiting the generality of the foregoing, if a Borrower is resident for tax purposes in the United States,

(A)   any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Company and the Administrative Agent executed originals of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable Laws or reasonably requested by the Company on behalf of such Borrower or the Administrative Agent as will enable such Borrower or the Administrative Agent, as the case may be, to determine whether or not such Lender is subject to backup withholding or information reporting requirements; and

(B)   each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding tax with respect to payments hereunder or under any other Credit Document shall deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Company on behalf of such Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)   executed originals of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(2)   executed originals of Internal Revenue Service Form W-8ECI,

(3)   executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation,

(4)   in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect

68

that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of such Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) executed originals of Internal Revenue Service Form W-8BEN, or

(5)　executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable Laws to permit such Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(iii)　Each Lender shall promptly (A) notify the Company and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction, and (B) take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such Lender, and as may be reasonably necessary (including the re-designation of its Lending Office) to avoid any requirement of applicable Laws of any jurisdiction that any Borrower or the Administrative Agent make any withholding or deduction for taxes from amounts payable to such Lender.

(iv)　Each of the Borrowers shall promptly deliver to the Administrative Agent or any Lender, as the Administrative Agent or such Lender shall reasonably request, on or prior to the Closing Date (or such later date on which it first becomes a Borrower), and in a timely fashion thereafter, such documents and forms required by any relevant taxing authorities under the Laws of any jurisdiction, duly executed and completed by such Borrower, as are required to be furnished to such Lender or the Administrative Agent by the Borrowers under such Laws in connection with any payment by the Administrative Agent or any Lender of Taxes or Other Taxes, or otherwise in connection with the Credit Documents, with respect to such jurisdiction.

(f)　*Treatment of Certain Refunds.*　Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender or the L/C Issuer, or have any obligation to pay to any Lender or the L/C Issuer, any refund of Taxes withheld or deducted

from funds paid for the account of such Lender or the L/C Issuer, as the case may be. If the Administrative Agent, any Lender or the L/C Issuer determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this Section, it shall pay to such Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses and net of any loss or gain realized in the conversion of such funds from or to another currency incurred by the Administrative Agent, such Lender or the L/C Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, that each Borrower, upon the request of the Administrative Agent, such Lender or the L/C Issuer, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, such Lender or the L/C Issuer in the event the Administrative Agent, such Lender or the L/C Issuer is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Administrative Agent, any Lender or the L/C Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or any other Person.

Section 3.02. *Increased Costs*; *Reserves on Eurocurrency Rate Obligations*.

(a) *Increased Costs Generally.* If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.02(e)) or the L/C Issuer;

(ii) subject any Lender or the L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit or any participation in a Letter of Credit, or change the basis of taxation of payments to such Lender or the L/C Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or the L/C Issuer); or

70

       (iii)     impose on any Lender or the L/C Issuer or the London interbank market any other condition, cost or expense affecting this Agreement or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or the L/C Issuer of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or the L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or the L/C Issuer, the Company will pay (or cause the applicable Designated Borrower to pay) to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

       (b)    *Capital Requirements*.  If any Lender or the L/C Issuer determines that any Change in Law affecting such Lender or the L/C Issuer or any Lending Office of such Lender or such Lender's or the L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the L/C Issuer's capital or on the capital of such Lender's or the L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender, participations in Letters of Credit held by such Lender, or the Letters of Credit issued by the L/C Issuer, to a level below that which such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the L/C Issuer's policies and the policies of such Lender's or the L/C Issuer's holding company with respect to capital adequacy), then from time to time the Company will pay (or cause the applicable Designated Borrower to pay) to such Lender or the L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the L/C Issuer or such Lender's or the L/C Issuer's holding company for any such reduction suffered.

       (c)    *Certificates for Reimbursement*.  A certificate of a Lender or the L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or the L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Company shall be conclusive absent manifest error.  The Company shall pay (or cause the applicable Designated Borrower to pay) such Lender or the L/C Issuer, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    *Delay in Requests.*  Failure or delay on the part of any Lender or the L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or the L/C Issuer's right to demand such compensation; *provided*, that no Borrower shall be required to compensate a Lender or the L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the L/C Issuer, as the case may be, notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    *Additional Reserve Requirements.*  The Company shall pay (or cause the applicable Designated Borrower to pay) to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "**Eurocurrency liabilities**"), additional interest on its funded participation in the unpaid principal amount of each L/C Advance equal to the actual costs of such reserves allocated to such L/C Advance by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which in each case shall be due and payable on each date on which fees are payable with respect to such Commitments; *provided* the Company shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender.  If a Lender fails to give notice 10 days prior to the relevant date of payment, such additional interest or costs shall be due and payable 10 days from receipt of such notice.

Section 3.03.  *Compensation for Losses.*  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Company shall promptly compensate (or cause the applicable Designated Borrower to compensate) such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any failure by any Borrower to make payment of any drawing under any Letter of Credit (or interest due thereon) denominated in an Alternative

Currency on its scheduled due date or any payment thereof in a different currency; or

(b)     any assignment of L/C Advances on a day other than the last day of the Interest Period therefor as a result of a request by the Company pursuant to Section 12.13;

including any loss of anticipated profits, any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such L/C Advance, from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract.  The Company shall also pay (or cause the applicable Designated Borrower to pay) any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Company (or the applicable Designated Borrower) to the Lenders under this Section 3.03, each Lender shall be deemed to have funded each L/C Advance made by it at the Eurocurrency Rate for such L/C Advance by a matching deposit or other borrowing in the offshore interbank market for such currency for a comparable amount and for a comparable period, whether or not such L/C Advance was in fact so funded.

Section 3.04.  *Mitigation Obligations*; *Replacement of Lenders.*

(a)     *Designation of a Different Lending Office*.  If any Lender requests compensation under Section 3.02, or any Borrower is required to pay any additional amount to any Lender, the L/C Issuer, or any Governmental Authority for the account of any Lender or the L/C Issuer pursuant to Section 3.01, then such Lender or the L/C Issuer shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its participations in L/C Borrowings hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender or the L/C Issuer, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.02, as the case may be, in the future, and (ii) in each case, would not subject such Lender or the L/C Issuer, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender or the L/C Issuer, as the case may be.  The Company hereby agrees to pay (or to cause the applicable Designated Borrower to pay) all reasonable costs and expenses incurred by any Lender or the L/C Issuer in connection with any such designation or assignment.

(b)     *Replacement of Lenders*.  If any Lender requests compensation under Section 3.02, or if any Borrower is required to pay any additional amount to

any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Company may replace such Lender in accordance with Section 12.13.

Section 3.05. *Survival.* All of the Borrowers' obligations under this Article 3 shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

# ARTICLE 4
## COLLATERAL SECURITY

Section 4.01. *Security of the Borrowers.* The Obligations shall be secured (in the Cases, granted pursuant to Section 364(c)(2) of the Bankruptcy Code) by a perfected first priority security interest (subject only to Liens arising by operation of law, so long as the aggregate obligations secured thereby do not exceed $1,000,000) in the following: (a) the Collateral Accounts, including those set forth on Schedule 4.01, and all property held therein or any replacement or successor account and/or any and all substitutions, additions and accessions thereto, which shall include, but not be limited to, cash, investment property, securities, security entitlements, securities accounts and any and all financial assets credited to and held in the Collateral Accounts or any replacement or successor account, as such property may be released or substituted pursuant to the terms hereof; (b) to the extent not already included in clause (a) above, dividends, distributions, income, interest; and (c) all proceeds of the foregoing, including, without limitation, the roll-over or reinvested proceeds of the foregoing, whether now existing or hereafter arising (collectively, the "**Pledged Collateral**"). Pledged Collateral held in the Collateral Accounts shall not be available for use by the Borrowers, whether pursuant to Section 363 of the Bankruptcy Code or otherwise and shall be released to the Borrowers only as described herein. The Pledged Collateral shall not be subject to any surcharge or carve-out for the fees of any entity or party, including without limitation the (i) the Bankruptcy Court, (ii) United States Trustee or (iii) any statutory committee appointed in the Cases.

Section 4.02. *Security Interest.* For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for and in consideration of the Issuers' agreement to issue the Letters of Credit and the Lenders' agreement to purchase participations therein, each Credit Party hereby grants (a) in the Case of the Company, pursuant to Section 364(c)(2) of the Bankruptcy Code) to the Administrative Agent, for the benefit of the L/C Issuer and the Lenders (the "**Secured Parties**"), a security interest in the Pledged Collateral and (b) in the case of each Borrower, for the benefit of the Secured Parties, a security interest in the Pledged Collateral, in each case to secure the

74

punctual payment and performance of all the Obligations of the relevant Borrower under the Credit Documents with respect to Letters of Credit issued for the benefit of such Borrower or a Subsidiary of such Borrower. Each Credit Party covenants and agrees that (i) with respect to the Pledged Collateral consisting of the Collateral Accounts, the property held therein and any and all proceeds thereof, the Administrative Agent shall have sole and exclusive control over such Pledged Collateral and that it shall take all such steps as may be necessary to cause the Administrative Agent to have sole and exclusive control over such Pledged Collateral; (ii) it shall not sell, transfer, assign, or otherwise dispose of any of the Pledged Collateral without the prior written consent of the Administrative Agent; (iii) it shall do or cause to be done all things necessary to preserve and keep in full force and effect the perfected first priority security interest in the Pledged Collateral granted to the Administrative Agent hereunder (subject to laws affecting creditor's rights, generally); and (iv) it shall not create or permit the existence of Liens or security interests in the Pledged Collateral in favor of third parties other than Liens arising by operation of law, so long as the aggregate obligations secured thereby do not exceed $1,000,000.

Section 4.03. *Additional Obligations.* The Credit Parties agree that additional Eligible Collateral will be deposited by a Borrower with the Administrative Agent, in accordance with Section 7.12. All such items shall be held by the Administrative Agent in accordance with the terms of this Agreement.

Section 4.04. *Certain Rights and Duties of Administrative Agent and Lenders.* The Credit Parties acknowledge that the Administrative Agent and the Lenders have no duty of any type with respect to the Pledged Collateral except for the use of due care in safekeeping any of the Pledged Collateral actually in the physical custody of the Administrative Agent or the Lenders; prior to the occurrence of any Event of Default the Administrative Agent's and the Lenders' rights with respect to the Pledged Collateral shall be limited to the Administrative Agent's and the Lenders' rights as secured party and pledgee and the right to perfect their security interest, preserve, enforce and protect the Lien granted hereunder and their interest in the Pledged Collateral.

Section 4.05. *Power of Attorney, etc.* Each Credit Party hereby irrevocably constitutes and appoints the Administrative Agent the true and lawful attorney-in-fact for and on behalf of such Credit Party with full power of substitution and revocation in its own name or in the name of the such Credit Party to make, execute, deliver and record, as the case may be, any and all financing statements, continuation statements, notices of exclusive control, assignments, proofs of claim, powers of attorney, leases, discharges or other instruments or agreements which the Administrative Agent in its sole discretion may deem necessary or advisable to perfect, preserve, or protect (and, after the

occurrence and during the continuance of an Event of Default, to enforce) the Lien granted hereunder and the Administrative Agent's, the L/C Issuer's and the Lenders' interest in the Pledged Collateral and to carry out the purposes of this Agreement, including but without limiting the generality of the foregoing, any and all proofs of claim in bankruptcy or other insolvency proceedings of such Credit Party, with the right, upon the occurrence and during the continuance of an Event of Default, to collect and apply to the Obligations all distributions and dividends made on account of the Pledged Collateral. The rights and powers conferred on the Administrative Agent by each Credit Party are expressly declared to be coupled with an interest and shall be irrevocable until all the Obligations are paid and performed in full. A carbon, photographic, or other reproduction of a security agreement (including this Agreement) or a financing statement is sufficient as a financing statement to the extent permitted by applicable law.

Section 4.06. *Release of Collateral.* The Administrative Agent shall grant a release of its Lien on the Pledged Collateral:

(a)     In the event that (i) the Total Collateral Amount exceeds the Total Collateral Requirement and (ii) the Borrower Collateral Amount for any Borrower exceeds such Borrower's Collateral Requirement by at least $1,000,000 (for any Borrower, the amount of such excess over the sum of such Borrower's Collateral Requirement plus $1,000,000 being referred to herein as the "**Excess Amount**") then, so long as no Event of Default has occurred and is continuing, the Administrative Agent shall, at the request and expense of the relevant Borrower, release such portions of the Pledged Collateral designated by such Borrower in an amount up to the Excess Amount for such Borrower (or such smaller amount as may be requested by such Borrower); *provided*, that in no event shall the Administrative Agent be required to release any Pledged Collateral after the occurrence and during the continuance of an Event of Default or in an aggregate amount that is less than $1,000,000 in the aggregate across all Borrowers. Each Borrower agrees to reimburse the Administrative Agent on demand for any and all out-of-pocket costs and expenses incurred by the Administrative Agent in connection with any such partial release of the Pledged Collateral, including, without limitation, reasonable attorney's fees.

(b)     In the event that (i) any and all Letters of Credit are fully drawn or expire or are returned to the Administrative Agent for cancellation, (ii) all Unreimbursed Amounts with respect to any drawings of Letters of Credit have been fully satisfied pursuant to the provisions of this Agreement and the other Credit Documents, (iii) no other Obligations, whether contingent or otherwise (other than inchoate indemnification obligations which do not arise under authorizations for air release of cargo or releases of shipment without surrender of

76

marine bills of lading), are then outstanding and (iv) the Aggregate Commitments have been terminated the Lien of the Administrative Agent on the Pledged Collateral shall be automatically released and the Administrative Agent shall promptly, after request by the Company and at the Company's sole cost and expense, execute, or cause to be executed, such instruments of release and discharge as may be reasonably requested by any Borrower.

Section 4.07. *Optional Collateral Deliveries.* The Company (or, once the Final DIP Order has become a Final Order, any other Borrower) may at any time deliver to the Administrative Agent and pledge hereunder additional Eligible Collateral in excess of the amount required pursuant to Section 7.12(a) or (b).

# ARTICLE 5
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 5.01. *Conditions of Initial Credit Extension.* The obligation of the L/C Issuer to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a) <u>Financing Order(s)</u>. The Administrative Agent and the L/C Issuer shall have received a copy of a Financing Order (either the Interim DIP Order or the Final DIP Order), which Financing Order (i) shall have been entered, upon an application or motion of the Company reasonably satisfactory in form and substance to the Administrative Agent, on such prior notice to such parties as may in each case be reasonably satisfactory to the Administrative Agent, (ii) shall authorize the Credit Extension, (iii) shall approve the payment by the Borrowers of all of the Fees set forth in Section 2.03, (iv) shall be in full force and effect, (v) shall grant (A) a Superpriority Claim as contemplated by Section 364(c)1 of the Bankruptcy Code (without the requirement to file any motion or pleading or to make any demand) in respect of all Obligations of the Company, which Superpriority Claim shall be senior to each other claim in the Cases (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Interim Cash Management Order and the Final Cash Management Order and any Superpriority Claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the secured parties under Section 5.21 of the Amended Term Loan Agreement, in each case which claims shall be *pari passu* with the Superpriority Claims of the Administrative Agent hereunder), (B) a valid, perfected and non-avoidable Lien on the Pledged Collateral in the Company Collateral Account in favor of the Administrative Agent hereunder and under the other Credit Documents and (C) the payment on a current basis of the reasonable fees and disbursements of respective professionals (including, but not limited to,

77

the reasonable fees and disbursements of counsel and internal and third-party consultants, including financial consultants, and auditors) for the Administrative Agent (including the payment on the Closing Date or as soon thereafter as is practicable of any unpaid pre-petition fees and expenses), and (vi) shall not be subject to a pending appeal or motion for leave to appeal, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent.

