**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Tel.:  (212) 696-6000
Fax:  (212) 697-1559
Steven J. Reisman
L.P. Harrison 3rd
T. Barry Kingham

*Proposed Conflicts Counsel for Debtors and
  Debtors-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CIT GROUP INC., <u>et al.</u>, | : | Case No. 09-16565 |
| Debtors. | : | (Motion for Joint Administration Pending) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CIT GROUP INC., <u>et al.</u>, | : | Adversary Proceeding No. 09-____ |
| Plaintiffs, | : | |
| v. | : | |
| M&T CREDIT SERVICES, LLC; SIEMENS FINANCIAL SERVICES, INC.; FIFTH THIRD LEASING COMPANY; WELLS FARGO BANK NORTHWEST, N.A.; WELLS FARGO BANK, N.A.; INEOS POLYMERS INC.; WELLS FARGO EQUIPMENT FINANCE, INC.; NORTH AMERICA RAIL LEASING #2 LLC; BNY MIDWEST TRUST COMPANY; MANUFACTURERS AND TRADERS TRUST COMPANY; and WILMINGTON TRUST COMPANY, | : | **DEBTORS' COMPLAINT FOR INJUNCTIVE AND <u>DECLARATORY RELIEF</u>** |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs CIT Group Inc. ("CIT") and CIT Group Funding Company of Delaware LLC ("Delaware Funding"), the debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively, the "Debtors"), by their undersigned attorneys, allege upon knowledge with respect to their own acts, and upon information and belief as to all other matters, as follows:

1. This is an adversary proceeding commenced by the Debtors pursuant to sections 105(a) and 362(a) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 7001(7), 7001(9) and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable hereto by Bankruptcy Rule 7065, seeking: (i) a preliminary injunction precluding Defendants, based upon an event of default triggered by CIT's bankruptcy filing, from exercising any remedies against CIT's non-debtor subsidiary The CIT Group/Equipment Finance, Inc. ("CIT-EF"), its property or other interests (the "Additional Default Remedies") -- not including the demand for payment of Stipulated Loss Value (in exchange for title to railcars), and any other amounts due and payable under the Headleases (as defined below) -- under certain "lease-in, lease-out" transactions of railcars (the "Headlease Transactions") during the pendency of the Debtors' chapter 11 cases or, in the alternative, (ii) extension and application of the automatic stay under section 362(a) of the Bankruptcy Code to stay the enforcement of the Additional Default Remedies against CIT-EF, its property or other interests.

2. If the relief requested herein is not granted, the Debtors and their estates will be irreparably harmed, the value of the Debtors' estates could be diminished, and the Debtors' efforts to reorganize will be unduly hampered.

## JURISDICTION AND VENUE

3. On November 1, 2009 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4. On or shortly after the Petition Date, the Debtors will seek consolidation of the chapter 11 cases of the Debtors with their affiliated debtors' chapter 11 cases (collectively, the "Chapter 11 Cases"), along with joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

5. The Debtors continue to manage and operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

6. This adversary proceeding is initiated by the Debtors pursuant to Bankruptcy Rule 7001(7) (to obtain an injunction or other equitable relief), Bankruptcy Rule 7001(9) (to obtain a declaratory judgment), and Bankruptcy Rule 7003. Bankruptcy Rule 7065 provides that a temporary restraining order or preliminary injunction may be issued by the Court without security.

7. The Debtors seek injunctive relief and a declaratory judgment to protect the property of the Debtors' estates as of the commencement of this proceeding.

8. This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

9. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O) and, accordingly, this Court has the power to enter final findings of fact and conclusions of law, subject to review pursuant to 28 U.S.C. § 158.

10. Venue is proper before this Court pursuant to U.S.C. §§ 1408 and 1409.

## THE PARTIES

11. Plaintiff CIT, a debtor, is a Delaware corporation with its principal place of business located at 505 Fifth Avenue, New York, New York 10017. CIT is a bank holding company that, among other things, provides financial products and advisory services to small and middle market businesses. In addition, through various debtor and non-debtor subsidiaries, CIT operates railcar and locomotive leasing fleets, covering most bulk industries in North America. Plaintiff Delaware Funding, a debtor, is an indirect, wholly owned subsidiary of CIT.

12. Defendant M&T Credit Services, LLC is a limited liability company with its principal place of business located at One M&T Plaza, Buffalo, New York 14203. M&T Credit Services, LLC is named as a defendant here in its capacity as a Lessor (as defined herein), or a successor in interest to a Lessor, in one or more Headlease Transactions.

