SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Gregg M. Galardi
J. Gregory St. Clair

Proposed Counsel for Debtors and
  Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :    Chapter 11
                                            :
CIT GROUP INC. and                          :    Case No. 09-16565 (ALG)
CIT GROUP FUNDING COMPANY                    :
OF DELAWARE LLC,                            :
                                            :
                      Debtors.              :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF FILING OF MODIFIED SECOND AMENDED PREPACKAGED REORGANIZATION PLAN OF CIT GROUP INC. AND CIT GROUP FUNDING COMPANY OF DELAWARE LLC

**PLEASE TAKE NOTICE** that on November 25, 2009, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors")[1] filed the attached revisions to the Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (the "Second Amended Plan"). Exhibit A hereto shows the changes to the Second Amended Plan as filed with the Court on November 1, 2009. The Second

---

[1]    CIT Group Inc. is located at 505 Fifth Avenue, New York, NY 10017. Its tax identification number is 65-xxx1192. In addition to CIT Group Inc., CIT Group Funding Company of Delaware LLC, Case No. 09-16566, is a debtor in these related cases. CIT Group Funding Company of Delaware LLC is located at 1 CIT Drive, Livingston, NJ 07039. Its tax identification number is 98-xxx9146.

Amended Plan incorporating the changes shown on <u>Exhibit A</u> is titled the Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (the "Plan").  The Debtors reserve the right to make further changes and modifications to the Plan at or prior to the Confirmation Hearing (as defined below).

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider confirmation of the Plan shall be held before the Honorable Allan L. Gropper, United States Bankruptcy Judge, on **December 8, 2009 at 11:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court, Room 617, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 or as soon thereafter as counsel may be heard (the "Confirmation Hearing").

**PLEASE TAKE FURTHER NOTICE** that copies of the pleadings filed in these chapter 11 cases can be obtained by using the Bankruptcy Court's electronic case filing system at www.nysb.uscourts.gov using a PACER password (to obtain a PACER password, go to the PACER website, http://pacer.psc.uscourts.gov) or on the website maintained by the Debtors' proposed claims agent at http://www.kccllc.net/citgroup.

Dated: New York, New York
       November 25, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:      */s/ Gregg M. Galardi*
         Gregg M. Galardi
         J. Gregory St. Clair
         Four Times Square
         New York, New York 10036
         (212) 735-3000

         Proposed Counsel for Debtors and
          Debtors-in-Possession

# EXHIBIT A

**APPENDIX B**

**PLAN OF REORGANIZATION**Gregg M. Galardi, Esq.
J. Gregory St. Clair, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, New York 10036
(212) 735-3000

— and —

Chris L. Dickerson, Esq.
Jessica Kumar, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel for the Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
In re:                                    :    Chapter 11
                                          :
CIT Group Inc. (Tax ID 65-xxx1192)        :    Case No. 09-16565 (ALG)
CIT Group Funding Company of              :
Delaware LLC (Tax ID 98-xxx9146)          :
                                          :
                                          :
                      Debtors.            :
                                          :
                                          :
-------------------------------------------------------     x
```

**MODIFIED SECOND AMENDED PREPACKAGED REORGANIZATION PLAN**
**OF CIT GROUP INC. AND CIT GROUP FUNDING COMPANY OF DELAWARE LLC**

Dated: New York, New York
October 23,November 25, 2009

**TABLE OF EXHIBITS**

Exhibit A-1    ~~Reorganized CIT~~Third Amended And Restated Certificate of~~of~~Of Incorporation Of CIT Group Inc. ........................................................................ A-1-1

Exhibit A-2    Reorganized Delaware Funding Certificate of Amendment to Certificate of Formation ........................................................................ A-2- 1

Exhibit A-3    Reorganized Delaware Funding Amendment to Limited Liability Company Agreement ........................................................................ A-3-1

Exhibit A-4    Amended and Restated By-Laws of CIT Group Inc. ........................ A-4-1

Exhibit B    Description of New Common Interests ........................................ B-~~1~~

Exhibit C    Amended and Restated Confirmation ........................................ C

Exhibit D    Second Lien Credit And Guaranty Agreement, among CIT Group Inc., certain subsidiaries of CIT Group Inc., as guarantors, various lenders, and [      ], as administrative agent, and all agreements, certificates and other documents related thereto ........................................................................ D

Exhibit E    First Amendment, dated on or about the Effective Date, to the Second Amended And Restated Credit And Guaranty Agreement dated as of October 28, 2009 ...... E

Exhibit F    Directors And Officers Of Reorganized CIT ........................ F

Exhibit G    Directors And Officers Of Reorganized Delaware Funding ........ G

Exhibit H    List Of Rejected Contracts And Leases ........................ H

Exhibit I    Series A Notes Supplemental Indenture ........................ I

Exhibit J    Series B Notes Supplemental Indenture ........................ J

Exhibit K    Series A Notes Collateral Agency Agreement ........................ K

Exhibit L    Form Of New Notes Collateral Agreement ........................ L

Exhibit M    Senior – Junior Intercreditor Agreement ........................ M

Exhibit N    Junior Intercreditor Agreement ........................ N

Exhibit O    Uniform Commercial Code Filings ........................ O

Exhibit P    Amended Intercompany Notes And Ancillary Documents ........ P

Exhibit Q    Collateral Agreement Among C.I.T. Leasing Corporation And CIT Group Funding Company Of Delaware LLC ........................ Q

Exhibit R    Amended And Restated Long Term Incentive Program ........ R

Exhibit S    China Waiver and Forbearance Agreement ........................ S

Exhibit T    Non-Exclusive List Of Retained Claims And Causes Of Action ...... T-1-2

Exhibit U    Non-Exclusive List Of Released Derivative Causes Of Action ...... U

**TABLE OF SCHEDULES**

Schedule 1    List of Senior Unsecured Notes (excluding 2015 Hybrid Convertible/Equity Notes)........ S-1

Schedule 2    List of Long-Dated Senior Unsecured Notes ........................ S-2

1.6.     "*2011 Canadian Senior Unsecured Notes*" means the 5.60% Notes due November 2, 2011, issued by CIT Group Funding Company of Canada (n/k/a Delaware Funding) and guaranteed by CIT Group Inc., pursuant to the Indenture dated as of November 1, 2006.

1.7.     "*2015 Canadian Senior Unsecured Notes*" means the 5.20% Notes due June 1, 2015, issued by CIT Group Funding Company of Canada (n/k/a Delaware Funding) and guaranteed by CIT Group Inc., pursuant to the Indenture dated as of May 31, 2005.

1.8.     "*2015 Hybrid Convertible/Equity Notes*" means the equity units offered by CIT Group Inc. with a stated amount of $25, which equity units consist of a forward purchase contract issued by CIT Group Inc. and, initially, a 1/40 undivided beneficial ownership interest in a $1,000 principal amount senior note due November 15, 2015 issued by CIT Group Inc.

1.9.     "*Administrative Claim*" means a Claim arising under Bankruptcy Code section 507(a)(2) for costs and expenses of administration of the Chapter 11 Cases under Bankruptcy Code sections 503(b), 507(b), or 11 14(e)(2), including (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtors (such as wages, salaries and commissions for services and payments for goods, leased equipment and premises) and (b) all other claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, including Professional Fee Claims.

1.10.    "*Allowed*" means, with respect to a Claim within a particular Class, an Allowed Claim of the type described in such Class.

1.11.    "*Allowed Claim*" means a Claim (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court or the Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Debtors or the Reorganized Debtors or (c) pursuant to the terms of the Plan; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" under (i) above (the expiration of the Claims Objection Deadline or other applicable deadline), the Debtors do not waive their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.  An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law.  Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under the Plan, include interest on such Claim accruing from and after the Petition Date.

1.12.    "*Amended and Restated Confirmation*" means that certain Amended and Restated Confirmation dated October 28, 2009 by and between CIT Financial Ltd. and GSI attached hereto as Exhibit C.

1.13.    1.12. "*Australian Senior Unsecured Notes*" means (i) those certain 6.00% fixed rate notes due March 3, 2011 issued by CIT Group (Australia) Limited and guaranteed by CIT Group Inc. and (ii) those certain 3 month BBSW plus 34 bp Floating Rate Notes due March 3, 2011 issued by CIT Group (Australia) Limited and guaranteed by CIT Group Inc.

1.14.    1.13. "*Australian Senior Unsecured Note Claim*" means a Claim on account of the Australian Senior Unsecured Notes.

1.15.    1.14. "*Ballot(s)*" means each of the ballot forms distributed to each Holder of a Claim or Interest entitled to vote to accept or reject this Plan.

__1.31.__ ~~1.30.~~ "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors.

__1.32.__ ~~1.31.~~ "*Claims Objection Deadline*" means the first Business Day that is the latest of (i) the Effective Date; (ii) as to a particular Claim, 180 days after the filing of a proof of claim, or request for payment of, such Claim; or (iii) such other date as may be established by the Bankruptcy Court; provided however that notwithstanding the foregoing or anything in the Plan to the contrary, the Debtors and/or the Reorganized Debtors may seek to subordinate any Claim pursuant to Bankruptcy Code section 510 until the first Business Day that is 60 days following the Effective Date.

__1.33.__ ~~1.32.~~ "*Class*" means one of the classes of Claims or Interests listed in Article III below.

__1.34.__ ~~1.33.~~ "*Class 8-11 Excess Value Amount*" shall have the meaning ascribed to it in Article IV.H hereof.

__1.35.__ ~~1.34.~~ "*Class 8-11 Par Recovery Amount*" means the amount, measured as of the Petition Date, that would imply a recovery to holders of Long-Dated Senior Unsecured Note Claims, Senior Unsecured Note Claims, Senior Unsecured Term Loan Claims and Senior Unsecured Credit Agreement Claims equal to one hundred percent (100%) of the amount of Allowed Claims of all such Classes in the aggregate.

__1.36.__ ~~1.35.~~ "*Class 8-11 Securities*" means New Notes and New Common Interests distributed to holders of Long-Dated Senior Unsecured Note Claims, Senior Unsecured Note Claims, Senior Unsecured Term Loan Claims and Senior Unsecured Credit Agreement Claims pursuant to Articles III.G.8, III.G.9, III.G.10 and III.G.11 and Articles IV.B, IV.C, IV.D and IV.E hereof.

__1.37.__ ~~1.36.~~ "*Class 12 Par Recovery Amount*" means the amount, measured as of the Petition Date, that would imply a recovery to holders of Senior Subordinated Note Claims equal to one hundred percent (100%) of the amount of the Allowed Claim of such Class.

__1.38.__ ~~1.37.~~ "*Class 13 Par Recovery Amount*" means the amount, measured as of the Petition Date, that would imply a recovery to holders of Junior Subordinated Note Claims equal to one hundred percent (100%) of the amount of the Allowed Claim of such Class.

__1.39.__ ~~1.38.~~ "*Class 15 Par Recovery Amount*" means the amount, measured as of the Petition Date, equal to the aggregate combined liquidation preference of the Old Preferred Interests, plus accrued and unpaid dividends thereon.

__1.40.__ ~~1.39.~~ "*Collateral*" means any property or interest in property of the Estate subject to a lien or security interest to secure the payment or performance of a Claim, which lien or security interest is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

__1.41.__ ~~1.40.~~ "*Committee*" means any official committee appointed in the Chapter 11 Cases, as such committee may be reconstituted from time to time.

__1.42.__ ~~1.41.~~ "*Confirmation Date*" means the date of entry of the Confirmation Order on the docket of the Bankruptcy Court.

