UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

In re:                           :     Chapter 11
                                        :

CIT GROUP INC. and        :     Case No. 09-16565
CIT GROUP FUNDING COMPANY  :
OF DELAWARE LLC,         :     (Jointly Administered)
                                        :

             Debtors.[1]   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING (A) THE DEBTORS' DISCLOSURE STATEMENT PURSUANT TO SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, (B) SOLICITATION OF VOTES AND VOTING PROCEDURES, AND (C) FORMS OF BALLOTS, AND (II) CONFIRMING THE MODIFIED SECOND AMENDED PREPACKAGED REORGANIZATION PLAN OF CIT GROUP INC. AND CIT GROUP FUNDING COMPANY OF DELAWARE LLC**

---

[1]    CIT Group Inc. is located at 505 Fifth Avenue, New York, NY 10017. Its tax identification number is 65-xxx1192. In addition to CIT Group Inc., CIT Group Funding Company of Delaware LLC, Case No. 09-16566, is a debtor in these related cases. CIT Group Funding Company of Delaware LLC is located at 1 CIT Drive, Livingston, NJ 07039. Its tax identification number is 98-xxx9146.

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ..................................................................1
II.   BACKGROUND AND OVERVIEW OF THE PLAN ......................................4
      A.    The Debtors' Restructuring..............................................................4
            1.    Overview of the Plan ...........................................................10
            2.    The Confirmation Hearing .....................................................11
III.  THE DISCLOSURE STATEMENT SHOULD BE APPROVED...................12
IV.   THE DEBTORS' SOLICITATION AND VOTING PROCEDURES SHOULD
      BE APPROVED .................................................................................14
      A.    The Debtors Have Complied with the Applicable Notice Requirements..............14
      B.    The Debtors' Form of Ballots Should be Approved...............................16
      C.    The Voting Classes Were Provided a Reasonable Time to Accept or
            Reject the Plan ..................................................................17
V.    THE PLAN SHOULD BE CONFIRMED ...................................................18
      A.    The Plan Complies With The Applicable Provisions Of Title 11 (Section
            1129(a)(l))......................................................................18
            1.    Classification of Claims and Interests........................................19
            2.    Mandatory Contents of the Plan ..............................................23
            3.    Discretionary Contents of the Plan ..........................................29
            4.    Executory Contracts and Unexpired Leases .................................41
      B.    The Plan Complies With The Applicable Provisions Of Title 11 (Section
            1129(a)(2)).....................................................................41
      C.    The Plan Was Proposed In Good Faith (Section 1129(a)(3))...................42
      D.    All Payments To Be Made By The Debtors In Connection With These
            Cases Are Subject To The Approval Of The Court (Section 1129(a)(4)) ............44
      E.    The Plan Discloses All Required Information Regarding Postconfirmation
            Directors, Management And Insiders (Section 1129(a)(5)) .....................45
      F.    The Plan Does Not Provide For Any Rate Change Subject To Regulatory
            Approval (Section 1129(a)(6))................................................46
      G.    The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7))..............47
      H.    The Plan Has Been Accepted By The Requisite Classes Of Creditors and
            Interest Holders (Section 1129(a)(8)) .......................................50
      I.    The Plan Provides For The Payment Of Priority Claims (Section
            1129(a)(9)).....................................................................52
      J.    The Plan Has Been Accepted By At Least One Impaired, Non-Insider
            Class (Section 1129(a)(10))..................................................54
      K.    The Plan Is Feasible (Section 1129(a)(11)) ..................................54
      L.    The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12))
            ...............................................................................57
      M.    Continuation of Retiree Benefits (Section 1129(a)(13))........................57
      N.    The Plan Satisfies The "Cramdown" Requirements.............................58
            1.    The Plan Does Not Discriminate Unfairly with Respect to the
                  Deemed Rejecting Classes ...............................................59

    2.    The Plan Is "Fair and Equitable" with Respect to the Deemed
          Rejecting Classes ........................................................................................60
VI.   CONCLUSION ....................................................................................................62

# TABLE OF AUTHORITIES

**Cases**

Page

In re 203 N. LaSalle St. Ltd. Partnership, 190 B.R. 567 (Bankr. N.D. Ill. 1995),
  aff'd, 195 B.R. 692 (N.D. Ill. 1996), aff'd, 126 F.3d 955 (7th Cir. 1997),
  rev'd on other grounds, 526 U.S. 434 (1999) ...................................................59

In re 203 N. LaSalle St. Partnership, 126 F.3d 955 (7th Cir. 1997), rev'd on other
  grounds, 526 U.S. 434 (1999) ...........................................................................18

In re Adamson Co., 42 B.R. 169 (Bankr. E.D. Va. 1984) ............................................56

In re Adelphia Communications Corp., 368 B.R. 140 (Bankr. S.D.N.Y. 2007)
  appeal dismissed, 371 B.R. 660 (S.D.N.Y. 2007), aff'd, 544 F.3d 420 (2d
  Cir. 2008) ....................................................................................................4, 5, 7

Aetna Casualty & Surety Co. v. Clerk, United States Bankruptcy Court (In re
  Chateaugay Corp.), 89 F.3d 942 (2d Cir. 1996) ..............................................19

Air Lines Pilots Association, International v. American National Bank & Trust Co.
  of Chicago (In re Ionosphere Clubs, Inc.), 156 B.R. 414 (S.D.N.Y. 1993),
  aff'd, 17 F.3d 600 (2d Cir. 1994) .....................................................................30

In re Ambanc La Mesa Ltd. Partnership, 115 F.3d 650 (9th Cir. 1997)........................58

In re Bally Total Fitness of Greater New York, Inc., No. 07-12395 (BRL),
  2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)..............................16, 23, 30, 35, 39

Bank of America National Trust & Sav. Association v. 203 N. LaSalle St.
  Partnership, 526 U.S. 434 (1999)......................................................................61

In re Bloomingdale Partners, 170 B.R. 984 (Bankr. N.D. Ill. 1994) ............................20

Boston Post Road Ltd. Partnership v. Federal Deposit Insurance Corp. (In re
  Boston Post Road), 21 F.3d 477 (2d Cir. 1994)................................................20

In re Bryson Properties, XVIII, 961 F.2d 496 (4th Cir. 1992) .....................................58

In re Cajun Electric Power Cooperative, Inc., 150 F.3d 503 (5th Cir. 1998) ................58

In re Calpine Corp.,No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y.
  Dec. 19, 2007), appeal denied as moot, 390 B.R. 508 (S.D.N.Y. 2008),
  aff'd, No. 08-3658-bk, 2009 WL 4066937 (2d Cir. Nov. 25, 2009)...............19, 23, 35, 58

In re Cellular Information System, Inc., 171 B.R. 926 (Bankr. S.D.N.Y. 1994)...........55

In re Clarkson, 767 F.2d 417 (8th. Cir. 1985)..................................................................56

Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V. Inc.), 709 F.2d 762
    (1st Cir. 1983) ..................................................................................................42

In re Copy Crafters Quickprint Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988) .................12

In re Coram Healthcare Corp., 315 B.R. 321 (Bankr. D. Del. 2004) ...........................23

In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr. S.D.N.Y. 1990) .............47

In re DJK Residential LLC, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) ................39

In re Dana Corp., No. 06-10354 (BRL), 2007 WL 4589331 (Bankr. S.D.N.Y. Dec.
    26, 2007) ...........................................................................................................19

In re Deluca, No. 95-11924, 1996 Bankr. LEXIS 1950 (Bankr. E.D. Va. Apr. 12,
    1996) .................................................................................................................56

Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re
    Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) ......................33

In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723
    (Bankr. S.D.N.Y. 1992) ....................................................................................20

In re Eagle-Picher Industries, Inc., 203 B.R. 256 (Bankr. E.D. Pa. 1999) ...................44

In re Enron Corp., No. 02 Civ. 8489(AKH), 2003 WL 230838 (S.D.N.Y. Jan. 31,
    2003) .................................................................................................................30

In re Freymiller Trucking, Inc., 190 B.R. 913 (Bankr. W.D. Okla. 1996) ...................59

In re Gilbertson Restaurants LLC, Nos. 04-00384 to 00387, 2005 WL 783063
    (Bankr. N.D. Iowa Apr. 4, 2005) .....................................................................43

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007)..............................42

Grogan v. Garner, 498 U.S. 279 (1991)........................................................................18

In re Jartran, Inc., 44 B.R. 331 (Bankr. N.D. Ill. 1984).................................................47

John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,
    987 F.2d 154 (3d Cir. 1993)..............................................................................59

In re Johns-Manville Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1986), aff'd, 78 B.R.
    407 (S.D.N.Y. 1987), aff'd sub nom. Kane v. Johns-Manville Corp., 843
    F.2d 636 (2d Cir. 1988)....................................................................19, 42, 55, 59

JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Commc'ns), Bankr. No. 09-11435 (JMP) Adv. No. 09-01132 (JMP), 2009 WL 384197 (Bankr. S.D.N.Y. Nov. 17, 2009) ............................................23

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ........................................................18

In re Kent Terminal Corp., 166 B.R. 555 (Bankr. S.D.N.Y. 1994) .................................................18

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137 (2d Cir. 1984) ....................................................42

In re Leslie Fay Cos., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................42, 47

Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491 (D.N.J. 2005) ...............................44

Manati Sugar Co. v. Mock, 75 F.2d 284 (2d Cir. 1935) ..............................................................42

NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) .....................................................................43

In re One Times Square Associates Ltd. Partnership, 159 B.R. 695 (Bankr. S.D.N.Y. 1993), aff'd 165 B.R. 773 (S.D.N.Y.), aff'd mem., 41 F.3d 1502 (2d. Cir. 1994) ..................................................................................................................54

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000) ...............................................................35

In re Prudential Energy Co., 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ..........................................42, 55

In re Sherwood Square, 107 B.R. 872 (Bankr. D. Md. 1989) .......................................................45

In re Snyder, 144 B.R. 393 (C.D. Ill. 1990) ................................................................................59

In re Sound Radio, Inc., 93 B.R. 849 (8th Cir. 1985), aff'd in part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990) ............................................................56

In re Spiegel, Inc., No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005) .........................................................................................................25, 30, 34

In re Stolrow's, Inc., 84 B.R. 167 (B.A.P. 9th Cir. 1988) ............................................................43

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ......................................................45, 55, 56

Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142 (5th Cir. 1988) .....................................................................................12

In re Toy & Sports Warehouse, Inc., 37 B.R. 141 (Bankr. S.D.N.Y. 1984) .....................19, 50, 56

In re Trans World Airlines, Inc., 185 B.R. 302 (Bankr. E.D. Mo. 1995) ....................................46

Upstream Energy Services v. Enron Corp. (In re Enron Corp.), 326 B.R. 497 (S.D.N.Y. 2005) .................................................................................................35

<u>In re Victory Construction Co.</u>, 42 B.R. 145 (Bankr. C.D. Cal. 1984)..........................................47

<u>In re W.E. Parks Lumber Co.</u>, 19 B.R. 285 (Bankr. W.D. La. 1982) ............................................45

<u>In re Wabash Valley Power Ass'n, Inc.</u>, 72 F.3d 1305 (7th Cir. 1996)....................................19, 20

<u>In re Waern Building Corp.</u>, 145 F.2d 584 (7th Cir. 1944) ............................................................55

<u>In re Walker</u>, 165 B.R. 994 (Bankr. E.D. Va. 1994)......................................................................56

<u>In re Woodbrook Associates</u>, 19 F.3d 312 (7th Cir. 1994)............................................................19

<u>In re WorldCom, Inc.</u>, No. 02-13533(AJG), 2003 WL 23861928
    (Bankr. S.D.N.Y. Oct. 31, 2003) ...............................................20, 35, 41, 44, 59

<u>In re Zenith Electronics Corp.</u>, 241 B.R. 92 (Bankr. D. Del. 1999) .............................................59

## <u>Statutes</u>

11 U.S.C. § 1122.............................................................................................................................19

11 U.S.C. § 1123(a)(5).....................................................................................................................25

11 U.S.C. § 1123(a)(7).....................................................................................................................27

11 U.S.C. § 1123(b)(1)-(6) ..............................................................................................................25

11 U.S.C. § 1125(a)(1).....................................................................................................................12

11 U.S.C. § 1126(b)(1).....................................................................................................................12

11 U.S.C. § 1126(b)(2) .....................................................................................................................12

11 U.S.C. § 1126(c)..........................................................................................................................52

11 U.S.C. § 1126(f)..........................................................................................................................51

11 U.S.C. § 1126(g)..........................................................................................................................52

11 U.S.C. § 1129(a)(1).....................................................................................................................18

11 U.S.C. § 1129(a)(2).....................................................................................................................14

11 U.S.C. § 1129(a)(3).....................................................................................................................43

11 U.S.C. § 1129(a)(4).....................................................................................................................45

11 U.S.C. § 1129(a)(5).....................................................................................................................46

11 U.S.C. § 1129(a)(6)................................................................................................47

11 U.S.C. § 1129(a)(7)................................................................................................48

11 U.S.C. § 1129(a)(9)...........................................................................................53, 54

11 U.S.C. § 1129(a)(10)..............................................................................................55

11 U.S.C. § 1129(a)(11)..............................................................................................55

11 U.S.C. § 1129(a)(12)..............................................................................................58

11 U.S.C. § 1129(b)(1) ...............................................................................................59

11 U.S.C. § 1129(b)(2) ..........................................................................................61, 62

**Legislative Authorities**

H.R. Rep. No. 95-595 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963 .....................19

S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787 .........................19

**Other**

7 <u>Collier on Bankruptcy</u> ¶ 1129.03 [11] (Lawrence P. King <u>et al.</u>, 15th ed. rev.
   1999) ......................................................................................................................55

CIT Group Inc. and CIT Group Funding Company of Delaware LLC ("Delaware Funding"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or the "Reorganized Debtors"), and proponents of the Plan (defined below) that was filed with the Bankruptcy Court for the Southern District of New York (the "Court"), submit this Memorandum of Law in Support of Entry of an Order (I) Approving (A) the Debtors' Disclosure Statement Pursuant to Sections 1125 and 1126(b) of the Bankruptcy Code, (B) Solicitation of Votes and Voting Procedures, and (C) Forms of Ballots, and (II) Confirming the Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (as it may be amended or modified, the "Plan"),[2] pursuant to section 1129 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"). In support of confirmation, the Debtors respectfully represent as follows: [3]

## I.    PRELIMINARY STATEMENT

The Debtors come before this Court a little over thirty (30) days after filing petitions in these Chapter 11 Cases and propose a consensual Plan that will allow the Debtors to emerge from chapter 11 quickly and with significantly less debt and a new capital structure. The Plan represents the culmination of much effort by, among others, the Debtors, the Steering Committee (as defined below), and various other parties in interest to reach a fair and equitable resolution of the complex business and legal issues. These efforts have resulted in a Plan that maximizes value for the Debtors' economic stakeholders and provides a vehicle for the Debtors' successful emergence from chapter 11.

