UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-16565

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CIT GROUP, INC., ET AL.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            December 8, 2009

            11:07 AM


B E F O R E:

HON. ALLAN L. GROPPER

U.S. BANKRUPTCY JUDGE

1   Motion Filed by Debtors for Approval of Disclosure Statement

2   and Confirmation Hearing

3

4   Motion Filed by Debtors for an Order Authorizing CIT Group Inc.

5   to Assume Amended and Restated Long Term Incentive Program

6

7   Motion Filed by Bank of New York Mellon for an Order Modifying

8   the Automatic Stay and Authorizing the Release of Pledged

9   Collateral

10

11   Objection Filed by Jeffrey Weinberg to Approval of Plan

12

13   Modified Second Amended Prepackaged Plan

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dena Page

```
 1    A P P E A R A N C E S :

 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 3         Attorneys for Debtors

 4         Four Times Square

 5         New York, NY 10036

 6

 7    BY:   GREGG M. GALARDI, ESQ.

 8          J. GREGORY ST. CLAIR, ESQ.

 9

10

11    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

12         Attorneys for Debtor

13         101 Park Avenue

14         New York, NY 10178

15

16    BY:   STEVEN J. REISMAN, ESQ.

17

18

19    EMMET, MARVIN & MARTIN, LLP

20         Attorneys for Bank of New York Mellon

21         120 Broadway

22         32nd Floor

23         New York, NY 10271

24

25    BY:   EDWARD P. ZUJKOWSKI, ESQ.
```

```
1    LOWENSTEIN SANDLER

2         Attorneys for Lead Plaintiff

3         1251 Avenue of the Americas

4         New York, NY 10020

5

6    BY:   MICHAEL S. ETKIN, ESQ.

7

8

9    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10        Attorneys for Lenders' Steering Committee

11        1285 Avenue of the Americas

12        New York, NY 10019

13

14   BY:   ANDREW N. ROSENBERG, ESQ.

15         ALICE BELISLE EATON, ESQ.

16

17

18   SONNENSCHEIN NATH & ROSENTHAL LLP

19        Attorneys for Icahn Partners and affiliates

20        1221 Avenue of the Americas

21        New York, NY 10020

22

23   BY:   PETER D. WOLFSON, ESQ.

24         OSCAR N. PINKUS, ESQ.

25
```

```
1    WEIL, GOTSHAL & MANGES LLP

2         Attorneys for Citibank N.A., Citibank (China) Co., Ltd.

3         767 Fifth Avenue

4         New York, NY 10153

5

6    BY:   JOSEPH H. SMOLINSKY, ESQ.

7          DAVID N. GRIFFITHS, ESQ.

8

9

10   ALSO PRESENT:

11        ROBERT J. DUFFY, FTI Consulting

12        MR. JAMES KILMAN, Morgan Stanley

13        WILMER JAY LEININGER (TELEPHONICALLY)

14        DMITRI MAXIM (TELEPHONICALLY)

15        ANTONY MAZARUS (TELEPHONICALLY)

16        JOSEPH MONTGOMERY (TELEPHONICALLY)

17        STEPHEN NOFTALL (TELEPHONICALLY)

18        CHRIS STOVIC (TELEPHONICALLY)

19        MS. JANE SULLIVAN, Epiq Financial Balloting Group

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          THE COURT:  All right, I'll take appearances from

3    those in the courtroom, first, and then from anyone on the

4    telephone who wishes to have his or her appearance noted for

5    the record.

6          MR. GALARDI:  Good morning, Your Honor.  For the

7    record, Gregg Galardi of Skadden Arps on behalf of CIT,

8    debtors.

9          MR. ST. CLAIR:  Good morning, Your Honor.  Greg St.

10   Clair with Skadden Arps on behalf of CIT.

11         MR. ROSENBERG:  Good morning, Your Honor.  Andrew

12   Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison for the

13   lenders ' steering committee.

14         MS. EATON:  Good morning, Alice Eaton with Paul,

15   Weiss, Rifkind, Wharton & Garrison on behalf of the lenders'

16   steering committee.

17         MR. WOLFSON:  Good morning, Your Honor.  Peter

18   Wolfson, and with me is Oscar Pinkus for the Icahn Associates.

19         MR. REISMAN:  Good morning, Your Honor.  Steven

20   Reisman,

          Curtis, Mallet-Prevost, Colt & Mosle for the debtors,

21   conflicts counsel.

22         MR. ZUJKOWSKI:  Good morning, Your Honor.  Ed

23   Zujkowski, Emmet, Marvin & Martin for the Bank of New York

24   Mellon.

25         MR. SMOLINSKY:  Good morning, Joseph Smolinsky of

1    Weil, Gotshal & Manges on behalf of Citibank N.A. and Citibank

2    (China) Company, Limited as administrative agents for the U.S.

3    revolver and China facility, respectively.

4         THE COURT:  Anyone else in the courtroom who wishes to

5    appear?  All right, on the telephone.  Does anyone wish to note

6    his or her appearance for the record?

7         MR. STOVIC:  Yes, good morning, Your Honor.  My name

8    is Chris Stovic.  I'm appearing on my behalf by telephone.

9         THE COURT:  All right, I have your --

10        MR. STOVIC:  Motion to dismiss.

11        THE COURT:  -- motion to dismiss which is really, I

12   believe, properly characterized as an objection to confirmation

13   of the plan.  The motion was never brought on for a hearing and

14   doesn't set grounds to dismiss the case, but I'll take it as an

15   objection to the debtors' going forward and obtaining plan

16   confirmation today.  But I'll take, first, the debtors'

17   presentation, and then we'll get to any objections.

18        MR. STOVIC:  I've also filed, Your Honor, a motion to

19   object to the court orders.

20        THE COURT:  Yes, I've read your papers.  I will give

21   you an opportunity to speak at an appropriate time.

22        MR. STOVIC:  Yes, I understand, Judge.  I just wanted

23   to --

24        THE COURT:  I've read your papers.  I'm perfectly

25   aware of the documents that you have filed.

1          MR. STOVIC:  Very good, sir, thank you.

2          THE COURT:  All right?

3          MR. STOVIC:  Yes.

4          THE COURT:  Anyone else on the telephone?

5          MR. NOFTALL:  Good morning, Your Honor, this is

6     Stephen Noftall.

7          THE COURT:  Stephen?

8          MR. NOFTALL:  Yeah, I think you just received a letter

9     a couple days ago.

10          THE COURT:  You have a letter objecting to the plan.

11    All right.

12          MR. NOFTALL:  Not really, like, you just -- an

13    objection, more like a modification.

14          THE COURT:  All right.  Anyone else?

15          MR. MAZARUS:  Yes, Antony Mazarus (ph.).  This is

16    regarding my born down, the accused number 12557W --

17          THE COURT:  You don't have to give me the number.  I

18    have a letter from you with regard to the plan, is that

19    correct?

20          MR. MAZARUS:  I didn't send it to you.  I contacted

21    Bennett Fielderburg (ph.), and the e-mail was copied to Mr.

22    Galardi and all of the others listed there.

23          THE COURT:  All right, very good.  Then you've filed

24    something with the appropriate parties.  Anyone else on the

25    telephone?

1          MR. MAXIM:  Yes, Dmitri Maxim.

2          THE COURT:  And you also have a letter objecting to

3    the plan?

4          MR. MAXIM:  Yes.

5          THE COURT:  All right, anyone else?

6          MR. MONTGOMERY:  Good morning, Your Honor.  Yes,

7    Joseph Montgomery.

8          THE COURT:  And you're in the same position?

9          MR. MONTGOMERY:  Yes, sir.

10          THE COURT:  All right.  Anyone else?  All right, Mr.

11    Galardi, please go ahead.

12          MR. GALARDI:  Thank you, Your Honor.  Again, for the

13    record, Gregg Galardi on behalf of CIT Group.  Your Honor, we

14    had filed a notice of first amended agenda.  There are three

15    matters on the agenda today.  I would like to quickly proceed

16    through the first and the second, and then move to

17    confirmation.

18          THE COURT:  All right.

19          MR. GALARDI:  The first matter on the agenda, Your

20    Honor, is the debtors' motion authorizing CIT Group to assume

21    an amended and restated long-term incentive program.  The

22    response deadline for that motion was December 4th.  We did not

23    receive any objections.  Just briefly stated, Your Honor, the

24    company had a long-term incentive program which included, as

25    part of the incentives, the issuance of old common stock.  If

1   we are confirmed today, that old common stock will be

2   cancelled.  What we have sought to do by this motion is to

3   assume that long-term incentive plan, but instead, fill it with

4   new common stock if we're successful in confirming today.

5          We have discussed this motion with the steering

6   committee who agree to it.  We did serve it out on notice.

7   Under the program, which is substantially the same as the

8   previous program, we could issue up to five percent, or roughly

9   10.5 million more shares to executives, directors.  No stock

10  would be issued on the effective date.  It would be subject to

11  the new board's issuances.  But we did think it would be out of

12  an abundance of caution, to make clear that we could do that,

13  and in fact, ultimately, have some dilutive effect on what we

14  would be doing post-confirmation.

15         THE COURT:  Well, it's in your plan, as I understand

16  it.

17         MR. GALARDI:  Correct.  There is a provision that

18  said --

19         THE COURT:  It was fully disclosed.  And I think the