(b)     The Administrative Agent's receipt of the following, each of which shall be originals or telecopies or other electronic format (i.e. PDF) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Credit Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Administrative Agent and the L/C Issuer:

(i)     executed counterparts of this Agreement, sufficient in number for distribution to the Administrative Agent, each Lender and the Company;

(ii)     a certified copy of the Amended Term Loan Agreement;

(iii)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Credit Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Credit Documents to which such Credit Party is a party;

(iv)     such documents and certifications as the Administrative Agent may reasonably require to evidence that each Credit Party is duly organized or formed, and that each of the Company and each other Credit Party are validly existing, in good standing and qualified to engage in business in its jurisdiction of organization;

(v)     a favorable opinion of Skadden, Arps, Slate, Meagher and Flom LLP, counsel to the Credit Parties, addressed to the Administrative Agent and each Lender, as to such matters concerning the Credit Parties and the Credit Documents as the Administrative Agent may reasonably request and the favorable written opinions of local counsel for the Credit Parties in each jurisdiction in which any Credit Party is a registered organization under the UCC as to such matters concerning the Credit

78

Parties and the Credit Documents as the Administrative Agent may reasonably request;

(vi)    a certificate of a Responsible Officer of each Credit Party either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Credit Party and the validity against such Credit Party of the Credit Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(vii)    a certificate signed by a Responsible Officer of the Company certifying that the conditions specified in Section 5.02(a) and (b) have been satisfied;

(viii)    documentation and other information under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT ACT; and

(ix)    such other assurances, certificates, documents, consents or opinions as the Administrative Agent, the L/C Issuer, or the Required Lenders reasonably may require.

(c)    Any fees required to be paid on or before the Closing Date shall have been paid.

(d)    All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Cases shall be reasonably satisfactory in form and substance to the Administrative Agent.

(e)    Unless waived by the Administrative Agent, the Company shall have paid all reasonable and documented fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced at least one Business Day prior to the Closing Date, *plus* such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (*provided*, that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent).

(f)    The Closing Date shall have occurred on or before November 13, 2009.

Without limiting the generality of the provisions of the last paragraph of Section 11.03, for purposes of determining compliance with the conditions specified in this Section 5.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 5.02. *Conditions Precedent to All Credit Extensions.* The obligation of the L/C Issuer to honor any Letter of Credit Application is subject to the following conditions precedent:

(a) The representations and warranties of (i) each Credit Party contained in Article 6 and (ii) each Credit Party contained in each other Credit Document or in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except that (x) representations and warranties that are qualified by materiality shall be true and correct in all respects, (y) to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct as of such earlier date, and (z) for purposes of this Section 5.02, the representations and warranties contained in Section 6.07 shall be deemed to refer to the most recent statements furnished pursuant to subsections (a) and (b) of Section 7.01.

(b) No Default shall exist, or would result from such proposed Credit Extension or the application of the proceeds thereof.

(c) The Administrative Agent and the L/C Issuer shall have received a Letter of Credit Application in accordance with the requirements hereof.

(d) The Collateral Delivery Condition shall have been satisfied with respect to such Credit Extension.

(e) After giving *pro forma* effect to such Credit Extension, the Total Outstandings shall not exceed the Aggregate Commitments.

(f) After giving *pro forma* effect to such Credit Extension, and the delivery of any required Eligible Collateral to any Collateral Account, the Credit Parties shall be in compliance with Section 8.01(b) and Section 8.02(b)(xxiii).

(g) If the effective date of the Approved Restructuring Plan shall not have occurred, a Financing Order shall be in full force and effect, shall not be subject to a pending appeal or motion for leave to appeal and shall not have been,

80

reversed, modified or amended in any respect without the prior written consent of the Administrative Agent, stayed for a period of five Business Days or longer, vacated or subject to a stay pending appeal; *provided*, that at the time of the issuance of any Letter of Credit the aggregate amount of which, when added to the Total Outstandings, would exceed the amount authorized by the Interim DIP Order (collectively, the "**Additional Credit**"), the Administrative Agent and the L/C Issuer shall have received a copy of the Final DIP Order, which, in any event, shall have been entered by the Bankruptcy Court no later than thirty (30) days following the date of entry of the Interim DIP Order (or such later date as approved by the Administrative Agent) and shall have become a Final Order and at the time of the extension of any Additional Credit the Final DIP Order shall be in full force and effect and shall have become a Final Order.

(h)     In the case of a Credit Extension to be denominated in an Alternative Currency, there shall not have occurred any change in national or international financial, political or economic conditions or currency exchange rates or exchange controls which in the reasonable opinion of the Administrative Agent or the L/C Issuer would make it impracticable for such Credit Extension to be denominated in the relevant Alternative Currency.

(i)     All fees payable with respect to such Letter of Credit shall have been paid.

Each Letter of Credit Application submitted by the Company shall be deemed to be a representation and warranty that the conditions specified in Sections 5.02(a), (b), (d), (e) and (f) have been satisfied on and as of the date of the applicable Credit Extension.


## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

Each Credit Party represents and warrants to the Administrative Agent and the Lenders that:

Section 6.01.  *Organization*; *Requisite Power and Authority*; *Qualification.*  Each Credit Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in Schedule 6.01, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby and, in the case of the Borrowers, to request the extensions of credit hereunder, and (c) is qualified to do business and

81

in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

Section 6.02. *Capital Stock and Ownership.* The Capital Stock of each of the Company and its Restricted Subsidiaries (other than an Owner-Trustee) has been duly authorized and validly issued and is fully paid and non-assessable. Schedule 6.02 sets forth a true, complete and correct list as of the Closing Date of the legal name of the Company and each of its material Restricted Subsidiaries and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them.

Section 6.03. *Due Authorization.* Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto (except that any Owner-Trustee has not yet received instructions from the beneficiary of the owner trust).

Section 6.04. *No Conflict.* Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not: (a) violate any provision of any law or any governmental rule or regulation applicable to the Company or any of its Restricted Subsidiaries, any of the Organizational Documents of the Company or any of its Restricted Subsidiaries, or any order, judgment or decree of any court or other agency of government binding on the Company or any of its Restricted Subsidiaries; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of the Company or any of its Restricted Subsidiaries; (c)  result in or require the creation or imposition of any Lien upon any of the properties or assets of the Company or any of its Restricted Subsidiaries (other than any Liens created under any of the Credit Documents in favor of the Administrative Agent, on behalf of Secured Parties); (d) except to the extent it could not reasonably be expected to have a Material Adverse Effect, result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties; (e) require any approval of stockholders, members or partners; or (f) except to the extent it could not reasonably be expected to have a Material Adverse Effect, require any approval or consent of any Person under any Contractual Obligation of the Company or any of its Restricted Subsidiaries.

82

Section 6.05.  *Governmental Consents.*  Except for the Financing Orders and other bankruptcy-related orders contemplated by Section 7.13, the execution, delivery and performance by each of the Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, as of the Closing Date.

Section 6.06.  *Binding Obligation.*  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and (in the case of the Company) subject to the entry by the Bankruptcy Court of the Financing Orders and subject to the terms thereof, is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law).

Section 6.07.  *Historical Financial Statements.*  The Historical Financial Statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year end adjustments.  As of the Closing Date, neither the Company nor any of its subsidiaries has any contingent liability or liability for taxes, long term lease or unusual forward or long term commitment that is not reflected in the Historical Financial Statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Company and any of its Restricted Subsidiaries taken as a whole.  Since the date of the audited Historical Financial Statements, no Internal Control Event has occurred.

Section 6.08.  *No Material Adverse Change.*  Since the Closing Date, no event, circumstance or change has occurred that has caused, either in any case or in the aggregate, a Material Adverse Effect, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases.

Section 6.09.  *Adverse Proceedings*, *etc.*  Except as set forth on Schedule 6.10, there are no Adverse Proceedings (other than in respect of the Cases),

individually or in the aggregate, that (a) relate to any Credit Document or the transactions contemplated hereby or thereby or (b) could reasonably be expected to have a Material Adverse Effect. Neither the Company nor any of its subsidiaries (x) is in violation of any applicable laws (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (y) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 6.10. *Payment of Taxes.* Except as otherwise permitted under Section 7.03, and except to the extent failure to do so is permitted by Chapter 11 of the Bankruptcy Code, all material tax returns and reports of the Company and its Restricted Subsidiaries required to be filed by any of them have been timely filed taking into account extensions, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon the Company and its Restricted Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable. The Company knows of no material proposed tax assessment against the Company or any of its Restricted Subsidiaries which is not being actively contested by the Company or such Restricted Subsidiary in good faith and by appropriate proceedings; *provided*, that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

Section 6.11. *Properties.* Each of the Company and its Restricted Subsidiaries has (a) in the case of fee interests in real property, good, sufficient and legal title to, (b) in the case of other owned real or personal property, good, sufficient and legal title or ownership of, and (c) in the case of leasehold interests in real or personal property, valid leasehold interests and rights in, in each case, all of its properties and assets, including, without limitation, those reflected in its Historical Financial Statements referred to in Section 6.07 or, if more recent, in the most recent financial statements delivered pursuant to Section 7.01, in each case except for (x) assets disposed of since the date of such financial statements in the Ordinary Course of Business or as otherwise permitted under Section 8.05, (y) encumbrances and defects in title and (z) other defects in title that are not Liens and that would not result in a Material Adverse Effect. All such properties and assets are in working order and condition, ordinary wear and tear excepted.

Section 6.12. *Environmental Matters.* Neither the Company nor any of its subsidiaries nor any of their respective facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any

Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither the Company nor any of its Restricted Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law.  There are and, to each of the Company's and its Restricted Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against the Company or any of its Restricted Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither the Company nor any of its Restricted Subsidiaries nor, to any Credit Party's knowledge, any predecessor of the Company or any of its Restricted Subsidiaries has filed any notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any facility used for the operations of the Company or any of its subsidiaries, and none of the Company's or any of its subsidiaries' operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R.  Parts 260-270 or any state equivalent.  Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Laws by the Company or any of its subsidiaries could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.  No event or condition has occurred or is occurring with respect to the Company or any of its Restricted Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had, or could reasonably be expected to have, a Material Adverse Effect.

Section 6.13.  *No Defaults.*  Neither the Company nor any of its Restricted Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations (other than in respect of the Cases), and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

Section 6.14.  *Governmental Regulation.*  Neither the Company nor any of its Restricted Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  Neither the Company nor any of its Restricted Subsidiaries is a "registered investment

company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

Section 6.15. *Margin Stock.* No Letter of Credit issued hereunder shall be used by any Borrower for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

Section 6.16. *Employee Matters.* The Company, its Restricted Subsidiaries, and their respective employees, agents and representatives have not committed any material unfair labor practice as defined in the National Labor Relations Act that could reasonably be expected to have a Material Adverse Effect. Neither the Company nor any of its Restricted Subsidiaries has been or is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect. There has been and is (a) no unfair labor practice charge or complaint pending against the Company or any of its Restricted Subsidiaries, or to the best knowledge of the Company, threatened against any of them before the National Labor Relations Board or any other Governmental Authority and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement or similar agreement that is so pending against the Company or any of its Restricted Subsidiaries or to the best knowledge of the Company, threatened against any of them, (b) no labor dispute, strike, lockout, slowdown or work stoppage in existence or threatened against, involving or affecting the Company or any of its Restricted Subsidiaries that could reasonably be expected to have a Material Adverse Effect, (c) no labor union, labor organization, trade union, works council, or group of employees of the Company or any of its Restricted Subsidiaries has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed against the Company or any of its subsidiaries with the National Labor Relations Board or any other Governmental Authority, and (d) to the best knowledge of the Company, no union representation question existing with respect to any of the employees of the Company or any of its Restricted Subsidiaries and, to the best knowledge of the Company, no labor union organizing activity with respect to any employees of the Company or any of its Restricted Subsidiaries that is taking place, except (with respect to any matter specified in clause (a), (b), (c) or (d) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

Section 6.17. *Employee Benefit Plans.* The Company, each of its subsidiaries and each of their respective ERISA Affiliates are in material compliance with all applicable provisions and requirements of ERISA and the

Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan. Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified or has an application pending for such qualification, and nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status. No liability to the PBGC (other than required premium payments) or the Internal Revenue Service has been or is expected to be incurred by the Company, any of its subsidiaries or any of their ERISA Affiliates with respect to any Employee Benefit Plan. No ERISA Event has occurred or is reasonably expected to occur with respect to the Company, any of its subsidiaries or any of their respective ERISA Affiliates. Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, or otherwise funded entirely by the participants thereof, or accrued for on the financial statements of the Company or its Restricted Subsidiaries, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of the Company, any of its subsidiaries or any of their respective ERISA Affiliates. The present value of the aggregate benefit liabilities under each Pension Plan subject to Title IV of ERISA sponsored, maintained or contributed to by the Company, any of its subsidiaries or any of their ERISA Affiliates (determined as of the most recent valuation date on the basis of the actuarial assumptions specified for funding purposes pursuant to Section 430 of the Internal Revenue Code in the most recent actuarial valuation for such Pension Plan), did not exceed the aggregate current value of the assets of such Pension Plan by more than $10,000,000 in the aggregate. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of the Company, its subsidiaries and their respective ERISA Affiliates for a complete or partial withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete or partial withdrawal from all Multiemployer Plans, is zero. The Company, each of its subsidiaries and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

Section 6.18. *Certain Fees.* No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby.

Section 6.19.  *Solvency.*  The Credit Parties (other than the Debtors during the pendency of the Cases) are and, upon the incurrence of any Credit Extension by such Credit Parties on any date on which this representation and warranty is made, will be, Solvent.

Section 6.20.  *Compliance with Statutes*, *etc.*  Each of the Company and its subsidiaries is in compliance with its organizational documents and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of the Company or any of its Restricted Subsidiaries), except such non compliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 6.21.  *Disclosure.*  No representation or warranty of any Credit Party contained in any Credit Document, none of the Company's Annual Report on Form 10-K for the Fiscal Year ended December 31, 2008 or any subsequent filings by the Company with the Securities and Exchange Commission, and none of the reports, financial statements or other documents, certificates or written statements furnished to Lenders by or on behalf of the Company or any of its Restricted Subsidiaries for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact (known to the Company, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made.  There are no agreements, instruments and corporate or other restrictions to which any Credit Party is subject and there are no facts known (or which should upon the reasonable exercise of diligence be known) to the Company (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

Section 6.22.  *Terrorism Laws and FCPA.*  Each Credit Party is in compliance, in all material respects, with the Terrorism Laws.  No Letter of Credit will be used, directly or indirectly, in connection with any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 6.23.  *Insurance.*  The properties of the Company and each of its Restricted Subsidiaries are adequately insured with financially sound and reputable insurers and in such amounts, with such deductibles and covering such risks and otherwise on terms and conditions as are customarily carried or maintained by Persons of established reputation of similar size and engaged in similar businesses.

Section 6.24.  *Common Enterprise.*  The successful operation and condition of each of the Credit Parties is dependent on the continued successful performance of the functions of the group of the Credit Parties as a whole and the successful operation of each of the Credit Parties is dependent on the successful performance and operation of each other Credit Party.  Each Credit Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Credit Parties and (b) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies.  Each Credit Party has determined that execution, delivery, and performance of this Agreement and any other Credit Documents to be executed by such Credit Party is within its purpose, will be of direct and indirect benefit to such Credit Party, and is in its best interest.

Section 6.25.  *Perfection of Security Interest.*  Subject to the entry by the Bankruptcy Court of the Financing Orders, the provisions of this Agreement and the other Credit Documents create legal and valid Liens on all the Pledged Collateral in favor of Administrative Agent, for the benefit of Administrative Agent and the Secured Parties.  All filings, assignments, pledges and deposits of documents or instruments have been made and all other actions have been taken that are necessary or advisable, under applicable law, to establish and perfect the Administrative Agent's security interest in the Pledged Collateral.  The Pledged Collateral and the Administrative Agent's rights with respect to the Pledged Collateral are not subject to any set-off, claims, withholdings or other defenses.  Each Credit Party is the owner of the Pledged Collateral pledged by it free from any Lien, encumbrance or security interest, other than Liens granted hereby and Liens arising by operation of law securing obligations outstanding of $1,000,000 or less in the aggregate.

Section 6.26.  *Intellectual Property.*  Each Credit Party and its Restricted Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to the operation of its business as currently conducted, and the use thereof by the Credit Parties and their respective Restricted Subsidiaries does not infringe, misappropriate, dilute, misuse or

otherwise violate the rights of any other Person, except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.27. *Permits, etc.* Each Credit Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained, could not reasonably be expected to have a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except, to the extent any such condition, event or claim could not be reasonably be expected to have a Material Adverse Effect.

[Note: Deletion of Conversion of Intercompany Loans to the Company is acceptable only if such conversion has been completed.]

Section 6.28. *The Financing Orders.* Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Article 9 and the applicable provisions of the Financing Orders, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.


# ARTICLE 7
## AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect until payment in full of all Obligations and expiration of all Letters of Credit, each Credit Party shall perform, and shall cause each of its Restricted Subsidiaries to perform, all covenants in this Article 7.