13. Defendant Siemens Financial Services, Inc. is a corporation with its principal place of business located at 170 Wood Avenue South, Iselin, New Jersey 08830. Siemens Financial Services, Inc. is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

14. Fifth Third Leasing Company is a corporation with its principal place of business located at 38 Fountain Square Plaza, Cincinnati, Ohio 45202. Fifth Third Leasing Company is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

15. Defendant Wells Fargo Bank Northwest, N.A. is a national banking association organized under the laws of the State of Utah, with its principal place of business located at 79 South Main Street, Salt Lake City, Utah 84111. Wells Fargo Bank Northwest, N.A. is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

16. Defendant Wells Fargo Bank, N.A. is a national banking association organized under the laws of the United States, with its principal place of business located at 919 North Market Street, Wilmington, Delaware 19801. Wells Fargo Bank, N.A. is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

17. Defendant INEOS Polymers, Inc. is a corporation with its principal place of business located at 2600 South Shore Boulevard, League City, Texas 77573. INEOS Polymers, Inc. is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

18. Defendant Wells Fargo Equipment Finance, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business located at 733 Marquette Avenue, Minneapolis, Minnesota 55402. Wells Fargo Equipment Finance, Inc. is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

19. Defendant North America Rail Leasing #2 LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at c/o Babcok & Brown, LP, 599 Lexington Avenue, New York, New York 10022. North America Rail Leasing #2 LLC is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

20. Defendant Manufacturers and Traders Trust Company is a banking corporation organized under the laws of the State of New York, with its principal place of business located at One M&T Plaza, Buffalo, New York 14203. Manufacturers and Traders Trust Company is named as a defendant here in its capacity as a Lessor and/or Indenture Trustee

(as defined herein), or a successor in interest to a Lessor and/or Indenture Trustee, in connection with certain Headlease Transactions.

21. Defendant Wilmington Trust Company is a banking corporation organized under the laws of the State of Delaware, with its principal place of business located at Rodney Square North, 1100 Market Street, Wilmington, Delaware 14890. Wilmington Trust Company is named as a defendant here in its capacity as an Indenture Trustee and/or Security Trustee (as defined herein), or a successor in interest to an Indenture Trustee and/or Security Trustee, in connection with certain Headlease Transactions.

22. Defendant BNY Midwest Trust Company is a banking corporation organized under the law of the State of Illinois, with its principal place of business located at 2 North LaSalle Street, Chicago, Illinois 60602. BNY Midwest Trust Company is named as a defendant here in its capacity as a Lessor, or a successor in interest to a Lessor, in one or more Headlease Transactions.

**FACTUAL BACKGROUND**

23. CIT, through various subsidiaries (including CIT-EF), among other things, operates railcar and locomotive leasing fleets, covering most bulk industries in North America. This business line of CIT is commonly referred to as "CIT Rail."

24. CIT Rail's portfolio, which has a net investment of approximately $4.8 billion as of December 31, 2008, includes leases of railcars and locomotives to all of the United States and Canadian Class I railroads (which are those companies with annual revenues of at least $250 million) and other railroads, as well as to rail shippers including, for example, power producers shipping coal and agricultural companies shipping grain.

25. CIT Rail's operating lease fleet consists of approximately 115,000 railcars and 550 locomotives, including primarily: (i) covered hopper cars used to ship grain and

agricultural products, plastic pellets and cement; (ii) gondola cars for coal, steel coil and mill service; (iii) open hopper cars for coal and aggregates; (iv) center beam flat cars for lumber; (v) boxcars for paper and auto parts; and (vi) tank cars.

26. CIT Rail's portfolio includes railcars and locomotives which are owned by CIT Rail and leased to its customers (the "Company-Owned Railcars"). CIT Rail's portfolio also includes railcars and locomotives which, through the Headlease Transactions, CIT Rail leases from various financing sources and, in turn, subleases to its customers (the "Leased-In Railcars" and, together with the Company-Owned Railcars, the "Railcars"). CIT Rail effects the Headlease Transactions through CIT's non-debtor subsidiary CIT-EF.

27. CIT Rail has approximately 200 end-user customers utilizing Railcars which are subject to Headlease Transactions. The vast majority of CIT Rail's top 25 customers sublease from CIT-EF Railcars that are subject to the Headlease Transactions. Accordingly, the Headlease Transactions involve CIT Rail's core customers that are vital to the continued viability of CIT Rail's business and, ultimately, to CIT.