__1.43.__ ~~1.42.~~ "*Confirmation Hearing*" means the Bankruptcy Court's hearing to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

__1.44.__ ~~1.43.~~ "*Confirmation Order*" means the Bankruptcy Court's order confirming the Plan under section 1129 of the Bankruptcy Code.

__1.45.__ ~~1.44.~~ "*Contingent Value Rights*" shall have the meaning ascribed to it in Article IV.H hereof.

DeltaView comparison of pcdocs://wilsr01a/598486/1 and pcdocs://wilsr01a/598486/14. Performed on 11/25/2009.

**1.46.** ~~1.45.~~ "*Cure*" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an executory contract or unexpired lease of one or more of the Debtors and to permit the Debtors to assume that contract or lease under section 365(a) of the Bankruptcy Code.

**1.47.** ~~1.46.~~ "*CVRs*" shall have the meaning ascribed to it in Article IV.H hereof.

**1.48.** ~~1.47.~~ "*D&O Claims*" means any Claim arising from the Debtors' indemnification obligations under their constituent documents or other written agreements and/or pursuant to applicable general corporation law or other applicable business organization law, including those Claims described in Article VII.G hereof.

**1.49.** *"Debtholder Nominees"* shall have the meaning ascribed to it in Article IV.M hereof.

**1.50.** ~~1.48.~~ "*Debtors*" means CIT Group Inc. and Delaware Funding in their capacities as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code and, as to acts or rights on or after the Effective Date or when the context otherwise so requires, the post-confirmation entities reorganized hereunder.

**1.51.** ~~1.49.~~ "*Delaware Funding*" means CIT Group Funding Company of Delaware LLC (f/k/a CIT Group Funding Company of Canada).

**1.52.** ~~1.50.~~ "*DIP Facility*" means ~~any postpetition debtor-in-possession~~the letter of credit facility ~~provided to the Debtors during the Chapter 11 Cases~~or facilities established pursuant to the DIP Facility Agreement.

~~1.51.~~ ~~"*DIP Facility Agreement*" means the credit agreement and related security agreements, mortgages and similar documents governing the DIP Facility by and between the Debtors and the DIP Lender.~~

**1.53.** *"DIP Facility Agreement"* means the $500,000,000 Letter of Credit Agreement dated as of November 3, 2009 among CIT Group Inc., certain subsidiaries of CIT Group Inc., Bank of America, N.A., as Administrative Agent and L/C Issuer, the other Lenders party thereto and Banc of America Securities LLC as Sole Lead Arranger and Sole Bookrunner.

**1.54.** ~~1.52.~~ "*DIP Facility Claim*" means a Claim arising under or as a result of the DIP Facility.

**1.55.** ~~1.53.~~ "*DIP Lender*" means the lender(s) under the DIP Facility Agreement.

**1.56.** ~~1.54.~~ "*Disallowed Claim*" means any Claim against the Debtors which has been disallowed, in whole or in part, by Final Order or written agreement between the Debtors and the holder of such Claim, to the extent of such disallowance.

**1.57.** ~~1.55.~~ "*Disbursing Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors, in their sole discretion, to serve as disbursing agent under the Plan.

**1.58.** ~~1.56.~~ "*Disclosure Statement*" means the written disclosure statement that relates to the Plan, as amended, supplemented or modified from time to time, embodied in the Offering Memorandum and that is prepared and distributed in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3018.

**1.59.** ~~1.57.~~ "*Disputed Claim*" means any Claim, or any portion thereof, that is not an Allowed Claim or a Disallowed Claim.

**1.60.** ~~1.58.~~ "*Distribution Date*" means the date, occurring as soon as practicable after the Effective Date (but in no event more than ten (10) Business Days thereafter), on which the Disbursing Agent first makes distributions to holders of Allowed Claims as provided in Article V hereof.

**1.61.** ~~1.59.~~ "*Early Electing Long-Dated Senior Unsecured Note Claims Holder(s)*" means a holder of a Long- Dated Senior Unsecured Note Claim who makes election to either (i) participate in the transactions

1.74.    ~~1.72.~~ "*Final Order*" means an order or judgment, entered by the Bankruptcy Court or other court of competent jurisdiction, that has not been amended, modified or reversed, and as to which (i) no stay is in effect, (ii) the time to seek rehearing, file a notice of appeal or petition for certiorari has expired and (iii) no appeal, request for a stay, petition seeking certiorari, or other review is pending; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule (whether federal or state) may be but has not then been filed with respect to such order shall not cause such order not to be a Final Order.

1.75.    ~~1.73.~~ "*First Amended Plan*" means that First Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC dated as of October 16, 2009, as amended and superseded by this Plan except as otherwise provided herein.

1.76.    ~~1.74.~~ "*General Unsecured Claim*" means a Claim that is not a DIP Facility Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Debt Claim, Guarantee Claim, Canadian Senior Unsecured Note Claim, Canadian Senior Unsecured Note Guarantee Claim, Long-Dated Senior Unsecured Note Claim, Senior Unsecured Note Claim, Senior Unsecured Term Loan Claim, Senior Unsecured Credit Agreement Claim, Senior Subordinated Note Claim, Junior Subordinated Note Claim, or Subordinated 510(b) Claim.

1.77.    "*GSI*" means Goldman Sachs International.

1.78.    ~~1.75.~~ "*Guarantee*" means a guarantee of collection, payment, or performance, including a servicer performance guaranty, made by the Debtors as to the obligations of an affiliate or subsidiary of CIT Group Inc. but not including CIT Group Inc.'s guarantee of the Canadian Senior Unsecured Notes.

1.79.    ~~1.76.~~ "*Guarantee Claim*" means a Claim against the Debtors on account of a Guarantee (other than the Canadian Senior Unsecured Note Guarantee Claim).

1.80.    ~~1.77.~~ "*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.81.    ~~1.78.~~ "*Intercompany Claim*" means a prepetition Claim by a Debtor or a non-Debtor affiliate against another Debtor or non-Debtor affiliate.

1.82.    ~~1.79.~~ "*Intercompany Notes*" means (i) those three promissory notes issued, executed and delivered by CIT Financial Ltd. to Delaware Funding (f/k/a CIT Group Funding Company of Canada) as payee and dated July 5, 2005 in the amounts of $502,588,633, $502,588,633 and $703,624,085 and (ii) those two promissory notes issued, executed and delivered by CIT Financial Ltd. to Delaware Funding (f/k/a CIT Group Funding Company of Canada) as payee and dated November 1, 2006 each in the amount of $249,052,500.

1.83.    ~~1.80.~~ "*Interest*" means the legal, equitable, contractual and other rights of any Person (including any 401(k) plan or plan participant) with respect to the Old Common Interests, the Old Preferred Interests or any Other Equity Rights of the Debtors, whether or not transferable, and the legal, equitable, contractual or other rights of any Person to acquire or receive any of the foregoing.

1.84.    ~~1.81.~~ "*JPM*" means JPMorgan Chase Bank, N.A. solely in its capacity as administrative agent and issuing bank under the JPM L/C Facility Agreement.

1.85.    ~~1.82.~~ "*JPM L/C Facility*" means the letter of credit facility or facilities established pursuant to the JPM L/C Facility Agreement.

1.86.    ~~1.83.~~ "*JPM L/C Facility Agreement*" means the 2005 5-Year Letter of Credit Issuance and Reimbursement Agreement, dated as of May 23, 2005, by and among CIT Group, Inc., J.P. Morgan Securities Inc. as Sole Lead Arranger and Bookrunner, JPMorgan Chase Bank, N.A. as Administrative Agent and Issuing Bank,

1.103. 1.100. "*New Notes Indenture*" means that certain New Notes indenture documentation, to be filed by the Debtors as a Plan Supplement prior to the Confirmation Hearing.

1.104. 1.101. "*New Securities*" shall have the meaning set forth in Article V.C. hereof.

1.105. 1.102. "*Non-Electing Long-Dated Senior Unsecured Note Claims Holder(s)*" means a holder of a Long- Dated Senior Unsecured Note Claim who (a) does not make an election to either (i) participate in the transactions contemplated by the Offering Memorandum or (ii) receive the treatment set forth in Article III.G.8.b.A by the Late Election Date or (b) who votes against the Plan.

1.106. 1.103. "*Offering Memorandum*" means that certain document entitled "CIT Group Inc. & CIT Group Funding Company of Delaware LLC Offers to Exchange Relating to Any and All of Their Respective Outstanding Notes Listed Below and Solicitation of Acceptances of a Prepackaged Plan of Reorganization" as amended on October 16, 2009 and supplemented on October 23, 2009.

1.107. 1.104. "*Old Common Interests*" means the shares of common stock of CIT Group Inc. issued and outstanding immediately prior to the Effective Date.

1.108. 1.105. "*Old Delaware Funding Interests*" means the equity interests in Delaware Funding outstanding immediately prior to the Effective Date.

1.109. 1.106. "*Old Interests*" means collectively the Old Common Interests, the Old Preferred Interests and the Old Delaware Funding Interests.

1.110. 1.107. "*Old Preferred Interests*" means the shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock and Series D Preferred Stock of CIT Group Inc. issued and outstanding immediately prior to the Effective Date.

1.111. "*One-Percent Holders*" shall have the meaning ascribed to it in Article IV.M hereof.

1.112. 1.108. "*Other Equity Interests*" means the Interests represented by the Other Equity Rights.

1.113. 1.109. "*Other Equity Rights*" means, collectively, any options, warrants, conversion rights, rights of first refusal, finders fee arrangements, or other rights, contractual or otherwise, to acquire, subscribe for, receive or cause to be redeemed any common interests or preferred interests of the Debtors, or other ownership interests in the Debtors, and any contracts, subscriptions, commitments or agreements pursuant to which any non- Debtor party was or could have been entitled to receive or cause to be redeemed shares, securities or other ownership interests in the Debtors.

1.114. 1.110. "*Other Priority Claim*" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a DIP Facility Claim, Administrative Claim or Priority Tax Claim.

1.115. 1.111. "*Other Secured Claim*" means a Claim that is secured by a valid, duly perfected lien as of the Petition Date on property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.116. 1.112. "*Other Unsecured Debt Claims*" means the Australian Senior Unsecured Note Claims and any senior unsecured notes that are not listed on Schedule 1 or Schedule 2 hereto to which the Debtors are borrowers or issuers.

1.117. 1.113. "*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit or other entity as defined in section 101(15) of the Bankruptcy Code.

1.118. 1.114. "*Petition Date*" means the date on which the Debtors filed their petition for relief commencing the Chapter 11 Cases.

1.119. 1.115. "*Plan*" means this plan of reorganization and all exhibits and schedules hereto, as amended, modified or supplemented from time to time as permitted hereunder and by the Bankruptcy Code.

1.120. 1.116. "*Plan Supplement*" means the compilation of documents, including any exhibits to the Plan not included herewith, in form and substance reasonably satisfactory to the Debtors and the Steering Committee, that the Debtors shall file with the Bankruptcy Court on or before the date that is five (5) days prior to the Confirmation Hearing.

1.121. 1.117. "*Postpetition Interest*" means interest accruing on and after the Petition Date on a Claim.

1.122. 1.118. "*Preferred Stock CVRs*" shall have the meaning ascribed to it in Article IV.H of the Plan of Reorganization hereof.