---

2    Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

3    This Memorandum of Law and confirmation of the Plan are further supported by the Declaration of Robert J. Duffy In Support of Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC  (the "Declaration"), which is being filed in these Chapter 11 Cases in advance of the Confirmation Hearing.

As discussed more fully below, the pre-petition solicitation conducted by the Debtors and their agents satisfies all applicable nonbankruptcy law requirements governing the solicitation of a chapter 11 plan prior to the commencement of a Chapter 11 case, as well as all applicable requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), the local bankruptcy rules of this Court and General Orders 201 and 203 of the Court (the "Prepack Guidelines").

The proposed Plan has received overwhelming support from all of the Debtors' major constituencies, including acceptance of the Plan from senior unsecured noteholders, senior unsecured debt facility claim holders and senior and junior subordinated noteholders. In fact, all Classes entitled to vote have accepted the Plan in accordance with section 1126 of the Bankruptcy Code.

Additionally, despite the distribution of over 277,000 notices to parties in interest regarding the confirmation hearing (the "Confirmation Hearing") on the Plan, the Debtors received only fifteen (15) filed or informal objections to the Plan, which primarily relate to (i) holders of common stock in CIT Group Inc. requesting equity positions in the Reorganized CIT and/or cash payments, (ii) noteholders requesting reinstatement and/or payment in full of their notes and (iii) other non-substantive objections. Not a single party raises a substantive objection that presents an impediment to Plan confirmation.

In reply, and as more fully set forth below, the Debtors submit that the Plan fully complies with all requirements of the Bankruptcy Code. In particular, the provisions of the Plan, including the provisions governing treatment of common and preferred stock, are fair and equitable under Bankruptcy Code section 1129(b) because the Plan provides that stakeholders are paid in order of their priority in compliance with the absolute priority rule.

Consequently, because more senior stakeholders are not paid in full under the terms of the Plan, the objecting parties are not entitled to payment on account of their common or preferred stock. In addition, the objecting noteholders' positions are not dissimilar to thousands of other similarly situated noteholders, the vast majority of whom voted to accept the Plan. Thus, the individual noteholders' objections to the treatment of their respective notes do not warrant setting aside the votes of thousands of other noteholders in favor of the Plan. For these reasons, and as further set forth in this Memorandum, the Debtors submit that each of the objections fails to raise a basis for denying confirmation of the Plan and should be overruled on the merits.

Additionally, one objector, Mr. Jeffrey Weinberg, has objected to the Plan pursuant to a letter filed by the Court at Docket No. 96 to the extent that the Plan provides that holders of notes with a face value of $1,000 or less will have the amount of their notes rounded down to $0 and will not receive any new notes under the Plan. As the Debtors have advised such objector both telephonically and by way of letter, a bondholder who is entitled to receive $1,000 or less in New Notes after such a calculation will not be rounded down to the nearest multiple of $1,000 or zero. Under the Plan, New Notes will be issued in minimum denominations of $1 and multiples of $1. New Common Interests will be issued in whole shares beginning with a single share. The Plan does provide that the Debtors will not issue fractions of dollars of New Notes or fractions of shares of New Common Interests. To the extent that a bondholder might be entitled to a fraction of a dollar of New Notes or fraction of a share of New Common Interests, the Plan contains a mechanism of distributing Plan consideration to such holders to the extent New Notes or shares of New Common Interests remain available for distribution. The Debtors communicated with Mr. Weinberg via letter and telephone, and based upon the explanation set

forth above, Mr. Weinberg advised Debtors' counsel via electronic mail that his Plan objection is withdrawn.

Moreover, as plainly evidenced by the spirit of cooperation that permeated the Plan formulation process, the highly favorable results of the Plan voting, the widespread support of the Plan by the Steering Committee, noteholders and various other parties in interest, and the paucity of objections filed in large, complex Chapter 11 Cases such as these, the Plan is in the best interests of the Debtors' estates, creditors and other stakeholders. Notwithstanding that there are only a few objections to the Plan, which the Debtors believe will be resolved prior to the Confirmation Hearing or are without merit, the Debtors recognize their obligation under the Bankruptcy Code to demonstrate by a preponderance of the evidence that the Plan satisfies all requirements of section 1129 of the Bankruptcy Code.

Accordingly, the Debtors submit this Memorandum to establish the adequacy of the Debtors' Amended Offering Memorandum, Disclosure Statement and Solicitation of Acceptance of a Prepackaged Plan of Reorganization, dated October 16, 2009 and as supplemented on October 23, 2009 (including any supplements and annexes thereto, the "Disclosure Statement") and to demonstrate how the Plan satisfies all applicable requirements of the Bankruptcy Code.

## II. BACKGROUND AND OVERVIEW OF THE PLAN

### A. The Debtors' Restructuring

1. On July 20, 2009, the Debtors and their non-Debtor subsidiaries and affiliates (collectively, the "Company") entered into a syndicated senior secured term loan facility, as amended and restated on July 29, 2009, for up to $3 billion with Barclays Bank PLC, as administrative agent and collateral agent. As of August 4, 2009, the Company had drawn the entire $3 billion in financing under such facility. On October 28, 2009, the Company entered

into a further amendment and restatement of the facility, which permits additional commitments for multiple-draw senior secured term loans in an aggregate principal amount equal to up to $4.5 billion (the "Senior Credit Facility"). Bank of America, N.A. is the administrative and collateral agent under the Senior Credit Facility. As of October 30, 2009, the Company had drawn the entire additional $4.5 billion under the Senior Credit Facility. The total aggregate principal amount drawn by the Company under the Senior Credit Facility is $7.5 billion.

2.      At the time the Company and certain of its subsidiaries first entered into the Senior Credit Facility on July 20, 2009, the Company was undergoing a liquidity crisis precipitated by the July 15, 2009 announcement that there was no appreciable likelihood of additional government support in the near term. The Company was experiencing higher than normal draws on financing commitments taxing its limited available cash and faced a significant unsecured debt maturity on August 17, 2009. After failing to secure financing from certain traditional lenders, the Company entered into the Senior Credit Facility.

3.      Additionally, as part of the Senior Credit Facility, the Company was required to adopt a restructuring plan acceptable to a majority in number of a committee comprised of certain lenders under the Senior Credit Facility (the "Steering Committee") by October 1, 2009 (the "Approved Restructuring Plan"). Thus, over the two months following entry into the Senior Credit Facility, the Company and the Steering Committee entered into significant and protracted negotiations regarding the terms of the Approved Restructuring Plan. On October 1, 2009, the Steering Committee and the Company agreed to the terms of the Approved Restructuring Plan, and as a result the Company commenced solicitation of certain exchange offers and acceptances of the pre-packaged plan of reorganization described in the Offering Memorandum of that same date. As set forth in that Offering Memorandum, the Company's consummation of the exchange

offers were conditioned upon achieving certain liquidity and leverage conditions. Specifically, consummation of the exchange offers required, among other things, the reduction of the Company's debt by at least $5.7 billion in aggregate, with specific debt reduction targets for the periods from 2009 to 2012.

4.     Simultaneously with the commencement of the exchange offers, the Approved Restructuring Plan required the Debtors to solicit most of their bondholders and other holders of bank debt with respect to a pre-packaged bankruptcy plan (i.e., the Plan). The solicitation of the Plan was intended to provide the Company with an option to proceed with a voluntary bankruptcy filing that would be resolved expeditiously with minimal disruption to its business. As of October 29, 2009, the conditions to the exchange offers were not satisfied and not likely to be satisfied; however, sufficient acceptances to the Plan had been obtained and, thus, on November 1, 2009, the Company determined to commencement the Chapter 11 Cases and seek to confirm and ultimately implement the terms of the Plan.

5.     Under the Plan, certain of the Company's noteholders will receive New Notes, while other noteholders will receive shares of newly issued New Common Interests and either New Notes or Contingent Value Rights. The Company established October 29, 2009 at 11:59 p.m. (Prevailing Eastern Time) as the deadline for receipt of votes to accept or reject the Plan (the "Initial Solicitation"). On October 16, 2009, the Debtors amended the Plan to, among other things, include certain Long-Dated Senior Unsecured Notes that had not been previously solicited as part of the Plan. In accordance with the continued postpetition solicitation permitted by Bankruptcy Code section 1125(g), the Debtors established November 13, 2009 at 11:59 p.m. (Prevailing Eastern Time) as the deadline for the holders of such notes to vote to accept or reject the Plan (the "Long-Dated Senior Unsecured Notes Solicitation"). The Debtors further amended

the Plan on October 23, 2009 to, among other things, modify the treatment of the Canadian Senior Unsecured Note Claims. In connection with such modification and in accordance with the continued postpetition solicitation permitted by Bankruptcy Code section 1125(g), the Debtors extended the deadline for the holders of Canadian Senior Unsecured Note Claims to vote to accept or reject the Plan until November 5, 2009 at 11:59 p.m. (Prevailing Eastern Time) (the "Canadian Senior Unsecured Notes Solicitation"). While the conditions of the exchange offers were not satisfied, all impaired classes entitled to vote on the Plan have accepted the Plan by more than two-thirds in amount and one-half in number.

6.　　On November 1, 2009 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York. No trustee or examiner has been appointed in the Chapter 11 Cases. On the Petition Date, the Debtors filed the Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC, dated October 23, 2009, and the Disclosure Statement. A meeting of creditors pursuant to Bankruptcy Code section 341 was held on December 2, 2009 at the offices of the United States Trustee for the Southern District of New York (the "U.S. Trustee"). The U.S. Trustee solicited interest from creditors for appointment to an official committee of unsecured creditors, however insufficient responses were obtained and no such committee was appointed by the U.S. Trustee.

7.　　In accordance with the Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Establishing Procedures for Objecting to Disclosure Statement and Plan, (C) Approving Form and Manner of Notice of Combined Hearing, and (D) Waiving Requirement for Meetings of Creditors or Equity Security Holders (Docket No. 45) (the "Scheduling Order"), on or before November 6, 2009, the Debtors caused

the Revised Summary of Plan and Notice of (I) Meeting Of Creditors; (II) Commencement of Chapter 11 Cases and (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and Revised Proposed Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Establishing Procedures for Objecting to Disclosure Statement and Plan, (C) Approving Form and Manner of Notice of Combined Hearing, and (D) Waiving Requirement for Meetings of Creditors or Equity Security Holders (Docket No. 33) (the "Combined Notice") to be mailed to all of the Debtors' creditors and interest holders.[4]  See Affidavit of Service re: Summary of Plan and Notice of (I) Meeting of Creditors; (II) Commencement of Chapter 11 Cases, (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and (IV) Procedures for Recommending Individuals to Serve as Directors of Reorganized CIT Group, Inc. (Docket No. 80). Additionally, the Debtors published the Combined Notice in The Wall Street Journal (Global Edition) on November 6, 2009.  See Affidavit of Publication of Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization in the Wall Street Journal (Global Edition) (Docket No. 91).  Publication of the Combined Notice was in substantial compliance with the Scheduling Order and Bankruptcy Rule 2002(l).