20  abundance of caution is unnecessary.  It's in the plan, it's

21  consistent with 1129, which requires that matters be disclosed,

22  and it's, I assume, it's either within the powers of the board

23  to adopt as a matter of corporate law, or it's part of your

24  plan and adopted as such, at least initially.  Your motion is a

25  motion that, as far as I can tell, relies entirely on the

1    business judgment of the debtor.  I don't think it even

2    mentions Section 503(c) of the Bankruptcy Code.

3           MR. GALARDI:  Correct, Your Honor.

4           THE COURT:  And therefore, I think the belt and

5    suspenders is improper.  We don't need this belt and

6    suspenders.  I will enter an order providing the plan is

7    adopted, the incentive plan is adopted pursuant to the plan of

8    reorganization.  But I certainly am not going to approve an

9    incentive plan that doesn't even recognize the existence of

10   Section 503(c).

11          MR. GALARDI:  And Your Honor --

12          THE COURT:  I've already written, in another case,

13   that I don't believe 503(c) precludes a plan of any type

14   adopted by debtors as part of a confirmed reorganization plan.

15          MR. GALARDI:  And, Your Honor, because it was a go-

16   forward, postconfirmation, we understand Your Honor's opinion,

17   which is why we didn't mention 503(c).  And it was just simply

18   to make sure that everyone's aware of the five percent.  But I

19   understand Your Honor will take it pursuant to confirmation,

20   and I appreciate that.

21          THE COURT:  Well, perhaps, if you wish to revise the

22   order, that's fine, or I'll enter an appropriate order.

23          MR. GALARDI:  Your Honor, actually, what we could

24   do -- well, maybe we'll just revise the order just to make it

25   clear that that's five percent, because that was the only

1    concern we had that the number had to be disclosed.  But we do

2    believe it was fully disclosed in the plan that we would adopt

3    this.  In fact, it's less than the percentages that were in the

4    previously plan.  So we don't think there's a material

5    modification.  But we wanted to make sure everybody had notice

6    of it.

7         THE COURT:  I think that's fine.  And I appreciate

8    that.  But just seems to me that if it's adopted separately, we

9    get into a question that at least I have to consider 503(c).

10   If it's adopted under the plan, which is the way I think it

11   should be, and I commend the debtors for doing it that way,

12   then I think -- I'm not sure -- I don't believe 503(c) has any

13   applicability, and certainly a debtor that gets out of Chapter

14   11 has the right to adopt incentive plans in accordance with

15   applicable nonbankruptcy law.

16        MR. GALARDI:  And --

17        THE COURT:  So I think we'll enter an appropriate

18   order.  Does anyone wish to be heard on this issue?  All right,

19   then we'll enter an appropriate order.

20        MR. GALARDI:  Your Honor, the next matter on the

21   agenda is not our motion.  It's the motion of Bank of New York,

22   but I would note for the record that we had no objection to the

23   lift stay and no objection to the form of order.  So I don't

24   know if -- I know counsel is here.

25        MR. ZUJKOWSKI:  Good morning, Your Honor.  Ed

1    Zujkowski of Emmet, Marvin & Martin for the Bank of New York

2    Mellon.  As Mr. Galardi stated, this is a technical motion.

3    It's designed to free up certain securities that Bank of New

4    York holds as collateral agent for the debtor.

5         THE COURT:  Does anyone -- let me ask.  The debtors

6    don't object.  Does anyone wish to be heard?

7         All right, I'll grant the motion.

8         MR. ZUJKOWSKI:  Your Honor, may I hand up an order?

9    Thank you.

10        THE COURT:  Surely.  Thank you.

11        All right, now we proceed to the main issue, which is

12   confirmation of the plan.

13        MR. GALARDI:  Correct, Your Honor.  Moving, now, to

14   the last matter on the agenda, which is the scheduled hearing

15   on both the disclosure statement and confirmation of the plan,

16   Your Honor, we have in the courtroom today, I'd like to

17   introduce Mr. Robert Duffy who has testified at the first day.

18   We have also submitted his declaration in support of

19   confirmation.  He's in the front row.  We also have Mr. James

20   Kilman who is -- raised his hand in the back, whose declaration

21   we introduced in support of confirmation.  And also, we have

22   Ms. Jane Sullivan whose declaration was put in in support of

23   confirmation, as well, with respect to the voting tabulation

24   reports.

25        Your Honor, I can go through -- and I'll leave it to

1    Your Honor -- we think, how best to proceed.  I can go through

2    why we think our plan has, in fact, satisfied the conditions

3    for approval of the disclosure statement.  Your Honor is

4    familiar with those.  We have, in fact, filed and as a matter

5    of the record, and we'd ask Your Honor to take into evidence in

6    support of the confirmation and disclosure statement various

7    documents that have been filed including the offering

8    memorandum, the amended offering memorandum, the supplement to

9    the offering memorandum.  As Your Honor is well aware, the

10   adequacy of the disclosure statement, those were all filed for

11   Your Honor's record at docket number 19.

12        We have also -- we can go through the analysis, Your

13   Honor.  It's normally a nine-factor analysis.  I can point Your

14   Honor to records in the disclosure statement as to why we

15   believe the disclosure statement is adequate.  All of the

16   objections raised with respect to confirmation, Your Honor, did

17   not go to the adequacy of the disclosure statement.

18        THE COURT:  Right.  Let's start with the question of

19   the disclosure statement.  Since this is filed as a prepackaged

20   plan, among other things, I have to find that the disclosure

21   circulated, disseminated prior to the petition date was

22   adequate under Section 1125 of the Bankruptcy Code.  I don't

23   believe that any of the filings I have assert that the

24   disclosure statement was not adequate, and I'll ask if anybody

25   wants to be heard on that separate issue.  I've reviewed the

1    dis -- all right?

2         Hearing no one, I have reviewed the disclosure

3    statement and find that it is adequate for the purposes for

4    which it was prepared and disseminated within the meaning of

5    Section 1125 of the Bankruptcy Code.  And so I think that

6    issue, as far as I'm concerned, is resolved.

7         MR. GALARDI:  Moving, then, to confirmation standards,

8    Your Honor.  Your Honor is very familiar with 1129(a) and (b).

9    Again, we have -- I can go through a detailed list, but my

10   reading of the objections that are outstanding do not go to the

11   adequacy of the disclosure statement, except for a couple of

12   issues that I am aware of which I take to be more valuation and

13   treatment of particular claimants.  In particular, Your Honor,

14   we think we have classified claims properly according to the

15   priority scheme.  We have separately classified a number of

16   classes, claims, and to the extent the claims are of the same

17   priority in the scheme, they have gotten the same recovery,

18   though they may be in separate classes.  We do believe that

19   those claims are, in fact, treated fairly under the plan.  As

20   I've already mentioned as evidence by Ms. Sullivan's --

21        THE COURT:  All right, let's start with that.  Ms.

22   Sullivan has filed a certification of voting that is on file

23   with the Court showing that each of the voting classes has

24   voted in favor with the plan in accordance with the required

25   amounts for numerosity and amount.  I don't know if there is

1    anyone who wishes any further record made with respect to the

2    certification of votes.  If anyone wishes to be heard?  Hearing

3    no one, then we'll accept that and accept the tabulation of

4    ballots that shows that in most of the classes there was

5    overwhelming acceptance of the plan.

6         MR. GALARDI:  All right, and I would only note, Your

7    Honor, that the only class that was a close call, I believe,

8    was either 10 or 11, and we --

9         THE COURT:  It was 10 by the tabulation I have in

10   front of me.

11        MR. GALARDI:  10 by the tabulation, and actually,

12   pursuant to our plan, we treated them as one collective class,

13   but Ms. Sullivan wanted to illustrate, as did we, that even if

14   they were separately classified, that, in fact, we would have

15   overwhelmingly gotten the support.  But we essentially treated

16   term debt and credit agreements separately, which is why we

17   also took their votes separately.  So either way, we would have

18   passed the standard, and that is the point because she also

19   added a combined vote to show that it was even better than the

20   sixty-six and two-thirds and fifty percent in amount.

21        THE COURT:  All right.

22        MR. GALARDI:  Your Honor, then, going on with respect

23   to the rest of the objections, as we read the objections, what