Section 7.01. *Certificates*; *Other Information.*

Unless otherwise provided below, the Company will deliver to the Administrative Agent and the Lenders:

(a)  Quarterly Financial Statements. As soon as available, and in any event within forty five (45) days (or such later date as the Company files its quarterly reports pursuant to Rule 12b-25 under the Exchange Act) after the end

of each Fiscal Quarter of each Fiscal Year (including the fourth Fiscal Quarter), the consolidated balance sheets of the Company and its subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(b)  _Annual Financial Statements_.  As soon as available, and in any event within ninety (90) days (or such later date as the Company files its annual reports pursuant to Rule 12b-25 under the Exchange Act) after the end of each Fiscal Year, (i) the consolidated balance sheets of the Company and its subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such financial statements a report thereon of PricewaterhouseCoopers LLP or other independent certified public accountants of recognized national standing selected by the Company, and reasonably satisfactory to Administrative Agent (which report shall be unqualified as to going concern and scope of audit (and shall not contain any explanatory paragraph or paragraph of emphasis with respect to going concern; _provided_ that it is understood a "going concern" qualification or exemption to the extent taken or made solely with respect to the Fiscal Year ending on December 31, 2009 shall not in and of itself cause a Default or Event of Default) and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Company and its subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) together with a written statement by such independent certified public accountants, to the extent consistent with the internal policies thereof, (1) stating whether, in connection therewith, any condition or event that constitutes a Default or an Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof and (2) stating the Company is then subject to Section 404 of the Sarbanes Oxley

Act of 2002, including an attestation report as to management's report on the Company's internal control over financial reporting showing no Internal Control Event;

(c)　　Statements of Reconciliation after Change in Accounting Principles. If, as a result of any change in accounting principles and policies (or the application thereof) from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of the Company and its subsidiaries delivered pursuant to Section 7.01(a) or (b) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent;

(d)　　Notice of Default. Prompt written notice (but, in any event, within three (3) Business Days of the Company becoming aware thereof) (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to the Company with respect thereto; (ii) that any Person has given any notice to the Company or any of its Restricted Subsidiaries or taken any other action with respect to any event or condition set forth in Section 10.01(b); or (iii) of the occurrence of any event or change that has caused, either in any case or in the aggregate, a Material Adverse Effect, or (iv) the occurrence of any Internal Control Event which is required to be publicly disclosed of which any officer of the Company or the Company has knowledge which notice shall be accompanied by a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action the Company has taken, is taking and proposes to take with respect thereto;

(e)　　Notice of Litigation. Prompt written notice (but, in any event, within three (3) Business Days of the Company becoming aware thereof) of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Company to Lenders, or (ii) any development in any Adverse Proceeding that, in the case of either clause (i) or (ii) if adversely determined, could be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, or which arises in respect of any material Indebtedness of the Company or its Restricted Subsidiaries or alleges any criminal misconduct by any Credit Party together in each case with such other information as may be reasonably available to the

92

Company to enable the L/C Issuer and Lenders and their respective counsel to evaluate such matters;

(f) <u>ERISA</u>. (i) In the event of the occurrence of any ERISA Event, a prompt written notice (but, in any event, within three (3) Business Days of the Company becoming aware thereof) specifying the nature thereof, what action the Company, any of its subsidiaries or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness (but, in any event, within three (3) Business Days of the Authorized Officer of the Company becoming aware thereof), copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by the Company, any of its subsidiaries or any of their respective ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (B) all notices received by the Company, any of its subsidiaries or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (iii) copies of such other documents or governmental reports or filings relating to any Employee Benefit Plan as Administrative Agent shall reasonably request;

(g) <u>Information Regarding Pledged Collateral</u>. The Company will furnish to Administrative Agent prompt written notice of any Lien (other than subject only to Liens arising by operation of law, so long as the aggregate obligations secured thereby do not exceed $1,000,000) or claims made or asserted against any material portion of the Pledged Collateral or interest therein;

(h) <u>Violations of Terrorism Laws</u>. Promptly (i) if any Credit Party obtains knowledge that any Credit Party or any Person which owns, directly or indirectly, any Securities of any Credit Party, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, such Credit Party will notify Administrative Agent and (ii) upon the request of any Lender, such Credit Party will provide any information in such Credit Party's possession such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(i) <u>Other Information</u>. (i) Promptly upon request of the Administrative Agent, copies of (A) all financial statements, reports, notices and proxy statements sent or made available generally by the Company to its security holders acting in such capacity or by any Restricted Subsidiary of the Company to its security holders other than the Company or another Restricted Subsidiary of the Company, (B) consolidating balance sheets of the Company and the other Borrowers as of the end of any Fiscal Year or any Fiscal Quarter and consolidating statements of earnings and cash flows for the Company and the

93

other Borrowers and the Subsidiaries as of the end of any Fiscal Year, (C) all regular and periodic reports and all registration statements and prospectuses, if any, filed by the Company or any of its Restricted Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, and (D) all press releases and other statements made available generally by the Company or any of its Restricted Subsidiaries to the public concerning material developments in the business of the Company or any of its Restricted Subsidiaries, (ii) promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Credit Party unless prohibited by law (other than any routine inquiry), (iii) promptly upon receipt thereof, copies of all financial reports submitted to any Credit Party by its auditors in connection with any audit of the books thereof and (iv) such other information and data with respect to the Company or any of its Restricted Subsidiaries as from time to time may be reasonably requested by Administrative Agent; and

       (j)    <u>Bankruptcy Court Pleadings</u>.  The Company shall provide to the Administrative Agent: (i) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Official Creditors' Committee appointed in the Cases or to the United States Trustee, as the case may be, the Financing Orders and the Cash Management Orders (in each case, which must be in form and substance satisfactory to the Administrative Agent in its sole discretion), all other proposed orders and pleadings related to this Agreement and/or the transactions contemplated hereby (which must be in form and substance satisfactory to the Administrative Agent in its sole discretion) and any Reorganization Plan and/or any disclosure statement related thereto, and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Official Creditors' Committee appointed in the Cases or to the United States Trustee for the Southern District of New York, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrowers that may be filed with the Bankruptcy Court or delivered to the Official Creditors' Committee appointed in the Cases or to the United States Trustee for the Southern District of New York;

       Documents required to be delivered pursuant to Section 7.01(a), (b) or (i)(i) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (iii) on which the Company posts such documents, or provides a link thereto on the Company's website on the Internet at the website address listed on Schedule 12.02; or (iv) on which such documents are posted on the Company's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a

commercial, third-party website or whether sponsored by the Administrative Agent); *provided*, that: (x) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (y) the Company shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Each Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arranger will make available to the Lenders and the L/C Issuer materials and/or information provided by or on behalf of such Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Electronic Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to any of the Borrowers or their respective Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrowers shall be deemed to have authorized the Administrative Agent, the Arranger, the L/C Issuer and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or their respective securities for purposes of United States Federal and state securities laws; (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Electronic Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Electronic Platform not designated "Public Side Information."

Section 7.02. *Existence.* Except as otherwise permitted under Section 8.05, each Credit Party will, and will cause each of its Restricted Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and governmental authorizations, qualifications, franchises, licenses and permits

material to its business and to conduct its business in each jurisdiction in which its business is conducted; *provided*, that except as prohibited by Section 8.05, no Credit Party or any of its Restricted Subsidiaries shall be required to preserve any such existence, right or governmental authorizations, qualifications, franchise, licenses and permits if such Person shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the L/C Issuer or the Lenders.

Section 7.03.  *Payment of Taxes and Claims.*  Each Credit Party will, and will cause each of its Restricted Subsidiaries to, or in case of leased assets will contract with the applicable lessee to, pay all material Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all material claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and/or that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; *provided*, that no such Tax or claim need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, (b) in the case of a Tax or claim which has or may become a Lien against any of the Pledged Collateral, such contest proceedings conclusively operate to stay the disposition of any portion of the Pledged Collateral to satisfy such Tax or claim and (c) in the case of leased assets, such contest proceedings are being conducted in accordance with terms set forth in applicable law.  No Credit Party (other than the Company) will file a U.S. federal consolidated income tax return, and no Credit Party will permit any of its Restricted Subsidiaries to file a U.S. federal consolidated income tax return.  No Credit Party will consent to the filing of any U.S. federal consolidated income tax return except with respect to which the Company is the common parent and filer.

Section 7.04. *Maintenance of Properties.*  Each Credit Party will, and will cause each of its Restricted Subsidiaries to, or in the case of leased assets will contract with the applicable lessee to, if the failure to do any of the following could reasonably be expected to constitute a Material Adverse Effect: (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material assets used or useful in the business of the Company and its Restricted Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof and (b) comply at all times with the provisions of all material leases to which it is a party as lessee under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

Section 7.05. *Books and Records*; *Inspections*. Each Credit Party will, and will cause each of its Restricted Subsidiaries to, (a) keep adequate books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by Administrative Agent (including employees of Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by Administrative Agent) to visit and inspect any of the properties of any Credit Party and any of its respective Restricted Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants, all upon reasonable notice and at such reasonable times during normal business hours (so long as no Default or Event of Default has occurred and is continuing) and as often as may reasonably be requested and by this provision the Credit Parties authorize such accountants to discuss with Administrative Agent, the L/C Issuer and Lender and such representatives the affairs, finances and accounts of the Company and its Restricted Subsidiaries. The Credit Parties acknowledge that Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Credit Parties' assets for internal use by Administrative Agent and the Lenders; *provided*, that in each case, the foregoing shall be subject to any confidentiality restrictions to which any Credit Party or its Subsidiaries are subject in the conduct of Ordinary Course of Business.

Section 7.06. *Restricted Subsidiaries*. Subject to Section 7.10, in the event that any Person becomes a Wholly-Owned Domestic Subsidiary of the Company (including by such Person ceasing to be excluded from the definition of "Restricted Subsidiary"), the Company shall (a) concurrently with such Person becoming a Wholly-Owned Domestic Subsidiary cause such Wholly-Owned Domestic Subsidiary to become a Credit Party hereunder by executing and delivering to Administrative Agent a Guarantor Counterpart Agreement, and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as are similar to those described in Section 5.01(b) (other than Section 5.01(b)(ii)). With respect to each such Restricted Subsidiary, the Company shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Restricted Subsidiary of the Company, and (ii) all of the data required to be set forth in Schedules 6.01 and 6.02 with respect to all Restricted Subsidiaries of the Company; *provided*, that such written notice shall be deemed to supplement Schedules 6.01 and 6.02 for all purposes hereof.

Section 7.07. *Further Assurances*. At any time or from time to time upon the request of Administrative Agent, each Credit Party will, at its expense,

promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent may reasonably request in order to effect fully the purposes of the Credit Documents, including providing Lenders with any information reasonably requested pursuant to Section 12.18. In furtherance and not in limitation of the foregoing and in accordance with the obligations under Article 4 and Article 9, each Credit Party shall take such actions as Administrative Agent may reasonably request from time to time to ensure that the Obligations are guarantied by the Guarantors and are secured by a Lien perfected at first priority (subject in priority only to Liens arising by operation of law, so long as the aggregate obligations secured thereby do not exceed $1,000,000) on the Pledged Collateral.

Section 7.08. *Non-Consolidation.* Unless otherwise consented to by Required Lenders: the Company will and will cause each of its Restricted Subsidiaries (other than an Owner-Trustee) to: (a) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity and (b) provide that its board of directors or other analogous governing body will hold all appropriate meetings to authorize and approve such entity's actions, which meetings will be separate from those of other entities.

Section 7.09. *Purpose.* Letters of Credit may be used solely to support obligations and commitments of the Borrowers and their respective Subsidiaries and shall be issued in favor of third party beneficiaries. No Letter of Credit will be used, whether directly or indirectly, for any purpose that entails a violation of any law, including Regulations T, U and X of the Board of Governors of the Federal Reserve System.

Section 7.10. *Unrestriction of Restricted Subsidiary.* The board of directors of the Company may at any time by one (1) Business Day's prior written notice to the Administrative Agent request that any of its subsidiaries that is a Restricted Subsidiary be released from its obligations under this Agreement and shall cease to constitute a Subsidiary Guarantor and a Restricted Subsidiary of the Company. Upon such request such subsidiary shall be entitled to be released pursuant to Section 11.10(b) from its Obligations and shall cease to constitute a Subsidiary Guarantor and a Restricted Subsidiary of the Company; *provided*, that (a) substantially contemporaneously therewith, such subsidiary shall become a Special Purpose Vehicle (whether bankruptcy remote or not), Regulated Entity, Joint Venture or Immaterial Subsidiary; (b) both before and after giving effect to the foregoing, no Event of Default shall have occurred and be continuing; (c) such Restricted Subsidiary shall not own any Capital Stock in any Credit Party or any Restricted Subsidiary thereof; and (d) the Administrative Agent shall have received a duly executed certificate from an Authorized Officer of the Company certifying the satisfaction of the foregoing conditions, together with such back-up

98

information as the Administrative Agent may reasonably request in connection therewith.

Section 7.11. *Approved Restructuring Plan.* The Debtor shall comply in all material respects with the Approved Restructuring Plan at all times. No Credit Party nor any of its Restricted Subsidiaries shall enter into any material documentation of the transactions contemplated under, or in connection with, the Approved Restructuring Plan unless such documentation is reasonably satisfactory to the Administrative Agent and the L/C Issuer.

Section 7.12. *Collateral Coverage.* (a)The Total Collateral Amount shall at all times equal or exceed the Total Collateral Requirement. If at any time the Total Collateral Amount is less than the amount of the Total Collateral Requirement, then the Credit Parties shall promptly provide to the Administrative Agent and pledge hereunder such additional Eligible Collateral as may be necessary to eliminate such shortfall.

(b)    The Borrower Collateral Amount for each Borrower shall at all times equal or exceed the Collateral Requirement for such Borrower. If at any time the Borrower Collateral Amount for any Borrower is less than the amount of such Borrower's Collateral Requirement, then the relevant Borrower shall promptly deliver to the Administrative Agent and pledge hereunder such additional Eligible Collateral as may be necessary to eliminate such shortfall.

Section 7.13. *Cash Management Order.* No later than (a) three days after the Petition Date (or such later date as agreed by the Term Loan Agent and the Lenders Steering Committee), the Company shall provide to the Administrative Agent and the L/C Issuer evidence of approval by the Bankruptcy Court of the Interim Cash Management Order, and (b) twenty-five days after the Petition Date (or such later dates as agreed by the Term Loan Agent in its reasonable discretion), the Company shall provide to the Administrative Agent and the L/C Issuer evidence of final approval by the Bankruptcy Court of the Final Cash Management Order.


# ARTICLE 8
## NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect, until payment in full of all Obligations, and expiration of all Letters of Credit each Credit Party shall perform, and shall cause each of its Restricted Subsidiaries to perform, all covenants in this Article 8.