28. The railcar leasing business is highly competitive. This is particularly the case in the current environment where the supply of railcars far exceeds demand. The operations goal of the railcar leasing business is to consistently initiate new leases and renew existing leases with as little off-lease time for the railcars as possible. Also, most of CIT Rail's Railcar lease customers generally require full-service leases, under which the customer relies on CIT Rail to arrange and pay for the maintenance of the equipment and to pay property taxes. Accordingly, it is of critical importance to CIT-EF that it maintain its reputation for stability and reliability, and that its ability to initiate new Railcar leases and renew existing Railcar leases going forward not be seriously impaired by CIT's bankruptcy filing.

I.      **Overview of The Headlease Transactions**

29.     Each of CIT Rail's Headlease Transactions consists of two leases: a headlease and a sublease. In each Headlease Transaction, CIT-EF enters into or assumes an equipment headlease (the "Headlease") with a lessor for the lease of Leased-In Railcars. CIT-EF then enters into various subleases (the "Subleases") with its customers (the "Sublessees"), whereby CIT-EF leases to them the Leased-In Railcars associated with the Headlease Transactions.

30.     A mix of Company-Owned and Leased-In Railcars are sometimes included under the same Sublease, and Sublessees pay rents to CIT-EF on the Railcars on a consolidated basis. Cash inflows associated with Leased-In Railcars are thereby commingled with cash inflows associated with Company-Owned Railcars. Similarly, the Railcars, whether Leased-In or Company-Owned, typically are marked with the same CIT Rail reporting mark. Accordingly, from a customer perspective, there is no distinction between a Leased-In Railcar and a Company-Owned Railcar.

31.     As of September 2009, there are approximately 28,493 Leased-In Railcars in the Company's railcar fleet, and the contractual rents owed to CIT-EF under the Subleases with respect to the Leased-In Railcars were approximately $12.8 million per month. This amount includes: (i) the scheduled rent due on all Subleases; (ii) the rent due on expired Subleases under which customers continue to operate the Railcars on a holdover basis; and (iii) the aggregate per diem amounts paid to CIT-EF in September 2009, and may increase or decrease from month to month based on the short-term nature of the Subleases. Presently, CIT-EF maintains 41 separate Headlease Transactions.

32.     While the structure of each Headlease Transaction is similar, there are three distinct categories of Headlease Transactions, referred to as: (i) the CIT Rail Trusts; (ii)

the Bombardier Leveraged Leases; and (iii) the Bombardier Single-Investor Leases. Each category of Headlease Transaction is described below.

### A. The CIT Rail Trusts

33. Of the 41 Headlease Transactions, 20 were created under a CIT rail trust program between 2001 to 2007 (collectively, the "CIT Rail Trusts"). Each of the 20 CIT Rail Trusts was created by CIT-EF entering into a participation agreement (the "Participation Agreement") in which it agreed to the sale and leaseback of certain Company-Owned Railcars under a leveraged Headlease Transaction.

34. In addition, each beneficiary (the "Owner Participant") of each entity purchasing Company-Owned Railcars entered into a trust agreement with an owner trustee as lessor (the "Lessor" or "Owner Trustee"), pursuant to which the Lessor agreed, among other things, to hold the trust estate for the benefit of the Owner Participant.

35. Each Lessor accepted delivery of the bill of sale of Company-Owned Railcars and executed and delivered the Headlease in which the Lessor agreed to lease the Railcars back to CIT-EF. Concurrent with the execution and delivery of the Participation Agreement, each Lessor also entered into an indenture (the "Indenture") with an indenture trustee (the "Indenture Trustee") pursuant to which the Lessor agreed, among other things, to issue notes (the "Railcar Notes") to the Indenture Trustee or the loan participants (the "Loan Participants") participating in the financing of the Leased-In Railcars under each Indenture. In some of the Headlease Transactions, the Owner Trustee or Lessor entered into a security agreement (the "Security Agreement") with a security trustee (the "Security Trustee"). The rights and obligations under the Security Agreement, and the role of the Security Trustee, are substantially similar to those of the Indenture and Indenture Trustee, respectively.

36. The proceeds of the sale of each tranche of Railcar Notes were applied, together with equity contributions made by the Owner Participant, to effect the purchase of the corresponding Leased-In Railcars. Under the terms of the Indenture, each Lessor granted to the Indenture Trustee a security interest in, and lien on, the Lessor's right, title and interest in, among other things, the Headlease, the Leased-In Railcars and the Parent Guaranty (as defined below). This pledge of assets by the Lessor to the Indenture Trustee is security for the Lessor's obligation to make payments to the Indenture Trustee on the Railcar Notes.