1.123. 1.119. "*Priority Tax Claim*" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.124. 1.120. "*Pro rata*" means with reference to any distribution on account of or in exchange for any Claim in any Class, the proportion that the amount of a Claim (numerator) bears to the aggregate amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) (denominator) in such Class.

1.125. 1.121. "*Professional*" means any professional employed in the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code.

1.126. 1.122. "*Professional Fee Claim*" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date.

1.127. 1.123. "*Reinstate*," "*Reinstated*" or "*Reinstatement*" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; provided, however, that other than contractual rights set forth in the Senior Credit Facility, any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.128. 1.124. "*Reorganized CIT*" means CIT Group Inc. on and after the Effective Date.

~~1.125. "*Reorganized CIT Certificate of Incorporation*" means the certificate of incorporation of Reorganized CIT in effect under the laws of the State of Delaware, as amended by the Plan, substantially in the form annexed hereto as Exhibit A-1.~~

1.129. ~~1.126.~~ "*Reorganized Debtors*" means Reorganized CIT and Reorganized Delaware Funding.

1.130. ~~1.127.~~ "*Reorganized Delaware Funding*" means CIT Group Funding Company of Delaware LLC on and after the Effective Date.

1.131. ~~1.128.~~ "*Reorganized Delaware Funding Amendment to Limited Liability Company Agreement*" means the amendment to Reorganized Delaware Funding's limited liability company agreement in effect under the laws of the State of Delaware, as amended by the Plan, substantially in the form annexed hereto as Exhibit A-3.

1.132. ~~1.129.~~ "*Reorganized Delaware Funding Certificate of Amendment to Certificate of Formation*" means the certificate of amendment to the certificate of formation of Reorganized Delaware Funding in effect under the laws of the State of Delaware, as amended by the Plan, substantially in the form annexed hereto as Exhibit A-2.

1.133. ~~1.130.~~ "*Security*" shall have the meaning ascribed to it in Section 101(49) of the Bankruptcy Code.

1.134. ~~1.131.~~ "*Senior Credit Facility*" means that certain Amended and Restated Credit and Guaranty Agreement dated as of July 29, 2009 (as amended, supplemented or otherwise modified from time to time) by and among CIT Group Inc., a Delaware corporation, certain subsidiaries of Company listed on the signature pages thereto, Barclays Bank PLC, as administrative agent and collateral agent, and the banks and other financial institutions from time to time party thereto as agents and lenders together with all collateral and loan documents contemplated thereby or executed in connection therewith.

1.135. ~~1.132.~~ "*Senior CVRs*" shall have the meaning ascribed to it in Article IV.H hereof.

1.136. ~~1.133.~~ "*Senior Subordinated Notes*" means the 12.00% Subordinated Notes due December 18, 2018 issued by CIT Group Inc. pursuant to the Indenture dated as of January 20, 2006 and the Second Supplemental Indenture dated as of December 24, 2008 with CUSIP numbers 125581FS2 and U17186AF1.

1.137. ~~1.134.~~ "*Senior Subordinated Note Claim*" means a Claim on account of the Senior Subordinated Notes.

1.138. ~~1.135.~~ "*Senior Subordinated Notes Exchange*" shall have the meaning ascribed to it in Article IV.F hereof.

1.139. ~~1.136.~~ "*Senior Unsecured Credit Agreement Claim*" means a Claim on account of the Senior Unsecured Credit Agreements.

1.140. ~~1.137.~~ "*Senior Unsecured Credit Agreement Exchange*" shall have the meaning ascribed to it in Article IV.E hereof.

1.141. ~~1.138.~~ "*Senior Unsecured Credit Agreements*" means the 2005 5-Year Unsecured Credit Agreement and the 2006 5-Year Unsecured Credit Agreement.

1.142. ~~1.139.~~ "*Senior Unsecured Note Claim*" means a Claim on account of the Senior Unsecured Notes.

1.143. ~~1.140.~~ "*Senior Unsecured Note Exchange*" shall have the meaning ascribed to it in Article IV.C hereof.

DeltaView comparison of pcdocs://wilsr01a/598486/1 and pcdocs://wilsr01a/598486/14. Performed on 11/25/2009.

**1.157.** *"Third Amended And Restated Certificate Of Incorporation Of CIT Group Inc."* means the certificate of incorporation of Reorganized CIT in effect under the laws of the State of Delaware, as amended by the Plan, substantially in the form annexed hereto as Exhibit A-1.

**1.158.** ~~1.154.~~ *"Trading Day"* means, with respect to any security listed or traded on a securities exchange or other quotations system, a day on which such security is traded or quoted on the principal securities exchange or quotation system on which such security is then listed or quoted.

**1.159.** *"TRS Impairment"* has the meaning set forth in the Amended and Restated Confirmation.

**1.160.** ~~1.155.~~ *"Unimpaired"* means, with reference to a Claim or Interest, a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.161.** ~~1.156.~~ *"Voting Deadline"* means October 29, 2009 at 11:59 p.m. New York City time.

**C.**     **Rules of Interpretation**

In the Plan (a) any reference to a contract, instrument, release, indenture or other agreement or document as being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or on such terms and conditions, (b) any reference to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented, (c) unless otherwise specified, all references to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**D.**     **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**E.**     **Exhibits**

All exhibits (as amended from time to time following their initial filing with the Bankruptcy Court) are incorporated into and are a part of the Plan as if set forth in full herein, and, to the extent not attached hereto, such exhibits shall be filed with the Bankruptcy Court as part of the Plan Supplement. To the extent any exhibit contradicts the non-exhibit portion of the Plan, unless otherwise ordered by the Bankruptcy Court the non-exhibit portion of the Plan shall control.

# ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims and Priority Tax Claims are not classified and holders of such Claims are not entitled to vote on the Plan.

such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. If the Claim of a holder of an Other Secured Claim exceeds the value of the Collateral that secures it, such holder will have an Other Secured Claim equal to the Collateral's value and a General Unsecured Claim for the deficiency.

### 3. Class 3— Other Unsecured Debt Claims and Guarantee Claims

*a.* *Claims in Class:* Class 3 consists of Other Unsecured Debt Claims and Guarantee Claims against the Debtors.

*b.* *Treatment:* The legal, equitable and contractual rights of the holders of Other Unsecured Debt Claims and Guarantee Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Other Unsecured Debt Claim or an Allowed Guaranteed Claim shall have its Claim Reinstated. For the avoidance of doubt, the Guarantee Claims Reinstated pursuant to this Article III.G.3 shall include the Amended CIT Group Guaranty (as defined in the Amended and Restated Confirmation attached hereto as Exhibit C), which Amended CIT Group Guaranty shall be Reinstated and shall not be Impaired in any respect by CIT Group Inc. or Reorganized CIT and shall be in full force and effect on the Effective Date.

### 4. Class 4—Intercompany Claims

*a.* *Claims in Class:* Class 4 consists of all Intercompany Claims.

*b.* *Treatment:* The legal, equitable and contractual rights of the holders of Intercompany Claims are Unimpaired by the Plan. Unless the holder of such claim and the Debtors agree to different treatment, on the Effective Date, each holder of an Allowed Intercompany Claim shall have its Claim Reinstated.

### 5. Class 5— General Unsecured Claims

*a.* *Claims in Class:* Class 5 consists of all General Unsecured Claims.

*b.* *Treatment:* The legal, equitable and contractual rights of the holders of General Unsecured Claims are Unimpaired by the Plan. Unless the holder of such claim and the Debtors agree to different treatment, on the Effective Date, each holder of an Allowed General Unsecured Claim shall have its Claim Reinstated.

### 6. Class 6— JPM L/C Facility Claims

*a.* *Claims in Class:* Class 6 consists of JPM L/C Facility Claims in the amount of the aggregate face amount outstanding on the Petition Date, approximately $350 million. To the extent of cash collateral held by JPM on the Petition Date, approximately $100 million, this Claim is secured; otherwise it is unsecured.

*b.* *Treatment:* The legal, equitable and contractual rights of holders of JPM L/C Facility Claims are Impaired by the Plan.

(A) If Class 6 JPM L/C Facility Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, Reorganized CIT or a subsidiary of Reorganized

CIT in the case of letters of credit for which a subsidiary of Reorganized CIT is a co-applicant or account party shall provide JPM with cash collateral on account of all outstanding undrawn letters of credit issued under the JPM L/C Facility in the percentages specified in the JPM L/C Facility Agreement generally and no less than 103% of the face amount of such outstanding undrawn letters of credit and JPM may apply such cash collateral to any subsequently arising reimbursement obligations under the JPM L/C Facility Agreement (the "*Cash Collateralization*"). All fees and other charges arising under or in respect of the JPM L/C Facility Agreement shall be paid on, or as soon as reasonably practicable after, the Effective Date by Reorganized CIT. In addition to the release provided in Article XIII.H. 1 of the Plan and in the Confirmation Order, upon the Effective Date each non-Debtor subsidiary and affiliate of CIT Group Inc. that was or is a co-applicant or account party on a letter of credit issued under the JPM L/C Facility and JPM and/or any other lender(s) under the JPM L/C Facility shall execute a mutual release and waiver of any and all claims against JPM and/or any other lenders under the JPM L/C Facility in respect of the JPM L/C Facility and/or the JPM L/C Facility Agreement arising prior to the Effective Date.

(B) If Class 6 JPM L/C Facility Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, (i) Reorganized CIT or a subsidiary of Reorganized CIT in the case of letters of credit for which a subsidiary of Reorganized CIT is a co-applicant or account party shall satisfy any Claims for reimbursement under the JPM L/C Facility that arose during the Chapter 11 Cases in full on, or as soon as reasonably practicable after, the Effective Date and (ii) following the Effective Date, Reorganized CIT or a subsidiary of Reorganized CIT in the case of letters of credit for which a subsidiary of Reorganized CIT is a co-applicant or account party shall pay all such Claims for reimbursement under the JPM L/C Facility in the ordinary course of business and upon the terms set forth in the JPM L/C Facility Agreement, as set forth in more detail in Article IV.I herein. In exchange for Reorganized CIT maintaining the reimbursement obligations in the immediately preceding (i) and (ii), JPM shall not pursue any subsidiary or affiliate of CIT Group Inc. or any other entity that JPM contends may be co-liable with CIT Group Inc. under the JPM L/C Facility Agreement for any remedies, claims or causes of action arising out of or relating to the JPM L/C Facility or the JPM L/C Facility Agreement, as set forth in more detail in Article IV.I herein.

### 7. *Class 7— Canadian Senior Unsecured Note Claims*

*a.* *Claims in Class:* Class 7 consists of Canadian Senior Unsecured Note Claims in the Allowed amount of approximately $~~2,188~~2,149 million, which constitutes principal plus accrued but unpaid prepetition interest.

*b.* *Treatment:* The legal, equitable, and contractual rights of holders of Canadian Senior Unsecured Note Claims are Impaired by the Plan.