---

[4] Supplemental service of the Combined Notice was made on November 17, 2009;  November 18, 2009; November 19, 2009; and November 24, 2009.  See Affidavit of Service (Supplemental) of James Sean McGuire re: Summary of Plan and Notice of (I) Meeting of Creditors; (II) Commencement of Chapter 11 Cases, (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and (IV) Procedures for Recommending Individuals to Serve as Directors of Reorganized CIT Group Inc. (Docket No. 107); Affidavit of Service re: Summary of Plan and Notice of (I) Meeting of Creditors; (II) Commencement of Chapter 11 Cases, (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and (IV) Procedures for Recommending Individuals to Serve as Directors of Reorganized CIT Group Inc. (Docket No. 123); Affidavit of Service (Supplemental) of James Sean McGuire re: Summary of Plan and Notice of (I) Meeting of Creditors; (II) Commencement of Chapter 11 Cases, (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and (IV) Procedures for Recommending Individuals to Serve as Directors of Reorganized CIT Group Inc. (Docket No. 125); Affidavit of Service re: Summary of Plan and Notice of (I) Meeting of Creditors; (II) Commencement of Chapter 11 Cases, (III) Combined Hearing on Disclosure Statement and Confirmation of Plan of Reorganization and (IV) Procedures for Recommending Individuals to Serve as Directors of Reorganized CIT Group Inc. (Docket No. 147).

8.      On November 25, 2009, the Debtors filed and caused to be served (i) the Notice of Filing of Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company Of Delaware LLC (Docket No. 143), (ii) Notice of Filing of Proposed Confirmation Order (Docket No. 144), and (iii) Notice of Filing of Plan Supplement (Docket No. 145).  See Affidavit of Service (Docket No. 146).  Supplemental service of such documents was made on December 1, 2009.  See Affidavit of Service (Docket No. 167).  On December 1, 2009, the Debtors filed and caused to be served the Notice of Filing of Page to Modified Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (Docket No. 152).  See Affidavit of Service (Docket No. 165).  Substantially contemporaneously herewith, the Debtors filed with the Court additional non-material Plan modifications and a revised proposed order confirming the Plan.

9.      If consummated, the effect of the Plan will be to significantly deleverage the Company's balance sheets by significantly reducing CIT Group Inc.'s and Delaware Funding's obligations under its bond and bank debt through the conversion of such debt into longer-term maturing debt and equity.  The Company's resulting debt structure will address liquidity constraints by extending maturity dates of certain of the Company's debt and eliminating approximately $10 billion in unsecured debt.  The Debtors believe that, through the Plan, holders of claims will obtain a substantially greater recovery from the estates than the recovery they would receive if the Debtors liquidated through Chapter 7.  The Debtors further believe that the Plan, if consummated, will substantially enhance the Company's capital structure and liquidity position, afford the Company the opportunity and ability to continue their businesses as viable going concerns and to execute its broad business restructuring strategy, and preserve ongoing employment for the Company's employees.

## 1. Overview of the Plan

10. The Plan provides for the restructuring of the Debtors' liabilities in a manner designed to maximize recoveries to holders of Claims against and Interests in the Debtors. In summary, the Plan provides for the Exchanges, pursuant to which (i) holders of Canadian Senior Unsecured Note Claims will receive their pro rata share of Series B Notes, equal to a distribution in the amount of 100% of such holder's Allowed Canadian Senior Unsecured Note Claim, (ii) Electing Long-Dated Senior Unsecured Note Claims and holders of Senior Unsecured Note Claims will receive their pro rata share of (a) Series A Notes and (b) New Common Interests, (iii) holders of Senior Unsecured Term Loans Claims and Senior Unsecured Credit Agreement Claims shall receive their pro rata share of (a) (1) indebtedness under credit facilities of Reorganized CIT on substantially the same terms as the Series A Notes in lieu of a distribution of Series A Notes or (2) Series A Notes, at each such holder's election, and (b) New Common Interests, and (iv) holders of Senior Subordinated Note Claims and Junior Subordinated Note Claims shall receive specified percentages of New Common Interests and Contingent Value Rights, in full satisfaction and settlement of such Claims and Interests. Moreover, the Plan provides for the issuance of Contingent Value Rights to holders of Old Preferred Interests. The Plan also provides for the Cash Collateralization of the JPM L/C Facility.

11. Moreover, under the Plan, Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Other Unsecured Debt Claims and Guarantee Claims), Class 4 (Intercompany Claims), Class 5 (General Unsecured Claims), and Interests in Class 17 (Old Delaware Funding Interests) are Unimpaired and holders of such Claims and Interests are deemed to accept the Plan. Claims in Class 14 (Subordinated 510(b) Claims) and Interests in Class 15 (Old Preferred Interests), Class 16 (Old Common Interests) and Class 18 (Other Equity Interests (if any)) are Impaired under the Plan and are deemed to reject the Plan.

12.	As discussed above, prior to the Petition Date, the Debtors solicited approval of the Plan, as authorized by section 1126(b) of the Bankruptcy Code.  Moreover, the solicitation of Class 8 commenced prepetition on October 16, 2009, in accordance with applicable nonbankruptcy law, and continued postpetition through November 13, 2009.  The Debtors contend that such continued solicitation beyond the Petition Date is in compliance with the provisions of Bankruptcy Code section 1125(g).  Additionally, the solicitation of Class 7 originally commenced on or about October 3, 2009 and, based upon a change to the treatment for holders of Class 7 Canadian Senior Unsecured Note Claims, the deadline for holders of Class 7 to vote on the Plan was extended to November 5, 2009.  Accordingly, the Debtors contend that such continued solicitation beyond the Petition Date is likewise in compliance with the provisions of Bankruptcy Code section 1125(g).

### 2.	The Confirmation Hearing

13.	On the Petition Date, the Debtors filed with this Court the Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (the "Second Amended Plan"), and the Disclosure Statement.  By the Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Establishing Procedures for Objecting to Disclosure Statement and Plan; (C) Approving Form and Manner of Notice of Combined Hearing, and (D) Waiving Requirement for Meetings of Creditors or Equity Security Holders (the "Scheduling Order") (Docket No. 15), the Court scheduled the hearing for approval of the Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing") for December 8, 2009 at 11:00 a.m. (prevailing Eastern time).  The Court established December 1, 2009 at 4:00 p.m. (prevailing Eastern time) as the date and time by which objections were to be filed and received (the "Objection Deadline").  On November 25, 2009 (Docket No. 143), December 1, 2009 (Docket No. 152) and December 7, 2009 (Docket No.

177) the Debtors filed the Plan reflecting certain non-material modifications to the Second Amended Plan.

### III.    THE DISCLOSURE STATEMENT SHOULD BE APPROVED

14.    Under section 1126(b) of the Bankruptcy Code, pre-petition disclosure statements are subject to requirements distinct from postpetition disclosure statements.  First, the solicitation must be "in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation."  11 U.S.C. § 1126(b)(1).  Second, "if there is not any such law, rule, or regulation . . . acceptance or rejection [of the Plan must have been] solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of [the Bankruptcy Code]."  11 U.S.C. § 1126(b)(2).

15.    Section 1125(a) of the Bankruptcy code defines "adequate information" as

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).  The adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties."  In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988).  As such, in examining the adequacy of the information contained in a disclosure statement, the bankruptcy court enjoys broad discretion.  See Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988).

16.     The Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Disclosure Statement is extensive and comprehensive.  It contains descriptions and summaries of, among other things, (a) the Plan (Disclosure Statement pages 18-28; 164-224) ; (b) certain events preceding the commencement of these Chapter 11 Cases (Disclosure Statement pages 1-5; 10-13; 69-70; 137-143); (c) claims asserted against the Debtors' estates (Disclosure Statement pages 6; 18-28; 183-190); (d) securities to be issued under the Plan (Disclosure Statement 82-128; Exhibit B to Appendix B to the October 23, 2009 supplement to the Disclosure Statement); (e) risk factors affecting the Plan (Disclosure Statement pages 36-64; 220-224); (f) liquidation analyses setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case (Disclosure Statement Appendix B-1 Appendix B-2; October 23, 2009 supplement to the Disclosure Statement Appendix A-1 and Appendix A-2); (g) financial information and valuations that would be relevant to creditors' determinations of whether to accept or reject the Plan (Disclosure Statement pages 66-68; 69-70; 138-143; 216-220; Disclosure Statement Appendix A); and (h) federal tax law consequences of the Plan (Disclosure Statement pages 229-248).

17.     In addition, the Disclosure Statement was the subject of review and comment by the Steering Committee.  Accordingly, the Debtors submits that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

## IV. THE DEBTORS' SOLICITATION AND VOTING PROCEDURES SHOULD BE APPROVED

18.     The Bankruptcy Rules require, among other things, that a debtor distribute its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities, and that creditors and equity security holders be permitted a reasonable period of time in which to accept or reject the proposed plan.  Fed. R. Bankr. P. 3017, 3018.  The Debtors respectfully submit that they have met all such requirements and no party in interest has objected with respect to these matters.

### A.     The Debtors Have Complied with the Applicable Notice Requirements

19.     Bankruptcy Rule 3017(d) requires that, unless otherwise ordered, a debtor shall transmit to all creditors, equity security holders, and the United States Trustee:

1.     the plan, or a court approved summary of the plan;
2.     the disclosure statement approved by the court[5];
3.     notice of the time within which acceptances and rejections of such plan may be filed;
4.     and such other information as the court may direct including any opinion of the court approving the disclosure statement or a court approved summary of the opinion.

Fed. R. Bankr. P. 3017(d). This rule also requires that all creditors and equity security holders be given notice of the time fixed for filing objections to the proposed disclosure statement and the hearing on confirmation, and that a ballot be mailed to each creditor and equity security holder entitled to vote on the plan.  Id.

20.     In connection with the Plan, the Debtors prepared the Disclosure Statement describing, among other things, the proposed reorganization and its effects on holders of claims

---

[5]     As this is a prepackaged plan, the solicitation was conducted pursuant to section 1126(b) of the Bankruptcy Code, and therefore, without prior approval of the Disclosure Statement by this Court.

against and interests in the Debtors. Following the launch of the solicitation of votes on the Plan, the Debtors, through their voting agent, Epiq Financial Balloting Group, LLC ("FBG"), caused copies of the Disclosure Statement, the Plan (attached to the Disclosure Statement) and the appropriate ballot (a "Ballot") (such materials, a "Solicitation Package") to be transmitted to the holders of notes impaired under the Plan.[6] See Declaration of Service and Vote Certification of Financial Balloting Group LLC in Connection with the Second Amended Prepackaged Reorganization Plan of CIT Group Inc. and CIT Group Funding Company of Delaware LLC (Docket No. 157) (Date Filed: December 1, 2009) (the "Tabulation Declaration"). Solicitation Packages were also sent to the agents for the debt included in Class 10 Senior Unsecured Term Loan Claims and Class 11 Senior Unsecured Credit Agreement Claims. Additionally, Solicitation Packages were sent directly to the lenders holding claims in Class 6 JPM L/C Facility Claims. Solicitation Packages for Class 6, Class 10, and Class 11 contained an annex to the Disclosure Statement and a Ballot appropriate for each class.

21.     In accordance with applicable non-bankruptcy law, the Debtors established 11:59 p.m. (prevailing Eastern Time) on October 29, 2009 as the deadline for a majority of the holders of claims entitled to vote to accept or reject the Plan (the "Voting Deadline"), a date which was approximately twenty (20) business days following the mailing of the Ballots.

22.     Pursuant to Bankruptcy Code section 1125(g), and in light of the modified treatment resulting from the Debtors' amendment of the Disclosure Statement on October 16, 2009 and the supplement to the Disclosure Statement, holders of claims in Class 7 and Class 8 maintained Voting Deadlines of November 5, 2009 at 11:59 p.m. (prevailing Eastern Time) and

---

[6]     In certain instances, counsel for the Debtors transmitted the Solicitation Packages to the agents or counsel for certain bank-related debt.

November 13, 2009 at 11:59 p.m. (prevailing Eastern Time), respectively. Thus, the holders of such claims were given twenty (20) business days to vote to accept or reject the Plan in accordance with applicable non-bankruptcy law.

23.     As set forth in the Tabulation Declaration, all Impaired Classes of Claims entitled to vote on the Plan voted to accept the Plan. As noted above, the Debtors' solicitation was a success, with all Classes voting to accept the Plan. Class 14 Subordinated 510(b) Claims, Class 15 Old Preferred Interests, Class 16 Old Common Interests and Class 18 Other Equity Interests are Impaired under the Plan and are deemed to reject the Plan. With respect to such Classes, the Debtors request that the Plan be confirmed pursuant to section 1129(b) of the Bankruptcy Code. Accordingly, and as further outlined in the Debtors' solicitation procedures motion (Docket No. 13), the Debtors submit that they have fully complied with the notice requirements of Bankruptcy Rule 3017(d).

**B.     The Debtors' Form of Ballots Should be Approved**

24.     Bankruptcy Rule 3018(c) provides, in relevant part, that an "acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c).

25.     The Debtors, either through FBG or directly, caused the Solicitation Packages to be served and distributed to each of the holders (or their nominees) of claims in the voting classes, the appropriate Ballots in the forms annexed to the Tabulation Declaration. The forms for the Ballots are based on Official Form No. 14, but were modified to address the particular aspects of these Chapter 11 Cases and to include certain additional information that the Debtors believe to be relevant and appropriate for each class of Claims. The Debtors respectfully submit that the Ballots are adequate and appropriate and should be approved in all respects.