24   the objections raise is, essentially, I think a fundamental

25   question which we think is actually addressed by Mr. Duffy's

1    declaration but having many of the pro se people on the phone,

2    I'm not sure they had an opportunity to read that declaration.

3    As we read the declaration, there were, essentially, two themes

4    plus one concern.  The first concern was a gentleman, I think

5    it was Mr. Weinberg, raised a concern that he had 1000 dollars

6    of bonds, and Your Honor had asked us, or the Court had asked

7    us to respond to that, that they were still going to get

8    shares.

9           THE COURT:  Right.

10           MR. GALARDI:  And we did, in fact, put on the docket a

11    letter response by our firm to Mr. Weinberg that does explain

12    that you will not -- because of the fractional share, and we

13    understand it's a complicated formula --

14           THE COURT:  But you're issuing shares in dollar --

15           MR. GALARDI:  Dollar amounts.

16           THE COURT:  -- amounts.  There's no minimum, as I

17    understand.

18           MR. GALARDI:  That is correct.  And it's whole

19    numbers, Your Honor, and then there is a more sophisticated

20    mechanism for partial shares.  But with respect to people who

21    even hold low amounts of bond debt, they will, in fact, receive

22    shares and bond debt in small increments.  So that was -- and

23    that resolved that gentleman's objection, my understanding.

24    And I did not hear anything on the phone to the contrary.

25           THE COURT:  No, we -- I think --

1          MR. GALARDI:  He filed.

2          THE COURT:  -- he filed or wrote a letter that his

3    objection was resolved, and I think that this treatment of

4    small creditors is fair.  This has not been the policy of every

5    debtor that sometimes has another cutoff.  And I think this is

6    a particularly fair treatment of small holders of your debt.

7    All right.

8          MR. GALARDI:  Your Honor, there was one other

9    objection that was withdrawn, I believe, late last night or

10   this morning.  There was a reservation of rights filed by the

11   Canadian noteholders which was Class 7.  They reserved their

12   rights to see the final form of documentation.  We received

13   word last night, and I believe they have filed this morning --

14         THE COURT:  Yes, I saw.

15         MR. GALARDI:  -- a notice withdrawing that reservation

16   of rights, stating that the documentation is reasonably

17   acceptable to them, so we have, in fact, resolved that

18   objections, as well.

19         Then, Your Honor, there is a series of objections.

20   And I will say most of them come from common stockholders.  I

21   think one or two from a bondholder, some of the people on the

22   phone, and another from a preferred stockholder.  And I think

23   it goes to the fundamental question of how can you breach your

24   bond contract.  That was one way it was stated.  That may be

25   the motion for dismiss.  The second was, how is it that a

1    company could have, let's just say 5 or 8 -- 6 billion dollars

2    of book-value equity on its balance sheet and yet not make any

3    distribution to the common shareholders.  And I think the third

4    was, I will say, counterproposals to our plan saying that in

5    our exchange offer, there was an opportunity for common

6    stockholders to receive up to 2.5 percent of the equity of the

7    company, had the exchange offer succeeded and had the

8    recapitalization succeeded.  So a number of claimants said that

9    that would be a fair treatment with respect to the plan of

10   reorganization.  And that's how I read the numerous objections.

11   And I think some of those people are on the phone.

12           Your Honor, I would point out in the declarations of

13   Mr. Duffy and Mr. Kilman, I think those issues are resolved --

14   well, are addressed, I should say.  And I also could put on a

15   verbal proffer of Mr. Duffy if Your Honor thinks it would be

16   helpful for the claimants on the phone.  I think that may give

17   a way to distinguish between book value on your financial

18   statements and what we find is the valuation testimony from Mr.

19   Kilman as affirmed in his declaration, as well as the analysis

20   that Mr. Duffy has done as to why book value, from an

21   accounting perspective, need not compute into our recovery for

22   stockholders in a bankruptcy plan.  I look to Your Honor as to

23   how you think best to proceed.  I think it is in those

24   declarations.

25           THE COURT:  Well, it is in the declarations, but the

1    individuals on the phone probably have not seen them.  First, I

2    assume you would like to have their declarations part of the

3    record?

4         MR. GALARDI:  Yes, Your Honor, we would move into

5    admission the declarations of Ms. Sullivan, Mr. Duffy, and Mr.

6    Kilman.

7         THE COURT:  All right, does anyone wish to be heard as

8    to receiving those?  All right, then we'll do that.

9    (Declaration of Ms. Sullivan was hereby received into evidence

10   as of this date.)

11   (Declaration of Mr. Duffy was hereby received into evidence as

12   of this date.)

13   (Declaration of Mr. Kilman was hereby received into evidence as

14   of this date.)

15        THE COURT:  As to the issues, and I think you've

16   summed them up, I think we should have a proffer, or if

17   possible, very brief testimony by one or more of your

18   witnesses, on those issues.  I recognize that literally

19   billions of dollars of debt has agreed to this plan.  And it's

20   an enormous achievement.  I'm not getting to the final result,

21   but to have gotten the vote that you've gotten is an

22   achievement.  And I don't denigrate it.

23        On the other hand, I realize that the individuals on

24   the phone may be losing their savings, their life savings or

25   funds that are extremely important to them.  And I think it

1   would be appro -- and that is probably true of many people

2   throughout the country.  Proceedings of this nature produce a

3   great deal of hardship.  On the other hand, the Bankruptcy Code

4   is designed to discharge debtors and give them a fresh start

5   for a very good purpose, and a purpose that, in this case, is

6   served by the -- or is underscored, I should say, by the

7   importance of this entity, and it's important place in the

8   economy.  So think if we had a very brief testimony on the

9   narrow issues that have been raised, i.e., the value, the

10  difference between actual value and book value, and what

11  happened to, in effect, eliminate this very large book value, I

12  think it would be useful as a matter of record, and I'm sure

13  the people on the telephone would appreciate that.  Is that

14  practical?

15        MR. GALARDI:  That's acceptable, Your Honor.  Let me

16  ask -- yes, it's absolutely practical.  Let me just ask my

17  witness one question.

18        THE COURT:  Well, I can take a five-minute break, if

19  you'd like me to.

20        MR. GALARDI:  Three seconds will be enough.

21        THE COURT:  All right.

22        MR. GALARDI:  Your Honor, I think given the

23  attendance, and obviously, I hundred percent agree with Your

24  Honor that it's a serious issue for people who are losing their

25  savings.  I think it's probably better to put Mr. Duffy on the

1    stand and just asked a few questions so he can explain it --

2            THE COURT:  I think --

3            MR. GALARDI:  -- rather than a proffer.

4            THE COURT:  I think it would be very useful.  And then

5    the individuals on the phone can hear Mr. Duffy, and then I can

6    proceed to consider their objections.

7            Please state your name for the record.

8            MR. DUFFY:  Mr. Duffy.

9        (Witness duly sworn)

10           THE COURT:  Please be seated.  For those on the

11   telephone, Mr. Duffy has just taken the witness stand and he's

12   about to be examined briefly by Mr. Galardi who is counsel for

13   CIT in these Chapter 11 proceedings.

14   DIRECT EXAMINATION

15   BY MR. GALARDI:

16   **Q.    Mr. Duffy, could you state by whom you're employed?**

17   **A.    FTI Consulting.**

18   **Q.    And what is its role with respect to these cases?**

19   **A.    We are one of the debtors' financial advisors.**

20   **Q.    Okay, and in the context of your responsibilities, have**

21   **you had an opportunity to review the objections by a number of**

22   **the people that are on the phone?**

23   **A.    Yes, I have.**

24   **Q.    Okay, and what sort of accounting credentials do you have?**

25   **A.    I have worked in working with restructured companies for**

1   well over twenty years.

2   Q.   Okay, and could you explain what, in very brief terms,

3   what book value means?

4   A.   Book value is really the value of a company's assets as

5   per their financial statements.

6   Q.   Okay, and how do you arrive at a book value?

7   A.   It's based on the historical cost of those assets.

8   Q.   Okay, and in your experience, does book value always

9   reflect market value?

10  A.   No, it doesn't.