Section 8.01. *Indebtedness.* No Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness incurred by the Company or any of its Restricted Subsidiaries under (i) the JPM Facility or (ii) under any other facility (other than this Agreement) related to the issuance of letters of credit, in each case as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced in whole or in part from time to time; *provided*, that the sum of the aggregate L/C Exposure in respect of all letters of credit issued under the facilities described in clauses (i) and (ii) above *plus* the principal amount of all revolving loans outstanding thereunder *plus* the aggregate amount of the Obligations shall not at any time exceed $750,000,000;

(c)     Indebtedness incurred by the Company or any of its Restricted Subsidiaries under the Amended Term Loan Agreement as in effect on the date hereof;

(d)     (i) Indebtedness among the Company and its Restricted Subsidiaries arising in the Ordinary Course of Business or (ii) Indebtedness owed to any subsidiary of the Company; *provided*, that any event which results in any such subsidiary ceasing to be a subsidiary of the Company or any subsequent transfer of such Indebtedness (other than to the Company or another subsidiary of the Company) shall be deemed, in each case, to constitute an incurrence of such Indebtedness not permitted by this clause (ii);

(e)     Indebtedness incurred by the Company or any of its Restricted Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations incurred in connection with any transactions permitted by this Agreement including, without limitation, Permitted Acquisitions;

(f)     Indebtedness which may be deemed to exist pursuant to (i) any guaranties of obligations other than Indebtedness for money borrowed, or (ii) performance, surety, statutory, real estate operating leases, appeal or similar obligations incurred in the Ordinary Course of Business;

(g)     Indebtedness in respect of netting services, overdraft protections and otherwise in connection with customary Deposit Accounts maintained by a Credit

Party or any Restricted Subsidiary as part of its ordinary cash management program;

(h)     performance guaranties in the Ordinary Course of Business of the obligations (other than Indebtedness for money borrowed) of suppliers, customers, franchisees and licensees of the Company and its Subsidiaries or of the Company or its subsidiaries as a tenant or subtenant on real estate leases in the Ordinary Course of Business;

(i)     (i) guaranties by any Credit Party or any of its Restricted Subsidiaries of Indebtedness of the Company or any Restricted Subsidiary of a Credit Party (other than guaranties by a Subsidiary Guarantor or any of its Restricted Subsidiaries of Indebtedness of the Company (except after a Company Lien Event) or any Restricted Subsidiary that is not a Guarantor or a subsidiary of a Guarantor) otherwise permitted to be incurred pursuant to this Section 8.01 of the Company and (A) guaranties of Permitted Exchange Indebtedness by any Credit Party;

(j)     Indebtedness or letters of credit or revolving loans in respect of commitments for Indebtedness existing on the Closing Date (other than Indebtedness of the Company permitted pursuant to (b), (s), or (v));

(k)     (i) Indebtedness of the Company or any of its Restricted Subsidiaries under Rate Management Transactions entered into in the Ordinary Course of Business and not for speculative purposes and (ii) Indebtedness of Company or any of its subsidiaries under Rate Management Transactions in respect of foreign currencies entered into in connection with Permitted Exchange Indebtedness and not for speculative purposes;

(l)     purchase money Indebtedness or Capital Lease Obligations of the Company or any of its Restricted Subsidiaries; *provided*, that such Indebtedness or Capital Lease Obligations (x) may be incurred at the time of purchase of the assets acquired in connection therewith or financed thereunder or within one hundred eighty (180) days thereafter and (y) is or are secured only by (1) assets acquired in connection with such financing or financed thereunder and intangibles and proceeds related thereto ("**PMSI Assets**"), (2) any other PMSI Assets which may be acquired in connection with or financed under Indebtedness which is part of the same transaction or a related series of transactions as such Indebtedness, and (3) any other assets which are not prohibited by the terms of this Agreement from being pledged to secure such Indebtedness or Capital Lease Obligations;

(m)     Permitted Funding Indebtedness not to exceed $200,000,000 in any individual transaction or any series of related transactions; *provided*, any such

Indebtedness, to the extent secured, shall not be secured by a Lien on any asset constituting Term Loan Collateral other than Liens created, incurred, assumed or permitted to exist in reliance on Section 8.02(b)(xvi)(B);

(n)      Permitted Refinancing Indebtedness of Indebtedness described in clause (c), (j) or (l) (including subsequent refinancings of the foregoing that constitute Permitted Refinancing Indebtedness); *provided*, that any such Indebtedness, to the extent secured, shall not be secured by any collateral other than collateral that secured the Indebtedness being refinanced or collateral substantially similar thereto;

(o)      Indebtedness incurred or assumed in connection with or related to Bank Activities owing to CIT Bank;

(p)      (i) customary subordinated Indebtedness (whether term or revolving) with finance subsidiaries that are Special Purpose Vehicles or other subsidiaries in connection with securitizations, conduits or like transactions related to the Ordinary Course of Business to enable such Special Purpose Vehicle or such other subsidiaries to acquire Portfolio Assets to be transferred to such entities under such transactions, and (ii) limited guaranties of obligations of financing subsidiaries that are Special Purpose Vehicles or Restricted Subsidiaries in connection with securitizations, conduit facilities and like transactions related to Ordinary Course of Business (including, without limitation, to the extent applicable, performance guaranties (other than payment obligations with respect to the underlying Indebtedness that exceed 10% of the amount of such Indebtedness) and guaranties consistent with the delivery of a "true sale"/"absolute transfer" opinion with respect to any transfer by the Company or any Restricted Subsidiaries to the applicable financing subsidiary or other subsidiary of the Company;

(q)      unsecured guaranties by Aerospace, CIT Leasing Corporation or other Restricted Subsidiaries operating in CIT's Transportation Finance segment of Indebtedness of Special Purpose Vehicles with respect to the financing of newly acquired transportation assets or the lease of transportation assets in the Ordinary Course of Business;

(r)      guaranties by the Company (incurred prior to a Company Lien Event) or any Restricted Subsidiary of Indebtedness of subsidiaries of the Company that are not Credit Parties incurred for working capital purposes in the Ordinary Course of Business;

(s)      customary unsecured lines of credit (revolving and term) entered into in the Ordinary Course of Business, in existence on the Closing Date and

outstanding thereunder at any time thereafter in an aggregate amount not to exceed $3,200,000,000 for the Company and $800,000,000 in the aggregate for Foreign Subsidiaries;

(t)     other unsecured Indebtedness of the Company and its Foreign Subsidiaries incurred at a time when no Default or Event of Default shall have occurred and be continuing in an aggregate amount not to exceed at any time the greater of $500,000,000 or 1.0% of Total Assets;

(u)     guaranties by the Company or a Restricted Subsidiary of indebtedness or other obligations of an Owner-Trustee as lessor under a lease of Portfolio Assets or other related documents incurred in the Ordinary Course of Business;

(v)     Indebtedness under, and guaranties of, the TRS Facility not to exceed an outstanding notional amount of $2,125,000,000;

(w)     obligations of Restricted Subsidiaries to pay the deferred purchase price of receivables acquired in the trade finance business in connection with the Ordinary Course of Business;

(x)     unsecured guaranties by any Restricted Subsidiary of Indebtedness of the Company in an aggregate principal amount for all Restricted Subsidiaries not to exceed $25,000,000; *provided*, that such guaranties shall be subordinated to the payment in full of the Obligations pursuant to subordination provisions customary (in the reasonable determination of the Company) for intercompany obligations;

(y)     Permitted Reestablishment Indebtedness secured by Liens incurred in reliance on Section 8.02(b)(xxx); *provided*, that the Net Cash Debt Proceeds of such Indebtedness shall have been applied to the prepayment of Term Loans in accordance with Section 2.10(b) of the Amended Term Loan Agreement; and

(z)     Indebtedness of the Company incurred pursuant to the Interim Cash Management Order (prior to entry of the Final Cash Management Order) or the Final Cash Management Order (after entry of the same).

Notwithstanding anything to the contrary, (x) CIT Funding shall not be permitted to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness other than "Series B Notes" contemplated to be issued pursuant to the Approved Restructuring Plan (as further described therein) in accordance with Section 8.01(n) and unsecured notes guaranteed by Company and outstanding on the Closing Date, (y) the Barbados Entities shall not be permitted to, directly or

103

indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness other than in reliance on clauses (k), (n) and (v) of this Section 8.01 and (z) CIT Financial Ltd. shall not be permitted to Guarantee any Indebtedness of Company or any of its Restricted Subsidiaries. Notwithstanding anything in the foregoing, in no event shall any Credit Party, nor shall it permit any of its Restricted Subsidiaries to directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness to CIT Funding other than the Guarantee by the Company of the "Series B Notes" contemplated to be issued pursuant to the Approved Restructuring Plan (as further described therein) in accordance with Section 8.02(b)(xiv) and the Guarantee by the Company of notes of CIT Funding outstanding on the Closing Date.

Section 8.02. *Liens.* (a) No Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any Pledged Collateral, whether now owned or hereafter acquired, or any income or profits therefrom, except Liens granted pursuant to any Credit Documents in favor of Administrative Agent for the benefit of Secured Parties to secure the Obligations, other than Liens granted hereby and Liens arising by operation of law securing obligations outstanding of $1,000,000 or less in the aggregate.

(b)     No Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Security but excluding any Pledged Collateral) of the Company or any of its Restricted Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(i)     Liens to secure the Term Loan Obligations;

(ii)     (A) Liens for Taxes (1) for amounts not yet overdue, or (2) for amounts that are overdue if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts; and (3) Liens with respect to other claims described in Section 7.03; *provided*, that the requirements of Section 7.03 applicable thereto are complied with;

(iii)     statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and

104

materialmen, ordinary course Liens on aircraft for airport, navigation, and other en-route charges, permitted Liens under leases and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA), (i) for amounts not yet overdue, or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(iv)     Liens incurred in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of Borrowed Money Indebtedness or other Indebtedness), so long as no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Term Loan Collateral on account thereof, or deposits made to secure liability to insurance carriers;

(v)     easements, rights of way, restrictions, encumbrances, encroachments, and other minor defects or irregularities in title or ownership rights, in each case which do not and will not interfere in any material respect with the value or use of the property to which such Lien is attached or with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(vi)     any interest or title of or through a lessor or sublessor under any lease of real or personal property permitted hereunder;

(vii)     Liens solely on any cash earnest money deposits made by the Company or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement the consummation of which would be permitted hereunder;

(viii)     (A) purported Liens evidenced by the filing of precautionary UCC financing statements relating to transactions, (B) Liens evidenced by the filing of precautionary UCC financing statements related to securitizations, conduit facilities and similar transactions, and (C) Liens evidenced by prefilings of UCC financing statements filed in connection with securitizations, conduits and other similar transactions prior to the transfer of assets thereto, in each case, entered into in the Ordinary Course of Business;

105

(ix)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(x)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(xi)     licenses or sublicenses of patents, trademarks and other intellectual property rights granted by the Company or any of its Restricted Subsidiaries in connection with Ordinary Course of Business;

(xii)     Liens existing on the Closing Date (and, in the case of property that replaces property existing on the Closing Date, the equivalent Lien on such replacement property to the extent the applicable collateral agreements as in effect on the Closing Date require Liens on such replacement property) and Liens incurred after the Closing Date pursuant to the terms of agreements entered into prior to the Closing Date as in existence on the Closing Date;

(xiii)     Liens constituting (and rights of set off and any rights of use, possession or disposition with respect to) deposits with derivatives counterparties as may be required pursuant to customary derivatives contracts in connection with Indebtedness permitted pursuant to Section 8.01(k) or (v);

(xiv)     Liens on assets other than Restricted Collateral securing Indebtedness permitted pursuant to Section 8.01(l);

(xv)     Liens created, incurred, assumed or permitted to exist in connection with or related to Bank Activities to the extent such Liens secure Indebtedness or obligations not in excess of $100,000,000 for any individual transaction or series of related transactions and an amount not to exceed $1.0 billion in the aggregate during the term of this Agreement.

(xvi)     (A) Liens on assets other than Term Loan Collateral securing Indebtedness permitted pursuant to Section 8.01(m) and (B) Liens on Term Loan Collateral consisting of assets related to aircraft, railcars and related rights and documents securing Indebtedness permitted pursuant to Section 8.01(m);

(xvii)     Liens on the assets of a Restricted Subsidiary that is not a Credit Party securing Indebtedness and other obligations of such Restricted Subsidiary incurred in compliance with this Agreement;

106

(xviii)     Liens (A) that are rights of set-off (1) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (2) relating to pooled deposit or sweep accounts of the Company or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations and other cash management activities incurred in the Ordinary Course of Business, (3) relating to purchase orders and other agreements entered into with customers of the Company or any of its Restricted Subsidiaries in the Ordinary Course of Business, or (4) relating to Ordinary Course of Business with a syndicate member, participant, the Administrative Agent or L/C Issuer or letter of credit banks or issuer in a loan transaction, (B) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (C) encumbering reasonable customary initial deposits and margin deposits and attaching to commodity trading accounts or other brokerage accounts incurred in the Ordinary Course of Business, and (D) in favor of banking institutions arising as a matter of law or pursuant to customary account agreements encumbering deposits or financial assets (including the right of set-off) and which are within the general parameters customary in the banking and finance industry.

(xix)     Liens on Term Loan Collateral securing Permitted Exchange Indebtedness incurred to refinance Indebtedness existing as of the Closing Date of the Company or any Restricted Subsidiary

(xx)     Liens in favor of the Company or any Restricted Subsidiary; *provided*, that for the purposes of this clause Guarantors and subsidiaries of Guarantors may only grant Liens in favor of other Guarantors and/or subsidiaries of Guarantors;

(xxi)     (A) Liens existing on assets or property at the time acquired in connection with a workout or as the proceeds of collateral securing a Portfolio Asset, in each case, in the Ordinary Course of Business; and (B) other Liens on Portfolio Assets customarily set forth in documentation related thereto or created, incurred, assumed or permitted to exist on Portfolio Assets (but not encumbering any other assets) in the Ordinary Course of Business;

(xxii)     Liens on the assets of the Company and its subsidiaries in favor of CIT Bank to secure obligations of the Company or any subsidiary to CIT Bank existing on the Closing Date other than those permitted under Section 8.02(b)(xii); *provided*, the aggregate amount of the value of such assets shall not exceed $300,000,000, measured in the case of each asset at

the time such Liens is created and without giving effect to any reduction in the value of the asset subject to the Lien;

(xxiii)    Liens securing obligations in respect of Indebtedness permitted under Section 8.01(b) on Cash and Cash Equivalents that are not part of the Pledged Collateral in an aggregate amount not to exceed $500,000,000 less the Obligations at any time (plus a cushion not to exceed 5% of the aggregate L/C Exposure in respect of U.S. dollar-denominated letters of credit and 20% of the aggregate LC Exposure in respect of letters of credit denominated in currencies other than U.S. dollars) of Company or any Restricted Subsidiary, and Liens on any documents or intangibles related to the corresponding letters of credit;

(xxiv)    Liens on (and rights of set off and any rights of use, possession or disposition with respect to) Cash or Cash Equivalents (including, for purposes of this clause (xxiv), long-term obligations of the United States government, but excluding any Cash or Cash or Equivalents that is part of the Pledged Collateral or held in any "Funding Account" or "Sweep Account" (each as defined in the Amended Term Loan Agreement)) and guarantor rights, in each case securing daily mark-to-market obligations and other obligations of CIT Financial Ltd., CIT Financial (Barbados) Srl and the Company under the TRS Facility;

(xxv)    other Liens on assets other than the Term Loan Collateral securing Indebtedness of the Company or any Restricted Subsidiary incurred at a time when no Default or Event of Default shall have occurred and be continuing in an aggregate amount not to exceed $250,000,000 at any time outstanding;

(xxvi)    (A) Liens on assets (including the proceeds thereof) acquired by or assigned to any Credit Party or Restricted Subsidiary pursuant to operation of the trade finance business in the Ordinary Course of Business; *provided*, such Liens were in existence to secure an obligation of the seller or assignor of such asset and such Liens were not created by any Credit Party or Restricted Subsidiary in contemplation of such acquisition or assignment, and (B) Liens that are leases on aircraft, rail assets or any other leased assets that are leased in the Ordinary Course of Business;

(xxvii)    Liens on leased assets (including Portfolio Assets) arising from the action or inaction of a third party lessee;

108

(xxviii) Liens on the CITLC Assigned Note required to be incurred pursuant to Section 15 of the CITLC Loan Assignment and Intercreditor Agreement;

(xxix) Liens granted on assets in contemplation of any waivers or forbearances with respect to rail head leases existing on the Closing Date, so long as (A) for each such rail head lease, the value of such assets secured by such Liens do not exceed an amount equal to six months rent for such rail head lease and (B) on the date such Lien is granted, no Default or Event of Default shall have occurred and be continuing;

(xxx) Liens granted on any assets constituting Restricted Collateral at the time of such grant; *provided*, that (A) such Liens shall secure Indebtedness incurred by a Credit Party or a Restricted Subsidiary thereof in reliance on clause (l), (m), (v) or (y) of Section 8.01 contemporaneously with the granting of such Lien and (B) both immediately before and immediately after giving effect to such Lien, no Event of Default shall have occurred and be continuing;

(xxxi) Liens securing Indebtedness and other obligations of CIT China or CIT (Australia); *provided*, that any such Lien shall encumber only assets of CIT China, CIT (Australia) or their subsidiaries;

(xxxii) Liens on assets of the Company pursuant to the Interim Cash Management Order (prior to entry of the Final Cash Management Order) or the Final Cash Management Order (after entry of the same) securing Indebtedness under Section 8.01(z); and

(xxxiii) any extensions, substitutions, replacements or renewals of the foregoing; *provided*, that any such Lien shall encumber only the same type of collateral and value encumbered by the Lien being so extended, substituted, replaced or renewed.