37. Also concurrent with the execution and delivery of the Participation Agreement, CIT executed parent guaranties (each, a "Parent Guaranty") for the benefit of the Lessors, the Owner Participants, the Indenture Trustees and the Loan Participants (collectively, the "Beneficiaries"). Each Parent Guaranty provides that CIT will absolutely and unconditionally guarantee to the Beneficiaries (i) the full and prompt payment by CIT-EF of all obligations under the Headlease, and (ii) the due and complete performance of each and every other covenant, agreement and obligation to be performed by CIT-EF under the Headlease, the Participation Agreement and related agreements.

38. In addition to the security interest pledged under the Indentures, each of the CIT Rail Trust Headleases contemplates the pledge of additional collateral in the event of certain downgrade events involving CIT. Specifically, each of the 20 CIT Rail Trust Headleases provides that, if at any time the credit rating with respect to CIT's senior unsecured indebtedness falls below BBB by Standard & Poor's Rating Services ("S&P") or Baa2 by Moody's Investors Service, Inc. ("Moody's"), then all existing Subleases shall, at CIT-EF's election, be either (i) subject and subordinate to the Headlease, or (ii) assigned to the Lessor as security for CIT-EF's obligations under the Headlease (solely to the extent related to the Leased-In Railcars).

39. On or about April 24, 2009, such a downgrade event occurred, as S&P downgraded CIT's unsecured debt rating from BBB to BBB- and Moody's downgraded CIT from Baa2 to Ba2. As a result, on or about June 17, 2009, CIT-EF sent a Notice of Downgrade Event to each Lessor, stating that CIT-EF had elected to assign Subleases to the Leased-In Railcars to the Lessor as security for CIT-EF's obligations under each of the Headleases.

### B. The Bombardier Leveraged Leases

40. In addition to the CIT Rail Trusts, CIT-EF maintains 14 other leveraged Headlease structures, all of which were assumed from Bombardier Capital Rail Inc. ("Bombardier") in 2006 (the "Bombardier Leveraged Leases"). The Bombardier Leveraged Leases have a similar leveraged structure to the CIT Rail Trusts. Likewise, all of the Bombardier Leveraged Leases enjoy the benefit of a Parent Guaranty from CIT.

41. Unlike the CIT Rail Trusts, however, the Bombardier Leveraged Leases do not involve an initial sale and leaseback by CIT-EF of Company-Owned Railcars under a Participation Agreement. Instead, CIT-EF assumed Bombardier's obligations under each of the Bombardier Leveraged Leases subsequent to the consummation of the initial sale and leaseback transaction. The then-existing Subleases and all future Subleases were also pledged under the Headlease Transaction documents, and a guaranty by the Bombardier parent in the initial transaction was replaced by a Parent Guaranty from CIT.

42. In addition, all of the Bombardier Leveraged Leases, as amended, require CIT-EF to provide a payment direction letter for each applicable Sublease (the "Payment Direction Letters") to the Indenture Trustees upon certain downgrade events. Specifically, CIT-EF agreed to deliver Payment Direction Letters to the Indenture Trustees if CIT's unsecured indebtedness fell below BBB- from S&P or below Baa3 from Moody's. The Payment Direction

Letters are addressed to the Sublessees and instruct them to pay all Sublease rents on Leased-In Railcars directly to the Indenture Trustees. Upon the occurrence of CIT's bankruptcy, the Indenture Trustees have the right to deliver the Payment Direction Letters to the Sublessees.

43. A downgrade event occurred on or about April 24, 2009. Accordingly, CIT-EF has executed and delivered undated Payment Direction Letters to the Indenture Trustees for each of the 14 Bombardier Leveraged Leases. To date, no Payment Direction Letters have been sent by an Indenture Trustee to any Sublessee.

### C. The Bombardier Single-Investor Leases

44. In addition to the leveraged lease structures described above, CIT-EF also assumed from Bombardier seven separate leases whereby CIT-EF leases Leased-In Railcars from a single investor (the "Bombardier Single-Investor Leases").

45. One of the Headleases in the Bombardier Single-Investor Leases requires the issuance by CIT-EF of a Payment Direction Letter similar to the one described above in connection with the Bombardier Leveraged Leases. The remaining six Headleases in the Bombardier Single-Investor Leases do not require the issuance by CIT-EF of a Payment Direction Letter. Like all of the Headleases, the Bombardier Single-Investor Leases enjoy the benefit of a Parent Guaranty.