(A) If Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Canadian Senior Unsecured Note Claim shall receive its pro rata share of Series B Notes, equal to a distribution in the amount of 100% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest), as set forth more fully in Article IV.A herein. The Intercompany Notes shall be modified to extend the maturity dates thereunder to correspond with the maturity dates of the Series B Notes and shall not be further modified other than as required to effectuate the transactions contemplated by the Plan without the consent of ~~a majority~~66-2/3% in aggregate principal amount of the holders of the Series B Notes then outstanding; provided, however, that without such consent, the Intercompany Notes may be amended in a manner that is (i) ministerial, (ii) for tax purposes, and (iii) does not adversely affect the holders of Series B Notes, and the CIT Leasing Support Agreements shall

remain in place and in effect through such extended maturity dates of the Intercompany Notes.  As of the Effective Date, the CIT Leasing Support Agreements shall be secured by a security interest granted by C.I.T.  Leasing Corporation in favor of Delaware Funding, and any modifications to the CIT Leasing Support Agreements shall be filed as a Plan Supplement; provided, however, that the CIT Leasing Support Agreements shall not further be modified without the consent of ~~a majority~~66-2/3% in aggregate principal amount of the holders of the Series B Notes then outstanding; provided, further, however, that without such consent the CIT Leasing Support Agreements may be amended in a manner that (i) ministerial, (ii) for tax purposes, and (iii) does not adversely affect the holders of the Series B Notes.  Delaware Funding's security interest will be on ~~substantially~~exactly the same collateral securing the Series A Notes and the Series B Notes, subject to difference in perfection required by contract and applicable law.  Pursuant to the intercreditor arrangements between the collateral agent under the Series A Notes, the collateral agent under the Series B Notes and Delaware Funding, Delaware Funding will agree not to exercise any remedies with respect to such security interest without the consent of the collateral agent under the Series B Notes.  The Debtors shall file the amended Intercompany Notes and any security agreement evidencing the securitization of C.I.T. Leasing Corporation's obligations under the CIT Leasing Support Agreements and certain related documents as Plan Supplements.  ~~On and after~~As of the Effective Date, those holders of Canadian Senior Unsecured Note Claims voting to accept the Plan (i) shall ~~be deemed to withdraw~~dismiss with prejudice the Canadian Senior Unsecured Note Litigation and any other action(s) pending against Delaware Funding as well as its directors and officers in which such holders are participants, alleging the same causes of action based on the same transaction that is the subject of the Canadian Senior Unsecured Note Litigation; (ii) shall forbear from participating, directly or indirectly, in any action brought by noteholders or debtholders against CIT Group Inc., Delaware Funding or their directors and officers alleging the same causes of action based on the same transaction that is the subject of the Canadian Senior Unsecured Note Litigation; and (iii) shall turnover any proceeds received by such holders as a result of or arising from ~~any subsequent litigation against CIT Group Inc., Delaware Funding or their directors and officers based on the causes of action asserted in the Canadian Senior Unsecured Note Litigation~~such litigation as referred to in clauses (i) and (ii) above; provided, however, that nothing in the foregoing sentence (including clauses (i), (ii) and (iii)) shall apply to any claim or cause of action based on any act, omission, transaction, event or other occurrence taking place after the Effective Date.  Holders of Canadian Senior Unsecured Note Claims shall have until the Extended Canadian Senior Unsecured Note Claims Voting Deadline to vote to accept or reject the Plan; provided, however, that those certain holders of Canadian Senior Unsecured Note Claims that have entered into the agreement in principle with the Debtors to support the Plan shall vote on or before ~~the Voting Deadline.~~November 2, 2009.

(B)     If Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Canadian Senior Unsecured Note Claim shall receive its pro rata share of (i) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) (a) ~~6.16~~6.05% of New Common Interests if Class 12 and Class 13 vote to accept the Plan, (b) ~~6.26~~6.14% of New Common Interests if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, (c) ~~6.77~~6.64% of New Common Interests if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, and (d) ~~6.77~~6.64% of New Common Interests if neither Class 12 nor Class 13 vote to accept the Plan, allocated to 30% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest), each (i) and (ii) on account of the Canadian Senior Unsecured Notes Guarantee Claim against CIT Group Inc., as set forth more fully in Article IV.A herein.

(C)     If Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, the holders of Allowed Canadian Senior Unsecured

Note Claims shall retain their Canadian Senior Unsecured Notes and Allowed Canadian Senior Unsecured Note Claims against Delaware Funding, provided, however, that:

(i)  such holders may not, in the aggregate, recover more than the Allowed amount of their Canadian Senior Unsecured Note Claim on account of the combined claims against CIT Group Inc. and Delaware Funding; and

~~(ii)~~ (ii) the Debtors reserve the right to, among other things, (w) not amend the Senior Credit Facility to remove Delaware Funding as a guarantor of the Senior Credit Facility, (x) estimate such holders' claims against Delaware Funding after receiving the distribution of Series A Notes and New Common Interests, (y) extend the maturity of those certain Intercompany Notes in accordance with the terms thereof or (z) merge Delaware Funding into CIT Group Inc. in accordance with the terms of the Canadian Senior Unsecured Note Indentures.

## 8. *Class 8 — Long-Dated Senior Unsecured Note Claims*

*a.    Claims in Class:*  Class 8 consists of Long-Dated Senior Unsecured Note Claims in the Allowed amount of approximately $1,189 million, which constitutes principal plus accrued but unpaid prepetition interest.  For purposes of determining the principal plus accrued but unpaid prepetition interest amount of Allowed Long-Dated Senior Unsecured Note Claims with respect to the non-U.S. dollar denominated Long-Dated Senior Unsecured Notes, an equivalent U.S.-dollar principal plus accrued but unpaid prepetition interest amount of each such series of Long-Dated Senior Unsecured Notes plus accrued but unpaid prepetition interest rates will be determined by multiplying the principal plus accrued but unpaid prepetition interest amount of such Long-Dated Senior Unsecured Notes by the weekly average of the applicable currency exchange rate in the most recent Federal Reserve Statistical Release H.10 which has become available prior to the Voting Deadline.  Such equivalent U.S. dollar principal amount will be used in all cases when determining the consideration to be received pursuant to the Long-Dated Senior Unsecured Note Exchange per $1,000 principal plus accrued but unpaid prepetition interest amount of Long-Dated Senior Unsecured Notes so exchanged.

*b.    Treatment:*

(A)    Each Electing Long-Dated Senior Unsecured Note Claims Holder shall be included in Class 8A and on, or as soon as reasonably practicable after, the Effective Date, such holder of an Allowed Long-Dated Senior Unsecured Note Claim shall receive its pro rata share of (i) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Long-Dated Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Long-Dated Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows:  (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~3.59~~3.58% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~3.65~~3.64% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~3.95~~3.94% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~3.95~~3.94% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~3.35~~3.34% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 3.40% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~3.68~~3.67% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~3.68~~3.67% of New Common Interests, as set forth more fully in Article IV.B herein.

(B)     Each Non-Electing Long-Dated Senior Unsecured Note Claims Holder shall be included in Class 8B and the legal, equitable, and contractual rights of the holders of the Non-Electing Long-Dated Senior Unsecured Note Claims are Unimpaired by the Plan and such holders shall have their Claims Reinstated.

(C)     Only Electing Long-Dated Senior Unsecured Note Claims Holders shall receive the treatment specified in Article III.G.8.b.A herein.

### 9.     Class 9— Senior Unsecured Note Claims

*a.     Claims in Class:*  Class 9 consists of Senior Unsecured Note Claims in the Allowed amount of approximately $~~25,504~~25,595 million, which constitutes principal plus accrued but unpaid prepetition interest.  For purposes of determining the principal plus accrued but unpaid prepetition interest amount of Allowed Senior Unsecured Note Claims with respect to the non-U.S. dollar denominated Senior Unsecured Notes, an equivalent U.S.-dollar principal plus accrued but unpaid prepetition interest amount of each such series of Senior Unsecured Notes will be determined by multiplying the principal plus accrued but unpaid prepetition interest amount of such Senior Unsecured Notes by the weekly average of the applicable currency exchange rate in the most recent Federal Reserve Statistical Release H. 10 which has become available prior to the Voting Deadline.  Such equivalent U.S. dollar principal amount will be used in all cases when determining the consideration to be received pursuant to the Senior Unsecured Note Exchange per $1,000 principal plus accrued but unpaid prepetition interest amount of Senior Unsecured Notes so exchanged.

*b.     Treatment:*  The legal, equitable, and contractual rights of holders of Senior Unsecured Note Claims are Impaired by the Plan.  On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Note Claim shall receive its <u>pro rata</u> share of (i) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows:  (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~77.07~~77.11% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~78.29~~78.33% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~84.69~~84.74% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~84.69~~84.74% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~71.85~~71.99% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~72.98~~ 73.13% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~78.96~~79.11% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~78.96~~79.11% of New Common Interests, as set forth more fully in Article IV.C herein.

### 10.     Class 10— Senior Unsecured Term Loan Claims

*a.     Claims in Class:*  Class 10 consists of Senior Unsecured Term Loan Claims in the Allowed amount of approximately $~~321~~320 million, which constitutes principal plus accrued but unpaid prepetition interest plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans.  Claims in Classes 10 and 11 are <u>pari passu</u> and shall be combined for voting purposes.  The Debtors reserve the right to seek Bankruptcy Court approval of a merger of Class 10 and Class 11.

*b.* *Treatment:* The legal, equitable, and contractual rights of holders of Senior Unsecured Term Loan Claims are Impaired by the Plan.

(A) If Class 10 Senior Unsecured Term Loan Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Term Loan Claim shall receive its pro rata share of (i) (a) indebtedness under credit facilities of Reorganized CIT on substantially the same terms as the Series A Notes in lieu of a distribution of the Series A Notes or (b) Series A Notes, each (a) and (b) equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans), at each such holder's election, and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans) as follows: (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.97% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.98% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 1.06% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 1.06% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.90% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.92% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 0.99% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 0.99% of New Common Interests, as set forth more fully in Article IV.D herein.

(B) If Class 10 Senior Unsecured Term Loan Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Term Loan Claim shall receive its pro rata share of (i) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows: (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.97% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.98% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 1.06% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 1.06% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.90% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.92% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 0.99% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 0.99% of New Common Interests, as set forth more fully in Article IV.D herein.

### *11.* *Class 11— Senior Unsecured Credit Agreement Claims*

*a.* *Claims in Class:* Class 11 consists of Senior Unsecured Credit Agreement Claims in the Allowed amount of approximately $3,1013,100 million, which constitutes principal plus accrued but unpaid prepetition interest plus such prepetition other amounts as may be contractually obligated under the Senior Unsecured Credit Agreements. Claims in Classes 10 and 11 are pari passu and shall be combined

for voting purposes.  The Debtors reserve the right to seek Bankruptcy Court approval of a merger of Class 10 and Class 11.

      *b.*     *Treatment:*  The legal, equitable, and contractual rights of holders of Senior Unsecured Credit Agreement Claims are Impaired by the Plan.

      (A)     If Class 11 Senior Unsecured Credit Agreement Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Credit Agreement Claim shall receive its <u>pro rata</u> share of (a) (i) indebtedness under credit facilities of Reorganized CIT on substantially the same terms as the Series A Notes in lieu of a distribution of the Series A Notes or (ii) Series A Notes, each (i) and (ii) equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which ~~Allowed Claim~~ constitutes principal plus accrued but unpaid prepetition interest<u>, plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Credit Agreements</u>), at each such holder's election, and (b) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which ~~Allowed Claim~~ constitutes principal plus accrued but unpaid prepetition interest <u>plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans</u>) as follows: (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~9.37~~<u>9.34</u>% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~9.52~~<u>9.49</u>% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~10.30~~<u>10.26</u>% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~10.30~~<u>10.26</u>% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~8.74~~<u>8.72</u>% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~8.88~~<u>8.86</u>% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~9.60~~<u>9.58</u>% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~9.60~~<u>9.58</u>% of New Common Interests, as set forth more fully in Article IV.E herein.