### C. The Voting Classes Were Provided a Reasonable Time to Accept or Reject the Plan

26.     Bankruptcy Rule 3018(b) provides that pre-petition acceptances or rejections of a plan are valid only if the plan was transmitted to substantially all the holders of claims or interests in each solicited class and the time for voting was not unreasonably short. Bankruptcy Rule 3018(b) also requires that the solicitation comply with section 1126(b) of the Bankruptcy Code (i.e., that it comply with applicable nonbankruptcy law or contain "adequate information").

27.     The Debtors commenced solicitation of votes for approval of the Plan on or about October 3, 2009 and October 5, 2009, respectively. The Debtors established 4:00 p.m. (prevailing Eastern time) on October 29, 2009 as the Voting Deadline, which is a period of twenty (20) business days, in accordance with applicable securities laws. At the time solicitation commenced, the Plan had been developed in large part through substantial and productive negotiations between the Debtors and the Steering Committee and various other parties in interest. As a result, the holders of the vast majority of the dollar amount of the claims against the Debtors had significant familiarity with, and the opportunity to provide input on, the Plan's material terms prior to receipt of the Solicitation Package.

28.     In addition, as discussed above, the holders of claims in Class 7 and Class 8 maintained Voting Deadlines of November 5, 2009 at 11:59 p.m. (prevailing Eastern Time) and November 13, 2009 at 11:59 p.m. (prevailing Eastern Time), respectively. The solicitation of Classes 7 and 8 complied with the provisions of Bankruptcy Code section 1125(g). Specifically, Bankruptcy Code section 1125(g) provides that "[n]otwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law." In

compliance with section 1125(g), the solicitation of Class 8 commenced on October 16, 2009, in accordance with applicable non-bankruptcy law, and continued postpetition through November 13, 2009. Moreover, although solicitation of Class 7 initially commenced on or about October 3, 2009, the treatment for such Class was later modified and the voting deadline for Class 7 extended to November 5, 2009 in accordance with Bankruptcy Code section 1125(g). Therefore, the Debtors submit that the voting period under the Solicitation Procedures followed by the Debtors should be approved.

## V.  THE PLAN SHOULD BE CONFIRMED

29.     To confirm the Plan, the Court must find that both the Plan and the Debtors are in compliance with each of the requirements of section 1129(a) of the Bankruptcy Code. See Grogan v. Garner, 498 U.S. 279, 291 (1991); In re 203 N. LaSalle St. P'ship, 126 F.3d 955, 960-61 (7th Cir. 1997), rev'd on other grounds, sub nom. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship, 526 U.S. 434 (1999); Kane v. Johns-Manville Corp., 843 F.2d 636, 648 (2d Cir. 1988); In re Bally Total Fitness of Greater N.Y., Inc., No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007); In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994). As set forth below, the Debtors, and the Plan presented by the Debtors, satisfy all of the requirements of section 1129(a) of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

### A.     The Plan Complies With The Applicable Provisions Of Title 11 (Section 1129(a)(l))

30.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern

classification of claims and interests and the contents of the plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5912;  H.R. Rep. No. 95-595, at 412 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6368;  see also In re Johns-Manville Corp., 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (noting that confirmation objections under section 1129(a)(1) usually involve failure of plan to conform to either section 1122(a) or section 1123 of Bankruptcy Code), aff'd sub nom. Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re Dana Corp., No. 06-10354 (BRL), 2007 WL 4589331, at *2 (Bankr. S.D.N.Y. Dec. 26, 2007) (analyzing compliance of chapter 11 plan under sections 1122 and 1123 for purpose of determining compliance with section 1129(a)(1); In re Calpine Corp., No. 05-60200 (BRL), 2007 WL 4565223, at *7 (Bankr. S.D.N.Y. Dec. 19, 2007) (same), appeal denied as moot, 390 B.R. 508 (S.D.N.Y. 2008), aff'd, No. 08-3658-bk, 2009 WL 4066937 (2d Cir. Nov. 25, 2009); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

### 1.    Classification of Claims and Interests

31.    Section 1122 of the Bankruptcy Code provides:

(a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)    A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

32.    Courts have repeatedly stated that "[a] debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan."  In re Wabash Valley Power Ass'n, Inc., 72 F.3d 1305, 1321 (7th Cir. 1996) (citing In re Woodbrook Assocs., 19 F.3d 312 (7th Cir. 1994)); accord Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct. (In re

Chateaugay Corp.), 89 F.3d 942, 949-50 (2d Cir. 1996); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992). In Wabash Valley Power, the court identified at least three circumstances in which separate classification is permissible: (a) where "'significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar'" (indeed, such claims are required to be separately classified); (b) where "there are 'good business reasons' to do so"; and (c) where "the claimants have sufficiently different interests in the plan." Wabash Valley Power, 72 F.3d at 1321 (alterations in original; citations omitted).

33. Indeed, "[s]eparate classification of similar claims is permissible only upon proof of a legitimate reason for separate classification." Boston Post Road Ltd. P'ship. v. Fed. Deposit Ins. Corp. (In re Boston Post Road), 21 F.3d 477, 481 (2d Cir. 1994); see also In re WorldCom, Inc., No. 02-13533(AJG), 2003 WL 23861928, at *47 (Bankr. S.D.N.Y. Oct. 31, 2003) ("A debtor need not place all substantially similar claims in the same class as long as the debtor has a reasonable basis for the separate classification."). A lack of similarity can be demonstrated by differences in "legal rights or bankruptcy priorities," as well as "business reasons relevant to the success of the reorganized debtor." In re Bloomingdale Partners, 170 B.R. 984, 997 (Bankr. N.D. Ill. 1994); see also id. ("As an example, it might be vital to a debtor to be able to treat customers' warranty claims differently than trade creditor claims, even though they are all general unsecured claims.").

34. The Plan meets these requirements. In addition to DIP Facility Claims, Administrative Claims and Priority Tax Claims, which are not required to be classified, the Plan designates eighteen (18) Classes of Claims and Interests. Article III of the Plan provides for the separate classification of Claims and Interests with respect to the Debtors based upon differences

in the legal nature or priority of such Claims and Interests.  Further, all Claims within each class are substantially similar to other Claims included in the same Class.

35.     The Classes of Claims against and Interests in the Debtors under the Plan are as follows:  Class 1 Other Priority Claims, Class 2 Other Secured Claims, Class 3 Other Unsecured Debt Claims and Guarantee Claims, Class 4 Intercompany Claims, Class 5 General Unsecured Claims, Class 6 JPM L/C Facility Claims, Class 7 Canadian Senior Unsecured Note Claims, Class 8 Long-Dated Senior Unsecured Note Claims, Class 9 Senior Unsecured Note Claims, Class 10 Senior Unsecured Term Loan Claims, Class 11 Senior Unsecured Credit Agreement Claims, Class 12 Senior Subordinated Note Claims, Class 13 Junior Subordinated Note Claims, Class 14 Subordinated 510(b) Claims, Class 15 Old Preferred Interests, Class 16 Old Common Interests, Class 17 Old Delaware Funding Interests, Class 18 Other Equity Interests.

36.     The Canadian Senior Unsecured Note Claims and Long-Dated Senior Unsecured Note Claims have been separately classified from other Senior Unsecured Note Claims.  First, the Canadian Senior Unsecured Notes were issued by Delaware Funding, while the Senior Unsecured Notes and the Long-Dated Senior Unsecured Notes were issued by CIT Group Inc., and holders of such Canadian Senior Unsecured Notes contend that such notes are structurally senior to the Senior Unsecured Notes and the Long-Dated Senior Unsecured Notes.  Second, the Long-Dated Senior Unsecured Notes maintain maturity dates in 2019 and beyond while the Senior Unsecured Notes maintain shorter-term maturities.  Accordingly, the Debtors properly classified such Notes separately.

37.     Moreover, the debt facilities classified in Class 10 Senior Unsecured Term Loan Claims and Class 11 Senior Unsecured Credit Agreement Claims are structurally and contractually distinct from the Debtors' note facilities and indeed from each other.   Accordingly,

CIT Group Inc. has properly separately classified such debt facilities into Class 10 and Class 11, however the Plan combines Class 10 and Class 11 for voting purposes.

38.     Additionally, the Senior Subordinated Notes are contractually subordinated to other unsecured debt of CIT Group Inc., and the Junior Subordinated Notes are likewise contractually subordinated to the Senior Subordinated Notes.  Accordingly, the separate classification of Class 12 Senior Subordinated Note Claims and Class 13 Junior Subordinated Note Claims is justified and proper.

39.     Finally, Subordinated 510(b) Claims consist of Claims subordinated pursuant to Bankruptcy Code section 510(b) and arising from or relating to the Old Interests.  Such Subordinated 510(b) Claims are thus distinct from all other Claims due to their statutorily subordinated nature and are additionally subordinated to the Interests from which such Claims arise, justifying the proper separate classification of Class 14 Subordinated 510(b) Claims. Moreover, Interests are junior in priority to Claims (other than Subordinated 510(b) Claims) under the Bankruptcy Code.  The Debtors additionally separately classified those Interests in CIT Group Inc. and Delaware Funding, as the Plan has been separately proposed by each Debtor, and Class 17 Old Delaware Funding Interests consists of all of the Interests in Delaware Funding and there are no Interests in Delaware Funding in any other Class.

40.     This classification scheme was not designed with an eye toward fashioning (nor, given the overwhelming and across-the-board acceptance, did it create) a single impaired accepting class.  Rather, it is the variance in the nature of the Claims in such Classes that requires separate classification.  The classification scheme set forth in the Plan also allows each Class of Impaired creditors the opportunity to cast meaningful votes on the Debtors' Plan, satisfying the basic purposes of classification under section 1122 of the Bankruptcy Code.  The Debtors

additionally separately classified preferred, common and other Interests based upon the distinct rights of such Interests.

41.     As these titles above suggest, these Classes of Claims and Interests are different and the Debtors have valid business, factual, and legal reasons for separately classifying the various Classes of Claims and Interests created under the Plan.  See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), Bankr. No. 09-11435 (JMP) Adv. No. 09-01132 (JMP), 2009 WL 384197, at *34 (Bankr. S.D.N.Y. Nov. 17, 2009) (to be published in B.R.) (finding that the plan's separate classification was "appropriate given the disparate legal rights and payment expectations" of noteholders and general unsecured creditors); Calpine Corp., 2007 WL 4565223, at *7 (finding that "[v]alid business, factual and legal reasons" justified separate classification of various claims and interests); Bally Total Fitness, 2007 WL 2779438, at *3 (same); In re Coram Healthcare Corp., 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (finding noteholders represented a "voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").  Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

## 2.     Mandatory Contents of the Plan

42.     Section 1123(a) of the Bankruptcy Code identifies seven requirements for the contents of a plan of reorganization.  The Plan fully complies with each requirement of section 1123(a).  Article III of the Plan designates Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code, and specifies the treatment of each Class of Claims and Interests that is impaired in accordance with section 1123(a)(3) of the Bankruptcy Code. Article II specifies the Classes of Claims and Interests that are not impaired under the Plan, as required by section 1123(a)(2) of the Bankruptcy Code.

43.     Further, as required by section 1123(a)(4) of the Bankruptcy Code, the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.  This is true for each Class other than perhaps Class 8.  With respect to Long-Dated Senior Unsecured Note Claims, holders of Long-Dated Senior Unsecured Note Claims who vote to accept the Plan will be placed in Class 8A.  Holders of Long-Dated Senior Unsecured Note Claims who vote to reject the Plan will be placed in Class 8B.

44.     Moreover, following the applicable voting deadline for holders of Class 8 Claims, at the request of certain holders of Long-Dated Senior Unsecured Note Claims the Debtors established a procedure whereby holders of Class 8B Claims (i.e., holders of Long-Dated Senior Unsecured Note Claims that previously voted to reject the Plan or did not vote on the Plan) could elect to receive the Impaired treatment provided to holders of Class 8A Claims (i.e., holders of Long-Dated Senior Unsecured Note Claims that previously voted to accept the Plan) and exchange their Long-Dated Senior Unsecured Notes for Series A Notes and New Common Interests, as provided for in the Plan with respect to Class 8A.  On November 19, 2009, the Debtors transmitted to holders of Class 8B Claims the Impaired Treatment provided Class 8A Claims pursuant to the Notice Of Opportunity To Elect Impaired Treatment Under Second Amended Prepackaged Plan Of Reorganization Of CIT Group Inc. And CIT Group Funding Company Of Delaware LLC (the "Postpetition Class 8B Election Notice"), whereby holders of Class 8B Claims could elect to receive the Impaired treatment described immediately above. Unless holders of Class 8B Claims have voluntarily elected to receive the Impaired treatment provided to Class 8A Claims pursuant to the Postpetition Class 8B Election Notice, each holder of a Claim within Class 8A and Class 8B will receive the same treatment as other claimholders

in Class 8A or Class 8B, respectively. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

**(a)**      **The Plan Provides Adequate Means for Implementation**

45.      Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. 11 U.S.C. § 1123(a)(5). Adequate means for implementation of a plan may include retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancellation or modification of any indenture; curing or waiving of any default; extension of a maturity date or change in an interest rate or other term of outstanding securities; amendment of the debtor's charter; or the issuance of securities in exchange for cash, property, or existing securities, all in exchange for claims or interests or for any other appropriate purpose. See generally In re Spiegel, Inc., No. 03-11540(BRL), 2005 WL 1278094, at *5 (Bankr. S.D.N.Y. May 25, 2005).