11  Q.   Can you explain why?

12  A.   Well, I mean, book value is based on the historical costs,

13  as opposed to market value is based on what those assets are

14  worth today or what those assets can generate in terms of cash

15  flows based on the assets.

16  Q.   Okay, so Mr. Duffy, am I correct that the objections

17  queried whether -- how could a company have certain book value,

18  5, 6 billion dollars, and yet no recovery to the equity or

19  common shareholders?

20  A.   Yes.

21  Q.   In your own words, how can that be the case?

22  A.   Well, the reason that's the case is the book value is

23  based on what the original assets were acquired at, and just

24  because the original assets were acquired at a certain value

25  doesn't mean that those assets, today, are worth that same

1    amount. It's similar to, maybe, a house. If you buy a house,

2    just because you bought your house and you paid 50,000 dollars

3    or 100,000 dollars for your house, that doesn't mean that your

4    house is still worth 50 or 100,000 dollars. In fact, the value

5    of your house can go down. Similarly, the value of a company's

6    assets can go down.

7    Q.    Okay, have you read the valuation in the plan and

8    disclosure statement?

9    A.    Yes, I have.

10   Q.    And what is your understanding of the range of value in

11   the plan for the reorganized CIT's equity?

12   A.    I think the midpoint of the value is about 8 billion

13   dollars.

14   Q.    And do you have an understanding of how much debt is being

15   reduced pursuant to this plan?

16   A.    Yes, I do.

17   Q.    And does that provide any explanation to the people on the

18   phone as to why they might not or should not receive value

19   under a plan of reorganization?

20   A.    I think it does.

21   Q.    Can you explain why?

22   A.    Yes.  The midpoint of the valuation is 8 billion dollars.

23   There's well north of 11 billion dollars of debt that is

24   getting extinguished. And as you understand and look at the

25   value, in addition to the unsecured debt, there's also

1    preferred notes that also would come before the common equity.

2    So even if -- even before you take into account the preferred

3    and you look at the valuation, even if you looked at any high

4    range of valuation, there wouldn't be money in any circumstance

5    that would be available to the common shareholders.

6    Q.    So that's even under a reorganized CIT value.

7    A.    Yes, that's under a reorganized CIT value.

8    Q.    Okay, and Mr. Duffy, just briefly, are there circumstances

9    that happened between July and today that also may have hurt

10   the market value of their assets?

11   A.    Yes.

12   Q.    Okay, and could you explain that.

13   A.    I think as we've gone through and the business has

14   operated, there's been -- the business has -- there's been

15   pluses and minuses, and there's been operational items that

16   could have affected the value.

17   Q.    Okay, and let me ask you.  Did FTI do the liquidation

18   analysis?

19   A.    Yes, we did.

20   Q.    And what does the liquidation analysis show with respect

21   to a return to equity?

22   A.    It shows that there'll be no return to equity.

23   Q.    And what about with respect to a return to the preferred

24   stockholders?

25   A.    There'll be no return to the preferred stockholders.

1          MR. GALARDI:  Your Honor, I would pass the witness to

2     anybody on the phone.

3          THE COURT:  Well, that'd be difficult for parties on

4     the phone to examine a witness, and that's not usually

5     practice, but I should ask if anybody on the telephone wishes

6     further explanation.  The testimony, as I understand it, is

7     that the value of the company that is set forth in a separate

8     declaration which is part of the record, at the midpoint is,

9     today, 8 billion dollars.

10          THE WITNESS:  Yes.

11          THE COURT:  That's the best estimate of the experts,

12     as I understand it.  The debt, today, is before its adjusted

13     under the plan, is 11 billion dollars.  And that's debt of the

14     company, is that correct?

15          THE WITNESS:  No.

16          MR. GALARDI:  I think the correct way to say it, Your

17     Honor, is the debt is being reduced pursuant to the plan --

18          THE WITNESS:  Right.

19          THE COURT:  Yes.

20          MR. GALARDI:  -- somewhere between 10.5 and 11 billion

21     dollars.

22          THE COURT:  10.5 and 11 billion dollars.

23          THE WITNESS:  That is correct.

24          THE COURT:  That's the debt that's being adjusted --

25          MR. GALARDI:  Adjust in the plan.

1          THE COURT:  -- in the plan.

2          THE WITNESS:  Yes.

3          THE COURT:  Or affected by the plan.

4          THE WITNESS:  That's correct.

5          THE COURT:  So there's additional debt over and above

6     that, I gather.

7          THE WITNESS:  Yes.

8          THE COURT:  All right.  Under those circumstances,

9     there is simply no value for the common equity, and there's no

10    value for the preferred equity, as I understand your testimony.

11         THE WITNESS:  That is correct.

12         THE COURT:  And I gather that one of the holders of

13    the preferred equity is the United States.

14         THE WITNESS:  That is correct.

15         THE COURT:  They hold the most recent tranche of

16    preferred debt, is that correct?

17         THE WITNESS:  That is correct.

18         THE COURT:  And they're receiving the same lack of

19    recovery as all the other preferred shareholders, as I

20    understand it.

21         THE WITNESS:  That is correct.

22         THE COURT:  And that's even though they put in -- I

23    gather they bought the preferred stock fairly recently, is that

24    correct?

25         THE WITNESS:  That is correct.

1        THE COURT:  All right.  All right, does anyone who has

2    inquired about these matters and filed papers with the Court

3    wish to raise any issues or wish any further testimony on these

4    issues?  I think perhaps the best way to proceed is for them to

5    raise issues with me, but I wanted the parties to hear directly

6    from those who had filed declarations with the Court so that

7    they could understand that we do not take this step lightly in

8    terms of confirming the plan.  On the other hand, the

9    Bankruptcy Code is available, in appropriate circumstances, to

10   reduce debt and the affected bond debt, here, is being reduced,

11   substantially, under the plan, and to, in some cases, provide

12   no return for the common equity.  Or the preferred equity, in

13   this situation.

14        MR. STOVIC:  I object, Your Honor, to the comments

15   made by FTI, Mr. Duffy.

16        THE COURT:  He's not the FBI.  He's FTI.  I assure

17   you, he is not a representative of the FBI.

18        MR. STOVIC:  I said FT.

19        THE COURT:  FT.  All right, and you are Mr. Stovic?

20        MR. STOVIC:  Stovic, yes, sir.

21        THE COURT:  All right.

22        MR. STOVIC:  All right, I'd like to take a step

23   forward in respect to his explanation pertaining to the

24   historical value, and so forth, I have no dispute pertaining to

25   that.  I am aware of the things.  Okay, what matters up here is

1   particularly for the noteholders, that I didn't buy the

2   property for equity to benefit such as the equity holders,

3   stockholders.  Indeed, even to make gains or so forth.  We

4   bought, knowing it would become draft on the day of maturity.

5   That's the day that they filed for Chapter 11 bankruptcy.  That

6   was on Sunday.  To my knowledge, most of the courts were closed

7   on Sunday.  That probably means that the bankruptcy court take

8   for granted that it was filed in time.  That results in not

9   paying the notes which were draft on the date when they filed

10  for Chapter 11 bankruptcy.  This is preuse of the funds.  And

11  they were not invested for the long term.  There was a specific

12  date, including the net --

13          THE COURT:  All right.

14          MR. STOVIC:  -- and that's why those bonds were

15  bought.

16          THE COURT:  All right.

17          MR. STOVIC:  Bought for that.

18          THE COURT:  I understand your argument, Mr. Stovic,

19  and I have your papers in front of me.  So I understand your

20  argument.

21          MR. STOVIC:  I would like to make one more note, okay?

22          THE COURT:  All right.

23          MR. STOVIC:  I know that you are aware of it, okay,

24  but I use for an example Penn Traffic Corporation (sic).  In

25  the past eleven years, they filed three times under Chapter 11

1    bankruptcy, okay?  Once, we convert the notes to equities, with

2    par value, whatever it will be, which is a worthless security.

3    I'm being exchanged the draft for worthless security.  That's

4    what it amounts to.

5              THE COURT:  All right.

6              MR. STOVIC:  That will be my final comment on that,

7    sir.

8              THE COURT:  Thank you.

9              MR. STOVIC:  I just want you to be aware of it.

10             THE COURT:  Thank you.  Well, I'm not necessarily --