Notwithstanding any of the foregoing to the contrary, the Credit Parties shall not permit CIT Funding or any of the Barbados Entities to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, other than, in the case of the Barbados Entities, Permitted Funding Liens.

Section 8.03. *No Further Negative Pledges.* No Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, enter into any agreement prohibiting the creation or assumption of any Lien securing the Obligations upon

any of its properties or assets constituting Pledged Collateral, whether now owned or hereafter acquired.

Section 8.04. *Restrictions on Restricted Subsidiary Distributions.* Except as provided herein, no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary of the Company to (a) pay dividends or make any other distributions on any of such Restricted Subsidiary's Capital Stock owned by the Company or any other Restricted Subsidiary of the Company, (b) repay or prepay any Indebtedness owed by such Restricted Subsidiary to the Company or any other Restricted Subsidiary of the Company, (c) make loans or advances to the Company or any other Restricted Subsidiary of the Company, or (d) transfer any of its property or assets to the Company or any other Restricted Subsidiary of the Company, in each case other than restrictions (i) in agreements evidencing Indebtedness permitted by Section 8.01(l), Permitted Funding Indebtedness or Permitted Reestablishment Indebtedness, (ii) by reason of customary provisions restricting Liens, assignments, subletting or other transfers or distributions/dividends contained in loan documents, documentation relating to securitizations, conduit facilities and other similar transactions, equity documents, leases, licenses, joint venture agreements and similar agreements entered into in the Ordinary Course of Business or in assets obtained in workouts or by foreclosure or exercise of remedies, (iii) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement, (iv) in agreements as in effect on the date of this Agreement and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided*, that except with respect to Permitted Exchange Indebtedness, the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the date of this Agreement, (v) under applicable law, rule, regulation or order, (vi) in any agreement or instrument of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such agreement or instrument was entered into in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired, (vii) in provisions limiting the disposition or distribution of assets or property (including any agreement for the sale or other disposition of a Restricted Subsidiary) in asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of

110

such agreements, (viii) under Permitted Refinancing Indebtedness; *provided*, that (other than in the case of Permitted Exchange Indebtedness) the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced, (ix) Liens permitted to be incurred under Section 8.02 that limit the right of the debtor to encumber or dispose of the assets subject to such Liens, (x) restrictions on cash or other deposits or net worth imposed by customers or lessors under contracts or leases in each case, not constituting Indebtedness and entered into in the Ordinary Course of Business; (xi) in agreements relating to Indebtedness issued by CIT (Australia) or CIT China, (xii) in agreements governing Indebtedness of the type described in Section 8.01(b) or 8.01(v) (pursuant to the TRS Facility) or (xiii) any encumbrances or restrictions imposed by any amendments or refinancings of the contracts, instruments or obligations referred to above in clauses (i) or (viii); *provided*, that any such amendment or refinancing is not materially more restrictive, taken as a whole, with respect to encumbrances or restrictions set forth in the applicable clause (a) through (d) above, than such encumbrances and restrictions prior to such amendment or refinancing (as determined by the Company in good faith).

Section 8.05. *Fundamental Changes*; *Disposition Of Assets.* Subject to the last paragraph of this Section 8.05, no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or substantially all of its business, assets or property, except any Restricted Subsidiary of the Company may be merged with or into any Credit Party (*provided*, that prior to a Company Lien Event, a Subsidiary Guarantor or any subsidiary of a Subsidiary Guarantor may not be merged with the Company), or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to any Credit Party (*provided*, that, prior to a Company Lien Event, a Subsidiary Guarantor or any Restricted Subsidiary of a Subsidiary Guarantor may not be so liquidated, wound up or dissolved if its assets are transferred to the Company, nor shall all or any part of the business, property or assets of a Subsidiary Guarantor or any subsidiary of a Subsidiary Guarantor be conveyed, sold, leased, transferred or otherwise disposed of to the Company); *provided*, in the case of such a merger, such Credit Party shall be the continuing or surviving Person, (a) any Restricted Subsidiary that is not a Credit Party (other than Aerospace) may be merged into any other Restricted Subsidiary that is not a Credit Party, (b) any Special Purpose Vehicle may be merged with or into any Credit Party or any Restricted Subsidiary or, subject to compliance with Section

111

7.06 and Section 7.07, any Credit Party or any Restricted Subsidiary may be merged with or into any Special Purpose Vehicle; *provided*, that, in each case of this clause (b), such Credit Party or Restricted Subsidiary, as applicable, shall be the surviving or continuing Person and (c) any Restricted Subsidiary(other than, prior to a Company Lien Event, a Subsidiary Guarantor that is directly owned by Company)  may liquidate or dissolve if the Company determines in good faith that such liquidation or dissolution is in the best interests of Company and is not materially disadvantageous to the Lenders; *provided*, that if such Restricted Subsidiary is a Credit Party, its immediate parent company shall also be a Credit Party that is a Wholly-Owned Subsidiary of a Credit Party at the time of such liquidation or dissolution.

Section 8.06. *Conduct of Business.*  From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, engage in any business other than the businesses engaged in by such Credit Party or Restricted Subsidiary (or their subsidiaries) on the Closing Date and any reasonable extension or evolution of such businesses including, without limitation, all business conducted by banks (retail and commercial), investment banks and any businesses conducted by Regulated Subsidiaries of any Credit Party.

Section 8.07.  *Permitted Activities of the Company.*  The Company shall not directly own any assets other than (a) Capital Stock of subsidiaries, (b) assets in respect of, relating to or securing Rate Management Transactions, (c) Cash and Cash Equivalents and other immaterial assets held in accordance with Ordinary Course of Business consistent with past practice, and (d) intellectual property consistent with past practices.  Except for asset-based lending in the Ordinary Course of Business as presently conducted, until such time as the Receivables Borrowed Amount has been reduced to zero, neither Company nor any of its Domestic Subsidiaries shall conduct business related to the acquisition, origination, financing or disposition of trade receivables other than through The CIT Group/Commercial Services, Inc. or CMS Funding Company LLC.

Section 8.08.  *Investments in a Debtor.*  Except for the Capital Stock or other Investments held therein and any Liens thereon on the Closing Date, in no event shall any Credit Party, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, during the pendency of any Case, make or own any Investment in such Debtor or directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any of their respective property or assets of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, securing Indebtedness or obligations of a Debtor, in each case, other than pursuant to the terms of the Interim Cash Management Order (prior to entry

of the Final Cash Management Order) or Final Cash Management Order (after entry of the same).

Section 8.09.  *Investments in Regulated Entities.*  In no event shall any Credit Party, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, on and after the Closing Date make any Investment in CIT Bank or any other Regulated Entity other than (x) Investments consisting of Cash and Cash Equivalents, (y) Platform Transfers in accordance with Section 8.14 and (z) other Investments in CIT Bank or any other Regulated Entity required by, or necessary or prudent under the Bank Holding Company Act, the Federal Reserve Act or the Federal Deposit Insurance Act or any other applicable law or governmental requirement and any approval, waiver, consent, stipulation, agreement or commitment entered into in connection therewith or related thereto (*provided*, that such Investments are not made with Restricted Collateral).

Section 8.10.  *Amendments to Organizational Documents.*  No Credit Party shall amend or permit any amendments to any Credit Party's Organizational Documents if such amendment, termination, or waiver would be materially adverse to Administrative Agent, the L/C Issuer or the Lenders or would prevent any Credit Party from complying with its obligations under any Credit Document.

Section 8.11.  *Issuance of Disqualified Capital Stock.*  No Credit Party shall issue or sell any Disqualified Capital Stock except as permitted by Section 8.01, nor shall any Credit Party permit any of its Restricted Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of any shares of its Capital Stock or any Disqualified Capital Stock to any Person other than a Credit Party.

Section 8.12.  *Capital Stock of Subsidiaries.*  No Credit Party shall permit any of its direct or indirect subsidiaries (a) that is not a Restricted Subsidiary to own any Capital Stock in any Credit Party or any of its Restricted Subsidiaries or (b) that is a Foreign Subsidiary of any Credit Party to own any Capital Stock in a Domestic Subsidiary of any Credit Party.  No Credit Party shall sell or otherwise dispose of any Capital Stock in a Subsidiary Guarantor if as a result thereof such Subsidiary Guarantor would cease to constitute a Wholly-Owned Subsidiary of the Company, unless such Subsidiary Guarantor as a result of such sale or other disposition would cease to constitute a subsidiary of the Company.  No Subsidiary Guarantor or subsidiary thereof shall, prior to the occurrence of a Company Lien Event, issue Capital Stock to the Company or another Restricted Subsidiary (other than another Subsidiary Guarantor or subsidiary thereof); *provided*, that a Subsidiary Guarantor that is directly owned by the Company may issue Capital Stock to the Company.  No Credit Party shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit to

exist any Lien on or with respect to any Capital Stock directly owned by any Credit Party in any of its Wholly-Owned Subsidiaries, whether now owned or hereafter acquired, except for Liens permitted under clauses (i) through (v), (xv), (xix), (xxi)(A), and (xxii) and, to the extent relating to any of the foregoing clauses, clause (xxxiii) of Section 8.02(b).

Section 8.13.  *Chapter 11 Claims.*  The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of the Administrative Agent against the Debtors hereunder (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Interim Cash Management Order and the Final Cash Management Order and any Superpriority Claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the secured parties under Section 5.21 of the Amended Term Loan Agreement, in each case which claims shall be *pari passu* with the Superpriority Claims of the Administrative Agent hereunder).

Section 8.14.  *Platform Asset Transfers Excluded.*  Notwithstanding anything in this Agreement to the contrary, as long as after giving effect thereto, no Default or Event of Default would exist, Company and its Restricted Subsidiaries shall have the right to cause a Platform or Platforms and related Platform Assets to be contributed to CIT Bank (from a subsidiary (including a Guarantor) directly or from a subsidiary to the Company and then from the Company to CIT Bank) without limit or restriction; <u>provided</u>, that prior to any such transfer and contribution, the board of directors of Company, in consultation with the chief executive officer of Company, shall have determined such transfer and contribution of any Platform is in the best interests of Company's stockholders and would not cause Company to be unable to pay Indebtedness or related obligations when due.  For the avoidance of doubt, such transfers and contributions shall not be subject to the restrictions on Liens (except for the restrictions on Liens set forth in Section 8.02(a)) or transactions with Affiliates set forth in this Agreement.


# ARTICLE 9
## GUARANTY

Section 9.01.  *Guaranty of the Obligations.*  Subject to the provisions of Section 9.02, the Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent for the ratable benefit of the Guaranty Beneficiaries the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required

prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code) (collectively, the "**Guaranteed Obligations**"). Notwithstanding any provision to the contrary of this Agreement or of any other Credit Document, it is intended that the Guaranty and the Liens and security interests granted by the Guarantors hereunder not constitute a "Fraudulent Conveyance". For purposes hereof, "Fraudulent Conveyance" means a fraudulent conveyance under section 548 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the provisions of any applicable fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time. The parties hereto agree that, if the Guaranty or any Liens or security interests would, but for the application of this Section 9.01, constitute a Fraudulent Conveyance, the Guaranty and each such Lien and security interest shall be valid and enforceable only to the maximum extent that would not cause the Guaranty or such Lien or security interest to constitute a Fraudulent Conveyance.

Section 9.02. *Contribution by Guarantors.* All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceed its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations guaranteed. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of any other Debtor Relief Law; *provided*, that solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 9.02, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such

115

Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 9.02), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 9.02. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 9.02 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 9.02.

Section 9.03. *Payment by Guarantors.* Subject to Section 9.02, the Guarantors hereby jointly and severally shall agree, in furtherance of the foregoing and not in limitation of any other right which any Guaranty Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of the Company or any other Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code), the Guarantors will upon demand pay, or cause to be paid, in money, currency or a credit balance in any demand or Deposit Account, to Administrative Agent for the ratable benefit of the Guaranty Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Company's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Company for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Beneficiaries as aforesaid.

Section 9.04. *Liability of Guarantors Absolute.* Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectibility. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

116

(b)     Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Company and any Guaranty Beneficiary with respect to the existence of such Event of Default;

(c)     the obligations of each Guarantor hereunder are independent of the obligations of the Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of the Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrowers or any of such other guarantors and whether or not a Borrower is joined in any such action or actions;

(d)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; and, without limiting the generality of the foregoing, if the Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)     any Guaranty Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Guaranty Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy

117

that such Guaranty Beneficiary may have against any such security, in each case as such Guaranty Beneficiary in its discretion may determine consistent herewith or any other applicable Credit Document, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents; and

(f)       this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Guaranty Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Guaranty Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of the Company or any of its Restricted Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) to the extent consistent with applicable law, any defenses, set offs or counterclaims which the Borrowers may allege or assert against any Guaranty Beneficiary in

118

respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 9.05. *Waivers by Guarantors.* Each Guarantor hereby waives, for the benefit of the Beneficiaries: (a) any right to require any Guaranty Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against the Borrowers, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from the Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Guaranty Beneficiary in favor of the Borrowers or any other Person, or (iv)  pursue any other remedy in the power of any Guaranty Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrowers or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Guaranty Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Guaranty Beneficiary protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrowers and notices of any of the matters referred to in Section 9.04 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(NY) 02826/146/CA/cit.group.lc.ca.doc

Section 9.06. *Guarantors' Rights of Subrogation, Contribution, etc.* Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Commitments shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against the Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against the Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Guaranty Beneficiary now has or may hereafter have against the Borrowers, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Guaranty Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Commitments shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 9.02. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Guaranty Beneficiary may have against the Borrowers, to all right, title and interest any Guaranty Beneficiary may have in any such collateral or security, and to any right any Guaranty Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Administrative Agent on behalf of the Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 9.07. *Subordination of Other Obligations.* Any Indebtedness of Borrowers or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall

120

be held in trust for Administrative Agent on behalf of the Guaranty Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of the Guaranty Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 9.08. *Continuing Guaranty.* This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full and the Commitments shall have terminated. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 9.09. *Authority of Guarantors or Borrowers.* It is not necessary for any Guaranty Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 9.10. *Financial Condition Of Borrowers.* Any Credit Extension may be made to the Borrowers or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of the Borrowers at the time of any such grant or continuation. No Guaranty Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of the Borrowers. Each Guarantor has adequate means to obtain information from the Borrowers on a continuing basis concerning the financial condition of the Borrowers and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Guaranty Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrowers now known or hereafter known by any Guaranty Beneficiary.

Section 9.11. *Bankruptcy, etc.*

(a)     So long as any Guaranteed Obligations remain outstanding, no Guarantor (other than the Debtors) shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Required Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding against the Borrowers or any other Guarantor. The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy,

insolvency, receivership, reorganization, liquidation or arrangement of the Borrowers or any other Guarantor or by any defense which the Borrowers or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)     Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Beneficiaries that the Guaranteed Obligations which are guaranteed by the Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrowers of any portion of such Guaranteed Obligations.  The Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)     In the event that all or any portion of the Guaranteed Obligations are paid by the Borrowers, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Guaranty Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 9.12.  *Discharge of Guaranty Upon Sale of Guarantor.*  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Guaranty Beneficiary or any other Person effective as of the time of such asset sale or other disposition.

Section 9.13.  *Taxes.*  The provisions of Section 3.01 shall apply, *mutatis mutandi*, to the Guarantors and payments thereby.