## II. The Event of Default and Defendants' Potential Exercise of Default Remedies

46. Each Headlease provides that CIT's filing of a bankruptcy case is an event of default under the Headlease (the "Event of Default"). In turn, each Indenture provides that the Event of Default under the Headlease operates as an event of default under the Indenture.

47. The occurrence of an Event of Default will permit Defendants to seek to effectuate certain remedies and Additional Default Remedies, as set forth below.

### A. The Stipulated Loss Value Remedy

48. Under each of the Headleases, following an Event of Default, the Lessor is entitled to demand a liquidated damages payment equal to a stipulated loss value ("Stipulated Loss Value"). Stipulated Loss Value is generally designed to allow the Lessor to: (i) repay indebtedness incurred under the Indenture or otherwise in connection with the Headlease Transaction; (ii) recoup the equity investment made by the Lessor or Owner Participant as well as a return thereon; and (iii) provide additional compensation for certain adverse tax consequences as a result of the acceleration of income resulting from the early termination of the Headlease.

49. The aggregate Stipulated Loss Values for the Leased-In Railcar fleet under the Headlease Transactions is approximately $1.65 billion. If Stipulated Loss Value is demanded and paid, the Lessor would be required to mitigate its damages, which could include the transfer of all right, title and interest in the Leased-In Railcars to CIT-EF.

### B. The Additional Default Remedies

50. Significantly, whether or not the Lessor demands payment of Stipulated Loss Value, the Lessor also may, as part of its Additional Default Remedies, take effective control of the Railcars involved in its Headlease Transaction by: (i) terminating the Headlease; (ii) requiring the return and storage of Leased-In Railcars that are not subject to Subleases; and (iii) with respect to those Railcars that are subject to Subleases, foreclosing upon CIT-EF's rights and interests in the Subleases.

51. Upon the Event of Default triggered by the bankruptcy filing, the Indenture Trustee and Security Trustee are empowered under the Indentures and Security Agreements to control the Lessor's exercise of the Additional Default Remedies under the

Headlease. The Indenture Trustee or the Security Trustee generally act on the instruction of the majority in interest of the Loan Participants under the specific Headlease Transaction for which it acts as trustee.

52. As a further consequence of the Event of Default, the Indenture Trustees under the Bombardier Leveraged Leases and the Lessors under the applicable Bombardier Single-Investor Leases, may issue the Payment Direction Letters to the Sublessees whereby Sublessees would be instructed to pay rent directly to the Indenture Trustees.

### C. The Exercise of The Additional Default Remedies Would Be Highly Detrimental to The Debtors

53. This action seeks to restrain Defendants' exercise of the Additional Default Remedies -- those remedies other than demand for payment of Stipulated Loss Value and any other amounts due and payable under the Headleases (in exchange for title to Railcars) -- during the pendency of the Debtors' Chapter 11 Cases. The exercise of the Additional Default Remedies would not result in any greater payments, proceeds or value to the Lessors or the Indenture Trustees than they would receive from the payment of Stipulated Loss Value. However, the exercise of the Additional Default Remedies would likely destroy the going-concern value of the Railcars and therefore cause the needless loss of up to approximately $680 million of value to CIT Rail and, indirectly, to CIT. It could also result in significant damage to CIT Rail's overall franchise value and business because the customers of the Leased-In Railcars are also CIT Rail's customers for leasing of Company-Owned Railcars.

54. Moreover, the issuance of Payment Direction Letters will likely lead to confusion and the risk of defection by the Sublessees to CIT Rail's competitors. In a down market and with every customer looking for a competitive advantage, the Payment Direction Letters may cause the perception that CIT Rail (and ultimately CIT) has lost its standing in the

marketplace due to its inability to maintain and operate its rail fleet. In turn, CIT Rail will have difficulty trying to re-lease to existing customers as they move their business to competitors. Such defections will increase the sublease turnover rate and -- along with Defendants' potential termination of CIT's rights to the Railcars -- further operate to damage the franchise value of CIT Rail.