      (B)     If Class 11 Senior Unsecured Credit Agreement Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Credit Agreement Claim shall receive its <u>pro rata</u> share of (i) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows:  (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~9.37~~<u>9.34</u>% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~9.52~~<u>9.49</u>% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~10.30~~<u>10.26</u>% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~10.30~~<u>10.26</u>% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~8.74~~<u>8.72</u>% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~8.88~~<u>8.86</u>% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~9.60~~<u>9.58</u>% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~9.60~~<u>9.58</u>% of New Common Interests, as set forth more fully in Article IV.E herein.

*12.*      *Class 12— Senior Subordinated Note Claims*

     *a.*      *Claims in Class:* Class 12 consists of Senior Subordinated Note Claims in the Allowed amount of approximately $1,200 million, which constitutes principal plus accrued but unpaid prepetition interest.

     *b.*      *Treatment:* The legal, equitable, and contractual rights of holders of Senior Subordinated Note Claims are Impaired under the Plan. On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Subordinated Note Claim shall receive its <u>pro rata</u> share of (i) (A) 7.50% of New Common Interests if Class 7 and Class 13 vote to accept the Plan, (B) 7.56% of New Common Interests ~~in~~<u>if</u> Class 7 votes to accept the Plan and Class 13 does not vote to accept the Plan, (C) 7.50% of New Common Interests if Class 7 does not vote to accept the Plan and Class 13 votes to accept the Plan, and (D) 7.56% of New Common Interests if Class 7 and Class 13 do not vote to accept the Plan; <u>provided</u>, that Class 12 votes to accept the Plan; <u>provided</u>, <u>further</u>, <u>however</u>, that in the event that Class 12 does not vote to accept the Plan but the Plan is nonetheless confirmed, no holder of an Allowed Senior Subordinated Note Claim shall receive any shares of New Common Interests, and (ii) Contingent Value Rights, as set forth more fully in Article IV.F and Article IV.H herein.

*13.*      *Class 13—Junior Subordinated Note Claims*

     *a.*      *Claims in Class:* Class 13 consists of Junior Subordinated Note Claims in the Allowed amount of approximately $779 million, which constitutes principal plus accrued but unpaid prepetition interest.

     *b.*      *Treatment:* The legal, equitable, and contractual rights of holders of Junior Subordinated Note Claims are Impaired under the Plan. On, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Junior Subordinated Note Claim shall receive its <u>pro rata</u> share of (a) 1.50% of New Common Interests if Class 7 and Class 12 vote to accept the Plan or (b) 1.50% of New Common Interests if Class 7 does not vote to accept the Plan and Class 12 votes to accept the Plan; <u>provided</u>, that Class 12 and 13 vote to accept the Plan; <u>provided</u>, <u>further</u>, <u>however</u>, that if Class 12 and Class 13 do not vote to accept the Plan but the Plan is nonetheless confirmed, no holder of an Allowed Junior Subordinated Note Claim shall receive any shares of New Common Interests and (b) Contingent Value Rights, as set forth more fully in Article IV.G and IV.H herein.

*14.*      *Class 14— Subordinated 510(b) Claims*

     *a.*      *Claims in Class:* Class 14 consists of Subordinated 510(b) Claims.

     *b.*      *Treatment:* The legal, equitable and contractual rights of holders of Subordinated ~~5-10~~<u>510</u>(b) claims are impaired under the Plan. The holders of Subordinated ~~5 10~~<u>510</u>(b) Claims shall not receive or retain any property under the Plan on account of such Subordinated ~~5 10~~<u>510</u>(b) Claims.

*15.*      *Class 15— Old Preferred Interests*

     *a.*      *Interests in Class:* Class 15 consists of all Old Preferred Interests.

     *b.*      *Treatment:* The legal, equitable, and contractual rights of holders of Old Preferred Interests are Impaired under the Plan. On the Effective Date, all Old Preferred Interests shall be cancelled, terminated and extinguished. However, each holder of an Old Preferred Interest shall receive Contingent Value Rights, as set forth more fully in Article IV.H herein.

*16.*      *Class 16— Old Common Interests*

     *a.*      *Interests in Class:* Class 16 consists of all Old Common Interests.

# ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.** **Allocation To Holders Of Canadian Senior Unsecured Note Claims**

If Class 7 Canadian Senior Unsecured Note Claims vote to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Canadian Senior Unsecured Note Claim or the Reorganized Debtors, each holder of a Canadian Senior Unsecured Note Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Canadian Senior Unsecured Notes, free and clear of any liens, claims, charges, security interests or other legal or equitable encumbrances, limitations or restrictions (collectively, "*Liens*"), and any promissory notes or other evidence of indebtedness payable to each such holder of a Canadian Senior Unsecured Note Claim under any Canadian Senior Unsecured Notes shall thereafter be held of record by the Reorganized Debtors.  In exchange for such transfer and assignment of the Canadian Senior Unsecured Notes held by each holder of a Canadian Senior Unsecured Note Claim (the "*Canadian Senior Unsecured Note Exchange*"), on account of the approximately $~~2,188~~2,149 million Allowed Canadian Senior Unsecured Note Claims, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Canadian Senior Unsecured Note Claim shall receive its pro rata share of Series B Notes, equal to a distribution in the amount of 100% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest), in full settlement and satisfaction of any Claims held by such holder of an Allowed Canadian Senior Unsecured Note Claim.  Following the Canadian Senior Unsecured Note Exchange, all Canadian Senior Unsecured Notes transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist. The Intercompany Notes shall be modified to extend the maturity dates thereunder to correspond with the maturity dates of the Series B Notes and shall not be further modified other than as required to effectuate the transactions contemplated by the Plan without the consent of ~~a majority~~66-2/3% in aggregate principal amount of the holders of the Series B Notes then outstanding, provided, however, that without such consent, the Intercompany Notes may be amended in a manner that (i) is ministerial, (ii) for tax purposes, and (iii) does not adversely affect the holders of Series B Notes, and the CIT Leasing Support Agreements shall remain in place and in effect through such extended maturity dates of the Intercompany Notes.  As of the Effective Date, the CIT Leasing Support Agreements shall be secured by a security interest granted by C.I.T. Leasing Corporation in favor of Delaware Funding, and any modifications to the CIT Leasing Support Agreements shall be filed as a Plan Supplement.  Delaware Funding's security interest will be on ~~substantially~~exactly the same collateral securing the Series A Notes, subject to differences in perfection required by contract and applicable law; provided, however, that the CIT Leasing Support Agreements shall not further be modified without the consent of ~~a majority~~66-2/3% in aggregate principal amount of the holders of the Series B Notes then outstanding; provided, further, however, that without such consent the CIT Leasing Support Agreements may be amended in a manner that (i) is ministerial, (ii) for tax purposes, and (iii) does not adversely effect the holders of the Series B Notes.  Pursuant to the intercreditor arrangements between the collateral agent under the Series A Notes, the collateral agent under the Series B Notes and Delaware Funding, Delaware Funding will agree not to exercise any remedies with respect to such security interest without the consent of the collateral agent under the Series B Notes.  The Debtors shall file the amended Intercompany Notes and any security agreement evidencing the securitization of C.I.T. Leasing Corporation's obligations under the CIT Leasing Support Agreements and certain related documents as Plan Supplements.  ~~On and after~~As of the Effective Date, those holders of Canadian Senior Unsecured Note Claims voting to accept the Plan (i) shall ~~be deemed to withdraw~~dismiss with prejudice the Canadian Senior Unsecured Note Litigation and any other action(s) pending against Delaware Funding as well as its directors and officers in which such holders are participants; alleging the same causes of action based on the same transaction that is the subject of the Canadian Senior Unsecured Note Litigation; (ii) shall forbear from participating, directly or indirectly, in any action brought by noteholders or debtholders against CIT Group Inc., Delaware Funding or their directors and officers alleging the same causes of action based on the same transaction that is the subject of the Canadian Senior Unsecured Note Litigation; and (iii) shall turnover any proceeds received by such holders as a result of or arising from ~~any subsequent litigation against CIT Group Inc., Delaware Funding or their directors and officers based on the causes of action asserted in the Canadian Senior Unsecured Note Litigation~~such litigation as referred to in clauses (i) and (ii) above; provided, however, that nothing in the foregoing sentence (including clauses (i), (ii) and (iii)) shall apply to any claim or cause

of action based on any act, omission, transaction, event or other occurrence taking place after the Effective Date. Holders of Canadian Senior Unsecured Note Claims shall have until the Extended Canadian Senior Unsecured Note Claims Voting Deadline to vote to accept or reject the Plan; provided, however, that those certain holders of Canadian Senior Unsecured Note Claims that have entered into the agreement in principle with the Debtors to support the Plan shall vote on or before the Voting Deadline.November 2, 2009.

If Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Canadian Senior Unsecured Note Claim shall receive its pro rata share of (a) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (b) (i) 6.166.05% of New Common Interests if Class 12 and Class 13 vote to accept the Plan, (ii) 6.266.14% of New Common Interests if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, (iii) 6.776.64% of New Common Interests if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, and (iv) 6.776.64% of New Common Interests if neither Class 12 nor Class 13 vote to accept the Plan, allocated to 30% of such holder's Allowed Canadian Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest), each (a) and (b) on account of the Canadian Senior Unsecured Notes Guarantee Claim against CIT Group Inc.

If Class 7 Canadian Senior Unsecured Note Claims do not vote to accept the Plan and the Plan is nonetheless confirmed, the holders of Allowed Canadian Senior Unsecured Note Claims shall retain their Canadian Senior Unsecured Notes and Allowed Canadian Senior Unsecured Note Claims against Delaware Funding; provided, however, that: (i) such holders may not, in the aggregate, recover more than the Allowed Amount of their Canadian Senior Unsecured Note Claim on account of the combined claims against CIT Group Inc. and Delaware Funding; and (ii) the Debtors reserve the right to, among other things, (w) not amend the Senior Credit Facility to remove Delaware Funding as a guarantor of the Senior Credit Facility, (x) estimate such holders' claims against Delaware Funding after receiving the distribution of Series A Notes and New Common Interests, (y) extend the maturity of those certain Intercompany Notes in accordance with the terms thereof or (z) merge Delaware Funding into CIT Group Inc. in accordance with the terms of the Canadian Senior Unsecured Note Indentures.