46.      Article VI of the Plan and various other provisions of the Plan provide adequate means for the Plan's implementation. Those provisions relate to, among other things: (a) the consummation of the Exchanges; (b) the continued corporate existence of the Debtors; (c) the authorization and deemed occurrence of each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors; (d) the amendment of the organizational documents, including the Reorganized CIT Certificate of Incorporation, the Reorganized Delaware Funding Certificate of Formation and the Reorganized Delaware Funding Limited Liability Company Agreement, that will govern the Reorganized Debtors after the Effective Date; (e) the cancellation and termination of the Canadian Senior Unsecured Notes, the Electing Long-Dated Senior Unsecured Notes and those Long-Dated Senior Unsecured Notes that elected to receive Impaired Class 8A treatment

pursuant to the Postpetition Class 8B Election Notice, the Senior Unsecured Notes, the Senior Unsecured Term Loans, the Senior Unsecured Credit Agreements, the Senior Subordinated Notes, and the Junior Subordinated Notes transferred and assigned to the Reorganized Debtors; (f) the authorization and issuance of the New Notes and New Common Interests, (g) the identity of the members of the expanded board of directors and officers of the Reorganized Debtors; (h) the continuation or implementation of certain employment, retirement, indemnification and other agreements for any active directors (that may have been selected as members of the initial managing committee), officers and employees of Reorganized CIT; (i) the cash collateralization of the JPM L/C Facility; (j) the preservation of certain Causes of Action; (k) the execution, delivery, filing or recording of all contracts, instruments, releases, indentures, and other agreements or documents related to the foregoing; and (l) the exemption of the Debtors and the Reorganized Debtors from certain transfer taxes and recording fees.

47.     Moreover, based on the financial projections (the "Projections") attached to the Disclosure Statement as Appendix A, and the liquidity anticipated by both cash on hand and provided by transactions contemplated by the Plan, the BofA L/C Facility and the Senior Credit Facility, the Debtors have sufficient Cash to make all payments required to be made on the Effective Date or shortly after pursuant to the Plan.

### (b)     The Plan Prohibits the Issuance of Non-Voting Securities

48.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. In accordance with this requirement, the Third Amended And Restated Certificate Of Incorporation Of CIT Group Inc., Reorganized Delaware Funding Certificate of Formation and Reorganized Delaware Funding Agreement to Limited Liability Company Agreement, attached to the Plan as Exhibits

A-1, A-2 and A-3, respectively, provide that the Company shall not issue any non-voting equity securities to the extent required by section 1123(a)(6).  Furthermore, Article IV.K of the Plan provides that the Organizational Documents of each Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, including section 1123(a)(6).

> **(c)** **The Selection of Officers and Members of the Initial Managing Committee of the Reorganized Debtors is Consistent with the Interests of Creditors and Equity Security Holders and with Public Policy**

49.    Finally, section 1123(a)(7) of the Bankruptcy Code requires that a plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan." 11 U.S.C. § 1123(a)(7).  This provision is supplemented by section 1129(a)(5) of the Bankruptcy Code, which directs the scrutiny of the Court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization – i.e., creditors and equity holders.  See 7 Collier on Bankruptcy ¶ 1123.01[7], at 1123-15 (Lawrence P. King et al., 15th ed. rev. 1999).

50.    Article IV.M of the Plan provides for the manner of selection of the Board of CIT Group Inc.  Specifically, after the Effective Date the Board would consist of thirteen directors: (a) five of whom will consist of individuals who were serving as directors on November 1, 2009, (b) four of whom will be nominees proposed to the Nominating and Governance Committee of the Board (the "N&GC") by the Steering Committee (the "Steering Committee Nominees"), (c) three of whom will be nominees (the "Debtholder Nominees") proposed to the N&GC by CIT Group Inc. Noteholders (other than members of the Steering Committee) owning more than

27

1% of the aggregate outstanding principal amount of outstanding CIT bonds and unsecured bank debt claims (the "One-Percent Holders") and (d) one of whom will be CIT's Chief Executive Officer.

51.     Further, the Plan provides that CIT Group Inc. has engaged Spencer Stuart, an internationally recognized director search firm, to assist the N&GC in identifying, interviewing and selecting Steering Committee Nominees. Spencer Stuart will identify Steering Committee Nominees who are independent of CIT Group Inc., not affiliated with, or representatives of, any of the members of the Steering Committee or the One-Percent Holders, and who possess the qualifications, skills and experience specified by the N&GC. Finally, the Plan provides that the candidates that are approved by the N&GC will be submitted to the full Board for consideration and approval for appointment to the Board, with such appointment subject to the review of the Federal Reserve.

52.     Moreover, the Debtors have filed as (i) Exhibit F to the Plan the list of directors and officers of CIT Group Inc. as of the Petition Date, with the exception of one director who resigned on November 16, 2009, as well as the process for selection of new Board members of Reorganized CIT and (ii) Exhibit G to the Plan those directors and officers of Delaware Funding and Reorganized Delaware Funding. The Debtors are presently interviewing candidates and proceeding with the selection and review process of such candidates for appointment to the Board of Reorganized CIT, subject to the review of the Federal Reserve.

53.     The selection process outlined above provides adequate representation of the interests of holders of Claims and Interests and is consistent with public policy. Accordingly, the Plan provisions satisfy the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3. Discretionary Contents of the Plan

54. Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a plan of reorganization, but are not required. For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases. 11 U.S.C. § 1123(b)(1), (2). A plan also may provide for: (a) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; (b) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest; or (c) the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests. 11 U.S.C. § 1123(b)(3), (b)(4). Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [Title 11]." 11 U.S.C. § 1123(b)(5), (6).

55. As described above, the Plan provides for the impairment of certain Classes of Claims and Interests, while leaving others unimpaired. The Plan thus modifies the rights of the holders of certain Claims and Interests and leaves the rights of others unaffected. See Plan, Article III. The Plan provides for the assumption or rejection of executory contracts or unexpired leases to which the Debtors are parties. See Plan, Article VII. The Plan is a settlement and compromise of the claims and interests of various parties based upon the relationship and transactions among such parties and the Debtors. The Plan also provides for the retention and enforcement of certain claims by the Reorganized Debtors. See Plan, Article IV.O.

### (a)  The Plan's Debtor Release Provisions Are
### Permissible and Should be Approved

56.     Under Bankruptcy Code section 1123(b)(3)(A), a chapter 11 plan may provide for

"the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

11 U.S.C. § 1123(b)(3).  The rules governing the approval of a settlement under Bankruptcy

Rule 9019 are useful in evaluating plan releases.  In reviewing such releases, courts frequently

use the benchmark for approval of a settlement under Bankruptcy Rule 9019.  See, e.g., Bally

Total Fitness, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the

Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order

under Bankruptcy Rule 9019 approving such compromise."); Spiegel, Inc., No. 03-11540, 2005

WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) and Bankruptcy Rule

9019(a)).  Under Bankruptcy Rule 9019, the Court may approve a settlement so long as it does

not ""fall[] below the lowest point in the range of reasonableness."" Cosoff v. Rodman (In re

W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (quoting Newman v. Stein, 464 F.2d 689, 693

(2d Cir. 1972)); see also In re Enron Corp., No. 02 Civ. 8489(AKH), 2003 WL 230838, at *2

(S.D.N.Y. Jan. 31, 2003) ("[A]pproval of the settlement lies within the sound discretion of the

bankruptcy court . . . .") (citations omitted); In re Purofied Down Prods. Corp., 150 B.R. 519,

522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the

underlying [dispute]."); Air Lines Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Trust Co. of Chicago

(In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426-27 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir.

1994).

57.     Here, the Plan provides for certain releases by the Debtors of certain of the

Debtors' and the Debtors' subsidiaries' directors, officers, managers, members employees,

advisors and agents, as well as certain key creditor constituencies, such as the Steering

Committee and agents under the DIP Facility and the Exit Facility. More specifically, pursuant to Article XIII.H.1 (the "Debtor Release"), the Effective Date constitutes a discharge and release of (i) the Debtors' or the Debtors' subsidiaries' members, members of boards of managers, directors and officers (acting in such capacity or as the Debtors' agents or employees), employees, advisors, attorneys, agents or representatives, in each case to the extent acting in any such capacity since May 8, 2009, or any of their successors or assigns (in each case acting in such capacity); (ii) the Steering Committee (in such capacity) and its current members, members of boards of managers, directors and officers (acting in such capacity or as the Steering Committee's agents or employees), employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of its successors or assigns (in each case acting in such capacity); (iii) solely with respect to the DIP Facility and the DIP Facility Agreement, Bank of America, N.A. as Administrative Agent and L/C Issuer and Banc of America Securities LLC as Sole Lead Arranger and Sole Bookrunner; (iv) solely with respect to the Exit Facility and the Exit Facility Agreement, the Exit Facility Lender(s) and any agents under the Exit Facility; and (v) solely with respect to the JPM L/C Facility or the JPM L/C Facility Agreement, JPM or any other lender under the JPM Facility Agreement (in each case acting in such capacity), (vi) The Bank of New York Mellon f/k/a The Bank of New York (as successor to J.P. Morgan Trust Company, National Association, as successor to Bank One Trust Company, N.A.) solely in its capacity as indenture trustee of the Long-Dated Senior Unsecured Notes and the Senior Unsecured Notes; (vii) Law Debenture Trust Company of New York (as successor to The Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture trustee of the Canadian Senior Unsecured Notes; and (viii) Wilmington Trust Company (as successor to The Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture

trustee of the Senior Subordinated Notes and the Junior Subordinated Notes from any claims and causes of action which the Debtors, their Estates and the Reorganized Debtors, and any Person seeking to assert claims or exercise rights of any of the foregoing that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date (including (a) to the extent the underlying claims and causes of action are property of Delaware Funding's Estate, the claims and causes of action asserted in the Canadian Senior Unsecured Notes Litigation and (b) to the extent the underlying claims and causes of action are property of the Debtors' Estates, the claims and causes of action asserted in any direct or derivative litigation, including, but not limited to, those included on the Debtors' non-exclusive list of released derivative actions filed as a Plan Supplement), in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Offering Memorandum, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors, their Estates or the Reorganized Debtors, as of the Effective Date. For the avoidance of doubt, pursuant to Article XIII.H.1 of the Plan the Debtors, as of the Effective Date, are also deemed to forever release, waive and discharge any and all claims and causes of action that the Debtors, the Estate or the Debtors' affiliates may have against Goldman Sachs International ("GSI") that would constitute or effect a TRS Impairment, including, without limitation, any claims or causes of action arising from Bankruptcy Code sections 544, 547 and 548 relating to the Amended and Restated Confirmation and any agreements entered into by one or more of the Debtors and GSI in connection therewith.

      58.     The Debtors have proposed the Debtor Release based on their sound business judgment and submit that the Debtor Release is reasonable and satisfies the standard that courts generally apply when reviewing settlements. The Debtors do not believe that there are any

valuable claims or causes of action against the released parties. Further, the Debtors submit that even if claims or causes of action were arguably available, litigation costs and the likelihood of recovery would militate against prosecuting them. The Debtors submit that the Debtor Release is well-considered and reasonable and represents a valid exercise of the Debtors' business judgment. The Debtor Release is consistent with applicable law and precedent and represents a valid settlement of whatever claims or causes of action the Debtors may have against the released parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and, for this reason, should be approved.

**(b) The Plan's Releases by Holders of Claims Provisions Are Permissible and Should be Approved**

59. Article XIII.H.2 (the "Releases by Holders of Claims") provides a similar discharge and release from claims and causes of action which any holder of a Claim may be entitled to assert, but only if such holder votes affirmatively in favor of the Plan. Specifically, the Plan provides that the only holders of Claims and Interests who are bound by the Releases by Holders of Claims are those who affirmatively voted in favor of the Plan. In both the Plan and the Disclosure Statement, the Releases by Holders of Claims (as well as the Debtor Release, the exculpation provisions and the injunction enforcing the releases) was conspicuously set off in bold font, and in soliciting votes on the Plan, the Debtors sent Ballots which unambiguously provided in bold font in several places, including in the certification provision of the Ballots, that a vote in favor of the Plan constituted acceptance of the Releases by Holders of Claims.