11   I'm aware of your argument, and I will deal with it in a

12   moment.

13             MR. NOFTALL:  Yes, Your Honor.  This is Stephen

14   Noftall.

15             THE COURT:  Stephen?

16             MR. NOFTALL:  There was a 10.5 billion dollars of debt

17   in use?

18             THE WITNESS:  Yes, that's correct, 10.5 to 11.

19             MR. NOFTALL:  Sure, the last time you had something

20   like 5 billion dollars which was equity.  So we're trying to

21   understand this, like, 15 billion dollars of assets were

22   reduced?

23             THE COURT:  No, that doesn't follow, sir.  You can't

24   just add debt and equity together and get a number.  The equity

25   comes behind the debt.  The debt has to be satisfied before the

1    equity has a recovery, ordinarily, in a bankruptcy situation.

2    That's why parties by debt, rather than equity.

3            MR. NOFTALL:  Yeah, my concept was the assets were

4    reduced down, too, in the reorganization, right?

5            THE COURT:  Yes.

6            MR. NOFTALL:  So there's a significant amount of

7    write-off -- or write-downs, here, in terms of the assets.

8            THE COURT:  Yes.

9            MR. NOFTALL:  There's 10 billion dollars of debt being

10   reduced, but substantially more assets being reduced.

11           THE COURT:  Yes.

12           MR. NOFTALL:  Yeah, okay, the point being that while

13   the debts are being reduced, substantially, the assets are

14   being also reduced, substantially, as well.  So, yes, the point

15   is that this is kind of like you -- the witness mentioned the

16   house value being, like, buying at 100,000 dollars, and now it

17   being worth scrap.  At the same token, that could be valued

18   more in the next two or three years from now.  And as it stands

19   right now, in bankruptcy, it's about scarcing 5 billion to

20   something like 11 billion and it's not what the real common

21   equity is.  So it's kind of a -- anyway, sorry, lost my train

22   of thought.

23           THE COURT:  All right.  I think I understand your

24   observation.  But just to make this comment, as a matter of

25   practice, in bankruptcy, we have to do the valuations as of the

1     confirmation date and proceed from there.  Obviously, the

2     debtors may do better in the future.  The comment from Mr.

3     Stovic a few moments ago was that he expected the debtors to do

4     worse.  One never knows, but one does the valuation as best one

5     can as of the time of the confirmation, ordinarily, and can't

6     wait for things to improve if they do.

7              Anyone else wish to be heard?  All right, Mr. --

8              MR. MONTGOMERY:  Joseph Montgomery.  You're going to

9     have to give me a little bit of leeway, here, on my ignorance,

10    but I'll try to make this brief.

11             THE COURT:  Well, it will -- if Mr. Montgomery --

12    well, go ahead.

13             MR. MONTGOMERY:  I understand -- I mean, it's tough

14    for me to dig into everything that was accomplished.  This

15    thing, all the publications, they kept revising it.  And it's

16    tough for me to comprehend it.  But is it fair to say that each

17    of all the other classes are going to get, like, seventy cents

18    on the dollar?

19             THE COURT:  You'll have to refer to the disclosure

20    statement and the summary which has a projection as to the

21    recovery of each of the individual classes.  I gather that you

22    are a holder -- I'm looking at your letter of --

23             MR. MONTGOMERY:  I'm a preferred holder --

24             THE COURT:  -- preferred stock.  And I gather the

25    preferred stock recovery is deemed of no value, and therefore,

1    you're not a voting party.  Mr. Galardi, is that correct?

2         MR. GALARDI:  Yeah, Your Honor, to go through, the

3    senior unsecured gets seventy cents in debt and then equity, so

4    he's correct on that.  There are still two classes that are

5    senior to the preferred.  There is a subdebt class and a junior

6    subdebt that get percentages of equity.  So based on an 8

7    billion dollar equity value, there's a recovery, but it's not

8    at that seventy cents level.  And then the preferred get the

9    contingent value rights --

10        THE COURT:  Right.

11        MR. GALARDI:  -- because if somehow this stock trades

12   favorably, he would get a recovery, which is, as Mr. Kilman is

13   prepared to take the stand, there is some variability in doing

14   any valuation analysis.  And so there is a potential that he

15   may get a recovery based on straight economic value of the

16   stock upon emergence.

17        MR. MONTGOMERY:  And I do understand that, thank you.

18   But from what I understood, the upper class would get seventy

19   cents on the dollar, and then they're also getting thirty cents

20   in new common, which, you know, my math is probably a little

21   bit different than everybody else's but that seems to add up to

22   a hundred percent of, or almost, of recovery, when we're,

23   preferred and common, get nothing.  And that's my

24   interpretation of that, and, you know, on the issuance of new

25   common, you can give out in, you know, in layman's terms, you

1  can give that out in restitution for, you know, any loss.  It

2  just doesn't seem fair to the people that have invested for so

3  long and held onto it for so long, even before the government.

4  So --

5        THE COURT:  All right.

6        MR. MONTGOMERY:  -- I would like to hear how that

7  seems fair.

8        THE COURT:  All right, I'll note your position.

9  Perhaps I could, on your behalf, ask the witness one question.

10       Is it your understanding, Mr. Duffy, that any creditor

11  is receiving more than a hundred cents in respect of the

12  creditor's claim in these cases?

13       THE WITNESS:  No.

14       THE COURT:  All right.  That is an appropriate

15  question, Mr. Montgomery.  Is any creditor getting more than a

16  hundred cents on the dollar?  And the answer to that is no.

17  I'm sure the creditors in the room would agree with that.

18       MR. MONTGOMERY:  Okay.  Thank you, Your Honor.

19       THE COURT:  Thank you.

20       MR. HOLLINGSWORTH:  Yes, this is --

21       THE COURT:  All right.

22       MR. HOLLINGSWORTH:  -- Robert Hollingsworth.  Can I

23  weigh in?

24       THE COURT:  Well, you can't weigh in, but if you have

25  a question and you have a statement you wish to make, you may

1    make it.  I have your letter, I assume, Mr. Hollingsworth, and

2    I will get it in front of me.

3             MR. HOLLINGSWORTH:  Yes, thank you.  I just want to

4    say one thing very brief on this issue.  I accept Mr. Duffy's

5    comments about assets -- market assets versus those that are

6    held on books.  I feel like there's a fairness issue, here,

7    being that the bondholders but not the shareholders were given

8    the opportunity of voting for the October 2nd exchange offer,

9    the reorganization, which would have provided common

10   shareholders a two and a half percent stake, or else they had

11   the choice of voting for, you know, the prepackaged bankruptcy,

12   which is what we're doing now, effectively keeping for

13   themselves that 2.5 percent stake.  And although I know that

14   the argument has been made this morning that liabilities are

15   actually greater than assets at market value, I think that

16   that's an open question going forward because market conditions

17   can change.  So given that, and given that the bondholders but

18   not the shareholders were given a choice to cut out the

19   shareholders, I feel like there is a fairness issue, and that

20   it would be a much more equitable, fair solution to actually

21   give the shareholders, which were not, apparently, represented

22   by anyone, their interests were not represented very well by

23   anyone on the CIT board, who would give them a two and a half

24   percent stake.

25             THE COURT:  Well, thank you.  I will -- let me just

make two observations.  First, it is correct that the
shareholders weren't given the opportunity to vote, but they
were presumed to have voted no because they were not receiving
any direct and substantial recovery, although there is a
possibility of a recovery under the contingent value rights, as
I understand it.  The board of this company, like all
companies, is ultimately elected by shareholders.  I assume
this board was originally elected by shareholders, and I don't
think that the voting structure of the Bankruptcy Code is
designed not to have shareholders represented, but the reason
the creditors voted is because they're not receiving in their
recovery a clear one hundred cents on the dollar.  They were
solicited to determine whether they were satisfied in their
recovery, and then in allowing certain recovery to be allocated
to the more junior classes.

       As to the fact that market conditions can change, yes,
they can, but as I said earlier, the ordinary rule is that we
determine conditions as they are today.

       So I think -- have we dealt with all the principles
that have been raised by parties?  Then Mr. Stovic, I will come
back to your objection.