# ARTICLE 10
## EVENTS OF DEFAULT AND REMEDIES

Section 10.01. *Events of Default* . Any of the following shall constitute an Event of Default:

(a) *Failure to Make Payments When Due*. Failure by the Borrowers to pay (i) when due Obligations consisting of Unreimbursed Amounts; or (ii) within three (3) Business Days of the date due any interest, fees or other amounts due hereunder; or

(b) *Default in Other Agreements*. (i) Failure of any Credit Party or any of their respective Restricted Subsidiaries, in each case that is not a Debtor, to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.01(a)) in an aggregate principal amount of $100,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party or any of their respective Restricted Subsidiaries, in each case that is not a Debtor, with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above, or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders) to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) or to require the prepayment, redemption, repurchase or defeasance of, or to cause the Company or any of its Restricted Subsidiaries to make any offer to prepay, redeem, repurchase or defease such Indebtedness, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; *provided*, that no Event of Default shall arise under this Section 10.01(b) due to any such breach or default solely resulting from the Cases or emergence of any Debtor from the Cases, in each case, in accordance with the Approved Restructuring Plan; or

(c) *Breach of Certain Covenants*. Failure of any Credit Party to perform or comply with (i) any term or condition contained in Section 7.01 (unless no time period is specified therefor), Section 7.02, Section 7.11, Section 7.12(b) or Article 8; or

(d) *Breach of Representations*, *etc.* Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Restricted Subsidiaries in writing pursuant hereto or thereto or

123

in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e) *Other Defaults Under Credit Documents.* Any Credit Party shall default in the performance of or compliance with (i) Section 7.12, and such default shall not have been remedied or waived within two (2) days or (ii) any term contained herein or any of the other Credit Documents, other than any such term referred to in any other Section of this Section 10.01, and such default shall not have been remedied or waived within thirty (30) days after the earlier of (A) an officer of such Credit Party becoming aware of such default, or (B) receipt by the Company of notice from Administrative Agent or any Lender of such default; or

(f) *Claims, Judgments and Attachments.* (i) Any money judgment, writ or warrant of attachment or similar process involving in the aggregate at any time an amount in excess of $100,000,000 (in either case to the extent not fully covered by insurance (less any deductible) as to which a solvent and unaffiliated third party insurance company has acknowledged coverage) shall be entered or filed against the Company or any of its Restricted Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than the date that enforcement proceedings shall have been commenced by any creditor upon such judgment order or five (5) days prior to the date of any proposed sale thereunder) or (ii) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Company which have a value in excess of $100,000,000 in the aggregate; or

(g) *Dissolution.* Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(h) *Employee Benefit Plans.* (i) There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of the Company, any of its subsidiaries or any of their respective ERISA Affiliates in excess of $100,000,000 during the term hereof; or (ii) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest under Section 401(a)(29) or 412(n) of the Internal Revenue Code or under ERISA; or

(i) *Change of Control.* A Change of Control shall occur; or

(j)     *Guaranties and other Credit Documents.*  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect in any material respect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement ceases to be in full force and effect (other than by reason of a release of Pledged Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Administrative Agent shall not have or shall cease to have a valid and perfected Lien in the Pledged Collateral, in each case for any reason other than the failure of the Administrative Agent or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest (or, if any Cases are pending, the Company or any of its subsidiaries shall contest or support any other Person contesting) the validity or enforceability of any Credit Document in any material respect in writing or deny in writing that it has any further liability, including with respect to future extensions of credit by the L/C Issuer or the Lenders, under any Credit Document to which it is a party; or

(k)     *Insolvency Proceedings, etc.*  Any Credit Party that is a Non-Debtor Subsidiary or any other Significant Subsidiary at any time, or the Company after the effective date of the Approved Restructuring Plan, to the fullest extent permitted under applicable mandatory provisions of law becomes subject to any proceeding under Chapter 11 or Chapter 7 of the Bankruptcy Code or makes an assignment for the benefit of creditors generally; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property under any applicable law relating to insolvency or corporate reorganization; or a third person files for the opening of insolvency proceedings against such Person that result in the entry of an order for relief or remains undismissed, undischarged or unstayed for sixty (60) calendar days; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any applicable law relating to insolvency or corporate reorganization relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(l)     *Dismissal or Conversion of the Cases*; *Liquidation*; *Superpriority Claims.*  Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or the Company or any Subsidiary shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the

Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases and the order appointing such trustee, responsible officer or examiner shall not be reversed or vacated within 30 days after the entry thereof; the Board of Directors of the Company or any Subsidiary of the Company shall authorize a liquidation of such Person's business except as permitted by Section 8.05(c); or an application shall be filed by the Company or any Subsidiary for (i) the approval of any other Superpriority Claim in any of the Cases that is *pari passu* with or senior to the claims of the Administrative Agent against the Debtors hereunder (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Interim Cash Management Order and the Final Cash Management Order and any Superpriority Claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the secured parties under Section 5.21 of the Amended Term Loan Agreement, in each case which claims shall be *pari passu* with the Superpriority Claims of the Administrative Agent hereunder) or (ii)  the approval of any Lien on the Pledged Collateral (other that the Liens granted hereunder to the Administrative Agent), or there shall arise or be granted any such Lien on the Pledged Collateral; or

(m)     *Relief from Automatic Stay.*  The Bankruptcy Court shall enter an order or orders in the Cases granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors which have a value in excess of $25,000,000 in the aggregate; or

(n)     *Liens on Pledged Collateral.*  Any of the Pledged Collateral is subject to any Lien or any claim or demand that if unpaid might by law or upon bankruptcy, insolvency or otherwise, be given any priority whatsoever over any Credit Party's general creditors with respect to the Pledged Collateral or is transferred for the purposes of the payment of indebtedness not arising hereunder or is taken by attachment, execution or any other form of legal process; or

(o)     *Other Actions with respect to Pledged Collateral.*  The assertion of any levy, seizure or attachment on the Pledged Collateral or the taking of any action by a regulatory authority to obtain control (which shall not have been vacated, discharged or stayed or bonded pending appeal within sixty (60) days from the entry thereof) of any part of the Pledged Collateral; or

(p)     *Financing Orders*.  (i) The Final DIP Order shall not have been entered by the date that is thirty (30) days after the date of entry of the Interim DIP Order, (ii) a Financing Order shall be vacated, stayed, reversed, modified or amended in any respect, without the prior written consent of the Required Lenders, (iii) a Financing Order shall cease to create a valid and perfected Lien or to be in full force and effect or (iv) any of the Loan Parties or any Subsidiary shall fail to comply with a Financing Order; or

(q)     *Carve-Outs*. The Pledged Collateral shall become subject to any surcharge or carve-out for the fees of any entity or party, including without limitation (i) the Bankruptcy Court, (ii) the United States Trustee or (iii) any statutory committee appointed in the Cases; or

(r)     *Invalid Plan*.  A chapter 11 plan shall be confirmed in any of the Cases that is materially inconsistent with the Approved Restructuring Plan or that in any way impairs or modifies any of the Obligations, Liens, terms, rights and/or remedies set forth in any of the Credit Documents; or any of the Credit Parties shall seek support of, or fail to contest in good faith the filing or confirmation of, such a plan; or

(s)     *Supportive Actions*.  The Company or any Subsidiary of the Company shall take any action in support of any matter set forth in Sections 10.01(l), (m), (p) or (r) above or any other Person shall do so and such application is not contested in good faith by the Company and the relief requested is granted in an order that is not stayed pending appeal; or

(t)     *Material Impairment*.  The Company or any Subsidiary of the Company shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

Section 10.02.  *Remedies Upon Event of Default*.  If any Event of Default occurs and is continuing, the Administrative Agent may or, at the request of the Required Lenders, shall take any or all of the following actions, in each case without further order of or application to the Bankruptcy Court:

(a)     declare the obligation of the L/C Issuer to make Credit Extensions to be terminated, whereupon such obligation shall be terminated;

(b)     declare all amounts owing or payable hereunder or under any other Credit Document to be immediately due and payable, without presentment,

127

demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

(c)     exercise on behalf of itself, the Lenders and the L/C Issuer all rights and remedies available to it, the Lenders and the L/C Issuer under the Credit Documents; *provided*, that upon the occurrence of an entry of an order for relief with respect to any Subsidiary at any time, or the Company after the effective date of the Approved Restructuring Plan under the Bankruptcy Code of the United States, the obligation of the L/C Issuer to make Credit Extensions shall automatically terminate and all other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender; and

(d)     with or without prior notice to any Credit Party, and without demand for additional collateral, (i) require the Credit Parties to provide additional Eligible Collateral at any time (A) when the Total Collateral Amount is not equal to or greater than the Total Collateral Requirement at any time or (B) in the case of any Borrower, when its Borrower Collateral Amount is not equal to or greater than its Collateral Requirement, (ii) sell at public or private sale any or all of the Pledged Collateral; (iii) apply to, or set off against, the Obligations of the Credit Parties all or any portion of the Pledged Collateral or other property (other than property securing the Term Loan Obligations) of the Credit Parties in the possession of the Administrative Agent; (iv) convert any of the Pledged Collateral or any proceeds thereof into the applicable Alternative Currency, with any such conversion costs being considered a collection expense and added to the Obligations; and (v) at its discretion in its own name or in the name of the Credit Parties take any action for the collection of the Pledged Collateral, including the filing of a proof of claim in insolvency proceedings, and may receive the proceeds thereof and execute releases therefor.  The Credit Parties agree that the Administrative Agent has no obligation to sell or otherwise liquidate the Pledged Collateral in any particular order or to apply the proceeds thereof to any particular portion of the Obligations.

Section 10.03.  *Application of Funds.*  (a) Subject to Section 2.01(c), the Pledged Collateral shall be applied to satisfy drawings under Letters of Credit as they occur.  If any Pledged Collateral remains on deposit in the Collateral Accounts after all Letters of Credit have either been fully drawn or expired, such remaining Pledged Collateral shall be applied to the other Obligations, if any, in the order set forth below.

(b)     After the exercise of remedies provided for in Section 10.02, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article 3) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (including Commitment Fees but excluding Utilization Fees) payable to the Lenders and the L/C Issuer (including fees, charges and disbursements of counsel to the respective Lenders and the L/C Issuer (including fees and time charges for attorneys who may be employees of any Lender or the L/C Issuer) and amounts payable under Article 3), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid Utilization Fees and interest on any L/C Borrowings and other Obligations, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Third payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of any L/C Borrowings, ratably among the Lenders and the L/C Issuer in proportion to the respective amounts described in this clause Fourth held by them; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Company or as otherwise required by Law.

# ARTICLE 11
## ADMINISTRATIVE AGENT

Section 11.01. *Appointment and Authority.*

Each of the Lenders and the L/C Issuer hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the L/C Issuer, and neither any Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

Section 11.02.  *Rights as a Lender.*  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "**Lender**" or "**Lenders**" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 11.03.  *Exculpatory Provisions.*  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents); *provided*, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law; and

(c)     shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any of the Borrowers or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.01 and 10.02) or (ii) in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing

such Default is given to the Administrative Agent by the Company, a Lender or the L/C Issuer.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article 5 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 11.04. *Reliance by Administrative Agent.*

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of the L/C Issuer, the Administrative Agent may presume that such condition is satisfactory to the L/C Issuer unless the Administrative Agent shall have received notice to the contrary from the L/C Issuer prior to the issuance of such Letter of Credit. The Administrative Agent may consult with legal counsel (who may be counsel for the Company), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 11.05. *Delegation of Duties.* The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective

131

activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 11.06. *Resignation of Administrative Agent.* The Administrative Agent may at any time give notice of its resignation to the Lenders, the L/C Issuer and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the L/C Issuer, appoint a successor Administrative Agent meeting the qualifications set forth above; *provided*, that if the Administrative Agent shall notify the Company and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the L/C Issuer under any of the Credit Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the L/C Issuer directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Credit Documents, the provisions of this Article and Section 12.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Any resignation by Bank of America as Administrative Agent pursuant to this Section shall also constitute its resignation as L/C Issuer. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, (b) the retiring L/C Issuer shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring L/C Issuer to effectively assume the obligations of the retiring L/C Issuer with respect to such Letters of Credit.

Section 11.07. *Non-reliance on Administrative Agent and Other Lenders.* Each Lender and the L/C Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the L/C Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

Section 11.08. *No Other Duties*, *etc.*. Anything herein to the contrary notwithstanding, neither the Bookrunner nor the Arranger listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Credit Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the L/C Issuer hereunder.

Section 11.09. *Administrative Agent May File Proofs of Claim.* In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the L/C Issuer

133

and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the L/C Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the L/C Issuer and the Administrative Agent under Sections 2.03 and 12.04) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the L/C Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the L/C Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.03 and 12.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the L/C Issuer any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or the L/C Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender or the L/C Issuer in any such proceeding.

Section 11.10.  *Collateral and Guaranty Matters.*.  The Lenders and the L/C Issuer irrevocably authorize and direct the Administrative Agent:

(a)     to release any Lien on any property granted to or held by the Administrative Agent under any Credit Document (i) in accordance with Section 4.06, or (ii) subject to Section 12.01, if approved, authorized or ratified in writing by the Required Lenders; and

(b)     to release any Subsidiary Guarantor from its obligations under the Subsidiary Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Guaranty pursuant to this Section 11.10.

# ARTICLE 12
## MISCELLANEOUS

Section 12.01. *Amendments*, *Etc.* No amendment or waiver of any provision of this Agreement or any other Credit Document, and no consent to any departure by the Company or any other Credit Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Company or the applicable Credit Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, that no such amendment, waiver or consent shall:

(a) extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 10.02) without the written consent of such Lender;

(b) postpone any date fixed by this Agreement or any other Credit Document for any payment of interest, fees or other amounts due to the Lenders (or any of them) or any scheduled reduction of the Aggregate Commitments hereunder or under any other Credit Document without the written consent of each Lender directly affected thereby;

(c) reduce the principal of, or the rate of interest specified herein on, any L/C Borrowing, or any fees or other amounts payable hereunder or under any other Credit Document without the written consent of each Lender directly affected thereby; *provided*, that only the consent of the Required Lenders shall be necessary to amend the definition of "**Default Rate**";

(d) change Section 2.07 or Section 10.03 in a manner that would alter the *pro rata* sharing of payments required thereby without the written consent of each Lender;

(e) amend Section 1.06 or the definition of "**Alternative Currency**" without the written consent of each Lender;

(f) change any provision of this Section or the definition of "**Required Lenders**" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender; or

(g) release any Credit Party from the Guaranty or release all or substantially all of the Pledged Collateral in any transaction or series of related transactions without the written consent of each Lender, except to the extent the

135

release of any Subsidiary Guarantor is permitted pursuant to Section 11.10 or the release of Pledged Collateral is required pursuant to Section 4.06 (in which case such release may be made by the Administrative Agent acting alone);

and; *provided further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer in addition to the Lenders required above, affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Credit Document; and (iii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

Section 12.02. *Notices*; *Effectiveness*; *Electronic Communication.*

(a) *Notices Generally.* Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to a Borrower, the Administrative Agent or the L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 12.02; and

(ii) if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent

136

provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     *Electronic Communications*.  Notices and other communications to the Lenders and the L/C Issuer hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided*, that the foregoing shall not apply to notices to any Lender or the L/C Issuer pursuant to Article 2 if such Lender or the L/C Issuer, as applicable, has notified the Administrative Agent and the Company that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Company may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided*, that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "**return receipt requested**" function, as available, return e-mail or other written acknowledgement); *provided*, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     *The Electronic Platform*.  THE ELECTRONIC PLATFORM IS PROVIDED "**AS IS**" AND "**AS AVAILABLE.**"  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE ELECTRONIC PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE ELECTRONIC PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to any

137

Borrower, any Lender, the L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, that in no event shall any Agent Party have any liability to any Borrower, any Lender, the L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     *Change of Address*, *Etc.*  Each of the Borrowers, the Administrative Agent and the L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Company, the Administrative Agent and the L/C Issuer.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "**Private Side Information**" or similar designation on the content declaration screen of the Electronic Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "**Public Side Information**" portion of the Electronic Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)     *Reliance by Administrative Agent*, *L/C Issuer and Lenders*.  The Administrative Agent, the L/C Issuer and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of any Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Each Credit Party shall indemnify the Administrative Agent, the L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of any Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded

by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 12.03. *No Waiver*; *Cumulative Remedies*; *Enforcement*. No failure by any Lender, the Administrative Agent or the L/C Issuer to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Credit Document, the authority to enforce rights and remedies hereunder and under the other Credit Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 10.02 for the benefit of all the Lenders and the L/C Issuer; *provided*, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Credit Documents, (b) the L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer) hereunder and under the other Credit Documents, (c) any Lender from exercising setoff rights in accordance with Section 12.08 (subject to the terms of Section 2.07), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any Debtor Relief Law; and *provided*, *further*, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Credit Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 10.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 2.07, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 12.04. *Expenses*; *Indemnity*; *Damage Waiver*.

(a) *Costs and Expenses*. The Company shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and

139

administration of this Agreement and the other Credit Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable out of pocket expenses incurred by the L/C Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or the L/C Issuer (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Lender or the L/C Issuer), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent, any Lender or the L/C Issuer in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Credit Documents, including its rights under this Section, or (B) in connection with the Letters of Credit issued hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Letters of Credit.