### D. Despite Diligent Efforts, The Debtors Have Not Obtained Forbearance Agreements from Defendants and Other Claimholders

55. Over the past several weeks, CIT Rail has reached out to various claimholders associated with the Headlease Transactions in an effort to obtain a six-month forbearance on the exercise of all remedies in exchange for a payment by CIT-EF into a securities account an amount equal to the Headlease rent payments for the same six-month period. At the time of this action, CIT has not been able to finalize any forbearance agreements with the Defendants and, accordingly, there is nothing currently preventing Defendants from exercising the Additional Default Remedies as set forth herein.

### COUNT I

### Injunction Against Exercising The Additional Default Remedies
### Pursuant To 11 U.S.C. § 105
### (Injunctive Relief)

56. The Debtors repeat and reallege the allegations set forth in paragraphs 1 through 55 above and incorporate them into this Count as if fully set forth herein.

57. The Debtors have a high probability of successfully reorganizing under the terms of the Bankruptcy Code provided their estate assets are not unduly wasted during the critical stages of the reorganization by the Defendants' enforcement against CIT-EF of the Additional Default Remedies other than demand for payment of Stipulated Loss Value.

58. Defendants' enforcement of the Additional Default Remedies against CIT-EF -- other than demand for payment of Stipulated Loss Value -- during the critical stages of the reorganization will cause the Debtors to suffer immediate and substantial injury, loss or damages, and the administration of the Chapter 11 Cases will be impaired in the absence of an injunction.

59. Defendants' enforcement of the Additional Default Remedies against CIT-EF -- other than demand for payment of Stipulated Loss Value -- during the critical stages of the reorganization will frustrate not only the rehabilitative intent of chapter 11, but also the very purpose for which the Debtors filed for chapter 11 protection -- that is, to provide a fair, consolidated, orderly and consistent process by which the Debtors may address and resolve their liabilities for the benefit of all creditors of the Debtors.

60. A stay of, or injunction against, Defendants' enforcement of the Additional Default Remedies against CIT-EF during the critical stages of the reorganization will enhance the Debtors' prospects of achieving a successful reorganization and maximizing the value of their assets.

61. The harm to the Debtors' reorganization efforts outweighs the interests of the Defendants' enforcement of the Additional Default Remedies against CIT-EF.

### COUNT II

**Enforcement Or Extension of The Automatic Stay Imposed By 11 U.S.C. § 362(a)**
**(Declaratory Relief)**

62. The Debtors repeat and reallege the allegations set forth in paragraphs 1 through 55, and 57 through 61 above and incorporate them into this Count as if fully set forth herein.

63. Defendants' enforcement of the Additional Default Remedies against CIT-EF will hinder the Debtors' reorganization process to the detriment and prejudice of all parties in interest and is directly antithetical to the intent and purpose of the automatic stay.

64. Accordingly, the automatic stay provisions of section 362 of the Bankruptcy Code applicable to the Debtors should be enforced or extended to stay the enforcement of the Additional Default Remedies against CIT-EF.

65. An actual case or controversy has arisen and exists between the Debtors and the Defendants regarding the parties' rights and obligations under the Bankruptcy Code.

66. A prompt judicial determination of the respective rights of the parties in these respects is necessary and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, by this Complaint the Debtors pray for the following relief:

(a) pursuant to Count I, entry of an Order by the Court, pursuant to section 105(a) of the Bankruptcy Code, preliminarily enjoining Defendants, their agents, attorneys, accountants, parents, affiliates, subsidiaries, successors, transferees or assigns, and all persons acting in concert or participation with any of them, from exercising the Additional Default Remedies against CIT-EF, its property or other interests -- not including the demand for payment of Stipulated Loss Value (in exchange for title to Railcars), and any other amounts due and payable under the Headleases -- during the pendency of the Debtors' Chapter 11 Cases or, in the alternative;

(b) pursuant to Count II, entry of an Order by the Court declaring that the automatic stay imposed pursuant to section 362(a) of the Bankruptcy Code extends and applies to Defendants' enforcement of the Additional Default Remedies -- not including the demand for payment of Stipulated Loss Value (in exchange for title to Railcars), and any other

-17-

amounts due and payable under the Headleases -- against CIT-EF, its property or other interests; and

(c) an order granting the Debtors such other and further relief as this Court deems just, proper, fair and equitable under the circumstances.

Dated: New York, New York
November 1, 2009

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By: /s/ Steven J. Reisman
Steven J. Reisman
L.P. Harrison 3rd
T. Barry Kingham
101 Park Avenue
New York, New York 10178-0061
Tel.: (212) 696-6000
Fax: (212) 697-1559

*Proposed Conflicts Counsel for Debtors and
Debtors-in-Possession*