**B.      Allocation Of New Notes And Issuance Of New Common Interests To Holders Of Long-Dated Senior Unsecured Note Claims**

On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Long-Dated Senior Unsecured Note Claim or the Reorganized Debtors, each Electing Long- Dated Senior Unsecured Note Claims Holder shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Long-Dated Senior Unsecured Notes, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Long-Dated Senior Unsecured Note Claim under any Long-Dated Senior Unsecured Notes shall thereafter be held of record by the Reorganized Debtors.  In exchange for such transfer and assignment of the Long-Dated Senior Unsecured Notes held by each holder of a Long-Dated Senior Unsecured Note Claim (the "*Long-Dated Senior Unsecured Note Exchange*"), on account of such Electing Long-Dated Senior Unsecured Note Claims Holders' Allowed Long-Dated Senior Unsecured Note Claims, the Reorganized Debtors shall allocate to each such holder its pro rata share of (i) Series A Notes in the amount of 70% of such holder's Allowed Long-Dated Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Long-Dated Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows:  (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 3.593.58% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 3.653.64% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 3.953.94% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 3.953.94% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 3.353.34% of New Common Interests, (2) if Class 12 votes

to accept the Plan and Class 13 does not vote to accept the Plan, 3.40% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~3.68~~3.67% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~3.68~~3.67% of New Common Interests, in full satisfaction and settlement of any Claims held by such holder of an Allowed Long-Dated Senior Unsecured Note Claim. Following the Long- Dated Senior Unsecured Note Exchange, all Long-Dated Senior Unsecured Notes transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

**C.** **Allocation Of New Notes And Issuance Of New Common Interests To Holders Of Senior Unsecured Note Claims**

On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Senior Unsecured Note Claim or the Reorganized Debtors, each holder of a Senior Unsecured Note Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Senior Unsecured Notes, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Senior Unsecured Note Claim under any Senior Unsecured Notes shall thereafter be held of record by the Reorganized Debtors. In exchange for such transfer and assignment of the Senior Unsecured Notes held by each holder of a Senior Unsecured Note Claim (the "*Senior Unsecured Note Exchange*"), on account of the approximately $~~25,504~~25,595 million Allowed Senior Unsecured Note Claims, the Reorganized Debtors shall allocate to each such holder its pro rata share of (i) Series A Notes in the amount of 70% of such holder's Allowed Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Note Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows: (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~77.07~~77.11% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~78.29~~78.33% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~84.69~~84.74% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~84.69~~84.74% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~71.85~~71.99% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~72.98~~ 73.13% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~78.96~~79.11% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~78.96~~79.11% of New Common Interests, in full satisfaction and settlement of any Claims held by such holder of an Allowed Senior Unsecured Note Claim. Following the Senior Unsecured Note Exchange, all Senior Unsecured Notes transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

**D.** **Allocation Of New Notes And Issuance Of New Common Interests To Holders Of Senior Unsecured Term Loan Claims**

Claims in Classes 10 and 11 are pari passu and shall be combined for voting purposes. On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Senior Unsecured Term Loan Claim or the Reorganized Debtors, each holder of a Senior Unsecured Term Loan Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Senior Unsecured Term Loans, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Senior Unsecured Term Loan Claim under any Senior Unsecured Term Loans shall thereafter be held of record by the Reorganized Debtors. In exchange for such transfer and assignment of the Senior Unsecured Term Loans held by each holder of a Senior Unsecured Term Loan Claim (the "*Senior Unsecured Term Loan Exchange*"), on account of the approximately $~~321~~320 million Allowed Senior Unsecured Term Loan Claims (~~a~~)which constitutes principal plus accrued but unpaid prepetition interest plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans) (a) if Class 10 Senior Unsecured Term Loan Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Term Loan Claim shall receive its pro rata share of (i) (A) indebtedness under credit facilities of Reorganized CIT on substantially the same terms as the Series A Notes, in lieu of a distribution of

the Series A Notes or (B) Series A Notes, each (A) and (B) equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Term Loan Claim (which ~~Allowed Claim~~ constitutes principal plus accrued but unpaid prepetition interest <u>plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Term Loans</u>), at each such holder's election, and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Term Loan Claim ~~(which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest)~~ as follows:  (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.97% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.98% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 1.06% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 1.06% of New Common Interests or (b) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, 0.90% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.92% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 0.99% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, 0.99% of New Common Interests or (b) if Class 10 Senior Unsecured Term Loan Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Term Loan Claim shall receive its <u>pro rata</u> share of (A) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (B) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Term Loan Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) as follows:  (1) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (A) if Class 12 and Class 13 vote to accept the Plan, 0.97% of New Common Interests, (B) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, 0.98% of New Common Interests, (C) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 1.06% of New Common Interests, or (D) if neither Class 12 nor Class 13 vote to accept the Plan, 1.06% of New Common Interests or (2) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (A) if Class 12 and Class 13 vote to accept the Plan, 0.90% of New Common Interests, (B) if Class 12 votes to accept the Plan and Class 13 vote to accept the Plan, 0.92% of New Common Interests, (C) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, 0.99% of New Common Interests, or (D) if neither Class 12 nor Class 13 vote to accept the Plan, 0.99% of New Common Interests, in full satisfaction and settlement of any Claims held by such holder of an Allowed Senior Unsecured Term Loan Claim.  Following the Senior Unsecured Term Loan Exchange, all Senior Unsecured Term Loans transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

**E.**   **Allocation Of New Notes And Issuance Of New Common Interests To Holders Of Senior Unsecured Credit Agreement Claims**

Claims in Classes 10 and 11 are <u>pari passu</u>, and shall be combined for voting purposes.  On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Senior Unsecured Credit Agreement Claim or the Reorganized Debtors, each holder of a Senior Unsecured Credit Agreement Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Senior Unsecured Credit Agreements, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Senior Unsecured Credit Agreement Claim under any Senior Unsecured Credit Agreements shall thereafter be held of record by the Reorganized Debtors.  In exchange for such transfer and assignment of the Senior Unsecured Credit Agreements held by each holder of a Senior Unsecured Credit Agreement Claim (the "*Senior Unsecured Credit Agreement Exchange*"), on account of the approximately $~~3,101~~<u>3,100</u> million Allowed Senior Unsecured Credit Agreement Claims <u>(which constitutes principal plus accrued but unpaid prepetition interest plus such other prepetition amounts as may be contractually obligated under the Senior Unsecured Credit Agreements)</u> (a) if Class 11 Senior Unsecured Credit Agreement Claims votes to accept the Plan, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Credit Agreement Claim shall receive its <u>pro rata</u> share of (i) (A) indebtedness under credit facilities of Reorganized CIT on substantially the same terms as the Series A Notes, in lieu of a distribution of the Series A Notes or (B) Series A Notes, each (A) and (B) equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which ~~Allowed Claim~~ constitutes principal plus accrued but unpaid prepetition interest <u>plus such other prepetition amounts as may be contractually obligated under</u>

~~the Senior Unsecured Credit Agreements~~), at each such holder's election, and (ii) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Credit Agreement Claim ~~(which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest)~~ as follows: (A) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~9.37~~9.34% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~9.52~~9.49% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~10.30~~10.26% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~10.30~~10.26% of New Common Interests or (B) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (1) if Class 12 and Class 13 vote to accept the Plan, ~~8.74~~8.72% of New Common Interests, (2) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~8.88~~8.86% of New Common Interests, (3) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~9.60~~9.58% of New Common Interests, or (4) if neither Class 12 nor Class 13 vote to accept the Plan, ~~9.60~~9.58% of New Common Interests or (b) if Class 11 Senior Unsecured Credit Agreement Claims does not vote to accept the Plan and the Plan is nonetheless confirmed, on, or as soon as reasonably practicable after, the Effective Date, each holder of an Allowed Senior Unsecured Credit Agreement Claim shall receive its pro rata share of (A) Series A Notes, equal to a distribution in the amount of 70% of such holder's Allowed Senior Unsecured Credit Agreement Claim (which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest) and (B) New Common Interests allocated to 30% of such holder's Allowed Senior Unsecured Credit Agreement Claim ~~(which Allowed Claim constitutes principal plus accrued but unpaid prepetition interest)~~ as follows: (1) if Class 7 Canadian Senior Unsecured Note Claims votes to accept the Plan and (A) if Class 12 and Class 13 vote to accept the Plan, ~~9.37~~9.34% of New Common Interests , (B) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~9.52~~9.49% of New Common Interests, (C) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~10.30~~10.26% of New Common Interests, or (D) if neither Class 12 nor Class 13 vote to accept the Plan, ~~10.30~~10.26% of New Common Interests or (2) if Class 7 Canadian Senior Unsecured Note Claims does not vote to accept the Plan and (A) if Class 12 and Class 13 vote to accept the Plan, ~~8.74~~8.72% of New Common Interests, (B) if Class 12 votes to accept the Plan and Class 13 does not vote to accept the Plan, ~~8.88~~8.86% of New Common Interests, (C) if Class 12 does not vote to accept the Plan and if Class 13 votes to accept the Plan, ~~9.60~~9.58% of New Common Interests, and (D) if neither Class 12 nor Class 13 votes to accept the Plan, ~~9.60~~9.58% of New Common Interests, in full satisfaction and settlement of any Claims held by such holder of an Allowed Senior Unsecured Term Loan Claim. Following the Senior Unsecured Credit Agreement Exchange, all Senior Unsecured Credit Agreements transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

## F.      Issuance Of New Common Interests To Holders Of Senior Subordinated Note Claims

On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Senior Subordinated Note Claim or the Reorganized Debtors, each holder of a Senior Subordinated Note Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Senior Subordinated Notes, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Senior Subordinated Note Claim under the Senior Subordinated Notes shall thereafter be held of record by the Reorganized Debtors. In exchange for such transfer and assignment of the Senior Subordinated Notes held by each holder of a Senior Subordinated Note Claim (the "*Senior Subordinated Notes Exchange*"), on account of the approximately $1,200 million Allowed Senior Subordinated Note Claims each holder of an Allowed Senior Subordinated Note Claim shall receive its pro rata share of (i) (A) 7.50% of New Common Interests if Class 7 and Class 13 vote to accept the ~~p~~Plan, (B) 7.56% of New Common Interests ~~if~~in Class 7 votes to accept the Plan and Class 13 does not vote to accept the Plan, (C) 7.50% of New Common Interests if Class 7 does not vote to accept the Plan and Class 13 ~~V~~votes to accept the Plan, and (D) 7.56% of New Common Interests if Class 7 and Class 13 do not vote to accept the Plan; provided, that Class 12 votes to accept the Plan; provided, further, however, that in the event that Class 12 does not vote to accept the Plan but the Plan is nonetheless confirmed, no holder of an Allowed Senior Subordinated Note Claim shall receive any shares of New Common Interests, and (ii) Contingent Value Rights, in full satisfaction and settlement of any Claims held by such holder of an Allowed Senior Subordinated Note Claim. Following the Senior Subordinated Notes Exchange, the Senior Subordinated Notes transferred and assigned to the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

**G.** **Issuance Of New Common Interests To Holders Of Junior Subordinated Note Claims**

On, or as soon as reasonably practicable after, the Effective Date and without the need for any action by the holder of a Junior Subordinated Note Claim or the Reorganized Debtors, each holder of a Junior Subordinated Note Claim shall transfer and assign to the Reorganized Debtors all of such holder's rights and obligations under the Junior Subordinated Notes, free and clear of any Liens, and any promissory notes or other evidence of indebtedness payable to each such holder of a Junior Subordinated Note Claim under the Junior Subordinated Notes shall thereafter be held of record by the Reorganized Debtors. In exchange for such transfer and assignment of the Junior Subordinated Notes held by each holder of a Junior Subordinated Note Claim (the "*Junior Subordinated Notes Exchange*" and together with the Canadian Senior Unsecured Note Exchange, the Long-Dated Senior Unsecured Note Exchange, the Senior Unsecured Note Exchange, the Senior Unsecured Term Loan Exchange, the Senior Unsecured Credit Agreement Exchange and the Senior Subordinated Notes Exchange, the "*Exchanges*"), on account of the approximately $779 million Allowed Junior Subordinated Note Claims each holder of an Allowed Junior Subordinated Note Claim shall receive its pro rata share of (a) 1.51.50% of New Common Interests if Class 7 and Class 12 vote to accept the Plan or (b) 1.51.50% of New Common Interests if Class 7 does not vote to accept the Plan and Class 12 votes to accept the Plan; provided, that Class 12 and 13 votes to accept the Plan; provided, further, however, that if Class 12 and Class 13 do not vote to accept the Plan but the Plan is nonetheless confirmed, no holder of an Allowed Junior Subordinated Note Claim shall receive any shares of New Common Interests and (b) Contingent Value Rights, in full satisfaction and settlement of any Claims held by such holder of an Allowed Junior Subordinated Note Claim. Following the Junior Subordinated Notes Exchange, the Junior Subordinated Notes acquired by the Reorganized Debtors shall no longer be outstanding and shall automatically be cancelled and shall cease to exist.