60. In this circuit, it is well-settled that "[n]on-debtor releases may . . . be tolerated if the affected creditors consent," provided that adequate disclosure is provided to creditors voting on the Plan. Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d Cir. 2005); accord In re Adelphia

Commc'ns Corp., 368 B.R. 140, 266, 268 n. 307 (Bankr. S.D.N.Y. 2007) (noting that "[i]n the Second Circuit, it has long been the law that third party releases are permissible under at least some circumstances" and specifically approving of consensual third-party releases by creditors where such releases were prominently disclosed; observing that "[t]he Seventh Circuit has held . . . . that consensual releases are permissible, and the Metromedia court did not quarrel with the view"; the proposed release is appropriately disclosed, . . . consent can be established by a vote in support of a plan")(citing Metromedia Fiber, 416 F.3d at 142) appeal dismissed, 371 B.R. 660 (S.D.N.Y. 2007), aff'd, 544 F.3d 420 (2d Cir. 2008); In re Spiegel, Inc., No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (Lifland, J.) (nondebtor releases are consistent with the Bankruptcy Code if the creditors consent) (citing Metromedia Fiber, 416 F.3d at 142, appeal dismissed as moot, 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), aff'd, 269 F. App'x 56 (2d Cir. 2008)).  Courts have held that consent is present when a party votes to accept a plan.  See Adelphia Commc'ns, 368 B.R. at 268 (upholding releases with respect to those who voted in favor of plan).

61.     Here, the Releases by Holders of Claims was consensual and in conformity with prevailing Second Circuit law because a holder of an Impaired Claim entitled to vote on the Plan could have affirmatively rejected the Plan and the Releases by Holders of Claims themselves by casting a vote to "reject" or by abstaining from voting.

62.     Courts evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.  See Bally Total Fitness, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were negotiated in good faith and at arms' length, necessary to successful reorganization, and integral to the plan); Worldcom, Inc., 2003 WL 23861928 at *28 (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); Upstream Energy Servs v. Enron Corp. (In re Enron Corp.), 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct).

63.     Generally speaking, the effect of an appropriate exculpation provision is to set a standard of care of gross negligence or willful misconduct in future litigation for acts arising out of the restructuring.  See, e.g., In re PWS Holding Corp., 228 F.3d 224, 246-47 (3d Cir. 2000) (reasoning that an exculpation provision did not affect third party liability but rather "set[] forth the appropriate standard of liability" for the exculpated parties); see also Calpine Corp., 2007 WL 4565223, at *10 (finding that an exculpation provision that did not relieve any party of liability for gross negligence or willful misconduct was appropriate); Enron Corp., 326 B.R. at 501, 503-04 (holding that an exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).  Additionally, where a Court confirms a plan proposed in good faith, it is appropriate to set the standard of liability for those involved in the negotiation and formulation of that plan.  See PWS Holding, 228 F.3d at 246 (observing that

creditors providing services to the debtors are entitled to a "limited grant of immunity" for

"actions within the scope of their duties"); accord Worldcom, Inc., 2003 WL 23861928, at *28.

64.     Accordingly, exculpation clauses appropriately prevent future collateral attacks

against parties that have made substantial contributions to a debtor's reorganization.  Courts in

this District generally have specified three categories of parties that are appropriate candidates

for exculpation: (a) parties indemnified by the estate for their services; (b) parties to "[u]nique

[t]ransactions" that "contribute[] substantial consideration to the reorganization"; and (c) any

party when the exculpation provision is consensual and those voting had full notice.  Adelphia

Commc'ns, 368 B.R. at 268.

65.     Here, Article XIII.J (the "Exculpation") of the Plan provides an exculpation and

limitation of liability for Reorganized Debtors, the Debtors, the Estate, their subsidiaries, any

Committee, the Steering Committee, Bank of America, N.A. as Administrative Agent and L/C

Issuer and Banc of America Securities LLC as Sole Lead Arranger and Sole Bookrunner (solely

with respect to the DIP Facility and the DIP Facility Agreement), the Exit Facility Lender(s) and

any agents under the Exit Facility (solely with respect to the Exit Facility and the Exit Facility

Agreement), JPM or any other lender under the JPM Facility Agreement (in each case acting in

such capacity and solely with respect to the JPM L/C Facility or the JPM L/C Facility

Agreement), The Bank of New York Mellon f/k/a The Bank of New York (as successor to J.P.

Morgan Trust Company, National Association, as successor to Bank One Trust Company, N.A.)

solely in its capacity as indenture trustee of the Long-Dated Senior Unsecured Notes and the

Senior Unsecured Notes, Law Debenture Trust Company of New York (as successor to The

Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture

trustee of the Canadian Senior Unsecured Notes, Wilmington Trust Company (as successor to

The Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture trustee of the Senior Subordinated Notes and the Junior Subordinated Notes, Depository Trust Company and any other depositories (foreign or domestic) at which the Debtors' securities are held solely in their capacity as depositories for the Debtors' securities and facilitators for the Plan solicitation and election process and any and all of their respective current or former members, officers, directors, members of boards of managers, employees, equity holders, partners, affiliates, advisors, attorneys, agents or representatives, or any of their successors or assigns for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the negotiation of the terms of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, gross negligence or intentional fraud as determined by a final order of a court of competent jurisdiction. Moreover, to resolve an informal objection of the Indenture Trustee Parties, Article XIII.J shall also be amended to include the Indenture Trustee Parties as receiving such exculpation and limitation of liability thereunder.

66. Notwithstanding any other provision of the Plan, but without limiting the releases provided in the Plan or affecting the status or treatment of any Claim Allowed pursuant to the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, and no successors or assigns of the foregoing, shall have any right of action against the Reorganized Debtors, the Debtors, their Estates, their subsidiaries, any Committee, the Steering Committee, Bank of America, N.A. as Administrative Agent and L/C Issuer and Banc of America Securities LLC as Sole Lead

Arranger and Sole Bookrunner (solely with respect to the DIP Facility and the DIP Facility Agreement), the Exit Facility Lender(s) and any agents under the Exit Facility (solely with respect to the Exit Facility and the Exit Facility Agreement), JPM or any other lender under the JPM Facility Agreement (in each case acting in such capacity and solely with respect to the JPM L/C Facility or the JPM L/C Facility Agreement), The Bank of New York Mellon f/k/a The Bank of New York (as successor to J.P. Morgan Trust Company, National Association, as successor to Bank One Trust Company, N.A.) solely in its capacity as indenture trustee of the Long-Dated Senior Unsecured Notes and the Senior Unsecured Notes, Law Debenture Trust Company of New York (as successor to The Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture trustee of the Canadian Senior Unsecured Notes, Wilmington Trust Company (as successor to The Bank of New York Mellon f/k/a The Bank of New York) solely in its capacity as indenture trustee of the Senior Subordinated Notes and the Junior Subordinated Notes, Depository Trust Company and any other depositories (foreign or domestic) at which the Debtors' securities are held solely in their capacity as depositories for the Debtors' securities and facilitators for the Plan solicitation and election process or any of their respective current or former members, officers, directors, managers, employees, equity holders, partners, affiliates, subsidiaries, advisors, attorneys, agents or representatives, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the administration of the Chapter 11 Cases, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence as determined by a final order of a court of competent jurisdiction.

67.     The Exculpation provision is vital to the Chapter 11 Cases and appropriate under applicable law because the Exculpated Parties satisfy the relevant standard. As set forth in the Declaration, the Debtors formulated the Plan after negotiating extensively with numerous parties in good faith in the months leading up to the Petition Date.  Declaration ¶ 11.  Negotiation and compromise were crucial to the formulation of a feasible Plan and could not have occurred without the protection from liability that the Exculpation clause provides to the constituents involved.  Moreover, the Debtors have indemnified certain of the Exculpated Parties.  Further, the Exculpation provision, including its carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others.  See, e.g., In re Oneida Ltd., 351 B.R. 79, 94, n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that covered prepetition lenders, DIP lenders, creditor committees and their members, and the respective affiliates of each, except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); see also In re DJK Residential LLC, No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct); Bally Total Fitness, 2007 WL 2779438, at *8 (approving an exculpation provision that excluded gross negligence and willful misconduct and exculpated, among others, the DIP lenders, prepetition noteholders, the creditors committee, and new investors in certain circumstances without unresolved objections).

### (d)     The Plan's Injunction Provisions Are Permissible and Should be Approved

68.     In addition, Article XIII.I (the "Injunction") provides that except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, subject to the occurrence of the

Effective Date, all Persons that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors or their property on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing any action, in each case in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. By accepting distribution pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan is deemed to have specifically consented to the injunctions set forth in Article XIII.I.

69. The Injunction provision is necessary to preserve and enforce the Debtor Release, the Releases by Holders of Claims and the Exculpation and is narrowly tailored to achieve that purpose. Further, the Injunction provision is a key component of the ultimate reorganization. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992). Thus, the Court should approve the Injunction to the same extent it approves the Debtor Release, Releases by Holders of Claims, Exculpation and discharge provisions.

**(e)      The Plan Includes Additional Appropriate
Provisions That Are Not Inconsistent With
Applicable Sections of the Bankruptcy Code**

70. Finally, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable sections of the Bankruptcy Code, including: (a) the provisions of Article V of the Plan governing distributions

on account of Allowed Claims; (b) the provisions of Article VI establishing procedures for resolving Disputed, Contingent and Unliquidated Claims; and (c) the provisions of Article XII governing retention of jurisdiction by the Court over certain matters after the Effective Date. Accordingly, the Plan complies with the applicable provisions of the Bankruptcy Code and, therefore, meets the requirements of section 1129(a)(1) of the Bankruptcy Code.

71.     The foregoing Plan provisions are proper because, among other things, they are the product of arm's-length negotiations, have been critical to obtaining the support of the various constituencies for the Plan and are a part of the Plan that received support from a number and amount of holders of Claims in the Voting Classes sufficient to confirm the Plan. Such provisions are fair and equitable, are given for valuable consideration and are in the best interests of the Debtors and the Chapter 11 Cases. None of these provisions is inconsistent with the Bankruptcy Code and, thus, the requirements of Bankruptcy Code section 1123(b) are satisfied.

### 4.     Executory Contracts and Unexpired Leases

72.     In accordance with section 1123(b)(2) of the Bankruptcy Code, Article VII.A of the Plan provides for the assumption or rejection of the Debtors' executory contracts and unexpired leases not previously assumed or rejected. Moreover, the Plan provides that any contracts listed on <u>Exhibit H</u> to the Plan shall be rejected. The Debtors have listed on <u>Exhibit H</u> to the Plan that certain agreement dated as of July 2, 2002 by and between Tyco International Ltd., a Bermuda company, and CIT Group Inc. as an agreement to be rejected pursuant to the Plan.

### B.     The Plan Complies With The Applicable Provisions Of Title 11 (Section 1129(a)(2))

73.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "comply with the applicable provisions of [Title 11]." 11 U.S.C. § 1129(a)(2). The primary

purpose of section 1129(a)(2) is to ensure that the plan proponents have complied with the requirements of sections 1125 and 1126 of the Bankruptcy Code. See Worldcom, Inc., 2003 WL 23861928, at *49 ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); see also In re Texaco, Inc., 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988); In re Prudential Energy Co., 58 B.R. 857, 867 (Bankr. S.D.N.Y. 1986). As discussed above, the Debtors have complied with all applicable disclosure and solicitation requirements of Bankruptcy Code section 1125 and 1126.

### C. The Plan Was Proposed In Good Faith (Section 1129(a)(3))

74. Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Second Circuit has held that the standard of good faith requires "a showing that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (quoting Manati Sugar Co. v. Mock, 75 F.2d 284, 285 (2d Cir. 1935)); see also Johns-Manville, 68 B.R. at 631-32. In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if '"there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."'" In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting Texaco, Inc., 84 B.R. at 907); see also Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V. Inc.), 709 F.2d 762, 765 (1st Cir. 1983) (the good faith standard under section 1129(a)(3) requires that there must be "some relation" between the chapter 11 plan and the "statutory objective of resuscitating a financially troubled corporation" that chapter 11 was designed to serve).

75.     In determining whether the good faith requirement has been satisfied, the court will focus on "'the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Granite Broad. Corp., 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (citations omitted).  Accordingly, bankruptcy courts have asserted that the good faith requirement is satisfied if the plan has been proposed for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate and distributing that value to creditors.  See In re Gilbertson Rests. LLC, No. 04-003845, 2005 WL 783063, at *4 (Bankr. N.D. Iowa Apr. 4, 2005); see also In re Source Enters., Inc., No. 06-11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding that the good faith requirement satisfied in plan filed with legitimate and honest purposes of maximizing value of the estate and effectuating equitable distribution), aff'd, 392 B.R. 541 (S.D.N.Y. 2008).  Moreover, the Supreme Court has asserted that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).

76.     The Plan has been proposed by the Debtors in good faith, with legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to claimholders under the circumstances of these Chapter 11 Cases.  As described in the Declaration, the Debtors believe that the value of the Estates is far greater in the reorganization contemplated by the Plan than in a liquidation.

77.     It has been held that good faith in proposing a plan "also requires a fundamental fairness in dealing with one's creditors."  In re Stolrow's, Inc., 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988).  As the Court is aware, the Debtors have worked closely pre-petition with the Steering Committee and various other parties in interest to reach a largely consensual deal.  The Plan

reflects the end product of all these efforts and constitutes the agreement among all such parties in interest regarding the terms of the Debtors' restructuring.

78.     The support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by holders of Claims who voted on the Plan reflect the overall fairness of the Plan and the acknowledgment by the Debtors' Claimholders that the Plan has been proposed in good faith and for proper purposes. <u>See</u> <u>In re Eagle-Picher Indus., Inc.</u>, 203 B.R. 256, 274 (Bankr. E.D. Pa. 1999) (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive arms-length negotiations among the plan proponents and other parties in interest). Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code have been fully satisfied.