       As to the possibility of a further second or third
reorganization that you referred to, I cannot assume that.  I
have before me the feasibility analysis that the debtors have
prepared, indicating that they can succeed under this plan.  I

1    have literally billions of dollars of debt that have voted in

2    favor of it and believes that the instruments they'll be

3    receiving under the plan have value and the plan has been

4    constructed in a professional fashion and supported by two

5    experts, Mr. Duffy and also the affidavit filed by an officer

6    of Morgan Stanley.

7         You also raised the issue that your notes matured on

8    the very day of the filing.  Well, unfortunately, the maturing

9    of those notes might have been the final act or final cause of

10   this debtor actually to file.  But the fact that the notes

11   matured prior to the bankruptcy or on the day of the bankruptcy

12   does not give you any greater or lesser rights than any other

13   bondholder would have.  The filing, in effect, accelerates all

14   of the bonds and makes them all due immediately, and a note

15   that's a week overdue or a year overdue doesn't have any

16   greater rights than a note that hasn't quite come due except

17   that you might be entitled to interest to the date of the

18   filing.  So for those reasons and for the reasons expressed,

19   and based on the testimony, I will overrule your objection and

20   I will overrule the other letters and objections filed on the

21   ground that the Bankruptcy Code permits debt to be discharged

22   or written down, that stockholders are not entitled to a

23   recovery unless there is value for the stockholders or unless

24   the other creditors adopt a plan that provides otherwise.  And

25   as this plan has been presented and adopted after an enormous

1    amount of negotiation and effort, the plan does not call for

2    recover to stockholders, except for the limited recovery

3    provided to preferred holders.  The plan has been supported in

4    terms of the showing of insolvency and the propriety of the

5    fact that there is no recovery for stockholders by the

6    testimony of two witnesses, and including the testimony of Mr.

7    Duffy.  And I find that this is sufficient to overrule the

8    objections.

9         As to the other plan conditions, the debtors have to

10   satisfy the various subsections of 1129(a) and (b) and I find,

11   based on the record, that they have done so.  No substantial

12   issue has been raised with regard to any of the specifics of

13   1129(a) or (b) other than the matters that I've dealt with just

14   a few moments ago.

15        MR. STOVIC:  Objection to what's based mainly on two

16   points.  I'll give it to you.  Told you, it's the United States

17   Constitution, Article Four, would property rights to be secure

18   in their papers.  I find that I am not secure in my papers.

19   And number two, other one is the prohibition of Article One,

20   Section X, of the United States Constitution for it impairs the

21   obligation of contract.  So, therefore, I believe that the

22   bankruptcy court rules are a violation of the Constitution in

23   respect to the rights of the people under the provided lines of

24   the Constitution.

25        THE COURT:  All right, Mr. Stovic, I will overrule

1    your objection.  The United States Constitution contains a

2    bankruptcy clause within its terms, and the bankruptcy clause,

3    pursuant to the bankruptcy power, the Congress has adopted a

4    Bankruptcy Code that permits the steps taken in this case.  And

5    that is not withstanding the provisions of the Constitution

6    respecting the impairment of contracts or, in this case, any

7    security interests have been observed.  And I don't believe

8    your debt has any security attached to it, any lien or pledge

9    attached to it.  So --

10          MR. STOVIC:  No, there is no security attached to it.

11          THE COURT:  Well, sir, I am overruling your objection.

12    Thank you.  We're now proceeding forward.

13          MR. STOVIC:  Go ahead.

14          MR. HOLLINGSWORTH:  Your Honor, may I say one more

15    consideration, quickly?

16          THE COURT:  Go ahead.

17          MR. HOLLINGSWORTH:  I believe you would have it within

18    your right for a consideration to extend the period of which

19    the CVRs are valuated.  And since, again, it has been presented

20    to the Court, these are people's savings and savings for their

21    kids, and in the future, I would like to ask the Court if you

22    would consider to extend the period to which the CVRs are

23    valuated.  And if that is within your right, I hope you would

24    consider it.  And thank you for letting me interrupt.

25          THE COURT:  No, you -- I will pass your request to Mr.

1   Galardi on behalf of the company.  I don't know if the company,

2   under the plan, has any discretion in that respect.  I can

3   certainly respond as for the Court.  The Court has no power to

4   rewrite a plan that comes before it.

5       MR. HOLLINGSWORTH:  Okay, thank you.  I'm sorry to

6   interrupt.

7       THE COURT:  But, I will ask Mr. Galardi, in due

8   course, to take up the issue with his client.  I'm sure members

9   of the management are here and if they can consider it, I think

10  they've heard your statement.

11      MR. HOLLINGSWORTH:  Thank you very much, Your Honor.

12      MR. GALARDI:  And Your Honor, I can address it --

13      MR. MAXIM:  Your Honor -- sorry.  My name is Dmitri

14  Maxim, and I wanted to add something else to the discussion.

15  If it's possible just for a moment.

16      THE COURT:  I think the time, Mr. Maxim, has left, but

17  if you want to raise an issue that has not been raised, you may

18  do so very quickly.  I've read -- I have your letter and I've

19  read it, and I considered it in my ruling.

20      MR. MAXIM:  Yeah, but this is little bit different.

21  The problem for CIT was the cost of funds and this broken one

22  was an off the track funds isn't on the marketplace.  And some

23  groups of investors and bondholders and take advantage of this

24  situation, and then they do finally, when the possibility of

25  this prepackaged bankruptcy would be accepted by the Courts,

1  they will gain substantially because they were buying bonds at

2  the very low price, and now they will be getting money back,

3  and they will be getting equity.  So it's like again, issue of

4  fairness.

5       THE COURT:  Well, I have your letter, Mr. Maxim, and I

6  don't have power, as you request there, to award shareholders

7  an ownership stake in the new company.  I can only either

8  confirm or refuse to confirm the plan.  As to trading in the

9  bonds, as far as I am aware, it is lawful for parties to buy

10  and sell bonds in the marketplace, and that if you buy at a

11  certain price, you are still entitled to put in your claim as a

12  bondholder for the principal in interest on the bond.  That's a

13  fundamental principal of bankruptcy law, and I believe the

14  principals go back to the founding of the Constitution that's

15  just been referred to and the assumption of the debt of the

16  various states by the federal government.  So that goes back a

17  long ways.  However, I can only deal with today, and I have

18  your letter and statement.

19       MR. MAXIM:  Okay, thank you very much.

20       THE COURT:  Thank you.  All right, Mr. Galardi.  What

21  else do we need to do --

22       MR. GALARDI:  Your Honor, just --

23       THE COURT:  -- with regard to confirmation?

24       MR. GALARDI:  I think, Your Honor, I think the

25  declaration --

1          THE COURT:  I think we can let Mr. Duffy stand down --

2          MR. GALARDI:  Yeah, I think that'd be a good idea.

3          THE COURT:  -- from the stand.  All right.

4          MR. GALARDI:  Your Honor, just briefly, to respond to

5     the CVR issue --

6          THE COURT:  Thank you.

7          MR. GALARDI:  -- and the length of time.  I think it's

8     worthwhile.  And again, Mr. Ying is in the courtroom and could

9     testify to this, but Your Honor, with respect to the CVRs,

10    there was, actually, heavily negotiated the time frame for

11    which this would reign out.  Mr. Ying, and we can put him on

12    the stand, but --

13         THE COURT:  Will you state who Mr. Ying is?

14         MR. GALARDI:  Yes, Mr. Ying is a senior managing

15    partner at Evercore.  Your Honor, the problem with --

16         THE COURT:  State who Evercore is.

17         MR. GALARDI:  Evercore is a financial advisor,

18    investment banker to the company who helped construct the plan.

19    Your Honor, the longer the CVRs stay out there, the less the

20    value of the common equity because it puts a drag on the

21    company.  So unfortunately, there were negotiations about the

22    length of time that the CVRs would be out there, but as we

23    extend that time, we are actually diminishing the return of

24    those people that are actually getting the common equity, the

25    senior classes.  So unfortunately, though there was back and

1    forth, it was a compromise and settlement on that sixty day