(b) *Indemnification by the Company*.  The Company shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Credit Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Credit Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Credit Documents (including in respect of any matters addressed in Section 3.01), (ii) any Letter of Credit or other Issuer Document or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company or any other

140

Credit Party, and regardless of whether any Indemnitee is a party thereto; *provided*, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Company or any other Credit Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Credit Document, if the Company or such other Credit Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     *Reimbursement by Lenders*.  To the extent that the Company for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the L/C Issuer or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided*, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or L/C Issuer in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.06(c).

(d)     *Waiver of Consequential Damages, Etc*.  To the fullest extent permitted by applicable law, no Borrower shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

141

(e)     *Payments.*  All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)     *Survival.*  The agreements in this Section shall survive the resignation of the Administrative Agent and the L/C Issuer, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 12.05.  *Payments Set Aside.*  To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent, the L/C Issuer or any Lender, or the Administrative Agent, the L/C Issuer or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, the L/C Issuer or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and the L/C Issuer severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in the applicable currency of such recovery or payment. The obligations of the Lenders and the L/C Issuer under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 12.06.  *Successors and Assigns*

(a)     *Successors and Assigns Generally.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither any Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this

(NY) 02826/146/CA/cit.group.lc.ca.doc                    11/01/09 9:25 PM

Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the L/C Issuer and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     *Assignments by Lenders.*  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and participations in L/C Obligations at the time owing to it); *provided*, that any such assignment shall be subject to the following conditions:

(i)     *Minimum Amounts.*

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment or, if the Commitment is not then in effect, the principal outstanding balance of the participations in L/C Obligations of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "**Trade Date**" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)     *Proportionate Amounts.*  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the participations in L/C Obligations or the Commitment assigned.

143

(iii)    *Required Consents.*  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required  if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)    the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding).

(iv)    *Assignment and Assumption.*  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; *provided*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    *No Assignment to Company.*  No such assignment shall be made to the Company or any of the Company's Affiliates or Subsidiaries.

(vi)    *No Assignment to Natural Persons.*  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this

Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01,3.02, 3.03, and 12.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, each Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)     *Register*.  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     *Participations*.  Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the participations in L/C Obligations owing to it); *provided*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent, the Lenders and the L/C Issuer shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided*, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to

Section 12.01 that affects such Participant. Subject to subsection (e) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01,3.02 and 3.03 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender; *provided* such Participant agrees to be subject to Section 2.07as though it were a Lender.

(e) *Limitations upon Participant Rights*. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.02 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Company's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Company is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 3.01(e) as though it were a Lender.

(f) *Certain Pledges*. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided*, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g) *Resignation as L/C Issuer after Assignment*. Notwithstanding anything to the contrary contained herein, if at any time Bank of America assigns all of its Commitment pursuant to subsection (b) above, Bank of America may, upon 30 days' notice to the Company and the Lenders, resign as L/C Issuer. In the event of any such resignation as L/C Issuer, the Company shall be entitled to appoint from among the Lenders a successor L/C Issuer hereunder; *provided*, that no failure by the Company to appoint any such successor shall affect the resignation of Bank of America as L/C Issuer. If Bank of America resigns as L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to fund risk participations in Unreimbursed Amounts pursuant to Section 2.01(c)). Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring L/C Issuer, as the case may be, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to Bank of America to

146

effectively assume the obligations of Bank of America with respect to such Letters of Credit.

Section 12.07. *Treatment of Certain Information*; *Confidentiality.* Each of the Administrative Agent, the Lenders and the L/C Issuer shall hold all non-public information regarding Company and its Restricted Subsidiaries and their businesses clearly identified as such by Company and obtained by such Administrative Agent, Lender or L/C Issuer pursuant to the requirements hereof in accordance with such Administrative Agent, Lender or L/C Issuer 's customary procedures for handling confidential information of such nature, it being understood and agreed by Company that, in any event, the Administrative Agent, the Lenders and the L/C Issuer may make (a) disclosures of such information to Affiliates of such Person and to their directors, officers, employees, agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 12.07), (b) disclosures of such information reasonably required by any bona fide or potential assignee, transferee, Participant or sub-participant in connection with the contemplated assignment, transfer or participation (x) by the Administrative Agent of any agency position or the L/C Issuer of its letter of credit issuer position, (y) by such Lender of its Commitment or L/C Obligations or (z) by any direct or indirect contractual counterparties (or the professional advisors thereto) (*provided*, that such bona fide or potential assignees, transferees, participants, sub-participants, and counterparties and advisors are advised of and agree to be bound by the provisions of this Section 12.07), (c) disclosure to any rating agency when required by it, *provided*, that prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from any of the Administrative Agent, the L/C Issuer or any Lender, (d) disclosures to any Lender's financing sources, *provided*, that prior to any disclosure, such financing source is informed of the confidential nature of the information and agrees to be bound by the provisions of this Section 12.07, (e) disclosure of information which (A) becomes publicly available other than as a result of a breach of this Section 12.07 or (B) becomes available to the Administrative Agent, the L/C Issuer or any Lender on a non-confidential basis from a source other than the Company, (f) disclosures required or requested by any governmental agency or representative thereof or by the NAIC or pursuant to legal or judicial process and (vii) disclosures with the consent of the Company or any Restricted Subsidiary; *provided*, unless specifically prohibited by applicable law or court order, each of the Administrative Agent, the L/C Issuer or any Lender shall make reasonable efforts to notify the Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of the Administrative Agent, the L/C Issuer or such Lender by such

147

governmental agency) for disclosure of any such non-public information prior to disclosure of such information. Notwithstanding the foregoing, on or after the Closing Date, the Administrative Agent and the Arranger may, at their respective own expense, issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media. Notwithstanding any other provision of this Section 12.07, the parties (and each employee, representative, or other agent of the parties) may disclose to any and all Persons, without limitation of any kind, the tax treatment and any facts that may be relevant to the tax structure of the transactions contemplated by this Agreement and the other Credit Documents; *provided*, that no party (and no employee, representative, or other agent thereof) shall disclose any other information that is not relevant to an understanding of the tax treatment and tax structure of the transaction (including the identity of any party and any information that could lead another to determine the identity of any party), or any other information to the extent that such disclosure could reasonably result in a violation of any applicable securities law.

Section 12.08. *Right of Setoff.* If an Event of Default shall have occurred and be continuing, each Lender, the L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, the L/C Issuer or any such Affiliate to or for the credit or the account of any Borrower or any other Credit Party against any and all of the obligations of such Borrower or such Credit Party now or hereafter existing under this Agreement or any other Credit Document to such Lender or the L/C Issuer, irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Credit Document and although such obligations of such Borrower or such Credit Party may be contingent or unmatured or are owed to a branch or office of such Lender or the L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, the L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the L/C Issuer or their respective Affiliates may have. Each Lender and the L/C Issuer agrees to notify the Company and the Administrative Agent promptly after any such setoff and application; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09. *Interest Rate Limitation.* Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious

interest permitted by applicable Law (the "**Maximum Rate**").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of any Unreimbursed Amounts or, if it exceeds such Unreimbursed Amounts, refunded to the Company.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 12.10.  *Counterparts*; *Integration*; *Effectiveness.*  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Credit Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 5.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.11.  *Survival of Representations and Warranties.*  All representations and warranties made hereunder and in any other Credit Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

Section 12.12.  *Severability.*  If any provision of this Agreement or the other Credit Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement

149

and the other Credit Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 12.13. *Replacement of Lenders.* If any Lender requests compensation under Section 3.02, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Company the right to replace a Lender as a party hereto, then the Company may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.06), all of its interests, rights and obligations under this Agreement and the related Credit Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided*, that:

(a) the Company shall have paid (or caused a Designated Borrower to pay) to the Administrative Agent the assignment fee specified in Section 12.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its L/C Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents (including any amounts under Section 3.03) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company or applicable Designated Borrower (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.02 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d) such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

Section 12.14. *Governing Law*; *Jurisdiction*; *etc.*

150

(a)     *GOVERNING LAW*.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b)     *SUBMISSION TO JURISDICTION*.  EACH SUBSIDIARY BORROWER, AND FOLLOWING THE EFFECTIVE DATE OF THE APPROVED RESTRUCTURING PLAN, THE REORGANIZED COMPANY, IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  PRIOR TO THE EFFECTIVE DATE OF THE APPROVED RESTRUCTURING PLAN, THE COMPANY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE L/C ISSUER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY BORROWER OR ANY OTHER CREDIT PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     *WAIVER OF VENUE*.  EACH BORROWER AND EACH OTHER CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE

LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    *SERVICE OF PROCESS.*  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 12.15. *WAIVER OF JURY TRIAL.*  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.16. *No Advisory or Fiduciary Responsibility.*  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), each Borrower and each other Credit Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lead Arranger, are arm's-length commercial transactions between such Borrower, each other Credit Party and their respective Affiliates, on the one hand, and the Administrative Agent and the Lead Arranger, on the other hand, (B) each of such Borrower, and the other Credit Parties has consulted its own legal,

152

accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Borrower and each other Credit Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) the Administrative Agent, and the Lead Arranger each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for such Borrower, any other Credit Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor the Lead Arranger] has any obligation to such Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; and (iii) the Administrative Agent and the Lead Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Borrower, the other Credit Parties and their respective Affiliates, and neither the Administrative Agent nor the Lead Arranger has any obligation to disclose any of such interests to the Borrower, any other Credit Party or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrowers and the other Credit Parties hereby waives and releases any claims that it may have against the Administrative Agent and the Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.17. *Electronic Execution of Assignments and Certain Other Documents.* The words "**execution,**" "**signed,**" "**signature,**" and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.18. *Patriot Act.* Each Lender that is subject to the Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of each Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Borrower in accordance with the Patriot Act. Each Borrower shall, promptly following a request by the Administrative Agent or any

Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "**know your customer**" and anti-money laundering rules and regulations, including the Patriot Act.

Section 12.19. *Judgment Currency*. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Credit Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given. The obligation of each Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Credit Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from any Borrower in the Agreement Currency, such Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to such Borrower (or to any other Person who may be entitled thereto under applicable law).

(NY) 02826/146/CA/cit.group.lc.ca.doc

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**CIT GROUP INC.**

By: _____

Name:

Title:

**THE CIT GROUP/BUSINESS CREDIT, INC.**

By: _____

Name:

Title:

**THE CIT GROUP/COMMERCIAL SERVICES, INC.**

By: _____

Name:

Title:

**CIT LOAN CORPORATION (FORMERLY THE CIT GROUP/CONSUMER FINANCE, INC.)**

By: _____

Name:

Title:

**THE CIT GROUP/EQUIPMENT
FINANCING, INC.**


By: _____
Name:
Title:


**CIT HEALTHCARE LLC**


By: _____
Name:
Title:


**CIT CAPITAL USA INC.**


By: _____
Name:
Title:


**CIT LENDING SERVICES
CORPORATION**


By: _____
Name:
Title:


**CIT LENDING SERVICES
CORPORATION (ILLINOIS)**


By: _____
Name:
Title:

BAFFIN SHIPPING CO., INC.
C.I.T. LEASING CORPORATION
CAPITA COLOMBIA HOLDINGS
    CORP.
CAPITA CORPORATION
CAPITA INTERNATIONAL L.L.C.
CAPITA PREMIUM CORPORATION
CIT CHINA 12, INC.
CIT CHINA 13, INC.
CIT CHINA 2, INC.
CIT CHINA 3, INC.
CIT COMMUNICATIONS FINANCE
    CORPORATION
CIT CREDIT FINANCE CORP.
CIT CREDIT GROUP USA INC.
CIT FINANCIAL LTD. OF PUERTO
    RICO
CIT FINANCIAL USA, INC.
CIT GROUP (NJ) LLC
CIT GROUP SF HOLDING CO., INC.
CIT REALTY LLC
CIT TECHNOLOGIES
    CORPORATION
CIT TECHNOLOGY FINANCING
    SERVICES, INC.
EDUCATION LOAN SERVICING
    CORPORATION
GFSC AIRCRAFT ACQUISITION
    FINANCING CORPORATION
HUDSON SHIPPING CO., INC.
NAMEKEEPERS LLC
OWNER-OPERATOR FINANCE
    COMPANY
STUDENT LOAN XPRESS, INC.
THE CIT GROUP/BC SECURITIES
    INVESTMENT, INC.


**[CONTINUED]**

THE CIT GROUP/CAPITAL
FINANCE, INC.
THE CIT GROUP/CAPITAL
TRANSPORTATION, INC.
THE CIT GROUP/CMS SECURITIES
INVESTMENT, INC.
THE CIT GROUP/COMMERCIAL
SERVICES, INC.
THE CIT GROUP/COMMERCIAL
SERVICES, INC. (VA.)
THE CIT GROUP/CORPORATE
AVIATION, INC.
THE CIT GROUP/EQUITY
INVESTMENTS, INC.
THE CIT GROUP/FACTORING ONE,
INC.
THE CIT GROUP/FM SECURITIES
INVESTMENT, INC.
THE CIT GROUP/LSC SECURITIES
INVESTMENT, INC.
THE CIT GROUP/SECURITIES
INVESTMENT, INC.
THE CIT GROUP/VENTURE
CAPITAL, INC.
WESTERN STAR FINANCE, INC.


By: _____
Name:
Title:




THE CIT GROUP/CONSUMER
FINANCE, INC. (NY)
THE CIT GROUP/CONSUMER
FINANCE, INC. (TN)


By: _____
Name:
Title:

**FRANCHISE PORTFOLIO 1, INC.**
**FRANCHISE PORTFOLIO 2, INC.**


By: _____
Name:
Title:


**CIT REAL ESTATE HOLDING**
    **CORPORATION**


By: _____
Name:
Title:


**EQUIPMENT ACCEPTANCE**
    **CORPORATION**


By: _____
Name:
Title:


**CMS FUNDING COMPANY LLC**
**CIT MIDDLE MARKET HOLDINGS,**
    **LLC**
**CIT MIDDLE MARKET FUNDING**
    **COMPANY, LLC**


By: _____
Name:
Title:

**BANK OF AMERICA, N.A.,** as
Administrative Agent

By: _____
Name:
Title:

**BANK OF AMERICA, N.A.,** as a
Lender and L/C Issuer

By: _____
Name:
Title:

# COMMITMENTS
## AND APPLICABLE PERCENTAGES

| Lender | Commitment | Applicable Percentage |
|---|---|---|
| Bank of America, N.A. | $500,000,000 | 100.000000000% |
| | | |
| Total | $500,000,000 | 100.000000000% |

**DESIGNATED BORROWERS**

1.      The CIT Group/Business Credit, Inc.

2.      The CIT Group/Commercial Services, Inc.

3.      CIT Loan Corporation (formerly The CIT Group/Consumer Finance, Inc.)

4.      The CIT Group/Equipment Financing, Inc.

5.      CIT Healthcare LLC.

6.      CIT Capital USA Inc.

7.      CIT Lending Services Corporation

**Schedule 6.01**

**JURISDICTIONS OF ORGANIZATION AND QUALIFICATION**

## CAPITAL STOCK AND OWNERSHIP

**ADVERSE PROCEEDINGS**

**ADMINISTRATIVE AGENT'S OFFICE,
CERTAIN ADDRESSES FOR NOTICES**

COMPANY:

CIT Group Inc.
1 CIT Drive
Livingston, NJ 07039
Attention: Glenn Votek, Executive Vice President & Treasurer
Fax: (973) 740-5750
E-mail: glenn.votek@cit.com

in each case, with a copy to:

CIT Group Inc.
1 CIT Drive
Livingston, NJ 07039
Attention: General Counsel
Fax: (973) 740-5264
        E-mail: robert.ingato@cit.com

ADMINISTRATIVE AGENT:

*Administrative Agent's Office*
*(for payments):*
Bank of America, N.A.
901 Main Street
Mail Code:  TX1-492-14-12
Dallas, Texas 75202-3714
Attention:  Richard Piland
Telephone:  214 209 0987
Telecopier:  214 290 8370
Electronic Mail:  richard.a.piland@bankofamerica.com
Account No.:  1292000883
Ref:  CIT Group-LC Facility
ABA# 026009593

*Other Notices as Administrative Agent*:
Bank of America, N.A.
Agency Management
1455 Market Street, 5th Floo
Mail Code:  CA5-701-05-19
San Francisco, California 94103
Attention:  Charles Graber
Telephone:  415.436.3495
Telecopier:  415.503.5006
Electronic Mail:  charles.graber@bankofamerica.com

L/C ISSUER:

Bank of America, N.A.
Global Trade Operations
One Fleet Way
Mail Code:  PA6-580-02-03
Scranton, Pennsylvania 18507
Swift Address:  BOFAUS3N

Commercial L/Cs
Attention:  Anne Rodeghiero
Telephone:  570.330.4804
Telecopier:  212.293.8117
Electronic Mail:  anne.t.rodeghiero@bankofamerica.com

Standby L/Cs
Attention:  John Yzeik
Telephone:  570.330.4315
Telecopier:  800.755.8743
Electronic Mail: john.p.yzeik@bankofamerica.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :

In re:                           :     Chapter 11
                                  :

CIT GROUP INC. and         :     Case No. 09-16565
CIT GROUP FUNDING COMPANY  :
OF DELAWARE LLC,         :
                                  :

         Debtors.         :     (Jointly Administered)
                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364(c)(1), 364(c)(2) AND 364(e) AND (II) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c) AND LOCAL RULE 4001-2

Upon the motion (the "**Motion**"),[1] dated November 1, 2009, of CIT Group Inc.