**H.** **Allocation Of Contingent Value Rights**

On, or as soon as reasonably practicable after, the Effective Date and substantially contemporaneously with the Exchanges, the Reorganized Debtors shall allocate non-transferable contingent value rights (the "*Contingent Value Rights*" or "*CVRs*") to (i) holders of Senior Subordinated Note Claims (the "*Senior CVRs*") pro rata based on each such holder's share of the aggregate amount of Senior Subordinated Note Claims, (ii) holders of Junior Subordinated Note Claims (the "*Junior CVRs*") pro rata based on each such holder's share of the aggregate amount of Junior Subordinated Note Claims, and (iii) holders of Old Preferred Interests (the "*Preferred Stock CVRs*") pro rata based on each such holder's share of the aggregate combined liquidation preference of the Old Preferred Interests, including accrued and unpaid dividends thereon to the Petition Date. The CVRs entitle holders of such Claims to a distribution under the Plan in the form of New Common Interests under certain circumstances, as described in more detail below.

*1.* *CVR Distributions*

If, on the Measurement Date, the aggregate Fair Market Value of the Class 8-11 Securities exceeds the Class 8-11 Par Recovery Amount (such excess, the "*Class 8-11 Excess Value Amount*"), the Disbursing Agent shall, as soon as reasonably practicable after the Measurement Date, distribute or caused to be distributed to holders of CVRs, New Common Interests in the following order of priority:

FIRST, pro rata to holders of Senior CVRs, an amount of New Common Interests having an aggregate Fair Market Value (as adjusted to take into account the dilutive impact of any distribution required to be made on account of CVRs hereunder) equal to the lesser of (i) an amount such that, immediately after such distribution, the Class 8-11 Excess Value Amount (as adjusted to take into account the dilutive impact of any distribution required to be made on account of CVRs hereunder) is reduced to zero and (ii) the excess of (x) the Class 12 Par Recovery Amount over (y) the aggregate Fair Market Value (as adjusted to take into account the dilutive impact of any distribution required to be made on account of

Debtors to execute the same together with such other documents as the Exit Facility Lenders may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Facility.

## K.    Continued Existence and Vesting of Assets in Reorganized Debtors

The Debtors shall continue to exist after the Effective Date as separate corporate entities in accordance with the applicable law for the State of Delaware and pursuant to their certificate of incorporation and by laws and certificate of formation, or other governing documents, as amended and restated on the Effective Date.  The ~~Reorganized CIT~~Third Amended And Restated Certificate of ~~of~~Of Incorporation Of CIT Group Inc., the Reorganized Delaware Funding Amendment to Certificate of Formation and the Reorganized Delaware Funding Amendment to Limited Liability Company Agreement are attached hereto as Exhibits A-1, A-2 and A-3, respectively.

Among other things, the Debtors' existing certificates of incorporation or other governing documents, as applicable, shall be amended to include a provision prohibiting the issuance of nonvoting equity securities as required under section 1123(a)(6) of the Bankruptcy Code.

On and after the Effective Date, all property of the Estate, and all Litigation Claims, and any property acquired by the Debtors under or in connection with the Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Interests and Liens except as otherwise expressly provided in the Plan.  On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay charges that they incur on and after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

## L.    Cancellation of Interests and Agreements

On the Effective Date, except as otherwise expressly provided for in the Plan, (i) the Canadian Senior Unsecured Notes, the Long-Dated Senior Unsecured Notes, the Senior Unsecured Notes, the Senior Unsecured Term Loans, the Senior Unsecured Credit Agreements, the Senior Subordinated Notes, the Junior Subordinated Notes, the Old Preferred Interests, the Old Common Interests, and the Other Equity Interests or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of or Interests in the Debtors that are Reinstated under this Plan, to the extent not already cancelled, shall be deemed cancelled, terminated and of no further force or effect without any further action on the part of the Bankruptcy Court or any Person; provided, however, that notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Canadian Senior Unsecured Notes, the Long-Dated Senior Unsecured Notes, the Senior Unsecured Notes, the Senior Unsecured Term Loans, the Senior Unsecured Credit Agreements, the Senior Subordinated Notes and the Junior Subordinated Notes shall be deemed to continue in effect solely to the extent necessary to (1) allow holders of such Canadian Senior Unsecured Notes, the Long-Dated Senior Unsecured Notes, Senior Unsecured Notes, Senior Unsecured Term Loans, Senior Unsecured Credit Agreements, Senior Subordinated Notes and/or Junior Subordinated Notes to receive distributions, if any, under the Plan and (2) allow the Disbursing Agents to make distributions under the Plan as provided herein, and (ii) the obligations of the Debtors under the Canadian Senior Unsecured Notes, the Long-Dated Senior Unsecured Notes, the Senior Unsecured Notes, the Senior Unsecured Term Loans, the Senior Unsecured Credit Agreements, the Senior Subordinated Notes, the Junior Subordinated Notes, the Old Preferred Interests, the Old Common Interests, and the Other Equity Interests shall be discharged.

## M.  Board of Directors

CIT Group Inc.'s Board of Directors (the "*Board*") (which as of the date of this Plan has ten (10) members) has determined that the appropriate size of the Board ~~on and~~ after the Effective Date would be thirteen (13) directors: (a) five of whom will consist of individuals who were serving as directors on November 1, 2009, (b) four of whom will be nominees proposed to the Nominating and Governance Committee of the Board (the "N&GC") by the Steering Committee (the "Steering Committee Nominees"), (c) three of whom will be nominees (the "Debtholder Nominees") proposed to the N&GC by CIT Group Inc. noteholders (other than members of the Steering Committee) owning more than 1% of the aggregate outstanding principal amount of outstanding CIT bonds and unsecured bank debt claims (the "One-Percent Holders") and (d) one of whom will be CIT's Chief Executive Officer.  At the request of and in cooperation with the Steering Committee, CIT Group Inc. has engaged Spencer Stuart, an internationally recognized director search firm, to assist the ~~Nominating and Governance Committee of the Board (the "*N&GC*")~~ N&GC in identifying, interviewing and selecting candidates for the expanded Board and/or replacing members of the present Board who may determine to step down.  Spencer Stuart will identify candidates who are independent of CIT Group Inc., not affiliated with, or representatives of, any of the members of the Steering Committee or the One-Percent Holders, and who possess the qualifications, skills and experience specified by the N&GC.

~~The Steering Committee will recommend to the N&GC candidates for the Board from among the qualified individuals identified by Spencer Stuart (the "*Steering Committee Nominees*").~~  The candidates that are approved by the N&GC will be reviewed with the Federal Reserve Bank of New York (the "*Federal Reserve*") and, to the extent ~~approved by~~ the Federal Reserve has no objection, will be submitted to the full Board for consideration and appointment to the Board.  ~~Following the Effective Date, the Board will include five directors that were recommended to the N&GC by the Steering Committee.  The Board will nominate a slate of at least 13 directors for election at the 2010 annual meeting of stockholders, which slate will not include more than five of the directors serving as of the date hereof.~~ To the extent the N&GC or the Federal Reserve does not approve Steering Committee Nominees (whether such event occurs pre- or post-Effective Date), the Steering Committee shall be permitted to submit additional candidates to the N&GC until four members of the Board are Steering Committee Nominees.

## N.  Certain Corporate Governance Matters

On and after the Effective Date, Reorganized CIT will use its commercially reasonable best efforts to hold its next annual meeting no later than May 31, 2010.  CIT Group Inc. does not have a staggered or classified board and, accordingly, all directors of Reorganized CIT will be elected at the annual meeting.  During the Chapter 11 Cases, CIT Group Inc. will not implement a stockholders' rights plan other than (i) CIT Group Inc.'s August 12, 2009 tax benefits preservation plan or (ii) other actions CIT Group Inc. considers appropriate to preserve the benefit of net operating losses.  CIT Group Inc. will not amend its certificate of incorporation during the Chapter 11 Cases to create a staggered or classified board.  The Reorganized CIT Certificate of Incorporation will provide that the chairman of the board or secretary of Reorganized CIT shall call a special meeting of its stockholders at the request in writing of stockholders possessing at least 25% of the voting power of the issued and outstanding common stock of Reorganized CIT entitled to vote generally for the election of directors.

## O.  Preservation of Rights of Action; Settlement of Litigation Claims

Except as otherwise provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain all of the Litigation Claims, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of such Litigation Claims.  The Debtors will file as a Plan Supplement a non-exclusive list of claims or causes of action that the Debtors hold or may hold either in pending or potential litigation.  The Debtors reserve their rights to modify such list to add or delete parties or causes of action, but disclaims any obligation to do so.  The failure of the Debtors to specifically list any claim, right of

action, suit or proceeding herein or in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors of such claim, right of action, suit or proceeding, and the Reorganized Debtors will retain the right to pursue additional claims, rights of action, suits or proceedings.  Notwithstanding anything in this Plan to the contrary, neither the Debtors nor any of their affiliates shall take any action which would constitute or effect a TRS Impairment, including without limitation asserting any claims or causes of action arising from Bankruptcy Code sections 544, 547 and 548, relating to the Amended and Restated Confirmation and any agreements entered into by one or more of the Debtors and GSI in connection therewith.  In addition, at any time after the Petition Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors may settle some or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

## P.      Effectuating Documents; Further Transactions

The chairman of the board of directors, president, chief executive officer, chief financial officer or any other appropriate officer of the Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

## Q.      Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of debt and equity under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any contract, lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan shall be exempt from all taxes (including, without limitation, stamp tax or similar taxes) to the fullest extent permitted by section 1146 of the Bankruptcy Code, and the appropriate state or local governmental officials or agents shall not collect any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## R.      Release of Liens

Except as otherwise expressly provided herein, in the Confirmation Order or in any document, instrument or other agreement created in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of the Debtors or the Estate automatically shall be released, and the holders of such mortgages, deeds of trust, liens, or other security interests shall execute such documents as may be necessary or desirable to reflect or effectuate such releases.

# ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

## A.      Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of or in exchange for Claims that are Allowed Claims as of the Effective Date shall be made on the Distribution Date.  All Cash distributions shall be made from available Cash of the Reorganized Debtors.  Any distribution under the Plan of property other than Cash shall be made by the Disbursing Agent in accordance with the terms of the Plan.

(3)     The Reorganized CIT Certificate of Incorporation, the Reorganized Delaware Funding Certificate of Amendment to Certificate of Formation and the Reorganized Delaware Funding Amendment to Limited Liability Company Agreement in form and substance reasonably satisfactory to the Debtors and the Steering Committee shall have been executed.

(4)     The Exchanges shall have been consummated and all documents to be executed in connection therewith shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied or waived by the parties thereto.

(5)     The Debtors shall have executed and delivered all documents necessary to effectuate the issuance of New Notes and other documentation necessary to effectuate the Plan (including, without limitation, any material refinancings, modifications or amendments to any subsidiary level financing, conduits or securitizations) in form and substance reasonably satisfactory to the Steering Committee.

(6)     The Debtors shall have executed and delivered all documents necessary to effectuate the issuance of the New Common Interests in form and substance reasonably satisfactory to the Steering Committee.

(7)     All authorizations, consents and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

(8)     All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

(9)     ~~Nomination~~Proposal of the Steering Committee Nominees to the ~~N&GC.~~ N&GC.