**D.     All Payments To Be Made By The Debtors In Connection With These Cases Are Subject To The Approval Of The Court (Section 1129(a)(4))**

79.     Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). In essence, this subsection requires that any and all fees promised or received from the estate in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review. <u>See</u> <u>Worldcom Inc.</u>, 2003 WL 23861928, at *54; <u>Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)</u>, 329 B.R 491, 503 (D.N.J. 2005); <u>Drexel Burnham</u>, 138 B.R. at 760.

80.     Article II.B. of the Plan provides for the payment only of Allowed Administrative Claims, and pursuant to Article XIII.B, professionals holding Professional Fee Claims are required to file their final fee applications with the Court no later than sixty (60) after the

Effective Date.  These applications remain subject to Court approval under the standards established by the Bankruptcy Code, including the requirements of sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code, as applicable.  Finally, Article XII of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, including requests by Professionals.  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

      **E.**      **The Plan Discloses All Required Information Regarding Postconfirmation Directors, Management And Insiders (Section 1129(a)(5))**

81.      Section 1129(a)(5) of the Bankruptcy Code provides that a plan of reorganization may be confirmed if the proponent discloses the identity of those individuals who will serve as management of the reorganized debtor, the identity of any insider to be employed or retained by the reorganized debtor and the compensation proposed to be paid to such insider.  11 U.S.C. § 1129(a)(5)(B).  In addition, under section 1129(a)(5)(A)(ii), the appointment of, or continuation in office of, existing management must be consistent with the interests of creditors, equity security holders, and public policy.  11 U.S.C. § 1129 (a)(5)(A)(ii).

82.      In determining whether the postconfirmation management of a debtor is consistent with the interests of creditors, equity security holders, and public policy, a court must consider proposed management's competence, discretion, experience, and affiliation with entities having interests adverse to the debtor.  See In re Sherwood Square., 107 B.R. 872, 878 (Bankr. D. Md. 1989); see also In re W.E. Parks Lumber Co., 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal

basis").  In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists."  Sherwood Square Assocs., 107 B.R. at 878.  The case law also is clear that a plan may contemplate the retention of the debtor's existing directors and officers.  See, e.g., Texaco, Inc., 84 B.R. at 908 (determining that section 1129(a)(5) was satisfied where plan disclosed debtor's existing directors and officers who would continue to serve in office after plan confirmation); see also In re Trans World Airlines, Inc., 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995).

83.     The Debtors have fully satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.  As more fully described above, Article IV.M of the Plan provides for the manner of selection of the members of the expanded Board of Reorganized CIT.  Moreover, the Debtors have filed as Exhibit F to the Plan those directors and officers presently known to the Debtors who will or may serve on the Board of Reorganized CIT after the Effective Date, and the process for selection of members of the Board.  The Debtors have also filed as Exhibit G to the Plan the directors and officers who will serve as directors and officers of Reorganized Delaware Funding.  Accordingly, the Plan fully satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      The Plan Does Not Provide For Any Rate Change Subject To Regulatory Approval (Section 1129(a)(6))**

84.     Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor whose rates are subject to governmental regulation following confirmation, that appropriate governmental approval has been obtained for any rate change provided for in the plan, or that such rate change be expressly conditioned on such approval.  11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) of the Bankruptcy Code does not apply because there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Reorganized Debtors' rates.

### G. The Plan Satisfies The "Best Interests" Test (Section 1129(a)(7))

85.     The "best interests of creditors" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest has accepted the plan or will receive property of a value not less than what such holder would receive if the debtor were liquidated under Chapter 7.  <u>See</u> <u>Leslie Fay</u>, 207 B.R. at 787; <u>Kane</u>, 843 F.2d at 649.  Also, the best interest test focuses on individual dissenting creditors or interestholders, rather than classes of claims or interests.  <u>Leslie Fay</u>, 207 B.R. at 787; <u>Drexel Burnham</u>, 138 B.R. at 761.

86.     A court, in considering whether a plan is in the "best interests" of creditors, is not required to consider any alternative to the plan other than the dividend projected in a liquidation of all of the debtor's assets under chapter 7 of the Bankruptcy Code.  <u>See</u> <u>In re Crowthers McCall Pattern, Inc.</u>, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990); <u>In re Jartran, Inc.</u>, 44 B.R. 331, 389-93 (Bankr. N.D. Ill. 1984) (best interests test satisfied by showing that, upon liquidation, cash received would be insufficient to pay priority claims and secured creditors so that unsecured creditors and stockholders would receive no recovery); <u>In re Victory Constr. Co.</u>, 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984).  As section 1129(a)(7) of the Bankruptcy Code makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.  If a class of claims or equity interests unanimously accepts the plan, the best interests test automatically is deemed satisfied for all members of that accepting class.  <u>See</u> 11 U.S.C. § 1129(a)(7).  The test requires that each holder of a claim or interest either accepts the plan or will receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

87.     To determine the value that impaired creditors and equity security holders would receive if any of the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the aggregate dollar amount that likely would be generated by the hypothetical liquidation of such Debtor's assets by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of each of the Debtors would consist of the sum of the proceeds from the disposition of the Debtors' assets through a liquidation proceeding and the cash held by the Debtors at the time of commencement of a chapter 7 case.

88.     The Liquidation Value available to holders of Claims and Interests would be reduced by, among other things, (a) the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, (b) asset disposition expenses, (c) applicable taxes, (d) litigation costs, (e) Claims arising from the operation of the debtor during the pendency of the chapter 7 case and (f) all unpaid Administrative Claims incurred by the Debtor during the Debtor's chapter 11 case that are allowed in the chapter 7 case.

89.     The liquidation itself would trigger certain priority claims, such as claims for severance pay, and would likely accelerate the payment of other priority claims and priority tax claims that otherwise would be payable in the ordinary course of business.  These priority claims and priority tax claims would be paid in full out of the net liquidation proceeds, after payment of secured claims to the extent of the value of the underlying collateral, before the balance would be made available to pay general unsecured claims or to make any distribution in respect of Interests.  The Debtors believe that the liquidation also would generate a significant increase in general unsecured claims, such as rejection damage claims, and tax and other governmental claims.

90.     The Debtors performed liquidation analyses, attached to the Disclosure Statement as Appendix A-1 and Appendix A-2 (the "Liquidation Analyses," and each a "Liquidation Analysis"), to determine whether the Plan satisfies the "best interests" test and to assist creditors in determining whether to accept the Plan.  See Disclosure Statement supplement dated October 23, 2009, Appendix A-1 and Appendix A-2.  As set forth in Appendix A-1 and Appendix A-2 of the Disclosure Statement as well as in the Declaration, under any reasonable set of assumptions, the overall values that may be realized by the holders of Claims and Interests in hypothetical chapter 7 cases are significantly less than the value of the recoveries to these holders under the Plan.

91.     Specifically, the Liquidation Analyses show that recoveries under the Plan with respect to all Impaired Classes of Claims and Interests are estimated to be greater than recoveries available in a hypothetical chapter 7 liquidation.  The Debtors and their advisors estimate that (i) Impaired Classes 14, 16 and 18 will receive the same distribution under the Plan as in a liquidation (i.e., zero) and (ii) Impaired Classes 7, 8, 9, 10, 11, 12, 13 and 15 will receive more under the Plan than they would receive in a liquidation.  The Liquidation Analysis for each potential Chapter 7 liquidation scenario provides that in the event of a liquidation, the proceeds available for holders of Class 7, 8, 9, 10 and 11 Claims (all of whom would rank pari passu in a chapter 7 case for CIT Group Inc.) would range from $840 million to $11.8 billion, with a recovery of only 2.4% to 34.0% for holders of such Claims.  See Disclosure Statement Appendix A-1.  That Liquidation Analysis also provides that there would be no recovery to holders of Senior Subordinated Note Claims, Junior Subordinated Note Claims, Subordinated 510(b) Claims, Old Preferred Interests, Old Common Interests and Other Equity Interests.  In addition, the Liquidation Analysis for Delaware Funding provides that there would be no recovery from

the assets of Delaware Funding to holders of Canadian Senior Unsecured Note Claims under either (i) a complete liquidation of CIT Group Inc. and Delaware Funding, or (ii) the consummation of the Plan for CIT Group Inc. and the subsequent liquidation of Delaware Funding.  See Appendix A-2, Exhibits A-2.1 and A-2.2.

92.     In contrast, under the Plan, holders of Allowed Class 6 Claims and Allowed Class 7 Claims will receive an estimated 100% recovery; holders of Allowed Class 8, 9, 10 and 11 Claims will receive an estimated 94.1% recovery; holders of Allowed Class 12 Claims will receive an estimated 50% recovery; and holders of Allowed Class 13 Claims will receive an estimated 15.4% recovery.  Moreover, holders of Old Preferred Interests will receive Contingent Value Rights under the Plan.  Holders of Subordinated 510(b) Claims, Old Common Interests and Other Equity Interests receive nothing under the Plan or in Chapter 7 liquidation.  Therefore, holders of such Claims and such Interests will receive substantially more (as to Class 6, 7, 8, 9, 10, 11, 12 and 13 Claims and Class 15 Interests) or the same (as to Class 14 Claims and Class 16 and 18 Interests) under the Plan than in a liquidation.

93.     The best interests test is satisfied as to each Impaired Class of Claims and Interests because each dissenting holder of a Claim or Interest in each such Class will receive or retain under the Plan, on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive in a Chapter 7 liquidation of the Debtors' assets on such date.  As a result, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.     The Plan Has Been Accepted By The Requisite Classes Of Creditors and Interest Holders (Section 1129(a)(8))**

94.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan.  With respect

to an unimpaired class of claims, under section 1126 of the Bankruptcy Code, such unimpaired class of claims is "conclusively presumed" to have accepted the plan and need not be further examined under section 1129(a)(8). 11 U.S.C. § 1126(f); see In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984) (unimpaired classes of claims deemed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code). Thus, Classes 1 through 5 are conclusively presumed to have accepted the Plan.

95. With respect to an impaired class of claims, acceptance of a plan of reorganization is determined by reference to section 1126 of the Bankruptcy Code, which identifies the members of a class that may vote on a plan and the number and amount of votes necessary for the acceptance of a plan by a class of claims or interests. In particular, section 1126 provides that a plan is accepted by an impaired class of claims if the class members accepting hold at least two-thirds in amount and more than one-half in number of the claims held by the class members who have cast votes on the plan. See 11 U.S.C. § 1126(c), In these Chapter 11 Cases, all Classes of Impaired Claims entitled to vote on the Plan voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

96. However, under section 1126(g) of the Bankruptcy Code, impaired classes that neither receive nor retain property under the plan are deemed to have rejected the plan. See 11 U.S.C. § 1126(g). As holders of Claims or Interests in Classes 14, 15, 16 and 18 are neither receiving nor retaining property under the Plan, such Classes are deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g). As discussed more fully below, the Debtors have met the "cramdown" requirements in section 1129(b) of the Bankruptcy Code necessary to obtain confirmation of the Plan notwithstanding the deemed rejection of the Plan by Classes 14, 15, 16 and 18.

**I.**      **The Plan Provides For The Payment Of Priority Claims (Section 1129(a)(9))**

97.      Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code – administrative claims allowed under section 503(b) of the Bankruptcy Code – must receive cash equal to the allowed amount of such claims on the effective date of the plan.  11 U.S.C. § 1129(a)(9)(A).  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(4) through (7) of the Bankruptcy Code – generally, wage, employee benefit and deposit claims entitled to priority – must receive deferred cash payments of a value equal to the allowed amount of such claim or cash equal to the allowed amount of such claim on the effective date of the plan, depending upon whether the class has accepted the plan.  See 11 U.S.C. § 1129(a)(9)(B).  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code – i.e., priority tax claims – must receive deferred cash payments over a period not to exceed five years after the petition date, the present value of which equals the allowed amount of the claim.  See 11 U.S.C. § 1129(a)(9)(C).

98.      The Plan satisfies these requirements.  Subject to Article VI of the Plan, all holders of Allowed Administrative Claims will on the latest of (i) the Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtors relating thereto, (iv) in respect of liabilities incurred on the ordinary course of business, the date on which such liabilities are payable in the ordinary course of business, consistent with past practice or (v) such other date as may be agreed upon between the holder of such Allowed

Administrative Claim or becomes payable pursuant to an agreement between the Debtors or the Reorganized Debtors and the holder of such Administrative Claim, be paid in Cash equal to the unpaid portion of the Allowed Administrative Claim. In addition, on the later of the Effective Date or the date on which such DIP Facility becomes payable pursuant to any agreement between the Debtors and the holder of such DIP Facility Claim, DIP Facility Claims shall be paid in full in Cash equal to the full amount of such holder's Allowed DIP Facility Claim or such other treatment as to which the Debtors and such holder shall have agreed upon in writing. Accordingly, this proposed treatment complies with the requirement under Bankruptcy Code section 1129(a)(9)(A) that holders of claims arising under Bankruptcy Code sections 507(a)(2) and 507(a)(3) receive cash equal to the allowed amount of such claim, unless such claimant agrees to different treatment.