2    period.  And I don't think that we have any discretion under

3    the plan without damaging the recoveries to the senior classes

4    to extend that period of time.  But I thought I'd put that on

5    the record for Your Honor.

6              THE COURT:  All right.

7              MR. GALARDI:  If you needed Mr. Ying, he is in the

8    courtroom.

9              THE COURT:  No, as I said before, I don't have the

10   power to rewrite the plan.  I can only either confirm it or

11   deny confirmation.

12             MR. GALARDI:  Your Honor, with respect, then, to the

13   balance of the affirmative evidence, I think it's satisfied

14   with respect to confirmation of the plan, the valuations, the

15   projection, the liquidation analysis, it's all been set forth

16   in the declarations.  I think we've addressed the objections,

17   as Your Honor has addressed, so we think there is good grounds

18   to confirm the plan as drafted and as amended.  I would also

19   note, Your Honor, just a few things.

20             One, with respect to those amendments that have

21   actually happened post solicitation or over the last couple

22   days, I'll call them special interest modifications, as we have

23   settled in final documentation, you'll see such things as

24   Citibank's being included in the exculpation and limit -- the

25   exculpation --

1          THE COURT:  Right, I think you should just put on the

2     record the material modifications that have been made.

3          MR. GALARDI:  Well, Your Honor, I don't believe that

4     there are any material modifications --

5          THE COURT:  All right.

6          MR. GALARDI:  -- that would reflect any differences in

7     recoveries or affect, materially, anybody's rights.  These were

8     more, as I said, special matters, nothing of a material sort.

9          In addition, Your Honor, although we filed a

10    confirmation order yesterday, we have a revised confirmation

11    order today that simply includes, for example, Citibank and the

12    exculpation and limitation of liability, and we note that the

13    banks who had the option to elect junior credit facilities, no

14    one has elected junior credit facilities, so there's a deletion

15    of references to the junior credit facilities.  Again, no

16    material modifications to the plan since solicitation has

17    closed, and no material modifications to any of the orders.

18    They are really to reflect final agreements and documents, as

19    we have moved rather quickly.

20         The only other aspect of the confirmation order that I

21    would like to address with Your Honor is we have sought a

22    waiver of the stay to go effective as soon as possible.  I

23    believe that's now a fourteen-day stay.  We have sought a

24    waiver of that period.  The hope is if Your Honor sees fit to

25    confirm this plan, that the company would have a confirmation

1    order entered as early as today and finish up the mechanics of

2    issuing the securities and go effective as early as December

3    10th.

4         Your Honor asked me when I started these cases, what

5    was the need for speed.  I gave you the grounds of the need for

6    speed.  I would simply reiterate that those same grounds exist

7    today as to the reasons why we wanted to go through this

8    bankruptcy case as fast as possible.  Again, we are the fifth

9    largest bankruptcy, one of the largest financial services

10   companies to ever file bankruptcy, and in that respect, well, I

11   think the only large financial services company that,

12   hopefully, will emerge from a bankruptcy.  There are, as Your

13   Honor's pointed out, billions of dollars of debt that are

14   awaiting the issuance of the liens, and the new -- I'm sorry,

15   the new debt that are secured by liens as well as the new

16   equity.  And we have a business that does not simply stay well

17   in bankruptcy.  I think our customers have stayed with us, the

18   regulators have stayed with us.  But the earliest that we --

19   the earlier that we can consummate the plan, the better for the

20   business, and the more likely it is that the equity that we're

21   issuing will, in fact, be worth what we have said in the plan,

22   the 8 billion dollars number, or if not even higher, we hope.

23   And I think the earlier we issue and go effective the CVRs have

24   a greater chance of having value.

25        So Your Honor, we would ask, as part of the

1 confirmation order, that there be a waiver of the stay period.

2 We don't think that there have been, though serious,

3 significant, and obviously, personally trying objections to the

4 plan, we don't believe that under the Bankruptcy Code --

5 THE COURT: Was that in your proposed -- that's in

6 your proposed confirmation.

7 MR. GALARDI: That is in our proposed order. It has

8 been.

9 THE COURT: It's been in there.

10 MR. GALARDI: Yes, it has been. No one has objected

11 to that, Your Honor.

12 THE COURT: All right.

13 MR. GALARDI: So we would ask that we be able to go

14 effective as soon as practical, for our standpoint, after the

15 confirmation order, and we hope that that date is, as I said,

16 December 10th.

17 THE COURT: All right, does anyone wish to be heard?

18 All right, does anyone wish to be heard with regard to

19 the form of confirmation order? It's been on the docket. I

20 may have some very minor changes, but I'll bring them to

21 counsel's attention.

22 MR. GALARDI: Thank you.

23 THE COURT: They're not material, but I did want to

24 ask two questions -- or one question. I see, in the most

25 recent confirmation order, a provision with regard to the class

1    actions --

2            MR. GALARDI:  Correct, Your Honor.

3            THE COURT:  -- as being unaffected, in effect, by the

4    bankruptcy and the -- I'm paraphrasing, I'm not sure that's

5    exactly the right action -- at least unaffected in terms of

6    going against insurance or going against nondebtor parties, is

7    that correct?

8            MR. GALARDI:  Correct, Your Honor.

9            THE COURT:  And that's -- I assume that that

10   constitutes those class actions are your Class 14, which is the

11   510(b) class, is that correct?

12           MR. GALARDI:  Correct, Your Honor.  And Mr. Etkin is

13   here and he negotiated that language on behalf of those to

14   preserve, essentially, your insurance.

15           THE COURT:  So that, basically, constitutes the

16   agreement of Class 14 to the plan.

17           MR. GALARDI:  I wouldn't go so far as to say that.

18           THE COURT:  More or less.

19           MR. GALARDI:  It shows an indication that they were

20   aware and understand and that we have preserved --

21           THE COURT:  They have not objected to the plan,

22   anyway.

23           MR. GALARDI:  They have not objected, correct.

24           THE COURT:  And they're well represented.

25           All right, and the other thing is I think you have two

1    financings that are being approved in the confirmation -- or

2    finally approved in the confirmation order.  Exit financing and

3    is there the Chinese?

4             MR. GALARDI:  Well, it's --

5             THE COURT:  I'm not sure.

6             MR. GALARDI:  Yes, there's the Chinese facility --

7             THE COURT:  I need proffers.  You want a good faith

8    finding sort of financing, so I'll need proffers.

9             MR. GALARDI:  Absolutely, Your Honor.  Let me go back

10   to Mr. Duffy again.  If called as a witness, Your Honor, Mr.

11   Duffy would affirm that in connection with this plan, the

12   guarantees at that the CIT Group, Inc. is a guarantor of a

13   certain facility in China, that as a result of the filing of

14   CIT Group, there would have been a default in that facility.

15   Therefore, the Chinese facility, lenders under the Chinese

16   facility would have had a right to exercise certain remedies,

17   including foreclosing on their collateral in China.  That over

18   the course of the last two weeks, the company has negotiated in

19   good faith with the lenders, including Citibank who's

20   represented here, today, as their agent.  With respect to a

21   resolution of that default, that the lenders on that facility

22   were not willing to simply stand down with a reinstatement of

23   that guarantee in light of the secured debt that is being put

24   senior to it.  That a result of those negotiations, the parties

25   have agreed to enter into an agreement that provides for the

1   cash collateralization of that facility for a period of time to

2   the maturity or just short of the maturity until such time as

3   the company can pay off that facility or refinance the

4   facility.  And in addition, Mr. Duffy would testify that if the

5   facility had to be paid off, that it would be treated as an

6   equity investment in that company, and it could have locked the

7   amount, which I believe is about 242 million dollars, in China

8   and would have been money that was trapped and not otherwise

9   available the company, absent a sale.

10          Again, the parties have negotiated over the last two

11  and a half weeks.  Mr. Smolinsky has represented Citibank, the