("**CIT**") and CIT Group Funding Company of Delaware LLC ("**Funding**"), each as

debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned

cases (the "**Cases**") pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2) and 364(e) of

title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"),

and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern

District of New York (the "**Local Rules**"), seeking, among other things:

        (1)  authorization for CIT to (i) obtain post-petition financing in

        the form of the Letter of Credit Facility (the "**L/C Facility**") from Bank of

        America, N.A. and such other lenders party to a Letter of Credit

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Motion.

Agreement substantially in the form attached as Exhibit A to the Motion (the "**L/C Agreement**") among CIT, certain of its non-debtor subsidiaries (the "**Subsidiary Borrowers**" and, collectively, together with CIT, the "**Borrowers**"), and Bank of America, N.A., acting as Administrative Agent (in such capacity, the "**Administrative Agent**") and L/C Issuer (in such capacity, the "**L/C Issuer**"), (ii) permit and cause the Subsidiary Borrowers to become borrowers under the L/C Facility, and (iii) permit and cause certain of its non-debtor subsidiaries to become guarantors under the L/C Facility (collectively, the "**Guarantors**" [2]);

(2) authorization for CIT to execute and enter into, and for CIT to permit and cause the Subsidiary Borrowers and Guarantors to execute and enter into, the L/C Agreement, the Credit Documents (as defined in the L/C Agreement) and any exhibits attached thereto (collectively, and together with the letter agreements referred to in paragraph 4(c)(iii) below, the "**L/C Facility Documents**") and perform such other and further acts as may be required in connection with the L/C Facility Documents including, but not limited to, the posting of cash collateral from time to time to secure the Borrowers' respective obligations under the L/C Facility as required by the L/C Facility Documents;

(3) the granting of certain superpriority claims to the Administrative Agent, the L/C Issuer and the Lenders payable from, and

---

[2] The Subsidiary Borrowers and the Guarantors are defined in the L/C Facility Documents.

having recourse to, all pre-petition and post-petition property of CIT and its estate and all proceeds thereof;

(4)  the granting of non-voidable liens on cash collateral and other amounts posted by the Borrowers to and on deposit in the Collateral Accounts (as defined in the L/C Agreement) pursuant to the L/C Facility Documents (the "**Cash Collateral**") to the Administrative Agent, the L/C Issuer and the Lenders;

(5) the limitation of the Debtors' right to surcharge against cash collateral pursuant to section 506(c) of the Bankruptcy Code;

(6) pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (this "**Interim Order**") authorizing CIT and such other Borrowers that may be a joint account party with CIT, on an interim basis, to forthwith obtain letters of credit from the L/C Issuer under the L/C Facility Documents up to an aggregate principal or face amount not to exceed $125 million (subject to any limitations on issuances of letters of credit under the L/C Facility Documents); and

(7)  that this Court schedule a final hearing (the "**Final Hearing**") to be held within 20 days of the entry of the Interim Order to consider entry of a final order authorizing the balance of the letter of credit

issuances under the L/C Facility Documents on a final basis, as set forth in the Motion and the L/C Facility Documents filed with this Court.

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on (a) the United States Trustee for the Southern District of New York; (b) counsel to Bank of America, N.A., as L/C Issuer; (c) counsel to Bank of America, N.A., as Administrative Agent and Collateral Agent under the Senior Credit Facility (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) counsel to the Lenders' Steering Committee; and (f) those parties identified in the schedules of largest unsecured creditors annexed to the Debtors' chapter 11 petitions.

The Interim Hearing having been held by this Court on              , 2009.

Upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and Local Rule 4001-2.

3.      *Findings Regarding the L/C Facility.*

(a)      Good cause has been shown for the entry of this Interim Order.

(b)     The Borrowers have an immediate need to obtain the L/C Facility in order to permit, among other things, the orderly continuation of the operation of their businesses, to permit the Borrowers to honor certain contractual obligations to third parties and to maintain business relationships with vendors, suppliers and customers.  The access of the Borrowers to the L/C Facility is vital to the preservation and maintenance of the going concern values of the Borrowers and to a successful reorganization of the Debtors.

(c)     The Borrowers are unable to obtain letters of credit on more favorable terms from sources other than the L/C Issuer under the L/C Facility Documents and are unable to obtain adequate unsecured letters of credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

(d)     The terms of the L/C Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration as to each Borrower.

(e)     The L/C Facility has been negotiated in good faith and at arm's length among the Borrowers, the Administrative Agent and the L/C Issuer, and all of the Borrowers' obligations and indebtedness arising under, in respect of or in connection with the L/C Facility and the L/C Facility Documents, including without limitation, (i) all letters of credit issued for the account of the Borrowers pursuant to the L/C Agreement, (ii) all fees and other amounts payable to the Administrative Agent, the L/C Issuer and/or the Lenders under the L/C Facility Documents and (iii) any other "**Obligations**" (as defined in the L/C Agreement) (all of the foregoing in clauses (i), (ii) and (iii)

collectively, the "**L/C Obligations**"), shall be deemed to have been extended by the

Administrative Agent and the Lenders and their affiliates in good faith, as that term is

used in section 364(e) of the Bankruptcy Code and in express reliance upon the

protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code in the event that this Interim

Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    The Debtors have requested entry of this Interim Order pursuant to

Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2.  Absent granting the relief sought by

this Interim Order, the Debtors' estates and each of the Borrowers will be immediately

and irreparably harmed.  Consummation of the L/C Facility in accordance with this

Interim Order and the L/C Facility Documents, including the posting of cash collateral to

secure the obligations of the Borrowers, is therefore in the best interest of the Debtors,

their estates, the Borrowers and each of their respective subsidiaries.

4.    *Authorization of the L/C Facility and the L/C Facility Documents.*

(a)    CIT is hereby authorized to (i) enter into, and to permit and cause

the Subsidiary Borrowers and the Guarantors to enter into, the L/C Facility Documents,

(ii) obtain, on behalf of itself and certain Subsidiary Borrowers that may be co-account

parties with CIT, letters of credit pursuant to the L/C Agreement of up to an aggregate

principal or face amount of $125 million (plus interest, fees and other expenses and

amounts provided for in the L/C Facility Documents) and (iii) permit and cause the

Guarantors to guarantee the respective obligations of CIT and the Subsidiary Borrowers

with respect to such letters of credit, in each case in accordance with the terms of this

Interim Order and the L/C Facility Documents; provided however that nothing herein to the contrary shall be deemed to authorize CIT or the other parties to the Senior Credit Facility Agreement to violate the drawing limitations provided in section 6.1(b) of the Senior Credit Facility Agreement.

(b)     CIT is hereby authorized to post, on behalf of itself and the Subsidiary Borrowers that are joint account parties with CIT, cash collateral from time to time to secure the letters of credit issued pursuant to the L/C Agreement as required by the L/C Agreement.

(c)     In furtherance of the foregoing and without further approval of this Court, CIT is authorized and directed, and is authorized and directed to permit and cause the Subsidiary Borrowers and the Guarantors, to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) and to pay all fees, that may be reasonably required or necessary for the Borrowers' and/or Guarantors' performance of their respective obligations under the L/C Facility, including, without limitation:

(i)     the execution, delivery and performance of the L/C Facility Documents,

(ii)     the execution, delivery and performance of one or more amendments to the L/C Agreement for, among other things, the purpose of adding additional financial institutions as Lenders and reallocating the commitments for the L/C Facility among the Lenders, in each case in such form as CIT, the Subsidiary Borrowers,

the Guarantors, the Administrative Agent, the L/C Issuer and the Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the L/C Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the fees payable thereunder),

(iii)     the non-refundable payment to the Administrative Agent, the L/C Issuer or the Lenders, as the case may be, of the fees referred to in the L/C Agreement (and in the separate letter agreements between them, CIT, the Subsidiary Borrowers and the Guarantors in connection with the L/C Facility) and such reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the L/C Facility Documents, and

(iv)     the performance of all other acts required under or in connection with the L/C Facility Documents.

(d)     Upon execution and delivery of the L/C Facility Documents, the L/C Facility Documents shall constitute valid and binding obligations of the Borrowers, enforceable against each Borrower party thereto in accordance with the terms of the L/C Facility Documents.  No obligation, payment, transfer or grant of security under the L/C Facility Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.     *Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the L/C Obligations shall constitute allowed claims against CIT with priority over any and all administrative expenses, diminution claims and all other claims against CIT (except for any claim granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Cash Management Order and any superpriority claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the Senior Secured Lenders under section 5.21 of the Senior Credit Facility Agreement, which claims shall be *pari passu* with the superpriority claims granted herein), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of CIT and all proceeds thereof.  The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.     *L/C Liens*.  As security for the L/C Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge

agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, the Cash Collateral or the Collateral Accounts (as defined in the L/C Agreement), the Administrative Agent is hereby granted, for its own benefit and the benefit of the L/C Issuer and the Lenders, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the Cash Collateral and the accounts to which such Cash Collateral is credited (such liens and security interests granted to the Administrative Agent, for its own benefit and the benefit of the L/C Issuer and the Lenders, pursuant to this Interim Order and the L/C Facility Documents, the "**L/C Liens**").

7. *Subsidiary Borrowers.* The entry into the L/C Facility and the performance by CIT and the Subsidiary Borrowers of their respective obligations thereunder, including the mutual guaranties issued thereunder, do not, and shall not, provide a basis for a substantive consolidation of the assets and liabilities of the Debtors with the assets and liabilities of the Subsidiary Borrowers or a finding that the separate corporate identities of the Debtors and the Subsidiary Borrowers may be ignored. Notwithstanding any other provision of the L/C Facility Documents or this Interim Order, the Administrative Agent, the L/C Issuer, the Lenders and the other parties thereto have agreed to enter into the L/C Facility in express reliance on the Subsidiary Borrowers being separate and distinct legal entities, with assets and liabilities separate and distinct from those of the Debtors.

8. *Protection of Lenders' Rights.* The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Administrative Agent and the Lenders to exercise, immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the L/C Facility Documents (including, without limitation, the right to setoff the Cash Collateral), consistent with the terms of the L/C Agreement and subject to any notice requirements contained therein. In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the

Administrative Agent, the L/C Issuer or the Lenders set forth in this Interim Order or the L/C Facility Documents.  In no event shall the Administrative Agent, the L/C Issuer or the Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Cash Collateral.

9. *Cash Collateral.*

(a) No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Cash Collateral, and the Cash Collateral shall not be subject to any carve-out, whether pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or otherwise.

(b) The Cash Collateral shall not be available for use by the Debtors, whether pursuant to section 363 of the Bankruptcy Code or otherwise, and shall be released to the Debtors only in accordance with the provisions of the L/C Facility Documents.  In no event shall the Debtors be authorized to substitute any property for the Cash Collateral or "prime" the interests of the Administrative Agent, the L/C Issuer and the Lenders in the Cash Collateral.

10. *Perfection of L/C Liens.*

(a) The Administrative Agent, the L/C Issuer and the Lenders are hereby authorized, but not required, to take possession of or control over the Cash Collateral, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Administrative Agent on behalf

of the Lenders shall, in their sole discretion, choose to take possession of or control over the Cash Collateral, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order.

(b)     A certified copy of this Interim Order may, in the discretion of the Administrative Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

11.     *Preservation of Rights Granted Under this Interim Order.*

(a)     Pursuant to Section 10.20 of the Senior Credit Facility Agreement, upon the posting of the Cash Collateral to secure the obligations of the Borrowers under the L/C Facility, the liens of the Senior Secured Parties under the Senior Credit Facility on the Cash Collateral will be automatically released and will be of no further force or effect and upon such release, the L/C Liens will be the only security interests existing in the Cash Collateral. With the exception of claims granted to an affiliate of CIT on account of post-petition intercompany loans and transfers pursuant to the Cash Management Order and any superpriority claims that may be granted to a provider of debtor-in-possession financing, including without limitation such claims that may be granted to the Senior Secured Lenders under section 5.21 of the Senior Credit Facility Agreement (which claims shall be *pari passu* with the superpriority claims granted

13

herein), no superpriority claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Administrative Agent, the L/C Issuer and the Lenders, respectively, shall be granted or allowed while any portion of the L/C Facility (or any refinancing thereof) or the commitments thereunder or the L/C Obligations remain outstanding. Furthermore, no lien against the Cash Collateral shall be granted or allowed and the L/C Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise while any portion of the L/C Facility (or any refinancing thereof) or the commitments thereunder or the L/C Obligations remain outstanding.

(b)     Unless the L/C Facility shall have terminated in accordance with the terms of the L/C Facility Documents, the Debtors shall not seek, and it shall constitute an Event of Default under the L/C Facility documents if any of the Debtors seeks, or if there is entered, (i) any modifications or extensions of this Interim Order without the prior written consent of the Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Administrative Agent, or (ii) an order converting or dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims and security interests granted to the Administrative Agent and the Lenders pursuant to this Interim Order shall continue in

full force and effect and shall maintain their priorities as provided in this Interim Order until all L/C Obligations shall have been paid and satisfied in full (and that such Superpriority Claims and security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any L/C Obligations incurred prior to the actual receipt of written notice by the Administrative Agent, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the L/C Agreement with respect to any L/C Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any L/C Obligations incurred by CIT to the Administrative Agent or the Lenders prior to the actual receipt of written notice by the Administrative Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Administrative Agent, the L/C Issuer and Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the L/C Facility Documents with respect to all L/C Obligations.

(d)     Except as expressly provided in this Interim Order or in the L/C Facility Documents, the L/C Liens, the Superpriority Claims and all other rights and

remedies of the Administrative Agent, the L/C Issuer and the Lenders granted by the provisions of this Interim Order and the L/C Facility Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining L/C Obligations.  The terms and provisions of this Interim Order and the L/C Facility Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the L/C Liens, the Superpriority Claims and all other rights and remedies of the Administrative Agent and the Lenders granted by the provisions of this Interim Order and the L/C Facility Documents shall continue in full force and effect until the L/C Obligations are indefeasibly paid in full in accordance with the terms of the L/C Facility Documents.

      12.    *Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order and the L/C Facility Documents, the provisions of this Interim Order shall govern.

      13.    *Binding Effect; Successors and Assigns.*  The L/C Facility Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Administrative Agent, the L/C Issuer, the Lenders, any Committee appointed in these Cases, and the

Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Administrative Agent, the L/C Issuer, the Lenders and the Debtors and their respective successors and assigns; *provided*, *however*, that the Administrative Agent, the L/C Issuer and the Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

14. *Final Hearing*.  The Final Hearing is scheduled for                              , 2009 at before this Court.

15. The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any objections to entry of a final order on the Motion must be (a) filed with the Court no later than 4:00 p.m. (prevailing Eastern time) on                              , 2009 (the "Objection Deadline") and (b) served so as to be actually received by the following parties by the Objection Deadline: (i) CIT Group Inc., 1 CIT Drive, Livingston, New Jersey  07039 (Attn: Eric Mandelbaum); (ii) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 (Attn: Gregg M. Galardi and J. Gregory St. Clair); (iii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Paul K. Schwartzberg); (iv) those parties identified in the schedules of the

17

largest unsecured creditors annexed to the Debtors' petitions; (v) Davis Polk & Wardwell LLP, attorneys for the Administrative Agent, attention Peter Levin and Timothy Graulich.; (vi) Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for the Lenders' Steering Committee, attention Andrew N. Rosenburg and Alice Belisle Eaton; and (vii) counsel to any official committee(s) appointed in these cases.

Dated:   New York, New York
        _____, 2009

                        _____
                        UNITED STATES BANKRUPTCY JUDGE