(10)    CIT Group Inc. or a non-Debtor subsidiary of CIT Group Inc. shall provide cash collateral to the lenders under that certain Revolving Facility Agreement, dated September 24, 2007, among CIT Finance and Leasing Corporation as borrower, Citibank (China) Co., Ltd. Shanghai Branch as bookrunner, Citibank (China) Co., Ltd. Shanghai Branch and Standard Chartered Bank (China) Limited, Shanghai Branch as mandated lead arrangers, Citibank (China) Co., Ltd. Shanghai Branch as facility agent and the financial institutions party thereto as lender, as amended, to secure the obligations of CIT Group Inc.'s Chinese subsidiaries under the foregoing facility, as set forth in more detail in the agreement attached hereto as Exhibit S.

## B.     Waiver of Conditions

Each of the conditions (other than entry of ~~orders~~the Confirmation Order in Article X.A.1) set forth in Articles IX and X.A above may be waived in whole or in part by the Debtors with the consent of the Steering Committee, not to be unreasonably withheld, conditioned or delayed, without any notice to other parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtors or the Steering Committee regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors or the Steering Committee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# ARTICLE XI

## MODIFICATIONS AND AMENDMENTS

The Debtors may alter, amend or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date, with the consent of the Steering Committee which consent shall not be unreasonably withheld, conditioned or delayed.  The Debtors reserve the right to include any amended exhibits or schedules in the Plan Supplement.  After the Confirmation Date and prior to substantial

### H. Releases

#### 1. Releases by the Debtors

*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates and the Reorganized Debtors, and any Person seeking to assert claims or exercise rights of any of the foregoing, including any successor to the Debtors, their Estates and the Reorganized Debtors or estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b), shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, (including, (a) to the extent the underlying claims and causes of action are property of Delaware Funding's Estate, the claims and causes of action asserted in the Canadian Senior Unsecured Notes Litigation and (b) to the extent the underlying claims and causes of action are property of the Debtors' Estates, the claims and causes of action asserted in any direct or derivative litigation including but not limited to those included on the Debtors' non-exclusive list of released derivative actions filed as a Plan Supplement), in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Offering Memorandum, the Plan and the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or the Reorganized Debtors, as of the Effective Date against (i) the Debtors' or the Debtors' subsidiaries' members, members of boards of managers, directors and officers (acting in such capacity or as the Debtors' agents or employees), employees, advisors, attorneys, agents or representatives, in each case to the extent acting in any such capacity since May 8, 2009, or any of their successors or assigns (in each case acting in such capacity); (ii) the Steering Committee (in such capacity) and its current members, members of boards of managers, directors and officers (acting in such capacity or as the Steering Committee's agents or employees), employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of its successors or assigns (in each case acting in such capacity); and (iii) solely with respect to the DIP Facility and the DIP Facility Agreement, Bank of America, N.A. as Administrative Agent and L/C Issuer and Banc of America Securities LLC as Sole Lead Arranger and Sole Bookrunner; (iv) solely with respect to the Exit Facility and the Exit Facility Agreement, the Exit Facility Lender(s) and any agents under the Exit Facility; and (v) solely with respect to the JPM L/C Facility or the JPM L/C Facility Agreement, JPM or any other lender under the JPM Facility Agreement (in each case acting in such capacity), provided that nothing in this paragraph shall be deemed to operate as a waiver or release from any causes of action based on willful misconduct, gross negligence, or intentional fraud, in each case as determined by a final order of a court of competent jurisdiction. For the avoidance of doubt, pursuant to this Article XIII.H.1 of the Plan, as of the Effective Date, shall be deemed to forever release, waive and discharge any and all claims and causes of action that the Debtors, the Estate or the Debtors' affiliates may have against GSI that would constitute or effect a TRS Impairment, including without limitation any claims or causes of action arising from Bankruptcy Code sections 544, 547 and 548 relating to the Amended and Restated Confirmation and any agreements entered into by one or more of the Debtors and GSI in connection therewith.*

#### 2. Releases by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim that affirmatively votes in favor of the Plan shall have agreed, solely in its capacity as the holder of such Claim, to forever release, waive and discharge all claims, defenses, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than Unimpaired Claims, claims relating to Unimpaired Claims, and the rights to enforce the Plan and the contracts, instruments, releases, indentures or other agreements or documents delivered thereunder) and including the claims and causes of action asserted in the Canadian Senior Unsecured Notes Litigation against any and all present or future defendants named in the Canadian Senior Unsecured Notes Litigation, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or

unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Debtors' prepetition restructuring efforts, the Offering Memorandum, the Plan, the Disclosure Statement, or the JPM L/C Facility or the JPM L/C Facility Agreement, against: (i) the Debtors and the Reorganized Debtors and their respective subsidiaries; (ii) the Debtors' and their subsidiaries' members, members of boards of managers, directors and employees, advisors, attorneys, agents or representatives, officers (acting in such capacity or as the Debtors' agents or employees) in each case to the extent acting in any such capacity since May 8, 2009, or any of their successors or assigns (in each case acting in such capacity); and (iii) the Steering Committee (in such capacity) and its current members, members of boards of managers, directors and officers, employees, advisors, attorneys, agents or representatives (acting in such capacity or as the Steering Committee's agents or employees), or any of its successors or assigns (in each case acting in such capacity), each as of the Effective Date, provided that nothing in this paragraph shall be deemed to operate as a waiver or release from any causes of action based on willful misconduct, gross negligence or intentional fraud, in each case as determined by a final order of a court of competent jurisdiction. For the avoidance of doubt, nothing herein shall release any non-Debtor party from any contractual obligations.

## I.        Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors or their property on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Article XIII.I.

## J.        Exculpation and Limitation of Liability

The Reorganized Debtors, the Debtors, the Estate, their subsidiaries, any Committee, the Steering Committee, Bank of America, N.A. as Administrative Agent and L/C Issuer and Banc of America Securities LLC as Sole Lead Arranger and Sole Bookrunner (solely with respect to the DIP Facility and the DIP Facility Agreement), the Exit Facility Lender(s) and any agents under the Exit Facility (solely with respect to the Exit Facility and the Exit Facility Agreement), JPM or any other lender under the JPM Facility Agreement (in each case acting in such capacity and solely with respect to the JPM L/C Facility or the JPM L/C Facility Agreement) and any and all of their respective current or former members, officers, directors, members of boards of managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, shall not have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the negotiation of the terms of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, gross negligence or intentional fraud as determined by a final order of a court of competent jurisdiction, and in all respects

Dated: New York, New York
~~October 23,~~ November 25, 2009

_____

By:
Its:

Debtor and Debtor in Possession


/s/_____
By:
Its:

Debtor and Debtor in Possession

Gregg M. Galardi, Esq.
J. Gregory St. Clair, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

— and —

Chris L. Dickerson, Esq.
Jessica Kumar, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel for the Debtors and Debtors in Possession

**EXHIBIT B**

**TO**

**MODIFIED SECOND AMENDED PREPACKAGED REORGANIZATION PLAN
OF CIT GROUP INC. AND CIT GROUP FUNDING COMPANY OF DELAWARE LLC**

**DESCRIPTION OF NEW COMMON INTERESTS**

The principal terms of the New Common Interests to be issued by the Reorganized Debtors under the Plan shall be as follows:

| | |
|---|---|
| **Authorization:** | ~~800~~[_____] million shares[1] |
| **Initial Issuance:** | ~~400~~[_____] million shares[2] |
| **Par Value:** | $.01 per share |
| **Voting Rights:** | One vote per share |
| **Dividends:** | Payable at the discretion of the board of directors of Reorganized CIT |
| **Conversion Rights:** | None |
| **Splits and Adjustments:** | Generally, arithmetic splits, combinations, etc., are proportionately treated |
| **Restrictions on Transfer:** | None (other than restrictions imposed by applicable state and federal securities laws) |
| **Registration Rights:** | None |

---

[1]     Number is subject to final review and determination, total number of authorized shares will be announced at or prior to the Confirmation Hearing.

[2]     Number is subject to final review and determination, total number of issued shares will be announced at or prior to the Confirmation Hearing.

[This Page Intentionally Left Blank]

**SCHEDULE 2**

**TO**

**MODIFIED SECOND AMENDED PREPACKAGED REORGANIZATION PLAN OF CIT GROUP INC. AND CIT GROUP FUNDING COMPANY OF DELAWARE LLC**

**LIST OF LONG-DATED SENIOR UNSECURED NOTES**

| Title of Long-Dated Senior Unsecured Notes | Outstanding Principal Amount | CUSIP/ISIN |
|---|---|---|
| 6.25% Notes due August 15, 2021 | USD 43,204,000 | 12557WNP2 |
| 6.35% Notes due August 15, 2021 | USD 19,139,000 | 12557WNK3 |
| 6.15% Notes due September 15, 2021 | USD 27,174,000 | 12557WNX5 |
| 6.25% Notes due September 15, 2021 | USD 38,817,000 | 12557WNT4 |
| 6.10% Notes due November 15, 2021 | USD 63,647,000 | 12557WPF2 |
| 6.25% Notes due November 15, 2021 | USD 35,172,000 | 12557WPB1 |
| 5.85% Notes due December 15, 2021 | USD 14,529,000 | 12557WPP0 |
| 5.875% Notes due December 15, 2021 | USD 18,181,000 | 12557WPT2 |
| 5.90% Notes due December 15, 2021 | USD 18,463,000 | 12557WPX3 |
| 6.00% Notes due December 15, 2021 | USD 58,477,000 | 12557WPK1 |
| 5.95% Notes due February 15, 2022 | USD 12,325,000 | 12557WQP9 |
| 6.00% Notes due February 15, 2022 | USD 47,741,000 | 12557WQB0 |
| 6.00% Notes due February 15, 2022 | USD 36,570,000 | 12557WQK0 |
| 6.05% Notes due February 15, 2022 | USD 24,258,000 | 12557WQF1 |
| 5.85% Notes due March 15, 2022 | USD 12,016,000 | 12557WQX2 |
| 5.85% Notes due March 15, 2022 | USD 15,025,000 | 12557WRB9 |
| 5.85% Notes due March 15, 2022 | USD 19,227,000 | 12557WRF0 |
| 5.90% Notes due March 15, 2022 | USD 8,296,000 | 12557WQT1 |
| 5.95% Notes due March 15, 2022 | USD 27,181,000 | 12557WRK9 |
| 6.00% Notes due May 15, 2022 | USD 13,726,000 | 12557WRM5 |
| 6.00% Notes due May 15, 2022 | USD 18,355,000 | 12557WRP8 |
| 6.00% Notes due May 15, 2022 | USD 11,441,000 | 12557WRR4 |
| 6.15% Notes due June 15, 2022 | USD 30,302,000 | 12557WRT0 |
| 6.20% Notes due June 15, 2022 | USD 6,819,000 | 12557WRW3 |
| 6.25% Notes due June 15, 2022 | USD 4,611,000 | 12557WRZ6 |
| 6.50% Notes due June 15, 2022 | USD 15,028,000 | 12557WSC6 |
| 6.50% Notes due August 15, 2022 | USD 1,457,000 | 12557WA43 |
| 6.50% Notes due August 15, 2022 | USD 397,000 | 12557WA84 |
| 6.70% Notes due November 15, 2022 | USD 1,930,000 | 12557WC66 |
| 6.75% Notes due November 15, 2022 | USD 2,609,000 | 12557WSD4 |
| 6.75% Notes due December 15, 2022 | USD 676,000 | 12557WSH5 |
| 6.00% Notes due April 1, 2036 | USD 309,021,000 | 125581AY4 |
| 2.83% Notes due April 2, 2036[1] | JPY 20,000,00020,000,000,000 | XS0249719534 |

_____

(1)  These securities are not listed with the Depository Trust Company ("*DTC*").