99. In addition, the Plan provides that the holders of Priority Tax Claims are Unimpaired by the Plan. Unless the holders of such claim and the Debtors agree to a different treatment, on the Effective Date each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated. Finally, the Plan provides that, unless the holder of such Claim and the Debtors agree to a different treatment, on the Effective Date, each holder of an Allowed Other Priority Claim shall have its Claim Reinstated. Accordingly, this proposed treatment complies with the requirement under Bankruptcy Code section 1129(a)(9)(A) that holders of claims arising under Bankruptcy Code sections 507(a)(2) and 507(a)(3) receive cash equal to the allowed amount of such claim, unless such claimant agrees to different treatment.

100. Thus, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code. Accordingly, this proposed treatment complies with the requirement under Bankruptcy Code section 1129(a)(9)(B) that holders of claims arising under Bankruptcy Code

sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) receive cash payments equal to the allowed amount of such claim, unless such claimant agrees to different treatment.

### J. The Plan Has Been Accepted By At Least One Impaired, Non-Insider Class (Section 1129(a)(10))

Section 1129(a)(10) of the Bankruptcy Code provides that:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see Drexel Burnham, 138 B.R. at 771.

101. The Debtors have satisfied this requirement. As described above, the Plan has been accepted by all Classes of Impaired Claims (Class 6 JPM L/C Facility Claims, Class 7 Canadian Senior Unsecured Note Claims, Class 8A Long-Dated Senior Unsecured Note Claims, Class 9 Senior Unsecured Note Claims, Class 10 Senior Unsecured Term Loan Claims, Class 11 Senior Unsecured Credit Agreement Claims, Class 12 Senior Subordinated Note Claims, and Class 13 Junior Subordinated Note Claims) entitled to vote on the Plan and, to the best of the Debtors' knowledge, no entities included in such classes are "insiders" of the Debtors as the meaning of such term under the Bankruptcy Code. Accordingly, the Debtors have satisfied this requirement.

### K. The Plan Is Feasible (Section 1129(a)(11))

102. Pursuant to section 1129(a)(11) of the Bankruptcy Code, a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). One commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is

workable." 7 <u>Collier on Bankruptcy</u> ¶ 1129.03 [11], at 1129-64 (Lawrence P. King et al., 15th ed. rev. 1999); <u>see also</u> <u>In re One Times Square Assocs. Ltd. P'ship</u>, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("'It is not necessary that the success be guaranteed, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.'") (citations omitted), <u>aff'd</u> 165 B.R. 773 (S.D.N.Y.), <u>aff'd mem.</u>, 41 F.3d 1502 (2d Cir. 1994); <u>In re Cellular Info. Sys., Inc.</u>, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994); <u>Johns-Manville</u>, 68 B.R. at 635.

103.    It is clear, however, that section 1129(a)(11) does not require a guarantee of the plan's success; rather, the proper standard is whether the plan offers a "reasonable" assurance of success.  <u>See</u> <u>Drexel Burnham</u>, 138 B.R. at 762 ("'<u>It is not necessary that success be guaranteed</u>, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.' . . . The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since guarantee of future is not required.") (citations omitted)); <u>Kane</u>, 843 F.2d at 649 (a plan may be feasible although its success is not guaranteed); <u>In re Adelphia Bus. Solutions, Inc.</u>, 341 B.R. 415, 421-22 (S.D.N.Y. 2003); <u>In re Texaco, Inc.</u>, 84 B.R. at 910 ("All that is required is that there be reasonable assurance of commercial viability."); <u>In re Prudential Energy Co.</u>, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11)."); <u>see also</u> <u>In re Waern Bldg. Corp.</u>, 145 F.2d 584, 588 (7th Cir. 1944) ("[T]he word feasible does not connote absolute insurance of success but only reasonable assurance of success."); <u>In re Whittaker Mem'l Hosp. Ass'n</u>, 149 B.R. 812, 816 (Bankr. E.D. Va. 1993) ("It is not a blanket guarantee [of success] which is required, but rather a reasonable likelihood of success.").

104.    The plan proponent has an obligation to provide the court and interested parties with sufficient information to make the feasibility determination.  See In re Walker, 165 B.R. 994, 1005 (Bankr. E.D. Va. 1994).  Courts have identified a number of factors relevant to evaluating the feasibility of a proposed plan of reorganization, including:  (a) the prospective earnings or earning power of the debtor's business, (b) the soundness and adequacy of the capital structure and working capital for the debtor's postconfirmation business, (c) the debtor's ability to meet its capital expenditure requirements, (d) economic conditions, (e) the ability of management and the likelihood that current management will continue, and (f) any other material factors that would affect the successful implementation of the plan.  See, e.g., Prudential Energy Co., 58 B.R. at 862-63; see also In re Clarkson, 767 F.2d 417, 420 (8th. Cir. 1985); In re Deluca, No. 95-11924, 1996 Bankr. LEXIS 1950, at *51 (Bankr. E.D. Va. Apr. 12, 1996); In re Sound Radio, Inc., 93 B.R. 849, 856 (Bankr. D.N.J. 1988), aff'd in part, 103 B.R. 521 (D.N.J. 1989), aff'd, 908 F.2d 964 (3d Cir. 1990); Texaco, Inc., 84 B.R. at 910; In re Adamson Co., 42 B.R. 169, 176 (Bankr. E.D. Va. 1984); Toy & Sports Warehouse, 37 B.R. at 151.

105.    For purposes of determining whether the Plan satisfies these feasibility standards, the Debtors have analyzed their ability to meet their obligations under the Plan.  The Debtors' strategic business plan and the Projections provided by the Debtors in Appendix A to the Disclosure Statement indicate that, after giving effect to confirmation of the Plan, the Reorganized Debtors should have sufficient liquidity and capital resources conduct its businesses. See Disclosure Statement Appendix A.

106.    The Debtors also have built appropriate flexibility into the Projections to enhance their ability to maintain cash flows in the event that the current difficult economic environment, which has negatively impacted the Debtors, continues to affect the Debtors' near term financial

performance.  Thereafter, the Projections assume a return to a more favorable economic climate and more normalized level of provisions, non-accruals and charge-offs.  See Toy & Sports Warehouse, 37 B.R. at 151 (despite uncertainty as to whether the debtors would be able to use their flagship store, their projections were flexible enough to indicate that they could operate profitably without such store, which satisfied the feasibility test).  Further, management of the Reorganized Debtors is well-qualified to achieve success post-confirmation.  The Projections therefore demonstrate that (a) the Plan provides a feasible means of completing a reorganization of the Debtors' businesses as provided in the Plan and (b) subject to the risks described in the Disclosure Statement (see, e.g., Disclosure Statement, pages 36-64), there is reasonable assurance that the Debtors will be able to satisfy all of their obligations under the Plan, including under the assumed executory contracts and unexpired leases.  Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

### L.      The Plan Provides For The Payment Of Certain Fees (Section 1129(a)(12))

107.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provision be made for their payment.  11 U.S.C. § 1129(a)(12).  All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on the Effective Date, thereby satisfying section 1129(a)(12) of the Bankruptcy Code.

### M.      Continuation of Retiree Benefits (Section 1129(a)(13))

108.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits.  Pursuant to Article VII.F of the Plan, the Reorganized

Debtors will continue to pay "retiree benefits" (as defined in section 1114(a) of the Bankruptcy Code) at the previously established levels. Thus, the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

### N. The Plan Satisfies The "Cramdown" Requirements

109. As described above, the votes of holders of Class 14 Subordinated 510(b) Claims, Class 15 Old Preferred Interests, Class 16 Old Common Interests and Class 18 Other Equity Interests have not been solicited, and therefore such Classes (the "Deemed Rejecting Classes") are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. As a result, section 1129(a)(8) of the Bankruptcy Code, which requires that all impaired Classes accept the Plan, has not been satisfied with respect to the Deemed Rejecting Classes. Nonetheless, section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes:

> [I]f all of the applicable requirements of . . . section [1129(a) of the Bankruptcy Code] other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).

110. Thus, to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. See Kane, 843 F.2d at 648; In re Bryson Props, XVIII, 961 F.2d 496, 500 (4th Cir. 1992); In re Cajun Elec. Power Coop., Inc., 150 F.3d 503, 519 (5th Cir. 1998); In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 653 (9th

Cir. 1997); John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157 n.5 (3d Cir. 1993); In re Calpine Corp., 2007 WL 4565223, at *12; see also In re Zenith Elecs. Corp., 241 B.R. 92, 105 (Bankr. D. Del. 1999) (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it does not discriminate unfairly and is fair and equitable"); In re Snyder, 144 B.R. 393, 396 (C.D. Ill. 1990) (stating that "if all of the requirements required for confirmation other than the requirements in § 1129(a)(8) are present, the court must confirm the plan if it is fair and equitable to each class of claims which have not accepted the plan").

1. **The Plan Does Not Discriminate Unfairly with Respect to the Deemed Rejecting Classes**

111.    The Plan does not discriminate unfairly against holders of Claims or Interests in the Deemed Rejecting Classes. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists. See Johns-Manville, 68 B.R. at 636; In re 203 N. LaSalle St. Ltd. P'ship, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), aff'd, 195 B.R. 692 (N.D. Ill. 1996), aff'd, 126 F.3d 955 (7th Cir. 1997), rev'd on other grounds, 526 U.S. 434 (1999). Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. See, e.g., In re Freymiller Trucking, Inc., 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"). At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so. See Worldcom, Inc., 2003 WL 23861928, at *59 .

112.    All of the Class 14 Subordinated 510(b) Claims, Class 15 Old Preferred Interests, Class 16 Old Common Interests and Class 18 Other Equity Interests are placed into their

individual classes and given the same respective treatment; provided that Class 15 Old Preferred Interests are granted Contingent Value Rights on account of such Interests' seniority to Subordinated 510(b) Claims and other CIT Group Inc. Interests. The Interests in Class 15 Old Preferred Interests are legally distinct from and structurally senior to all other Interests in CIT Group Inc. and to Subordinated 510(b) Claims. The Claims and Interests in the Deemed Rejecting Classes are likewise properly subordinated to all other Claims of any nature, and are legally distinct. Moreover, the only other Class of Interests under the Plan is Class 17 Old Delaware Funding Interests, which Class is Unimpaired and deemed to accept the Plan. Class 17 Old Delaware Funding Interests consists solely of all of the Interests in Delaware Funding and there are no Interests in Delaware Funding in any other Class under the Plan. The Plan has been proposed separately by each of CIT Group Inc. and Delaware Funding, and constitutes a separate and distinct plan of reorganization for each such Debtors. Class 17 Old Delaware Funding Interests are Unimpaired because the only other Class of Claims against or Interests in Delaware Funding (i.e., Class 7 Canadian Senior Unsecured Note Claims) have voted in favor of the Plan. Accordingly, the Plan does not discriminate unfairly against the Deemed Rejecting Classes, thereby satisfying the first prong of section 1129(b)(1).

> **2.      The Plan Is "Fair and Equitable" with Respect to the Deemed Rejecting Classes**

113.    What constitutes "fair and equitable" treatment for the purposes of section 1129(b)(1) is set forth in detail in section 1129(b)(2) of the Bankruptcy Code. The codified requirements of the fair and equitable standard with respect to holders of subordinated claims and equity interests are found in sections 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code, respectively. Each section specifies two alternative requirements, only one of which must

be satisfied for a plan to be fair and equitable with respect to a dissenting class of equity interests.

See 11 U.S.C. §§ 1129(b)(2)(B)(i)-(ii), (C)(i)-(ii).

114.    A plan, therefore, will be found to be fair and equitable with respect to equity

interests if it complies with one of the following conditions:

> (i)    the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

> (ii)    the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).  See also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.

P'ship, 526 U.S. 434, 441 n.13 (1999).

115.    The Plan is also fair and equitable with respect to the Deemed Rejecting Classes.

First, there are no holders of any Claims against or Interests in CIT Group Inc. junior to the

Claims and Interests in the Deemed Rejecting Classes, and therefore no holders of any Claims

against or Interests in CIT Group Inc. junior to the Claims and Interests in the Deemed Rejecting

Classes will receive or retain any property under the Plan on account of such junior claim or

interest.  Second, pursuant to the Plan, no holders of Claims against or Interests in CIT Group Inc.

senior to the Rejecting Class is receiving more than full payment on account of such Claims

against or Interests in CIT Group Inc.  Accordingly, the Plan is fair and equitable as required by

section 1129(b) of the Bankruptcy Code.

## VI. CONCLUSION

The Plan complies with and satisfies all of the requirements of sections 1127 and 1129 of the Bankruptcy Code. Accordingly, the Debtors request that the Court (i) confirm the Plan, (ii) overrule any remaining Objections, and (iii) grant the Debtors such other and further relief as is just and proper.

Dated: New York, New York
December 7, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:       /s/ Gregg M. Galardi
          Gregg M. Galardi
          J. Gregory St. Clair
          Four Times Square
          New York, New York  10036
          (212) 735-3000

          Counsel for Debtors and
           Debtors-in-Possession

600020.10-Wilmington Server 1A - MSW