12  lenders, and as a result of those negotiations, we are asking

13  for Your Honor to approve the cash collateralization of that

14  facility.

15          The steering committee of lenders, whose money we

16  needed to have an amendment of that facility to approve, have

17  been involved with that, and it is -- we have received an

18  amendment to make that cash collateralization.

19          THE COURT:  All I need is a proffer that the parties

20  have negotiated in good faith and at arm's length and there are

21  no secret side deals.

22          MR. GALARDI:  Your Honor, I would say over the last

23  two and a half weeks --

24          THE COURT:  I think you already said that.

25          MR. GALARDI:  Fine.  And Your Honor, if it's simpler

1    for us to say the same thing with respect to the BofA and the

2    exit facility, that has been negotiated.

3          THE COURT:  I think that's been before the Court

4    before.

5          MR. GALARDI:  That has.

6          THE COURT:  All I need is a proffer that the parties

7    have negotiated in good faith, at arm's length, and that there

8    are no --

9          MR. GALARDI:  Your Honor --

10         THE COURT:  -- undisclosed side deals.

11         MR. GALARDI:  Your Honor, again, there is no

12    undisclosed deals.  The parties have gone back and forth over

13    months with respect to that facility and the other facilities.

14    The transactions are going to be characterized by good faith,

15    arm's length negotiations, as Mr. Duffy would testify, as Mr.

16    Ying would testify, as well.

17         THE COURT:  All right.  I think based upon the entire

18    record, the plan is confirmed under the provisions of the

19    Bankruptcy Code.  I commend the parties for having been able to

20    reach an agreement, most of which was reached prior to the date

21    of the filing.  I recognize the filing is taking place -- the

22    case took place very quickly, but it was preceded by many

23    months of negotiations, and it would not do the debtors any

24    good to remain in Chapter 11 any longer than they need to.

25         I've carefully considered the objections, and I

1    recognize the hardship that is imposed on many shareholders,

2    both preferred and common, and also on bondholders.  But we

3    can't ignore the need for restructuring.  If a company that has

4    fundamental values, as I am sure this one does, does not

5    restructure and does not get in a position to take its

6    appropriate place in the marketplace, it will ultimately fail

7    entirely, and that will do no one any good.  Either the

8    stockholders or the debtholders or the employees or other

9    stakeholders interested in the company.  Therefore, we

10   restructure companies as best we can, and this company has been

11   restructured in an extremely professional and appropriate

12   manner that is consonant with the Bankruptcy Code.

13            So I congratulate those who have put in countless

14   numbers of hours on the transaction, and I'll sign an

15   appropriate confirmation order.  I'm not sure if I have a disk,

16   but you can hand one up after the hearing.

17            Anything else today?

18            MR. GALARDI:  Just one point on that order, Your

19   Honor.  Because of -- I mentioned it -- there are junior credit

20   facilities which are no longer being issued which I didn't

21   think Your Honor wanted three more inches of paper this morning

22   to revise those documents, so the confirmation order will say a

23   plan, which will not change, and then the plan has exhibits.

24   We will -- those exhibits will change because certain

25   collateral documents don't come out.  What we intend to do, and

1    I think, actually, for people reading the docket afterwards, is

2    the confirmation order will approve the plan, the exhibits will

3    be, say, filed later.  So what we'll do in the next three

4    business days, and this is part of the revised order, we will

5    file the plan with the final form of exhibits so it is a matter

6    of record within the next two business days but does reflect

7    that there's no longer junior credit facilities.  But as Your

8    Honor can imagine, three inches of paper to make that work

9    today and then put it on Your Honor's desk at 8 a.m. this

10   morning, I didn't think it was good for Your Honor or good for

11   us.

12              THE COURT:  Well, I'm sure it was not good for the

13   people who put in an enormous amount of hard work and many late

14   nights, and I hope very much that some parties get some respite

15   going forward.  Thank you, very much.

16              MR. GALARDI:  Thank you, Your Honor.

17              MR. LEININGER:  Excuse me, excuse me?  Excuse me.

18              THE COURT:  Yes.

19              MR. LEININGER:  My name is Wilmer Jay Leininger.

20              THE COURT:  Yes.

21              MR. LEININGER:  And you asked if there was anything

22   else today.  I submitted a personal letter.

23              THE COURT:  Yes, I have -- I have -- were you on the

24   call?  Have you been on the call since the beginning?

25              MR. LEININGER:  No, I have not.

1      THE COURT:  Well, Mr. Leininger, we took up all the

2  objections one by one, and we closed the -- the record is now

3  closed.  I have your objection, and as I stated on the record,

4  I considered each of the objections in connection with my

5  decision approving the plan.  We had parties who were both

6  stockholders and debtholders who appeared on a timely basis and

7  whose objections were considered.  And I can reach for yours

8  right now and assure you that it was one of the ones that --

9      MR. LEININGER:  What I would like to know is what

10  impact this decision has on my situation.

11      THE COURT:  I think -- I think you need to contact

12  debtors' counsel who can -- you didn't leave a phone number on

13  your letter, but debtors' counsel can contact you and explain

14  anything that you do not understand.  I see you have a large

15  holding of 6.25 percent notes, and the plan sets forth

16  precisely what you get.  We had testimony today as to why the

17  debtors' book value of 5 billion dollars was not determinative,

18  and if you have any questions with respect to exactly what your

19  bonds will receive, I suggest you call Mr. -- I'll give you the

20  phone number of debtors' counsel.

21      MR. GALARDI:  212-735-2276.

22      THE COURT:  212-735 --

23      MR. GALARDI:  2276.

24      THE COURT:  2276, and that is Mr. --

25      MR. GALARDI:  Silverberg.

1        THE COURT:  Mr. Silverberg.  So call him this

2   afternoon.

3        MR. LEININGER:  Well, I did talk with him --

4        THE COURT:  All right.

5        MR. LEININGER:  -- prior to the hearing, and he was

6   unable to tell me what impact it would have.

7        THE COURT:  Well, then he'd better talk to his

8   cocounsel so he can tell you or put in writing and repeat, word

9   for word, the words of the disclosure statement which show you

10  what you get.  And if Mr. Silverberg can't do that, then I

11  suggest you talk to Mr. Galardi of his firm, and Mr. Galardi,

12  I'm sure, will be capable of telling you what you get under the

13  plan.  Or pointing you or faxing you the precise page.  Now, I

14  don't have your phone number, so it's up to you to call Mr.

15  Silverberg this afternoon.

16       MR. LEININGER:  I think the phone number's in the

17  letter.

18       MR. GALARDI:  It's at the bottom of the packet.

19       THE COURT:  It's in the bottom?

20       MR. GALARDI:  484, I think it is.

21       THE COURT:  Oh, yes, it's in the text.  All right,

22  then Mr. Silverberg can call you.

23       All right, I think this hearing is now concluded.

24       MR. GALARDI:  Thank you for your time, Your Honor.

25       (Proceedings concluded at 12:21 PM)

1

2                        I N D E X

3

4     WITNESS              EXAMINATION BY      PAGE

5     Mr. Duffy            Mr. Galardi         22

6

7                        E X H I B I T S

8     DEBTOR'S             DESCRIPTION         PAGE

9                          Declaration of      20
                           Ms. Sullivan

10
                           Declaration of      20
11                         Mr. Duffy

12                         Declaration of      20
                           Mr. Kilman

13

14                        RULINGS

15                                 Page        Line

16    Motion for an Order Authorizing   12        19
      CIT Group Inc. to Assume Amended

17    and Restated Long Term Incentive
      Program Not Granted Due to Lack

18    of Necessity; Appropriate Order
      Addressing Disclosure to be

19    Entered in its Stead

20    Motion for an Order Modifying the   13      7
      Automatic Stay and Authorizing

21    the Release of Pledged Collateral

22    Plan of Reorganization Confirmed    50      19

23

24

25

1

2                      C E R T I F I C A T I O N

3

4       I, Dena Page, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7       _____

8       Dena Page

9

10      Veritext

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  December 9, 2009

16

17

18

19

20

21

22

23

24

25